**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| KRISTEN FREDRICKS, JOSEPH V. CUFFARI, JOSEPH E. GANGLOFF, and JAMES M. READ, <br><br> *Plaintiffs*, <br><br> v. <br><br> COUNCIL OF THE INSPECTORS GENERAL ON INTEGRITY AND EFFICIENCY ("CIGIE"), INTEGRITY COMMITTEE("IC"); KEVIN H. WINTERS, Chairman, IC, in his official capacity; ROBERT P. STORCH, Vice-Chairman, IC, in his official capacity; GAIL S. ENNIS, Member, IC, in her official capacity; KIMBERLY A. HOWELL, Member, IC, in her official capacity; DALE A. CHRISTOPHER, Deputy Director for Compliance, U.S. Office of Government Ethics, in his official capacity; TOM MONHEIM, Member, IC, in his official capacity; CATHERINE S. BRUNO, Member, IC, in her official capacity; ALLISON LERNER, Inspector General, National Science Foundation, former Chair and Vice Chair, CIGIE, in her official capacity, <br><br> *Defendants*. | CIVIL CASE NO. 23-442 <br><br> **COMPLAINT** <br> **FOR DECLARATORY,** <br> **INJUNCTIVE, AND OTHER RELIEF** <br><br> JURY TRIAL DEMANDED |

**<u>INTRODUCTION</u>**

Plaintiffs find themselves enmeshed in an unjust, Kafkaesque[1] system produced by an unconstitutionally structured entity and abetted by a complete absence of independent oversight, accountability and lawful due process. The Supreme Court has frequently reiterated that the

---

[1] The Trial, Franz Kafka (1925).

structure and remit of federal agencies must comply with the Constitution. *U.S. v. Arthrex*, 141 S. Ct. 1970, 1981 (2021); *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020); *Lucia v. SEC*, 138 S. Ct. 2044 (2018); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010).  Yet the Council of the Inspectors General on Integrity and Efficiency ("CIGIE"), its Integrity Committee ("IC"), and the members of these bodies still exercise quintessentially executive powers under a structure that plainly violates the Constitution. This uncontrolled exercise of executive power, untethered from any Presidential control or supervision, is exacerbated by an unconstitutional funding mechanism that this Court also must proscribe.

## PARTIES

1. Kristen Fredricks is a career civil servant and member of the Senior Executive Service ("SES") and is currently Chief of Staff for the Inspector General ("IG") at the U.S. Department of Homeland Security ("DHS") and Acting Deputy IG for External Affairs.  This role entails, for instance, communications with Congress.  She has been subject to process and questioning by the Defendants.

2. Joseph V. Cuffari is currently the Presidentially Appointed and Senate Confirmed ("PAS") Inspector General ("IG") for the U.S. Department of Homeland Security ("DHS").  Through the pretense of conducting "investigations," the IC has continuously and relentlessly tormented Mr. Cuffari and subjected him to unlawful inquisitions starting a mere six weeks after his unanimous confirmation by the U.S. Senate in 2019.

3. James M. Read is a career civil servant and a member of the SES.  He is currently the Chief Counsel to the IG of the DHS.  Defendants have consistently, though without any authority, denied him the ability to properly represent his client, the Office of Inspector General ("OIG") for DHS.

4. Joseph E. Gangloff retired from government service in December 2019, after 43 years of government service.  He had served over 25 years in the SES in leadership positions with the Criminal Division of the Department of Justice, the Office of Government Ethics, and the Office of Inspector General for the Social Security Administration.

5. Once Mr. Gangloff retired, the Defendants ceased to have any legitimate authority over him; nevertheless, they have continued to subject him to their unlawful processes.

6. The Council of the Inspectors General on Integrity and Efficiency ("CIGIE") is an "independent entity" within the Executive Branch.  5 U.S.C. § 424(a)(1).  Its stated mission is "to address integrity, economy and effectiveness issues that transcend individual Government agencies and aid in the establishment of a professional, well-trained and highly skilled workforce in the Offices of Inspectors General."

7. The Integrity Committee ("IC") is a committee of CIGIE whose stated mission is "to receive, review, and refer for investigation, as appropriate, allegations of wrongdoing made against: an Inspector General (IG), designated staff members of an Office of Inspector General, the Special Counsel, U.S. Office of Special Counsel (OSC), and the Principal Deputy Special Counsel, OSC, and ensure the fair, consistent, timely, and impartial disposition of the allegations."

8. CIGIE and IC were created and are authorized by the Inspector General Reform Act of 2008, P.L. 110-40.  The Act defines the membership of CIGIE and the IC.  5 U.S.C. § 424(b), (d).

9. The membership of CIGIE and IC includes individuals who are neither appointed by nor are answerable to the President of the United States, and in several cases are members of the legislative branch.  5 U.S.C. § 424(b), (d).

10. Kevin H. Winters is the current Chairman of the IC.  Mr. Winters is the IG of Amtrak (National Railroad Passenger Corporation).   He was selected for that role by the Amtrak Board of

Directors.  He was neither nominated to his position by the President nor confirmed by the Senate.  The President has no authority to terminate Mr. Winters as IG of Amtrak, as that authority is vested exclusively in Amtrak's Board of Directors.  IG Winters was appointed to the IC by the then-Chairman of CIGIE.  In 2020, members of IC chose IG Winters to serve as IC's Chairman.  CIGIE has no authority to remove IG Winters from his position on IC.  The only possible political avenue of controlling IG Winters's exercise of office as Chairman of IC is impeachment.  He is sued in his official capacity.

11. Robert P. Storch is the PAS IG for the U.S. Department of Defense and is one of two Vice-Chairmen of the IC.  He was appointed to the IC by the then-CIGIE Chair. He is sued in his official capacity.

12. Gail S. Ennis is the PAS IG for the Social Security Administration and is a member of the IC. She was appointed to the IC by co-defendant, Allison Lerner.  She is sued in her official capacity.

13. Kimberly A. Howell is the IG for the Corporation for Public Broadcasting—a private nonprofit corporation.  She was appointed to the IC by co-defendant, Allison Lerner.   She is neither a PAS nor, on information and belief, a federal employee, and was appointed to the IG position by the Corporation for Public Broadcasting's ("CPB") Board of Directors.  The President has no authority to terminate Ms. Howell, as IG of CPB, as that authority is vested exclusively in its Board of Directors.  She is sued in her official capacity.

14. Dale A. Christopher is Deputy Director for Compliance, U.S. Office of Government Ethics ("OGE"), appointed to that office by the Director of OGE. Under the statute, the Director of OGE is an *ex officio* member of the IC but may delegate these responsibilities to another person

within OGE. *See* 5 U.S.C. § 424(d).  Mr. Christopher himself is not an IG nor is he a Presidential appointee.  He is sued in his official capacity.

15. Tom Monheim is a current member of the IC and has served as one of two IC Vice Chairmen since March 3, 2023, appointed to that position by the current CIGIE Chair.  He is the PAS Intelligence Community IG.  On information and belief, he was involved in the latest illegal inquiry directed at Plaintiff Cuffari.  He is sued in his official capacity.

16. Catherine S. Bruno is Assistant Director of the Office of Integrity and Compliance within the Federal Bureau of Investigation and is a member of the IC.  She is an *ex officio* member of the IC by virtue of 5 U.S.C. § 424(d).  On information and belief, she was chosen by the Director of the FBI.  She is sued in her official capacity.

17. Immediate past Chair of CIGIE Allison Lerner is the IG of the National Science Foundation ("NSF").  She was appointed by the Board of Directors of NSF.  She is not a PAS officer.  She was designated Vice Chair of CIGIE by the former Chair, and she became Chair starting on January 1, 2021.  She is sued in her official capacity.

## JURISDICTION AND VENUE

18. This Court has jurisdiction pursuant to 5 U.S.C. §§ 702-703 and 28 U.S.C. §§ 1331, 1361, and 2201.

19. This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and its equitable powers.

20. Venue is proper within this district pursuant to 28 U.S.C. § 1391.  Defendants are United States agencies or officials sued in their official capacities.  Half the plaintiffs are residents of this

judicial district and substantial parts of the events or omissions giving rise to the Complaint occurred within this district.

## STATEMENT OF FACTS

### KRISTEN FREDRICKS

21. Kristen Fredricks has been subject to IC's unconstitutional processes and threats.  She is chief of staff for the IG of DHS (Plaintiff Cuffari) and acting deputy IG for external affairs.

22. Ms. Fredricks is an attorney and career civil servant.  She received her Bachelor of Arts degree from the University of California-Berkeley and her Juris Doctor from Boston University School of Law.

23. Ms. Fredricks has been an active member in good standing of the bars of Massachusetts and California for over 20 years.

24. Prior to joining the Office of the Inspector General for the Department of Homeland Security ("DHS OIG") in late 2019, she worked for over a decade at the Social Security Administration ("SSA"), where she consistently received the highest possible performance ratings and numerous awards. Between 2010 and 2015, she worked as senior advisor to the Deputy Commissioner of SSA's Office of Hearings and Appeals, which at that time was one of the world's largest administrative courts.

25. In 2015, Ms. Fredricks was named Special Counsel to the Office of Chief Counsel to the Inspector General for SSA.

26. In 2019, Ms. Fredricks was told that the new IG for Homeland Security was encountering internal personnel difficulties in his office and asked whether Ms. Fredricks would consider detailing there to help him.  The request was conveyed by Gail Ennis, the IG for the Social Security Administration. In November 2019, Ms. Fredricks was detailed to the DHS OIG as a

GS-15 employee. She competitively applied for and was selected for Chief of Staff of DHS OIG and was appointed to the SES in December of 2020.  In the summer of 2021, Ms. Fredricks also assumed the role of acting Deputy IG for External Affairs at DHS OIG.

27. At the beginning of her detail, and as part of her duties, Ms. Fredricks contacted counsel at the IC and sought more information on how the IC operated.  Her purpose in doing so was to address her office's dysfunction, which included, but was not limited to, unlawful appointment of officers and reorganization of various offices and functions within DHS on the eve of IG Cuffari's confirmation.  Upon receiving Ms. Fredricks' inquiry, the IC counsel advised her that IG Cuffari "has to stop filing these Complaints" to the IC, apparently in reference to the documented allegations against various DHS OIG senior staff.  Despite confusing and contradictory advice, Ms. Fredricks continued to seek information on the IC process.

28. Eventually Ms. Fredricks herself was named as the subject of an IC Complaint alleging that she had revealed the name of a putative "whistleblower."  When she was notified that she was being investigated by the IC, she was further informed that because the IC was investigating actions Ms. Fredricks allegedly took in her "personal capacity," accordingly she could not be represented by a staff attorney at the DHS.  This *ex ante* determination and denial of an employee's ability to rely on government attorneys is a routine practice of the IC.  Fortunately, after seeing the dysfunction at DHS OIG early on, Ms. Fredricks had the foresight to obtain professional insurance, so she was able to afford private counsel to represent her in the IC investigation.  The IC eventually closed the investigation with no adverse findings.

29. According to the letters the IC sent to Plaintiffs, the IC investigations proceed in three stages. First, a complaint is filed with the IC ("Complaint").  If the IC deems it advisable, it sends an inquiry letter to the subject of the Complaint via the subject's official government email

address.  The allegations contained in the inquiry must be refuted by the subject such that no reasonable person could conclude, after further development of the record, that he or she had acted improperly.  This is the standard Ms. Fredricks and all plaintiffs were held to for each inquiry letter.  This standard, which presumes guilt and requires the subject to rebut the presumption violates the basic norms of due process and the law.  *See* 5 U.S.C. § 424(d)(7).

30. Although ultimately Ms. Fredricks was vindicated, there was never an opportunity to contest the IC's claim that the alleged conduct was taken in her "personal" rather than "official" capacity, or to ever seek reimbursement for the expenses associated with retaining private counsel.  Furthermore, although IC's investigations focused on the operations of DHS OIG, that agency was itself deprived of the ability to be represented by agency counsel whose duties are to defend the organization.  IC's early-stage and default determination that the person whose conduct is being investigated acted in a "personal" capacity is unilateral, unappealable, and prejudicial.  In fact, IC deems any attempt to dispute this determination as a new and separate offense and on that basis makes an immediate adverse finding against the subject.

31. While performing her official duties, Ms. Fredricks observed multiple meritless Complaints being filed against IG Cuffari.  In addition, two other DHS OIG senior executives informed her that they had IC complaints filed against them and expressed their concern that counsel for DHS OIG was not involved in helping them respond to those complaints despite the fact that DHS OIG had institutional equities at stake.  The Complaints against these high-ranking officials were closed without adverse findings.

32. The IC and its approach have been and are interfering with the DHS OIG's exercise of its legal responsibilities.

33. Ms. Fredricks was called as a witness in the IC's investigation of IG Cuffari regarding the circumstances surrounding a report authored by the Wilmer Hale firm ("The Report") (Redacted Copy Attached as Exhibit 1).

34. When IG Cuffari entered on duty, he encountered and was informed by career civil servant employees of multiple credible allegations of misconduct by senior DHS OIG officials.  After attempting and failing to get the IC to investigate these allegations, IG Cuffari sought a neutral, outside investigator.  As described below, this investigation was conducted by the Wilmer Hale law firm and resulted in the aforementioned Report.

35. The DHS OIG entered into a contract with Wilmer Hale to conduct an outside administrative investigation of those credible allegations of misconduct that IG Cuffari and several DHS OIG career civil service employees observed.  Even though IG Cuffari's office engaged Wilmer Hale only after the IC advised him to take "whatever actions he deemed appropriate" with respect to the allegations that IG Cuffari brought to IC's attention, the very act of engaging this neutral and well-respected law firm prompted yet another complaint against IG Cuffari.

36. The IC selected the IG of the Department of Transportation ("DOT") to conduct the investigation about awarding of the Wilmer Hale contract.  According to the IC's rules, since Ms. Fredricks was a witness and had information regarding the process to hire Wilmer Hale, DHS OIG counsel could not assist her, and so she once again had to engage private counsel, who aided her during the five-and-a-half-hour interview.  As a consequence, Ms. Fredricks was forced to spend, from her personal funds, over $4,000 in attorney fees connected to this interview, despite the fact that anything she may have observed with respect to the awarding of this contract she observed solely in and because of her official—not personal—capacity.

37. A week after her testimony as a witness in a complaint against IG Cuffari, the IC notified Ms. Fredricks that she was now the subject of yet another Complaint. The new investigation concerned alleged deletions of the U.S. Secret Service text messages which referenced the events of January 6, 2021. Mr. Cuffari was also a subject of this Complaint. The IC began its investigation despite the fact that no one in the DHS OIG has any control over the Secret Service or over where texts by members of that organization go. The OIG's remit is to serve as an inspector and auditor of the agency. Neither Ms. Fredricks, nor IG Cuffari, nor anyone else in the DHS OIG could control matters concerning text retention. In short, not only was no Plaintiff involved in any text deletions, there is no set of facts under which they could have been involved. Nevertheless, and despite the complaint's facial deficiency under the IC's rules, the IC sent an inquiry letter.

38. In any event, retention or deletion of governmental texts could be nothing but agency action of agency concern, and yet, once again the IC said it was investigating the complaint as a "personal capacity" matter and for that reason refused to allow any input from the counsel for the DHS OIG.

39. On April 3, 2023 Ms. Fredricks was served with yet another Request for Response with seven more requests having to do with an alleged deletion of records.

40. Although nothing having to do with this agency's text retention policies or practices can possibly be a "personal capacity" rather than "official business" matter, any attempt by Ms. Fredricks or anyone else to involve DHS OIG's personnel with pertinent knowledge or DHS OIG's counsel would, on information and belief, have been treated as a violation of the IC's self-serving procedures and would have resulted in an immediate adverse finding and recommendation by the IC.

41. The denial of her ability to consult with DHS OIG's counsel not only required Ms. Fredricks to incur additional unwarranted personal expenses, but it also precluded her from relying on any documents from OIG in formulating her response.  Instead, she was consigned to rely only on information that was in the public record.  As if this weren't enough, the IC in effect shifted the burden of disproving the allegations on Ms. Fredricks rather than itself.

42. On information and belief, the complaints against Ms. Fredricks and IC's decisions to investigate even obviously meritless complaints are retaliatory.  On information and belief, these retaliatory actions were taken as a result of Ms. Fredricks refusing to heed IC's improper "warning" to stop reporting allegations of the complete breakdown of chain of command within DHS OIG prior to and after IG Cuffari' s arrival.

43. The investigations into Ms. Fredricks, all of which are conducted by the unconstitutionally and unaccountably structured CIGIE and its Integrity Committee, have had a negative effect on Ms. Fredricks's work and actions.  These investigations have also undermined or ignored the due process rights she is owed as a federal employee.

**JOSEPH V. CUFFARI**

44. Joseph V. Cuffari is the Presidentially-appointed and Senate-confirmed Inspector General for the Department of Homeland Security.  He has been involved in conducting, supervising, and evaluating investigations and integrity issues for more than 36 years.

45. IG Cuffari received his Bachelor of Science in Business Administration degree from the University of Arizona (UA) in August 1984.  In May 1995, he received a Master of Arts degree in Management from Webster University, and in September 2002 he earned a Doctor of Philosophy (Ph.D.) in Management degree from California Coast University.  Also, in September 2002, he completed the Leadership in a Changing Environment seminar sponsored

by the Brookings Institution.  He was awarded a Certificate in Public Policy and Management from the UA in September 2005.  He also graduated from the U.S. Air Force's (USAF) Air University – Air War College in November 2016.

46. IG Cuffari served in the USAF for more than 40 years.  He began his service after graduating high school in 1977 as an enlisted airman.  He was subsequently competitively awarded an Air Force Reserve Officer Training Corps (AFROTC) scholarship for his studies at UA.  Upon graduating UA and being commissioned as an Air Force officer, he served on active duty, in the USAF Reserves, and eventually in the Arizona Air National Guard, retiring in 2017 at the rank of Lt. Colonel.

47. He was a career civil service employee and worked in the Department of Justice (DOJ) OIG for more than 20 years, honorably retiring in May 2013 as an Assistant Special Agent in Charge of a Field Office.  While working at DOJ OIG, he was selected to serve on difficult and sensitive investigations, including as a member of the team that evaluated the DOJ's response to and handling of the Aldrich Ames spy matter.  He was also selected to assist a foreign government with forming an OIG within its ministry of the interior.

48. Immediately prior to his confirmation as DHS IG, he served for six years as the Policy Advisor for Military and Veterans Affairs to two Governors of Arizona.

49. His experience on managing investigative teams is also extensive.  During his service with the USAF, he was selected as the Air Force Office of Special Investigations "Officer of the Year." As an USAF officer, he commanded three investigative field offices, including a joint NATO assignment in Naples, Italy.  He also served as a program evaluator/investigator for the DOD OIG, and as the Deputy Mission Support Group Commander for an Air National Guard wing.

50. This extensive prior professional experience was a basis for his appointment and confirmation to his current position.

51. The President announced his intent to nominate Mr. Cuffari on November 1, 2018, and formally nominated him two weeks later.  Mr. Cuffari's nomination lapsed with the expiration of the 115th Congress.  He was renominated on January 16, 2019.

52. In connection with the U.S. Senate's advise-and-consent authority, Mr. Cuffari appeared for his confirmation hearing before the Senate Homeland Security and Governmental Affairs Committee ("HSGAC") on March 5, 2019.  On March 11, 2019, in a bipartisan vote, the HSGAC reported his nomination to the Senate with a favorable recommendation.  On July 25, 2019, the full U.S. Senate confirmed him by a voice vote.

53. On July 26, 2019, the President signed Mr. Cuffari's appointment certificate.  On July 29, 2019, a U.S. Magistrate Judge in Tucson, Arizona administered the oath of office to him.

54. The previous Acting IG of DHS had abruptly retired on June 10, 2019, or about six weeks prior to Mr. Cuffari entering office.

55. Given the Acting IG's abrupt resignation, the timing of Mr. Cuffari's appointment was such that he quickly became aware of troubling matters at the office he had been appointed to lead.

56. In his many years of military and other government service, Mr. Cuffari had never before encountered this level of dysfunction and dishonesty by senior leadership.  There was a level of withholding information, flouting rules, disrespect for proper authority, and risk of disgrace to the organization with which he was previously unfamiliar.

57. Faced with an untenable structure and apparent insubordination, including with respect to matters concerning budget and human resources, Mr. Cuffari contacted the then-Chairman of CIGIE and other seasoned IGs to seek their professional advice.   Mr. Cuffari previously

worked for the IG of the Department of Justice, so he viewed other IGs generally, and that IG specifically, as good resources for advice and guidance.

58. By the third week of August 2019, Mr. Cuffari had made protected disclosures to the Senate HSGAC[2] committee on what he had found, what career employees had reported to him, and the problems he was facing.  He reported that even though the Senate had already been aware that DHS OIG was having significant troubles, the situation on the ground was considerably worse than the Senators knew and than Mr. Cuffari expected when he took the job.

59. HSGAC had been aware of the dysfunction within the DHS OIG which manifested in a variety of ways including (but not limited to) the filing of numerous frivolous IC complaints, the hiring of senior staff in a manner meant to circumvent PAS IG's ability to weigh in on the decisions, and budgetary machinations.  On December 6, 2019, HSGAC and the House Committee on Homeland Security, including Chairs and Ranking Members of both committees, sent a letter to IG Cuffari expressing their concerns on these long-standing challenges and highlighting that it had been "concerned for some time about DHS OIG's ability to perform its statutory mission."

60. Once the IC decided not to investigate the problems identified by Mr. Cuffari and other DHS OIG employees, he looked for ways to resolve them within the authority of his office.  Due to intra-office conflicts of interest, and other IGs' recommendations, IG Cuffari ultimately sought an outside, impartial investigator.

61. IG Cuffari kept the Senate Homeland Security and Governmental Affairs Committee (a committee of the U.S. Senate with jurisdiction over DHS and the one that had overseen

---

[2] Certain communications to the oversight committees of Congress are confidential and protected from public release or other disclosure.

Cuffari's nomination to his current position), the House Homeland Security Committee, both Appropriations committees, as well as the Office of Management and Budget, aware of the steps he had taken or was planning to take.

62. After a lawful solicitation, approved by the proper internal contracting and budgetary staff, the DHS OIG received inquiries from four entities.  Two of these entities maintained their interest after being informed of the extent of the project and submitted proposals for the undertaking. These proposals were evaluated by the contracting officers within DHS OIG.  They ultimately selected the proposal submitted by Wilmer Hale—a well-respected law firm with a national presence and experience in workplace investigations.

63. Eventually, Wilmer Hale prepared a report of its investigation, confirming many of IG Cuffari's and others' observations and fears.  The redacted (to comply with Privacy Act provisions and to protect the identity of witnesses) report is attached hereto as Exhibit 1.

64. In response to IG Cuffari's attempts to reestablish order within DHS OIG, he was targeted by a relentless stream of meritless retaliatory complaints to the IC that continues to this day.[3]  The lates Request for Response was served on April 3, 2023 and has eight requests.  The retaliatory complaints initiated a series of IC investigations, follow-ups, and requests for supplementary information which now total more than *63 requests*(!).  (Exhibit 2)(Chart of Claims).  The complaints baselessly alleged an endless series of transgressions by IG Cuffari, most of which have already been closed with no action or any findings adverse to Mr. Cuffari.  Thirteen complaints, though likewise meritless, remain pending with at least 18 supplemental inquiries recently added.  Nevertheless, responding even to these meritless complaints took inordinate

---

[3] And, it appears from press reports, relentless leaks and attacks in the press arising from these Complaints.

amounts of time and resources and interfered with IG Cuffari's ability to perform his official duties.

65. One of the still-pending complaints relates to the Wilmer Hale contract, while another alleges that IG Cuffari misstated the academic discipline of his degree, and one takes issue with matters of previous employment already addressed by the Senate in its advise-and-consent role. According to the IC's procedures, these allegations could not be pursued by it if the Department of Justice believed a criminal investigation was warranted.

66. On information and belief, the IC brought complaints and conducted investigations against IG Cuffari in cases where both the Justice Department *and* the Office of Special Counsel declined action on matters complained of.  It also did so despite the fact that an allegation of employment retaliation by a federal employee is within the exclusive province of the U.S. Merit Systems Protection Board ("MSPB"). *Elgin v. Dept. of Treasury*, 567 U.S. 1 (2012).  IC's actions violated IG Cuffari's right to due process and threatened the separation of powers and the unitary executive.

67. All but two of the complaints against Cuffari, albeit ultimately factually and legally deficient, related to allegations of violations in the performance of his official duties.  The other two concerned matters that allegedly occurred before his confirmation and while he was still a private citizen.  They were all served upon him at his official government email address.  He retained counsel at a cost of $7,000 to defend against these pre-confirmation allegations.  With respect to post-confirmation allegations, IC's requests included not only protected attorney-client information, but protected communications with Congress, as well as with the Office of Special Counsel under the relevant "whistleblower" provisions, as well as pre-decisional

information.  IC's requests also covered departmental records such as materials he received from DHS and other agencies, all of which were obtained during IG Cuffari' s official duties.

68. In the ordinary course of affairs, such requests would be handled by the principal deputy IG to whom Mr. Cuffari has delegated all such tasks.  The principal deputy IG generally directs DHS OIG's FOIA officer to gather requested material and provide them to the requesting party. This chain of command demonstrates beyond cavil that a) IG Cuffari held the documents in his official and not personal capacity, and b) that DHS OIG possessed strong institutional interests in responding to the requests for these materials.  But the IC process denied this reality by claiming that the inquiry was solely for matters in Mr. Cuffari's personal capacity.

69. Despite the fact that documents requested by IC were generated in IG Cuffari's official rather than personal capacity, IC denied IG Cuffari permission to use DHS OIG's resources (including OIG's staff attorneys) to respond to these complaints.  Indeed, DHS OIG was not permitted to intervene even to defend its own interests.

70. Denial of the views of OIG staff attorneys ensures that the IC's complaints interfere with the performance of IG Cuffari in his duties. After being informed that investigations by the IC were treading on privileged material that was provided to Congress, the IC has issued a batch of allegations over discretionary decisions involving multiple actors within the DHS OIG and required responses within 20 days.  These requests once again treat Mr. Cuffari's actions as having been made in his "personal capacity" and warn him that discussing the matter with other people in his office may itself be grounds for further investigations and findings of misconduct.  The requests demand Mr. Cuffari's thought processes in editing a report to Congress—a task entirely within his discretion.

71. The IC's request indicates that the IC is examining discretionary judgments made by dozens of DHS OIG personnel at all levels of the organization who are not subject to the IC's authority and who, although working in management chains that ultimately lead to IG Cuffari, were not closely supervised by IG Cuffari on a day-to-day basis as they worked on complex projects. This circumstance vividly illustrates the absurdity of the IC's "personal capacity" claim and construct. And it goes beyond the question of fairness to the respondent/subject, who is supposed to sit down with a private attorney and somehow formulate a response without talking to anyone in OIG who was involved in the complex matters under examination, which spanned years and some of which began before IG Cuffari was confirmed.

72. The IC has put Mr. Cuffari in an untenable position that can only be remedied by this Court. If he declines to answer questions, he is subject to an immediate finding of misconduct by not cooperating with an IC inquiry, but if he does answer them, he will be breaching his obligation to abide by the confidentiality principle and the duty to avoid creating the potential for harm of releasing such information as described in the Department of Justice Manual § 1-7.00.

73. Much like Plaintiff Fredricks, IG Cuffari had to obtain private counsel. As with Plaintiff Fredricks, the IC peremptorily and unlawfully declared that all of the complaints against Cuffari had to be answered in his personal capacity.

74. The incessant complaints to the IC and IC's never-ending investigations of these obviously meritless grievances caused substantial interference with IG Cuffari's official duties. Plaintiff Cuffari estimates the time to respond to these matters over the past three-and-a-half years may have reached 2,000 hours. Meeting the IC's constant demands and deadlines has come at a substantial cost. Twelve DHS OIG employees were needed to respond to the IC's voluminous requests for protected and other privileged materials. The production to IC eventually totaled

3 million documents and 400 Gigabytes of data.  It took DHS OIG employees more than 800 person-hours to produce the documents instead of performing their other duties.  At the same time, IC refused to investigate the very credible violations IG Cuffari and career employees uncovered in DHS OIG.  This campaign of distraction and harassment also impeded IG Cuffari's ability to fulfill the assurances of decisive action that he gave to the members of the U.S. Senate who, during IG Cuffari's confirmation process, had expressed deep concerns about the dysfunction within DHS OIG.

75. Specifically, during the confirmation process, senators asked the then-nominee Cuffari to do three things, *viz.*, 1) bring stability to the leadership function; 2) identify and hold individuals accountable for their misconduct; and 3) bring back a modicum of civility to the operations of the office.  Mr. Cuffari committed to doing so.  And despite a relentless stream of Complaints, presumably lodged by those discomfited by his efforts in this regard, he has largely done so.

76. One instance of IC process directly interfering with IG Cuffari's attempts to carry out his responsibilities and promises to the U.S. Senate occurred when he terminated an insubordinate employee who, among other things, refused a directed reassignment.  Because Mr. Cuffari promised the U.S. Senate to address the office's dysfunction were he to be confirmed, he exercised his prerogative to reassign an employee to another position.  Because she refused reassignment, she was placed on administrative leave.

77. The employee was removed from federal service on June 11, 2020; however, she received all the due process required under federal law prior to any action being taken against her.  The December 2020 Wilmer Hale Report further substantiated the propriety of the actions taken by Mr. Cuffari.  Nevertheless, a mere nineteen days after Mr. Cuffari made his recommendations, he received a letter from the IC stating that it had opened an investigation into a complaint that

IG Cuffari was allegedly retaliating against the employee for her complaint over the manner in which Wilmer Hale was engaged by DHS OIG.  The Office of Special Counsel had already investigated the claims of retaliation and found no substance to them, so it closed the investigation with no further action on September 3, 2020.  Mr. Cuffari provided this information to the IC.

78. Even assuming that IC can validly exercise such power, it has abused this power by continuously peppering the DHS OIG with demand letters making no allowance for privileged documents, including protected materials shared with Congress, materials from other offices not related to DHS, or other privileged materials.  IGs have the ability to obtain documents from their respective agencies.  But the IC operates as a "Super IG" and claims the unlimited power to commandeer documents from any agencies *including* those sent to Congress.

79. By law, IGs are granted authority to have access to the records within their department as unfettered as the head of the agency.  The IC has created a "Super IG" that claims the IG power across the whole of government including the legislative branch (which raises serious separation of powers concerns).  IC asserts it has the authority to obtain from any agency any documents any IG could obtain from that agency.

## JOSEPH E. GANGLOFF

80. Joseph E. Gangloff, a career civil servant and a lawyer, retired from government service in December 2019, after 43 years of government service.  Mr. Gangloff had served for over 25 years in the Senior Executive Service (SES) in leadership positions within the Criminal Division of the Department of Justice, the Office of Government Ethics, and the Office of Inspector General for the Social Security Administration.  He earned his Bachelor of Arts

degree *summa cum laude* from St. Joseph's University in Pennsylvania and *Juris Doctor* degree from the University of Pennsylvania, where he was awarded the Order of the Coif.

81. Mr. Gangloff's career focused at the domestic and international levels on the prevention, detection, investigation, and prosecution of public corruption. His service in the SES included serving as Principal Deputy Chief of the Public Integrity Section and as Senior Counsel in the Office of International Affairs of the Department of Justice's Criminal Division, Deputy Director of the United States Office of Government Ethics, and Chief Counsel to the Inspector General for the Social Security Administration.

82. As Principal Deputy Chief of the Public Integrity Section between 1994 and 2001, Mr. Gangloff's responsibilities encompassed handling nationally focused high-profile public corruption investigations and sensitive investigations including Independent Counsel matters and investigations of federal judges and members of Congress.

83. In addition to having responsibility for oversight of some of the nation's most sensitive public corruption cases, he was a principal drafter of the mission statement and procedures for the President's Council on Integrity and Efficiency ("PCIE"), which was a predecessor to CIGIE. In fact, he served as counsel to the IC when it was first formed and until leaving his position at the DOJ's Public Integrity Section.

84. Mr. Gangloff has earned international respect and acclaim for his contributions to the global fight against public corruption, having been a negotiator and drafter of the United Nations and Council of Europe's Conventions Against Corruption, as well as other similar multi-lateral instruments. In addition, he served for over a decade as an expert on international teams selected to assess country-specific compliance with these instruments; particularly significant reviews included an assessment of the Russian Federation. Notably, he has served as an adjunct

instructor at the International Law Academies in Budapest and Bangkok, The United Nations Asia and Far East Institute for the Prevention of Crime and Treatment of Offenders (in Tokyo), and American University's Law School.

85. During his 10-year tenure as a Deputy Director of the Office of Government Ethics, Mr. Gangloff had nationwide responsibility for oversight of over 4,000 agency ethics officials in the over 120 agencies of the Executive Branch.  He directed a wide range of audit, training, and technical support activities to ensure agency-specific program compliance; he was also responsible for monitoring administration of the financial disclosure system for Presidential appointees.

86. Well over two years after Mr. Gangloff retired, the IC notified him that it had opened an investigation against him "and other senior leaders."  In contravention of its usual practices, the IC provided no opportunity for Mr. Gangloff to respond to the allegations before launching a formal investigation.  In fact, the procedural flow chart submitted by the IC to Congress in its mandated annual report does not reflect any circumstance that could warrant launching a formal investigation without first allowing the subject to respond.  Despite the fact that the allegations against Mr. Gangloff apparently encompass a wide range of matters that occurred after his retirement and for which he had no responsibility or authority when employed, and despite (no longer being employed) Mr. Gangloff having no access to any pertinent documents including emails that would be necessary to defend himself, the IC has threatened him with sanctions.  The IC notification is vague, does not clearly inform him of the charges against him, and in the over 8 months since the notification, he has not been contacted by the IC to provide additional information.  This process violates the IC's own procedural requirements, including adherence to established timeframes.  Notably, the IC's guidance concerning its own

authority highlights that the IC does not have the power to take disciplinary action against an individual.  Mr. Gangloff as a retiree is not subject to any disciplinary action by his former agency or any other component of the executive branch.  5 U.S.C. § 424(d)(4)(A) (definition of staff member).

87. Mr. Gangloff served as Chief Counsel to the Inspector General for the Social Security Administration from mid-2015 until the end of 2019, when he retired from Government service to be the primary caregiver for his ailing mother.  As Chief Counsel, his responsibilities included serving as the agency's Whistleblower Ombudsman and Whistleblower Coordinator.

88. By letter dated June 7, 2022, the IC informed Mr. Gangloff that it had launched an investigation against him relating to his service as Chief Counsel to the Inspector General for the Social Security Administration.  Although the letter provided very few details, Mr. Gangloff could understand that in broad terms the complaint against him related to his involvement with Social Security's Civil Monetary Penalty Program ("CMPP"), as well as alleged retaliation against employees who complained about Mr. Gangloff's handling of that program.  IC Notice to Gangloff attached as Exhibit 3.

89. The IC's notification letter to Mr. Gangloff provided almost no pertinent information beyond stating merely that "the IC received a complaint alleging you and other senior leaders" engaged in vaguely identified, non-time-framed-conduct.

90. Notably, and contrary to IC's ordinary practice of inviting the subject of an allegation to provide information prior to initiating an investigation, the IC did not provide this opportunity to Mr. Gangloff.  In addition, the IC did not ask Mr. Gangloff to respond to any specific accusation. The IC did not identify possible sanctions that could be imposed against him.

91. Despite Mr. Gangloff having been retired for over two years, the IC asserted that it continued to have jurisdiction over him and other (unnamed) individuals with respect to the allegations made in the complaint.  This assertion is contrary to law.  5 U.S.C. § 424(d)(4)(C).

92. The IC did not identify what, if any, sanction could be imposed on Mr. Gangloff, regardless of the finding or conclusions of the IC's investigation.  Nonetheless, a threat of public defamation or other adverse action by the IC remains.  Further, while the notification states that an investigator "may contact you for an interview regarding this matter," and that Mr. Gangloff would have an opportunity to address any draft report of investigation (ROI), the IC has not contacted Mr. Gangloff at all other than through the notification letter, dated June 7, 2022. With respect to the IC's own processes, the IC has apparently ignored statutorily mandated deadlines and provided Mr. Gangloff with absolutely no information on the status of the investigation, the reasons for delays, the consequences of the IC's failures to follow its own policies and procedures, or any other matter.

93. As a former employee, Mr. Gangloff cannot receive the assistance of a lawyer from his former agency.  In fact, as noted above, the IC has taken the position that legal support from the agency would not be permitted in any event because IC allegations are "personal" to the subject of the investigation.  The overreach of the IC's assertion that the allegations against Mr. Gangloff are "personal" to him is underscored by the breadth of the IC's allegations, which broadly lump together actions of "other senior leaders" who were not even within the scope of Mr. Gangloff's supervisory authority and reflect actions that occurred well after he left the agency.

94. No process is available to allow Mr. Gangloff to review or obtain relevant agency documents. Even Mr. Gangloff's own emails from his time in government are unavailable to him.

Meaningfully determining the scope of relevant information would not be possible given the vagueness of the allegations as stated.

95. The broad scope of the allegations suggests that much of the conduct under investigation occurred *after* Mr. Gangloff retired, more than two-and-a-half years before the notification, and that additional conduct within the scope of the IC's investigation occurred wholly outside the areas of Mr. Gangloff's authority and responsibilities even during the period of his employment as a covered person.  Mr. Gangloff has had no contact with the Social Security Administration with reference to the IC's investigation.

96. The IC has had no other communication with Mr. Gangloff concerning this matter before or since the letter.  Mr. Gangloff has this accusatory letter hanging over his head with no recourse to remove it but this action.

### JAMES M. READ

97. James Read is the current Counsel to the Inspector General of Homeland Security.  He is a career civil servant, a member of the SES, and a lawyer.  Mr. Read has served as a career civil servant in the executive branch for over 30 years.  He has never held a political appointment.

98. Mr. Read received his Bachelor of Arts degree from Hamilton College and his *Juris Doctor* degree from the George Washington University Law School.

99. Mr. Read has been an active member in good standing of the bars of New York and the District of Columbia for over 30 years.

100. Following law school, Mr. Read served as a law clerk to the Chief Judge of the U.S. Claims Court (currently known as the U.S. Court of Federal Claims).

101. After a short stint in private practice, Mr. Read accepted a position at the Armed Services Board of Contract Appeals.

102.    Mr. Read has served in various positions in the executive branch since then, including Chief Counsel to the Chairman of the MSPB; Director of the MSPB Office of Appeals Counsel; Special Counsel for Personnel at the DOJ Executive Office for U.S. Attorneys; Special Assistant to the Director of the DOJ Office of Attorney Recruitment and Management; and Assistant General Counsel of the Office of Management & Budget.

103.    Mr. Read was appointed to the career Senior Executive Service in 2009.

104.    Inspector General Cuffari named Mr. Read Acting Counsel to the Inspector General effective December 30, 2019.  On or about March 29, 2020, Mr. Read assumed that role on a permanent basis.  Mr. Read had not known Inspector General Cuffari prior to November 2019.

105.    Like Ms. Fredricks, Mr. Read was appalled by the situation he encountered at DHS OIG, because it was far more extreme than he had seen previously in his then-30 years in Government.  He observed factional behavior, personalization of policy disagreements, and failure to conform conduct to the agency's mission.  Some senior staff actively opposed and undermined the Presidentially appointed leadership.  The DHS OIG office structure created by these senior career staff was non-standard in the extreme and designed to prevent appointed leadership from exercising any effective control over the office.

106.    The structure of the office was bizarre.  The HR function was misplaced, and the organization of attorneys in the office providing legal advice to the IG produced inconsistent advice.

107.    On or about July 1, 2020, the IC asked Inspector General Cuffari to respond to allegations of misconduct made against him.

108.    Acting on Inspector General Cuffari's behalf, Mr. Read requested an extension of time to respond.

109.    The IC informed Mr. Read that it was proceeding against IG Cuffari in his personal capacity and Mr. Read should not take part in representing him in responding to the allegations.

110.    Based on his review of the IC complaint, Mr. Read determined that the allegations against IG Cuffari involved actions IG Cuffari took within the scope of his official duties.  Mr. Read further determined that the interests of DHS OIG and Inspector General Cuffari were aligned, and therefore, that it was appropriate for DHS OIG attorneys to provide legal advice to IG Cuffari in the IC matter.

111.    The IC nonetheless informed Mr. Read that DHS OIG attorneys were not permitted to provide IG Cuffari with legal advice in the IC matter.

112.    Contrary to the IC's unsupported assertions, Mr. Read believed that he was obligated by the terms of his appointment to advise IG Cuffari in the IC matter.

113.    In a telephone call on or about July 25, 2020, an attorney associated with CIGIE threatened Mr. Read with an IC investigation if he were to provide advice to IG Cuffari in the IC matter.

114.    In the fall of 2020, CIGIE leadership proposed an amendment to the IC's rules that would give the IC authority to obtain any records of any Office of Inspector General, including records covered by the attorney-client and attorney work-product privileges, that the IC deemed relevant to an IC investigation.

115.    Mr. Read believed that CIGIE lacked authority to adopt such a rule; in addition, he believed that the rule was being promulgated in violation of the Administrative Procedure Act.  By letter dated November 20, 2020, and addressed to the Office of Management & Budget ("OMB"), Mr. Read set forth a detailed critique of the proposed rule.

116.    By letter to OMB dated November 22, 2020, the then-Chairman of CIGIE, objected to Mr. Read's letter, opining that it was "regrettable" that Mr. Read had raised legal arguments against

the proposed rule.  That letter appeared on CIGIE letterhead and was signed in his capacity as Chair of CIGIE.  Mr. Read was copied on this letter.  The episode demonstrates that CIGIE rejects even informed criticism by attorneys in the agencies as to its practices.

117.   Because Mr. Read reports directly to IG Cuffari, he is subject to the IC's authority under section 11(d)(4)(A)(i) of the Inspector General Act (5 U.S.C. § 424(d)(4)(A)(i)).

118.   By letter dated June 24, 2021, the IC demanded that Mr. Read respond to a complaint claiming that he had abused his authority, engaged in gross mismanagement, and engaged in conduct calling into question his integrity and independence, relating to discretionary management decisions he had made in the course of his official duties.  The Complaints, as usual, were served on Mr. Read at his official government email address.

119.   As is its usual practice, the IC informed Mr. Read that it was proceeding against him in his personal capacity.  As a result, Mr. Read was deprived of the advice of agency attorneys and instead had to retain private counsel to represent him in the IC matter.

120.   The IC also advised Mr. Read that he had the burden of "refuting" the allegations against him such that no reasonable person could conclude that he had acted improperly.

121.   After Mr. Read, through private counsel, submitted a detailed response to the IC, the IC closed the matter without any adverse determination.

122.   By letter dated May 6, 2022, the IC demanded that Mr. Read respond to additional allegations that he had acted improperly.  Although the allegations related exclusively to actions Mr. Read took as part of his official duties and were non-criminal in nature, the IC again advised Mr. Read that it was proceeding against him in his personal capacity.  The IC again advised Mr. Read that in order to avoid a full-blown investigation, he must refute the

allegations such that no reasonable person could conclude, after further development of the record, that he had acted improperly.

123.    Mr. Read again was forced to hire private counsel and through her again responded to the allegations.  Once again, the IC later closed the inquiry without any adverse determination.

124.    In yet another IC investigation (with Mr. Read this time being a witness rather than the subject of the investigation), IC investigators asked Mr. Read to submit to a "voluntary" interview.  The IC disingenuously characterizes such interviews as "voluntary;" however, on information and belief, an individual who exercises his due process rights and declines to participate will be automatically found guilty of failing to cooperate with the IC.

125.    During the interview, IC investigators again threatened Mr. Read with "scrutinizing" his actions, all of which related exclusively to Mr. Read's carrying out of his official duties.

126.    On April 3, 2023 he received another request from the IC with seven question regarding someone else's telephone records.

127.    On information and belief, DHS OIG attorneys requested that the DOJ appoint a government attorney or a private attorney at the government's expense to represent Mr. Read in the matter where Mr. Read served as a witness.  On information and belief, DHS OIG attorneys did not receive a response to this request in time for Mr. Read's interview with IC investigators.  As a consequence, Mr. Read was forced to spend over $5,000 from his personal funds in attorney fees connected to this interview.  He has spent at least 200 hours responding to baseless allegations that do not meet even the IC's stated standards of inquiry, not including the brand new request of the IC.

## THE OPERATIONS OF COUNCIL OF THE INSPECTORS GENERAL ON
## INTEGRITY AND EFFICIENCY AND THE INTEGRITY COMMITTEE

128.   CIGIE is a statutorily created body consisting essentially of all Inspectors-General in the

federal service as well as individuals who serve as IGs in the executive and legislative branches

as well as those who serve for various public corporations such as National Railroad Passenger

Corporation and the Corporation for Public Broadcasting.

129.   The membership of CIGIE is not limited to those IGs who have been nominated by the

President of the United States and confirmed by the Senate.

130.   For instance, legislative members are appointed as follows:

- The Architect of the Capitol appoints the Architect of the Capitol IG.  That IG is removable by the Architect of the Capitol.  2 U.S.C. §§ 1808(c)(1), (2).

- The Capitol Police Board appoints the Capitol Police IG.  The Capitol Police Board may remove that IG by unanimous vote.  2 U.S.C. §§ 1909(b)(1), (3).

- The Comptroller General appoints a Government Accountability Office ("GAO") IG. The GAO IG is removable by the Comptroller General.  31 U.S.C. §§ 705(b)(1), (2).

- The Director of the Government Publishing Office ("GPO") appoints a GPO IG.  That IG is removable by the Director.  44 U.S.C. §§ 3902(a), (b)(1).

- The Librarian of Congress appoints a Library of Congress IG.  That IG is removable by the Librarian of Congress.  2 U.S.C. §§ 185(c)(1)(A), (2)(A).

131.   The Integrity Committee is a statutorily created committee within CIGIE.  Four of the

Committee members are members of CIGIE appointed by the CIGIE Chairman.  Additionally,

an official of the Federal Bureau of Investigation serves on CIGIE and the Director of the

Office of Government Ethics or his designee also serve on the IC.  Given CIGIE's and IC's

structure, it is possible for the IC to have no PAS-eligible members on the IC.  Indeed,

currently, four of the seven members of the IC, including its chairman, are not PAS officials.

132.   The IC has informally adopted various policies and procedures governing its investigations.  These procedures are not merely internal operating rules but are rules that bind the subjects of investigations.  For example, the IC has determined that irrespective of the nature of the complaint lodged against any party, that party cannot rely on his agency's attorney to respond to allegations.  The IC has shifted the burden of proof against the person against whom a Complaint is lodged.  In contrast to established legal principles, the subject has the burden of "refuting" the allegations against him such that no reasonable person could conclude that he had acted improperly.  These policies violate the bedrock of law, the presumption of innocence, and tellingly, they do not appear to be part of IC's formal Policies and Procedures adopted in January 2018 and posted on IC's website.  *See* https://bit.ly/3YSxnpY

133.   The investigations by the IC are civil and should be based at least on civil burdens of proof. But, in practice, the subject of the investigation has to prove innocence beyond a reasonable doubt because that is what the IC wrongfully requires.

134.   Under IC's own rules, in order to trigger IC's action, any investigation must meet a "threshold standard" which, again according to IC's own definitions, "does not include discretionary management decisions, or action or inaction that constitutes simple negligence or wrongdoing," nor does it include a merely "debatable expenditure."  *See id.*, § 7.A; Appendix A.

135.   Despite IC's own standards for triggering investigations, IC on numerous occasions has investigated Plaintiffs over their discretionary management decisions and allegations that even if they were true (though they were not) did not rise to the level of "willful misconduct or gross and wanton negligence."  *Id.*

31

136.    When conducting investigations, the IC essentially assumes the authorities expressly vested in the Office of Inspector General for the relevant agency.  Thus, the March 25, 2021, Addendum to the IC's 2018 Policies and Procedures states that every OIG, upon request, must provide the IC "with full and timely access to all OIG records, documents, witnesses, and other information that the IC or its designee deems necessary."  As a result, the IC demands records and information that are otherwise available only to an agency's Inspector General and his staff.  Because members of the IC need not be appointed by the President and are not necessarily removable by him, the IC has exercised the quintessentially executive authority that is normally reposed only in "principal officers" of the United States without actually being staffed by such officers.

137.    Allison Lerner, while serving as Vice Chair of CIGIE, encouraged two OIG DHS senior executives to use government resources and their official titles to interfere in the Senate advise-and-consent process in hopes of scuttling IG Cuffari's nomination.  One of these executives would continue holding herself out as Acting IG until Mr. Cuffari was confirmed.  In other words, delays in and possible rejection of Mr. Cuffari's nomination personally benefited this official.

138.    Neither Ms. Lerner nor the current Chairperson of the IC, Kevin Winters, expressed any concerns regarding government employees using official resources to influence the Senate's advise-and-consent role, even when that person would benefit from a delay in filling the role.  This was a grave misuse of governmental resources for private gain and traduced 5 C.F.R. § 2635.502.

139.    The IC and CIGIE often take a political role, beyond simply supplying information to Congress.  While on official government time, two IC staff attorneys were dispatched to the

Hill in 2021 to lobby members to support various CIGIE legislative proposals. One such proposal was to transfer authority from the DOJ Office of Professional Responsibility to the DOJ OIG to investigate allegations of misconduct involving DOJ attorneys, in the performance of their prosecutorial functions. In addition, IC attorneys also lobbied against various Senators' amendments to the IG Act. Those lobbying efforts were shared at a December 14, 2021 CIGIE monthly meeting when CIGIE leadership praised the IC attorneys for their "hand-to-hand" combat on the Hill to defeat what CIGIE leadership viewed as "bad ideas" the Senators had presented in their amendments.

140.    As a result of their personal familiarity with IG Cuffari as well as being the people who, when asked, provided professional advice to him, the then-Chairman of CIGIE and the IC's Senior Assistant General Counsel both recused themselves from the investigation into IG Cuffari.

141.    Despite Ms. Lerner having been personally involved in an attempt to defeat IG Cuffari's nomination.  Ms. Lerner appointed two members of the IC, which was then tasked with acting on complaints against IG Cuffari.

142.    Neither CIGIE nor the IC provides any mechanism to review and address improper non-recusal decisions to force them to do so.  This both explains the relentless harassment against the Plaintiffs and the reasons it cannot be addressed.

143.    The Wilmer Hale Report implicates CIGIE leadership in improperly attempting to defeat IG Cuffari's nomination.  Yet, not only did CIGIE leadership not recuse themselves in response to a clear conflict of interest, they ignored this outside report by a disinterested and professional law firm because the leadership apparently viewed, without a basis in fact, the report itself as "retaliatory." *See Russell v. Dept. of Justice*, 76 M.S.P.R. 317 (1997) (retaliatory reports given

little weight).  By letter dated October 27, 2020, IG Cuffari requested IC Chairman Winters to recuse himself from matters involving IG Cuffari or DHS OIG.  Chairman Winters refused to do so and subsequently opened additional investigations into IG Cuffari and DHS OIG staff.

144.    In late 2020, the IC became aware that the insubordinate employee, whom IG Cuffari had removed from federal service, had made a threat against IG Cuffari.  When IG Cuffari and Mr. Read learned of the threat through another IG office, they inquired with the then-Chairman of CIGIE to obtain specific information as they only had heard a general report.  Instead of assisting IG Cuffari and Mr. Read with the requested information, IC Chairperson Winters responded that their inquiry about the threat would be viewed as interfering in an IC matter and would potentially result in yet another IC investigation against *them*.

145.    As a PAS IG, IG Cuffari is a principal officer of the United States and a federal law enforcement officer within the meaning of 18 U.S.C. § 115.  Because of IC Winters' refusal to apprise IG Cuffari of the circumstances and context of the alleged threat against him, he was left to his own devices to determine whether any steps had been taken to fully gather pertinent evidence and to begin the process of obtaining whatever protection may be warranted.

146.    IC Winters refused to recuse himself in matters relating to IG Cuffari or Mr. Read.

147.    At bottom, the leadership of CIGIE, through the IC, is attempting to undo the Presidential appointment and Senate confirmation of someone whom some of these individuals wished were never nominated.  Not only were the initial efforts to oppose the nomination improper, but even assuming they were proper, the involvement of these same individuals in subsequently investigating the very person they had politically opposed, demonstrates a blatant disregard for due process and separation of powers.

148.    To maintain impartiality in agency decision-making, IGs do not make recommendations for discipline or adverse action.  However, the IC acts as a "Super IG" in contravention of this policy.

149.    The IC does not merely make non-binding recommendations to other actors in the federal government.  Rather, it creates reports that include "recommendations for disciplinary action, up to and including removal" which can be professionally and personally adverse to an individual.  These reports are often made public and can result in termination and loss of reputation.  There is no third-party review of such reports.  The governing legal doctrine immunizes the government from liability for libel or slander.  Because there is virtually no redress for a slanderous report, due process protections during the investigation and report preparation stages are even more necessary and required.

150.    The IC by practice and by rule assumes all allegations that it determines to send to the subject for response are true and it is instead the duty of the subject to refute them beyond a reasonable doubt. *See* Exhibit 4 (Letter of IG Cuffari to IC p. 3 (Oct. 27, 2020)).

151.    The IC, without any legal authority, employs an irrebuttable presumption that all complaints it receives concern the subject's behavior in his personal rather than official capacity, thus precluding the subject from accessing an agency's legal counsel or even exculpatory documents.  This approach violates the Department of Justice's Guidelines on the use of agency counsel.  *See* 28 C.F.R. § 50.15(b) (default is to represent the individual unless not in agency's interest).  To defend an allegation personally, not knowing what the agency believes are its equities, is damaging to the individual and the agency.

152.    The IC threatens individuals who contact CIGIE to complain about the IC's actions, terming such contacts "interference" with the investigation even though CIGIE does not and

cannot interfere with any IC investigation.  Exhibit 5 (Letter of IC to IG Cuffari (Oct. 19, 2020); Exhibit 4 (Letter of IG Cuffari Response to IC (Oct. 27, 2020)).

153.   The IC unlawfully inserts itself and conducts investigations on matters that are governed by the Civil Service Reform Act ("CSRA"), which vests exclusive jurisdiction over such matters in the Office of Special Counsel and/or the MSPB.  *See, e.g.*, *Elgin v. Dept. of the Treasury*, 567 U.S. 1 (2012) (CSRA provides exclusive means for resolving federal employer/employee suits).

154.   The IC's disregard for any privileges (attorney-client, work product, classified material, deliberative process, provision of information to Congress as a whistleblower,[4] etc.) and any statutes that limit access to investigatory material to the IG of the agency involved or the Department of Justice, violates the separation of powers and due process of law and is not authorized by the Inspector General Reform Act.

155.   Rulemaking is a significant government power. Except as it concerns investigations of "the Special Counsel or the Deputy Special Counsel," IC has no rule-making authority. *See* 5 U.S.C. § 424(d)(12).  Despite the absence of such an authority, the IC construes its own regulations and rules of procedure as binding all individuals that it claims it has statutory power to investigate.  This practice undermines the Appointments Clause and the President's inherent power to remove officers of the United States.   In contravention of the Administrative Procedure Act, the Due Process Clause, and basic Constitutional structure, IC rules are unreviewable by anyone in the Administration, including CIGIE itself, of which IC is merely a committee.   The leaders of CIGIE have testified to Congress that the IC is purposely

---

[4] Disclosures made by federal employees to Congress are protected by law.  5 U.S.C. § 7211.

separated from CIGIE's review, not subject to its supervision, and that CIGIE does not and cannot intrude on IC matters and investigations or oversee its actions.

156.    The IC's approach to its investigations affects not only individuals, but also Executive Branch agencies, because counsel to the relevant agencies are not permitted to be involved in IC investigations even when agencies' institutional interests are at stake.

157.    The IC's procedures require the subject of any complaint to "fully refute the allegations" made against him and to do so without consulting agency counsel or exculpatory documents within the possession of the agency.  This approach violates due process of law, by both presuming guilt and limiting an individual's ability to defend himself.  Worse yet, these procedures are contrary to established legal principles and are not authorized by any statute or even IC's own regulations.

158.    In 2021, by majority vote of its members, CIGIE adopted a rule giving the IC a right of access to any and all records held by any office of an Inspector General within any agency to include IGs in the legislative branch.  Failure to turn over any document leads to an automatic finding of misconduct on the part of the official responsible for producing the documents.  Such a finding may be entered even if the agency in question refuses to turn the document over to the subject of the investigation (or his private counsel) on the ground that the document is privileged or classified.  (Unlike the Office of Special Counsel, which has the authority to obtain attorney-client privileged material, *see* 5 U.S.C. § 1212(b)(5)(C)(i), no statute grants CIGIE or the IC similar powers).

159.    As part of this rule the IC claims a right to have protected legislative material produced to it.  The Senate on learning of this requested that a "taint team" be created to review such

material.  On information and belief, the IC rejected the Senate's request to establish a "taint team" to review such legislative materials.

160.    CIGIE, as the repeated testimony of its officers reveals, takes no actions to control the IC and defers to the IC's members to determine their authority.

161.    CIGIE does fund the IC, however, these funds are not appropriated by Congress.

162.    IC is funded by a mechanism free from any Congressional or higher Executive control.  It is a forced "pass the hat" procedure unknown elsewhere in law.  IC's funding is derived from moneys Congress appropriated to fund various IG offices through a process whereby members of CIGIE, *i.e.*, the IG community, vote to allocate a portion of each of their appropriated budgets to the IC for its purposes and operations.  Those IGs who vote against the proposal still have that "approved" amount deducted from their offices' budgets and sent to the IC.

163.    The funding structure of CIGIE and the IC creates a host of Constitutional violations.

164.    The IG Act, 5 U.S.C. § 424(c)(3)(A)(ii), provides that "upon the authorization of the Executive Chairperson," each member IG "shall fund or participate in the funding" of CIGIE's activities.

165.    Section 5 U.S.C. § 424(b)(2)(A) provides that the Deputy Director for Management, Office of Management & Budget, is the "Executive Chairperson" of CIGIE.

166.    Section 5 U.S.C. § 424(c)(3)(A) provides that the Executive Chairperson "*may* authorize the use of interagency funding for" CIGIE's activities, and goes on to denote such functions as training, *the functions of the IC*, and any other authorized purpose as determined by CIGIE, as the activities that may be funded through this mechanism.

167.    Thus, the Executive Chairperson has discretion on whether or not to fund CIGIE and thus the IC.

168.    But both CIGIE and the IC have non-discretionary functions. *See* 5 U.S.C. § 424(c)(1) (things CIGIE "shall" do); 5 U.S.C. § 424(d)(1) (things the IC "shall" do).

169.    The Executive Chairperson's ability to cut off funding for the non-discretionary actions of CIGIE and the IC represents an unconstitutional delegation of power to the Executive branch over funding a non-discretionary task of the CIGIE entity.

170.    The vote of CIGIE to take a portion of each IG's Congressionally appropriated budget similarly violates the appropriations power of Congress.  Congress can not control CIGIE or the IC without defunding the IG's at the same time.  The mechanism for funding CIGIE and the IC not only allows the Executive Branch control of non-discretionary duties of CIGIE and the IC but also prevents Congressional control of those entities without striking at the resources of the IGs.

171.    The portions of 5 U.S.C. § 424(c) that allow funding of the IC without Congressional appropriation also leave it uncontrolled by Congress and therefore unconstitutional.

## CLAIMS FOR RELIEF

### Count I: Violation of the Appointments Clause

172.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully incorporated herein.

173.    The IC is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

174.    The IC functions as an autonomous entity.  CIGIE, the IC, and their members exercise significant authority pursuant to the laws of the United States, those members are, notwithstanding provisions of the Act to the contrary, officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

175.    By virtue of the wide-ranging discretion, duties, functions, and independence of the IC, members of the IC are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate.  Accordingly, the structure of the IC, which permits and requires membership of individuals not subject to Presidential appointment and Senate confirmation violates the Appointments Clause.

176.    In the alternative, the members of the IC are inferior officers whose appointments must be made by the President, a court of law, or the head of a department.  CIGIE is not a "department" within the meaning of Appointments Clause.  Even if CIGIE is a "department" within the meaning of the Appointments Clause, because the Chairman of CIGIE is not appointed by the President and is instead selected by the members of CIGIE themselves, and because the Chairman of CIGIE need not hold any PAS office, the Chairman of CIGIE is not a "head of the department" within the meaning of the Appointments Clause.  Therefore, the appointment of IC members by the Chairman of CIGIE violates the Appointments Clause.

177.    In addition, the IG of the Architect of the Capitol is a member of the legislative branch, so his inclusion in CIGIE and potentially on the IC violates not only the Appointments Clause of and removal power under the Constitution, but also the separation of powers.

178.    Furthermore, because the entities such as the National Railroad Passenger Corporation and the Corporation for Public Broadcasting are not "departments" within the meaning of the Appointments Clause and, in all events, the appointment power of the IGs for those entities is not vested in the head of those entities but rather in the relevant boards of directors as a whole, the membership on IC of members not appointed by the President, a court of law, or the head of a department, violates the Appointments Clause.

## <u>Count II: Unconstitutional Delegation of Federal Power to a Private Entity</u>

179.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully incorporated herein.

180.    Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." Article I, § 7 further requires legislation to be passed through bicameralism and presentment.

181.    Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Nor may it delegate to another branch the power to modify prior legislation through a process that bypasses bicameralism and presentment. *See Clinton v. City of New York*, 524 U.S. 417, 440-41 (1998).

182.    Additionally, Congress may grant regulatory power to an executive agency only if it provides an "intelligible principle" by which an agency can exercise it. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

183.    A statutory delegation lacks an intelligible principle and is thus unconstitutional if it grants an agency unfettered discretion to make policy decisions. *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (finding violation of the Vesting Clause where "Congress gave the SEC the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so"), *petition for cert. docketed*, No. 22-859 (Mar. 9, 2023).

184.    The doctrine has also been called "…rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

185.    Whether investigatory authority is deemed to be an executive or legislative function, it cannot be delegated to a private entity.  *See Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013) ("Federal lawmakers cannot delegate regulatory authority to a private entity.").

186.    With the Inspector General Reform Act of 2008, Congress has delegated federal investigatory authority over the operations of federal departments and the performance of federal employees to the IC—a nominally public entity but one that is staffed, at least in part, by private or hybrid individuals such as the Inspector General of the Corporation for Public Broadcasting and the hybrid entity of Amtrak.

187.    This unlawful delegation of authority includes, among other things, the power to obtain documents and information for all executive and legislative agency operations, to affect operations of various agencies within the United States Government, and to recommend removal of individuals from government service.

## Count III: Violation of the Administrative Procedure Act

188.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully incorporated herein. Defendants' promulgation of the IC Policies and Procedures ("ICPPs") constitutes a "rulemaking" within the meaning of the APA, 5 U.S.C. § 551(5) and is subject to the notice and comment requirements of 5 U.S.C. § 553.

189.    The ICPPs purport to be binding on third parties who are no longer with the government such as Mr. Gangloff.

190.    The ICPPs impose substantive requirements upon individuals and employees beyond those required by federal statutes and contradict them.

191.    Promulgation of the ICPPs without notice and without providing an opportunity for comment ignored procedures required by law.

192.    Defendants have treated the ICPPs and their other stated investigative policies as imposing binding legal obligations on those accused and other third parties.

193.    Defendants have commenced investigations against those accused and third parties, putting such third parties in the zone of protection of the APA.

194.    The ICPPs, having not undergone notice and comment, were unlawful when issued and implemented and must be set aside under 5 U.S.C. § 706(2)(D).

195.    Implementation of the ICPPs violates the Due Process Clause of the United States Constitution, so ICCP's must be set aside.

## Count IV: Violation of Due Process of Law

196.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully incorporated herein.

197.    Presumption of innocence, even in non-criminal matters is a bedrock principle of the rule of law and due process of law protections.  Although in non-criminal matters adverse inferences may be drawn against a defendant who chooses not to respond to various allegations, the burden of proof is always on the party seeking to impose the penalty.  Under the conditions of an IC investigation, all voluntary interviews are actually compelled by automatic adverse inference for failure to respond.

198.    The IC's procedures violate these basic principles.  When receiving a complaint, IC insists that the subject of the complaint "refute" the allegations against him such that no reasonable person could conclude that he had acted improperly.  In placing the burden of proof on the subject of the complaint, the IC violates due process of law.

199.    The due process of law violations threaten not only the subjects' employment but also their abilities to perform their duties and obligations to their respective agencies, and often professional legal obligations.  They also threaten the privileges held by institutional clients of the individuals investigated or caught up in investigations.  Finally, the reputational and professional injury can be substantial when such matters reach the press.

### Count V: Violation of Due Process of Law

200.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully incorporated herein.

201.    A fundamental principle of due process is the ability of any accused, whether in a criminal or civil matter to have access to and adduce any exculpatory materials.

202.    When conducting its investigations, the IC invariably requires the target to rely on private attorneys to respond to any IC communication.  At the same time, documents on which the target of the complaint may have relied in reaching the decision that prompted the complaint remain governmental documents and unavailable to the subject or his attorney.

203.    Because governmental documents (even ones created by the subject himself) may be unavailable to the subject of investigation or his attorney, all the while the subject must convince the IC that the allegations against him are such that no reasonable person could conclude that he had acted improperly, the procedure to which targets of complaints are subjected violates fundamental fairness and due process of law.

204.    When conducting its investigations, even while recognizing that responses to its inquiries may require that the target contact fact witnesses to obtain statements and records, the IC threatens the target that any such communication may be construed as an additional violation. This approach makes it impossible to ever meaningfully answer IC's charges without raising more charges in a perpetual loop.

## Count VI: Violation of Appropriations Clause

205.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully incorporated herein.

206.    The Constitution further provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const., art. I, § 9, cl. 7.

207.    CIGIE and IC take federal government money without an appropriations act:  CIGIE itself has exclusive authority to set its own budget by voting to reallocate money appropriated by Congress to various offices of Inspectors General, *see* 5 U.S.C. § 424(c)(3).  This vote is exempt from any Congressional supervision, because even if Congress were to cut the budget for a given OIG, CIGIE could simply vote to increase the "tax" on various other OIGs to make up for it, thus keeping its own budget level.  Both separately and in combination with the provisions shielding CIGIE and IC from executive supervision, this improper insulation from congressional budgetary supervision renders invalid any assertion of the CIGIE's and IC's authority.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs respectfully request that this Court enjoin the actions of the IC against Defendants and prohibit further actions by the IC against them without further order of this Court.  The Plaintiffs also request that the Court find unlawful and set aside the ICPPs and find unlawful the structure of the IC as well as the funding mechanism of the IC.  Also, the Plaintiffs seek a declaratory statement that any IC investigation of their acts while performing their duties cannot be deemed "personal," so that nothing prevents Plaintiffs' representation by—nor precludes their getting input from—their respective agencies and those agencies' counsel, and for any such other relief as may to the Court may seem just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of any triable issues.

April 4, 2023                                    Respectfully submitted,

/s/  John J. Vecchione

JOHN J. VECCHIONE (Va. Bar No. 73828)
Senior Litigation Counsel
GREGORY DOLIN, *Pro Hac Vice Forthcoming*
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
john.vecchione@ncla.legal

46