Exhibit 1

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

**Report of Independent Investigation:**

Allegations of Misconduct by (b) (6) ████████, (b) (6) ██████ and (b) (6) ████████

December 14, 2020

**Submitted by:**





WILMER CUTLER PICKERING HALE AND DORR LLP ®

~~Privileged & Confidential: Attorney Work Product~~

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

## Table of Contents

I.    Executive Summary ................................................................................................ 1

II.   Background ............................................................................................................ 3

III.  The Campaign To Undermine Acting (b) (6) .................................................... 5

   A.    (b) (6) Retirement and Succession Planning ................................................ 5

   B.    (b) (6) Pressures (b) (6) to Retire ................................................................ 6

   C.    (b) (6) Demands (b) (6) Retire .................................................................... 8

   D.    (b) (6) Extends His Retirement Date ........................................................... 9

   E.    (b) (6) is Publicly Criticized ...................................................................... 12

   F.    (b) (6) and (b) (6) Refer (b) (6) to CIGIE .................................................. 17

   G.    DHS OIG Employees' View of the Special Report ..................................... 19

   H.    (b) (6) Retroactively Changes (b) (6) Position Description ......................... 21

IV.   Attempts to Derail the Nomination of Dr. Cuffari as the New IG ........................ 24

V.    Undermining the New IG ...................................................................................... 29

   A.    (b) (6) Filled Vacancies to Limit the New IG ............................................. 29

   B.    Unprofessional Behavior Directed at IG Cuffari ........................................ 35

   C.    (b) (6) and (b) (6) Attempt to Investigate IG Cuffari .................................. 37

   D.    (b) (6) Accuses IG Cuffari of Unethical Conduct ...................................... 40

   E.    (b) (6) and (b) (6) Allege that IG Cuffari Violated the IG Act ..................... 41

   F.    (b) (6) and (b) (6) Seek to Withhold Information from IG Cuffari ............... 45

   G.    (b) (6) and (b) (6) Charge IG Cuffari with Abusing his Authority Regarding the Telework Policy ................................................................................... 46

   H.    (b) (6) Failure to Follow IG Cuffari's Directive ......................................... 52

   I.    Confusion Over a Meeting with Foreign Nationals at DHS OIG Leads to Further Suspicion ....................................................................................... 53

   J.    Another Dispute Leads (b) (6) and (b) (6) to Send Complaints about IG Cuffari to CIGIE IC and Congress ............................................................. 55

VI.   Mistreatment of Other DHS OIG Employees ...................................................... 57

   A.    An Atmosphere of Mistrust and Retaliation .............................................. 57

   B.    Accumulation of Power Through the Consolidation of Human Resources Management Division under the Office of Counsel ................................... 59

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

C.   Reassignment of ████████ and Initiation of a Criminal Investigation for Use of a
     Parking Pass ................................................................................................ 63

D.   Reassignment of ████████████████████ .................................................. 69

VII.   The Unconfirmed Remaining Allegations ........................................................ 69

A.   False Testimony Before Congress ................................................................. 70

B.   Preferential or Unfavorable Treatment of DHS OIG Employees ..................... 72

    1.   Appointment of ████████ as AIG ████████ .................................... 72

    2.   Investigation of ████████████, AIG ████████████████ ............... 74

    3.   Reprisal against ████████████ .......................................................... 76

    4.   Investigation of ████████████ ........................................................... 78

    5.   Investigation of ████████████ ........................................................... 80

    6.   Disciplinary Action Taken Against ████████ ...................................... 88

C.   Misconduct, Malpractice or Unprofessional Behavior ................................... 88

    1.   IG Cuffari Questions ████████ Drafting of an Ethics Screening Agreement ........ 88

VIII.   Conclusion .................................................................................................. 91

IX.   Appendices

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

## I.   EXECUTIVE SUMMARY

On May 4, 2020, the U.S. Department of Homeland Security Office of the Inspector General ("DHS OIG" or "the agency") engaged WilmerHale to undertake an independent investigation into allegations regarding three senior DHS OIG employees—(b) (6)              , (b) (6)              , and (b) (6)        .[1]  These employees allegedly engaged in an assortment of unprofessional behavior that was designed to undermine and contravene the authority of the two Inspectors General ("IGs") to whom they reported at DHS OIG from late 2017 to 2020.

WilmerHale investigated eighty-eight allegations pertaining to (b) (6)        , (b) (6)      , and (b) (6)    .  As part of our inquiry, we conducted over 70 interviews with current and former DHS OIG employees and other individuals, including (b) (6)        and (b) (6)      .  (b) (6)          declined to speak with us.  We also reviewed over 42,000 documents, including emails, text messages, memoranda, and DHS OIG policies.

Although our investigation did not substantiate all of the allegations, it revealed that (b) (6)          behavior exacerbated an atmosphere of mistrust and unprofessionalism to the detriment of the agency and its mission.  The agency was beset by employees' accusations of misconduct and retaliation, frequent internal investigations of OIG personnel, and complaints and counter-complaints filed with the Integrity Committee ("IC") of the Council of the Inspectors General on Integrity and Efficiency ("CIGIE"), the Office of Special Counsel ("OSC"), and Congress.

(b) (6)            motive for her actions appears to have been a desire to further her own professional ambitions and those of her allies—(b) (6)      and (b) (6)      —while diminishing the professional opportunities of those whom she disliked and/or viewed as disloyal.  (b) (6)        and (b) (6)        assisted (b) (6)        in her endeavors.  Indeed, current and former employees reported that (b) (6). (b) (6), (b) (6)      , and (b) (6)        retaliated against anyone whom they believed stood in their way or was perceived as disloyal.

Our inquiry revealed that soon after (b) (6)        was appointed to the (b) (6)            position by former (b) (6)        (b) (6)        , she expressed a strong desire to take over the top position at the agency.  Although she initially got along with (b) (6)          , who supported her goal of leading the agency, she began to criticize him and pressure him to leave the agency when he postponed his retirement.

By early 2019, the relationship between (b) (6)        and (b) (6)          had so deteriorated that (b) (6). (b) (6)      was openly hostile to (b) (6)      in meetings with other senior OIG staff members.  Current and former DHS OIG employees described (b) (6)        as plainly disrespectful to (b) (6)        , frequently turning her back toward him during meetings and rolling her eyes while he spoke.  The evidence also shows that (b) (6)        pressured (b) (6)      to retire so that she could take over as the (b) (6)        repeatedly called into question his fitness to lead the agency, and lobbied the OIG senior staff to join her efforts to push him out.  In May 2019, (b) (6)        and (b) (6)      used an internal inquiry to put public and political pressure on (b) (6)      to retire.  (b) (6)      ultimately did retire following the publication of (b) (6)              on the inquiry.

---

[1] Memorandum from DHS OIG Counsel to WilmerHale (May 7, 2020) (on file with author).  The allegations identified in that memorandum provided the foundation for WilmerHale's investigation.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

Following his retirement, ████ and others retroactively changed ████ personnel file to secure ████ position as his successor. ████ approved these retroactive changes, which purportedly justified her ability to serve in the position as the ████ until a new IG could be confirmed.

In November 2018, the President of the United States announced the nomination of Joseph Cuffari for the IG position. ████ soon began publicly expressing her lack of confidence in Dr. Cuffari's fitness for the role. Among other things, ████ and ████ expressed concerns that Dr. Cuffari's Ph.D. was from a "diploma mill" and that he lacked sufficient leadership experience. Multiple DHS OIG current and former employees confirmed that ████ openly disparaged Dr. Cuffari at work. ████ strenuously opposed Dr. Cuffari's nomination and shared her views freely within the agency, with DHS, with CIGIE, and with Congress. She often referred to DHS OIG as "[her] agency" and said that she needed to protect "her people" from Dr. Cuffari. Similarly, ████ called into question Dr. Cuffari's qualifications to serve as IG and expressed her concerns to DHS, CIGIE, and the ████.

For several months prior to Dr. Cuffari's confirmation, ████ worked with others to try to maintain control over the key leadership positions in the agency while simultaneously limiting IG Cuffari's ability to hire Senior Executive Service ("SES") employees. ████ and ████ had also effectuated an undocumented move of the human resources department to the legal department in August 2018 prior to Dr. Cuffari's nomination. This unusual move allowed ████ and ████ greater control over internal investigations and personnel actions.

Once Dr. Cuffari arrived at DHS OIG in July 2019, ████ actions soon led him to distrust her. ████, as she had done previously with ████, soon displayed overt hostility toward him. For instance, she, along with ████, tried to launch an investigation into IG Cuffari on the grounds that an OIG-funded trip he planned to the Southwest Border was, in fact, personal in nature. ████ and ████ also instructed colleagues to withhold information from IG Cuffari and sought to isolate IG Cuffari from other agency leaders. The work environment became so bitterly hostile that employees who left the agency during this period cited dissension and tension as contributing factors for their departures. Employees described the working environment as extremely challenging and noted that ████ and IG Cuffari had a "uniquely cold" relationship that made it difficult for them to work together, much less collaborate on key functions of the office. Indeed, both IG Cuffari and ████ filed multiple allegations of misconduct against each other to CIGIE during IG Cuffari's first four months on the job.

In sum, our investigation revealed that ████, with the assistance of ████ and ████, engaged in unprofessional conduct that elevated her own interests above those of the public. Nevertheless, our investigation did not reveal evidence substantiating many of the other allegations, including any allegation that ████, ████, or ████ engaged in illegal conduct.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

This report presents the key findings and observations of our investigation.[2]

## II.    BACKGROUND

In the aftermath of the September 11th terrorist attacks, the Department of Homeland Security ("DHS") was created by merging twenty-two separate federal agencies into a single Cabinet department.[3]   DHS is the third largest executive department in the federal government and has approximately 229,000 employees.[4]   Along with the creation of DHS, DHS OIG was established "to provide independent oversight and promote excellence, integrity, and accountability within DHS."[5]   DHS OIG conducts independent audits, investigations, and inspections of the programs and operations within DHS, and makes recommendations for how DHS can operate more effectively and efficiently.[6]   In 2005, Richard Skinner was confirmed as the first DHS IG.[7]   After his retirement in 2011, DHS OIG was led by Acting IG Charles Edwards.[8]   John Roth was confirmed as the second DHS IG in 2014 and served until 2017.[9]   (b) (6)   served as (b) (6)   from then until he retired on June 10, 2019.[10]   (b) (6)   served as the (b) (6)   (b) (6)   from June 10, 2019 until the confirmation by the U.S. Senate of Dr. Joseph Cuffari as the third DHS IG on July 25, 2019.[11]



---

[2]  Our investigative findings and conclusions are based upon the over 42,000 documents we reviewed and the over 70 witnesses interviews we conducted during the course of our investigation.  The discovery of additional relevant documents or identification of new witnesses could materially affect our findings and conclusions.  Most notably, (b) (6)   refused to speak with us, so we lack her perspective on some key events.
[3]  History, The Dep't. of Homeland Sec., (June 15, 2018), https://www.dhs.gov/history.
[4]  Secretary of Homeland Security, The Dep't. of Homeland Sec., (July 5, 2019) https://www.dhs.gov/secretary.
[5]  About Us, The Off. of the Inspector Gen., https://www.oig.dhs.gov/about (last visited Dec. 11, 2020).
[6]  Id.
[7]  Richard Skinner, GTS Coal., (2020), https://www.gtscoalition.com/about-us/strategic-advisors/skinner-richard-l/.
[8]  Id. (b) (6)                    (6)
[9]  Jim Roth, The Dep't of Homeland Sec., (Aug. 25, 2015) https://www.dhs.gov/person/john-roth; Ta (b) (6)
[10] (b) (6)
[11] (b) (6)

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*



Dr. Joseph Cuffari served in the Air Force and in the Arizona Air National Guard, where he filled a variety of leadership positions with the Air Force Office of Special Investigations and the Department of Defense Office of the Inspector General. He worked at the Department of Justice ("DOJ") from 1993 until 2013, serving in a variety of roles, the last of which was Assistant Special Agent in Charge of the DOJ's Office of Inspector General field office in Tucson, Arizona. Following his tenure at DOJ, Dr. Cuffari served as a policy advisor to the Governor of Arizona. He was confirmed as the DHS IG on July 25, 2019.[13]

---

[13] Meet the IG, The Off. Of the Inspector Gen., https://www.oig.dhs.gov/about/MeetTheIG (last visited Dec. 11, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

### III.    THE CAMPAIGN TO UNDERMINE ACTING ████████

###    A.    ████████ Retirement and Succession Planning

In June 2016, former IG John Roth appointed ████████ as the ████[14]  While ████████ had been planning on retiring that year, he decided he would remain as the ████ until a new IG was confirmed, which he hoped would happen by the end of 2018.[15]  ████████ began his tenure as ████████ in late 2017 when Mr. Roth retired.[16]

In 2018, ████████ elevated ████████ to the ████ role to help ensure a smooth transition to a new IG.[17]  ████████ intended for ████████ to take over in the event that ████████ retired prior to the confirmation of a new IG.[18]  On November 1, 2018, the White House announced the nomination of Dr. Joseph Cuffari for the IG role.[19]  Following the announcement, ████████ set a retirement date of April 2019.[20]

In November 2018, ████████ decided to assume the role of ████████ ████████ and to appoint ████████ to the ████ position he had previously held.[21]  The corresponding SF-50 Personnel Action document shows that ████████ position description was changed to ████████ effective November 11, 2018.[22]  During his interview, ████████ could not specifically recall his reason for appointing ████████ to the ████ role, but he explained that he wanted to ensure that there would be an orderly transition between his retirement and the start of the new IG.[23]  ████████ told us that he did not intend for the change in ████ ████████ position description to ████ to mean that she was actually taking over as ████.[24]  Rather, he expected that she would be serving as the "de facto" ████.[25]

████████ announced his plan in an agency-wide email, including his decision to appoint ████ ████████ to the ████ position.[26]  ████████ also wrote to ████████ ████████, and asked her to change his official position description to ████████ and to assign ████████ to the ████ position description.[27]  ████████ made these changes in November 2018.[28]  ████████ believed he needed to change his position description to ████████ because,

---

[14] Interview with ████████ (Aug. 7, 2020).
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *See* President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts, The White House, (Nov. 1, 2018), https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-intent-nominate-personnel-key-administration-posts-68/.
[20] Interview with ████████ (Aug. 7, 2020).
[21] *Id.*
[22] WHDHS-00000786.
[23] Interview with ████████ (Aug. 7, 2020).
[24] *Id.*
[25] *Id.*
[26] *See* WHDHS-00000033.
[27] WHDHS-00000034.
[28] WHDHS-00000656.



All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

under the Federal Vacancies Reform Act ("FVRA"), he could only hold the ███ title for a certain period of time—generally 210 days from when the vacancy occurred following IG Roth's retirement.[29]  While the FVRA does limit the length of time ███ could hold the title of ███ it did not expressly require ███ to formally change his position description.[30]  Thus, ███ belief that he needed to change his official position description from ███ to ███ after Dr. Cuffari's nomination was ███

At the time that ███ appointed ███ to the ███ position, multiple witnesses described the two as having a positive relationship.[32]  ███ had previously worked with ███ at ███ and was impressed with her work.[33]  When ███ called him to inquire about joining DHS OIG in the ███ role, ███ was supportive.[34]  He noted, however, that soon after she was appointed to the ███ role it became clear to him that ███ was interested in "taking over" the agency, and she occasionally told him so directly.[35]

**B.    ███ Pressures ███ to Retire**

Witnesses reported that, as 2019 approached, the relationship between ███ and ███ began to deteriorate.[36]  To ███ recollection, the relationship with ███ did not fall apart until the spring of 2019.[37]  He noted that ███ often became curt and aggressive with him.[38]  After their relationship soured, he noticed that she began having separate meetings with the AIGs and Deputy AIGs without informing him.[39]  ███, the ███, described these as "off-calendar" meetings.[40]  ███, the ███, ███, said it appeared that ███ was not making decisions and that ███ was "essentially running" the agency.[41]  ███ believed ███ conduct was odd, but he did not want to take their falling out personally or let it bother him.[42]  His hope was that the staff would

---

[29] Interview with ███ (Aug. 7, 2020).  The FVRA limits the length of time a person may serve as acting officer to 210 days, absent tolling or statutory exception.  5 U.S.C. § 3345, et seq.  The 210-day period is tolled, however, while a nomination is pending.  *Id.* At the time of IG Roth's retirement, Dr. Cuffari had not yet been nominated. ███

[30] 5 U.S.C. § 3346(a)-(b).

[31] *See generally* 5 U.S.C. § 3345, et seq. (containing no such written requirement). ███, ███ at DHS, explained that ███

[32] *See e.g.* Interview with ███ (Aug. 6, 2020).
[33] Interview with ███ (Aug. 7, 2020).
[34] *Id.*
[35] *Id.* Follow-Up Interview with ███ (Dec. 2, 2020).
[36] *See e.g.* Interview with ███ (Aug. 6, 2020).
[37] Interview with ███ (Aug. 7, 2020).
[38] *Id.*
[39] *Id.*
[40] Interview with ███ (Sept. 15, 2020).
[41] Interview with ███ (July 27, 2020).
[42] Interview with ███ (Aug. 7, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

not become aware of any acrimony among the senior leadership.[43]  According to ██ (b) (6) ██, ██. ██ (b) (6) ██ had a "Machiavellian" and dictatorial leadership style that involved "trash[ing]" people who did not support her.[44]

Other witnesses, including ██ (b) (3) (B), (b) (6) ██, ██ (b) (3) (B), (b) (6) ██ ██ (b) (6) ██, noticed the strained relationship between ██ (b) (6) ██ and ██ (b) (6) ██.[45] ██ (b) (3) (B), (b) (6) ██ stated the relationship started to sour during the government shutdown in December 2018.[46] ██ (b) (3) (B), (b) (6) ██ explained that ██ (b) (6) ██ (b) (6) ██ and ██ (b) (6) ██ thought that DHS OIG should essentially shut down all of its work, while ██ (b) (6) ██ thought certain high-impact audit work should continue.[47] ██ (b) (3) (B), (b) (6) ██ also thought ██ (b) (6) ██ was upset that ██ (b) (6) ██ believed ██ (b) (3) (B), (b) (6) ██ should be categorized as an essential employee and report to work during the shutdown.[48]  According to ██ (b) (3) (B), (b) (6) ██, ██ (b) (6) ██ ultimately deferred to ██ (b) (6) ██ and ██ (b) (6) ██ by agreeing to shut down audit work and furloughing ██ (b) (3) (B), (b) (6) ██.[49]  However, from that point forward, ██ (b) (3) (B), (b) (6) ██ observed that the relationship between ██ (b) (6) ██ and ██ (b) (6) ██ continued to deteriorate.[50] ██ (b) (3) (B), (b) (6) ██ described ██ (b) (6) ██ as a "bull in the china shop."[51]

Several other witnesses noticed the deteriorating relationship between ██ (b) (6) ██ and ██ (b) (6) ██ as well.  For example, ██ (b) (3) (B), (b) (6) ██, the ██ (b) (6) ██, explained that the situation in the office devolved to the point where staff felt they had to choose between "Team ██ (b) (6) ██" or "Team ██ (b) (6) ██."[52] ██ (b) (3) (B), (b) (6) ██ recalled numerous meetings where ██ (b) (6) ██ disrespected ██ (b) (6) ██, rolled her eyes at him, made snarky remarks, and moved her seat to sit sideways instead of facing him directly.[53] ██ (b) (6) ██, ██ (b) (6) ██, ██ (b) (3) (B) ██, and ██ (b) (3) (B), (b) (6) ██ both detailed the significant tension between ██ (b) (6) ██ and ██ (b) (6) ██.[54] ██ (b) (3) (B), (b) (6) ██ noted that ██ (b) (6) ██ was rude to ██ (b) (6) ██, frequently turning her back to him during meetings and rolling her eyes while he spoke.[55] ██ (b) (6), (b) (3) (B) ██ also observed ██ (b) (6) ██ sitting in meetings with almost her back to ██ (b) (6) ██.[56]  She described the situation as "awkward," "childish," and "frustrating."[57]

██ (b) (3) (B), (b) (6) ██ stated that ██ (b) (6) ██ would often call her venting about ██ (b) (6) ██ leadership, saying that he was "losing it" and needed to retire.[58]  According to ██ (b) (3) (B), (b) (6) ██, ██ (b) (6) ██ told

---

[43] *Id.*
[44] *Id.*
[45] Interview with ██ (b) (3) (B), (b) (6) ██ (Aug. 6, 2020).
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] Interview with ██ (b) (3) (B), (b) (6) ██ (Sept. 3, 2020).
[53] *Id.*
[54] Interview with ██ (b) (3) (B), (b) (6) ██ (Aug. 4, 2020); Interview with ██ (b) (3) (B), (b) (6) ██ (Sept. 15, 2020).
[55] Interview with ██ (b) (3) (B), (b) (6) ██ (Aug. 4, 2020).
[56] Interview with ██ (b) (6), (b) (3) (B) ██ (Sept. 15, 2020).
[57] *Id.*
[58] Interview with ██ (b) (3) (B), (b) (6) ██ (Sept. 3, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

her that ██████ and ██████ asked ██████ to retire, but that he was being stubborn.[59] ██████ told ██████ that she did not believe that other DHS OIG employees would respect her while ██████ remained the ██████.[60] ██████ reported that she refused ██████ invitation to try to convince ██████ to retire.[61] ██████ stated that she recalled ██████ telling ██████, "you were supposed to retire; you need to retire."[62]

In her interview, ██████ acknowledged that there were personal issues between ██████ and ██████, but she attributed the friction to the fact that ██████ has a forceful and direct personality.[63] ██████ said that ██████ and ██████ clashed on issues, but claimed she could not recall whether ██████ expressed a desire to become the ██████.[64] She explained that she and ██████ did have concerns about ██████ judgment as a result of some of the actions he took as ██████.[65] For example, ██████ explained that she and ██████ believed ██████ repeated extensions of his retirement date created uncertainties for the agency.[66]

██████ also acknowledged that ██████ and ██████ relationship became tense leading up to ██████ retirement.[67] ██████ recalled that ██████ disagreed with some of ██████ decisions and became "frustrated" when ██████ pushed off his retirement because it hindered their ability to plan for a transition.[68]

**C.     ██████ Demands ██████ Retire**

On March 21, 2019, ██████ called a meeting with ██████ and several of the AIGs to discuss "Transition Planning."[69] The real purpose of the meeting was to pressure ██████ to retire.[70] ██████ and ██████ later referred to this meeting as the "coup meeting."[71]

---

[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] Interview with ██████ (Sept. 15, 2020).
[63] Interview with ██████ (Aug. 27, 2020).
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] Interview with ██████ (Oct. 30, 2020).
[68] *Id.*
[69] WHDHS-00000061. ██████ invited ██████ and the following individuals: ██████ (AIG for ██████), ██████ (AIG for ██████), ██████ (former AIG for ██████), ██████ (AIG for ██████), and ██████. *Id.*
[70] *See* Interview with ██████ (Aug. 7, 2020).
[71] *Id.* Interview with ██████ (Aug. 6, 2020). ██████ also believed ██████ had a series of meetings with AIGs (without ██████ leading up to this "coup meeting." *Id.* We found no documentary evidence corroborating this statement. However, ██████ stated that, prior to the "coup meeting," ██████ approached senior staff, including ██████, to garner supporters to oppose ██████ and force him to retire. Interview with ██████ (Aug. 4, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

[b] (3) (B), (b) (6) accompanied [b] (6) to the meeting, but [b] (6) insisted that she leave.[72] [b] (6) explained that once the meeting started, [b] (6) "badgered" him to resign and claimed that the other AIGs in the meeting supported her position.[73] [b] (6) rebuffed her demand.[74] [b] (6) stated that he told [b] (6) that he would not relinquish his position and that he was committed to performing his duties so long as he was in the role.[75] [b] (3) (B), (b) (6), who was also present at the meeting, recalled that [b] (6) gave [b] (6) an ultimatum—if [b] (6) did not leave, [b] (6) would leave the agency.[76] According to [b] (6) [b] (6) said that she needed to take over as [b] (6) to ensure a smooth transition for when the new IG joined the agency.[77] [b] (3) (B), (b) (6) said that she got so uncomfortable with [b] (6) [b] (6) actions that she responded in the meeting, "this seems to be a situation where you and need to have a conversation.  I don't think you should be having it with us."[78]

[b] (3) (B), (b) (6) explained that she was not present for the meeting but heard from [b] (6) that [b] (6) [b] (6) became very upset because he believed that [b] (6) and the AIGs were "trying to force him out . . . to retire."[79]

[b] (3) (B), (b) (6), who did attend the meeting, provided a different account.  In her interview, she said that the intent of the meeting was to discuss transition planning with [b] (6), and that she, along with [b] (6), sought input from other SES employees on "decision points" to cover at the meeting.[80] [b] (3) (B), (b) (6) recalled feeling tension in the room during the meeting, although not specifically between [b] (6) and [b] (6), and [b] (3) (B), (b) (6) recalled that the meeting went "off course."[81]  She did not provide any further detail.

**D.   [b] (6) Extends His Retirement Date**

After the government shutdown, [b] (6) indicated he was planning to retire in May 2019.[82]  However, in April 2019 [b] (6) and [b] (6) [b] (6) called [b] (6) and asked him to extend his retirement date until the new IG was confirmed.[83] [b] (6) explained that [b] (6) and [b] (6) [b] (6) were concerned with the recent leadership changes at DHS, and they trusted [b] (6) and were concerned that the other leaders in DHS OIG lacked his experience.[84]

---

[72] Interview with [b] (3) (B), (b) (6) (Aug. 6, 2020). [b] (3) (B), (b) (6) also confirmed that [b] (6) excluded [b] (6) [b] (6) from the meeting.  Interview with [b] (3) (B), (b) (6) (Aug. 4, 2020).
[73] Interview with [b] (6) (Aug. 7, 2020).
[74] *Id.*
[75] *Id.*
[76] Interview with [b] (3) (B), (b) (6) (Aug. 4, 2020).
[77] *Id.*
[78] Interview with [b] (3) (B), (b) (6) (Sept. 15, 2020).
[79] Interview with [b] (3) (B), (b) (6) (Aug. 27, 2020).
[80] Interview with [b] (3) (B), (b) (6) (Oct. 30, 2020).
[81] *Id.*
[82] Interview with [b] (6) (Aug. 7, 2020).
[83] *Id.*
[84] *Id.*  With respect to the leadership changes at DHS, on April 7, 2019, DHS Secretary Kirstjen Nielsen resigned. Resignation Letter of Secretary of Homeland Security Kirstjen M. Nielson, Dep't. of Homeland Sec., (Apr. 7, 2019), https://www.dhs.gov/publication/resignation-letter-secretary-nielsen.  Two days later, on April 9, 2019, the Acting

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

██████████ confirmed that he and ████████ asked ████████ to delay his retirement, but emphasized that the request was rooted in a desire for stability at the agency during a time of upheaval rather than a reflection on ████████ specifically.[85]

On April 26, 2019, ████████ agreed to delay his retirement for several months.[86] ████████ told ████████ about his decision before he announced it to the full agency.[87] He believes he went to ██████████ office on Friday, April 26, right after the call from DHS leadership.[88] ████████ observed that ████████ was very upset by his decision to delay his retirement based on her facial expressions; she also told ████████: "You could have said no."[89] ████████ believes ████████ stormed out of her office after this discussion.[90] On April 29, 2019, ████████ sent an agency-wide email and explained that "[a]t the request of both ████████ and ████████, on April 26, [he] agreed to delay [his] pending retirement until the Senate confirms Joseph Cuffari, or July 31, 2019; whichever occurs first."[91] In his email, ████████ further explained that he declined their first request that he delay his retirement because he "consider[s] succession planning to be an important leadership responsibility" and that he believed ████████ and "the Assistant Inspectors General were well suited to move forward, and OIG is in good hands."[92] He noted, however, that DHS leadership believed "that the Department would benefit from the Office of Inspector General having more experienced leadership during this time of unprecedented Departmental turnover."[93] ████████ forwarded ████████ email to another DHS OIG employee and wrote, "Shoot me now."[94]

Less than two hours later, ████████ wrote to ████████ and ████████ stating, "One way to mitigate the risk that he stays after July 31 would be to not have any SES slots for him to remain in…Was ████████ slot slated to be used for anything?"[95] In her interview, ████████ assumed she was referring to ████████ staying after July 31st, and she explained there was a limited number of SES positions and the plan was to advertise and begin the interview process for ████████

---

Deputy Secretary Claire Grady submitted her resignation. Message from Secretary Kirstjen M. Nielson on Acting Deputy Secretary Claire Grady, Dep't. of Homeland Sec., (Apr. 7, 2019), https://www.dhs.gov/news/2019/04/09/message-secretary-nielsen-acting-deputy-secretary-grady. On April 10, 2019, Kevin McAleenan, Director of the Customs and Border Patrol, became the Acting Secretary of DHS. Message from Acting Secretary Kevin K. McAleenan, Dep't. of Homeland Sec., (Apr. 10, 2019), https://www.dhs.gov/news/2019/04/10/message-acting-secretary-kevin-k-mcaleenan. On April 11, 2019, Acting DHS Secretary McAleenan named David Pekoske, the Administrator of the Transportation Security Administration, as the Acting Deputy Secretary of DHS. Acting Secretary McAlennan Statement on the Designation of Administrator Pekoske to Serve as Senior Official Performing the Duties of the Deputy Secretary, Dep't. of Homeland Sec., (Apr. 11, 2019), https://www.dhs.gov/news/2019/04/11/acting-secretary-mcaleenan-statement-designation-administrator-pekoske-serve-senior.
[85] Interview with ████████ (Sept. 16, 2020).
[86] Follow-Up Interview with ████████ (Dec. 2, 2020).
[87] Id.
[88] Id.
[89] Interview with ████████ (Aug. 7, 2020); Follow-Up Interview with ████████ (Dec. 2, 2020).
[90] Id.
[91] WHDHS-00000072.
[92] Id.
[93] Id.
[94] Id.
[95] WHDHS-00000074.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

SES spot to fill with someone else at the time of his scheduled retirement.[96]  The effect of such a move would leave [(b) (6)] without a position after July 31.  About ten minutes after [(b) (6)] email, [(b) (6)] sent an email to [(b) (6)], [(b) (6)], and others confirming that they would begin interviewing to fill [(b) (6)] SES slot.[97]  Specifically, [(b) (6)] wrote, [(b) (6)] we were planning to fill INV's current vacancy with your SES slot and post the last slot on May 6 . . . .  Applications are being reviewed now and we will start interviews for the current vacancy in the next few weeks."[98]

Later that night, on April 29, 2019, [(b) (6)] sent an email to [(b) (6)] and [(b) (6)], with the subject line "Very stressful and now I can't sleep."[99]  Referencing the television show Game of Thrones, [(b) (6)] wrote, "Perhaps Arya would consider taking care of some business here?  The DHS OIG throne isn't as glam but we do have a night king that just. won't. die."[100]  [(b) (3) (B), (b) (6)] confirmed that this email referenced the television show Game of Thrones, and that it was reasonable to assume that the "night king" was a reference to [(b) (6)].[101]

The next day, April 30th, [(b) (6)] wrote to [(b) (6)]: "Do you think he will reach out directly to [(b) (6)] to discuss and cut you out of the discussion?  I just don't want her to be so helpful and responsive to him that she gives him info/advice that would be hard to walk back."[102]  In her interview, [(b) (6)] explained she did not want [(b) (6)] to advise [(b) (6)] on a course of action that made it difficult to follow the plan that was already in place to fill his SES spot with a new hire.[103]

For her part, [(b) (3) (B), (b) (6)] stated that she was concerned there was an "appearance of a lack of independence" because the request to [(b) (6)] to stay on as [(b) (6)] could be perceived as "a quid pro quo" for DHS OIG to "be less critical of [DHS] in [DHS OIG's] oversight work."[104]  [(b) (6)] stated that she expressed this concern to both [(b) (6)] and [(b) (6)].[105]  In his interview, however, [(b) (6), (b) (6)] stated that he did not view his request to [(b) (6)] as improper or an attempt to improperly influence [(b) (6)].[106]

Other witnesses corroborated [(b) (6)] negative reaction to the news of [(b) (6)] delayed retirement.  [(b) (3) (B), (b) (6)] stated that [(b) (6)] claimed that DHS's senior leadership had

---

[96] Follow-Up Interview with [(b) (3) (B), (b) (6)] (Dec. 11, 2020).
[97] WHDHS-00000075.
[98] *Id.*
[99] WHDHS-00000849.
[100] *Id.*  The television show Game of Thrones is a fantasy drama about the fight for the Iron Throne of the Seven Kingdoms of Westeros.  *See Game of Thrones* (HBO television broadcast Apr. 28, 2019).  The character of Arya Stark is a trained assassin.  *See id.*  In Episode three of Season eight, the character kills the Night King, the leader of zombie-like ice creatures known as the White Walkers, who are marching on the Seven Kingdoms to eliminate humankind.  *Id.*
[101] Follow-Up Interview with [(b) (3) (B), (b) (6)] (Dec. 11, 2020).
[102] WHDHS-00000075.
[103] Follow-Up Interview with [(b) (3) (B), (b) (6)] (Dec. 11, 2020).
[104] Interview with [(b) (3) (B), (b) (6)] (Aug. 12, 2020).
[105] *Id.*
[106] Interview with [(b) (3) (B), (b) (6)] (Sept. 16, 2020).

11

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

██████ in their "back pocket."[107] ██████ also told her that ██████ would never willingly retire, and that ██████ therefore needed to ensure that he did.[108] ██████, ██████, recalled that ██████ and ██████ made comments regarding ██████ in staff meetings such as "he's got to go" and "we have to get rid of him."[109]

## E.    ██████ is Publicly Criticized

In July 2017 and March 2018, DHS OIG retracted a total of 13 Emergency Management Oversight Team ("EMOT") reports regarding the Federal Emergency Management Agency ("FEMA") response to disasters.[110]  The EMOT reports were withdrawn in light of concerns that the reports were overly positive in their analysis of FEMA's performance.[111]  At a meeting with the House Oversight and Government Reform committee in March 2018, ██████ ██████ ███████████████████████████████████████████████████. DHS OIG thereafter undertook the internal investigation.[113] ██████ recused himself from the review of the reports because in his previous role as the ██████ he had approved the reports, and he did not want to be perceived as attempting to influence the investigation.[114] ██████ assigned the review to ██████[115]  A few months later, in June 2018, ██████ appointed ██████ to serve as ██████, reporting directly to her and not ██████.[116] ██████ explained that ██████ worked with ██████ on the review.[117]

██████ led the internal review team, which consisted of lawyers and analysts from the ██████.[118] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Finally, the review team hired an auditing firm to perform an external review of the EMOT reports and provide guidance on best practices ██████

---

[107] Interview with ██████ (Aug. 4, 2020).
[108] *Id.*
[109] Interview with ██████ (July 28, 2020).
[110] ██████
████████████████████████████████
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] Interview with ██████ (Aug. 7, 2020); Follow-Up Interview with ██████ (Dec. 2, 2020); ██████
██████
[115] Interview with ██████ (Aug. 7, 2020).
[116] Interview with ██████ (Oct. 30, 2020).
[117] Interview with ██████ (Aug. 7, 2020).
[118] ██████
██████

[119] *Id.*
[120] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

████ (b) (6) ████████████ ██ ████ was interviewed twice as part of the investigation.[122]

The fact-finding aspect of the internal investigation was completed in October 2018.[123]  On December 11, 2018, ███ (b) (6) ███ responded to a November 20, 2018 letter from the Senate Homeland Security and Governmental Affairs Committee ("HSGAC") outlining the corrective actions taken by the team in response to the internal review of the EMOT reports.[124]  In the letter, ███ (b) (6) ███ wrote, "My goal is to promote a culture of continuous improvement here at DHS OIG.  With ███ (b) (6) ███ having recently announced his retirement and my transition to the role of ███ (b) (6) ███, I can assure you that I will play an active role in driving and delivering necessary change."[125]

In his interview, ███ (b) (6) ███ stated that he believed ███ (b) (6) ███ letter to Congress completed the EMOT investigation.[126] ████████████████████████████████████

As explained above, on April 29, 2019, ███ (b) (6) ███ sent an agency-wide email announcing that he was putting off his retirement date at the request of DHS leadership.[129]  Later that night, (b)(6) ███ (b) (6) ███ sent her Game of Thrones email writing that on the "DHS OIG throne," there was "a night king that just. won't. die."[130]  Early the next morning, on April 30, 2019, ███ (b) (6) ███ sent an email to ███ (b) (6) ███ about publicly releasing the findings of the EMOT investigation.[131]  In the email, which had the subject line, "I think we need to do a public report/letter," ███ (b) (6) ███ wrote:

> Cc all the oversight committees and the department and cigie.  In the letter as part of corrective action note that we are making concurrent notification to ic for whatever action they deem appropriate.  We try to do a bipartisan call with Hsgac today to update them about ███ (b) (6) ███ and program office/staff briefings an d [sic] tell them we have to kill more emot reports in the pipeline.  We ask them what

---

[121] WHDHS-00000365. ███ (b) (3) (B), (b) (6) ███, the former ███ (b) (6) ███ in DHS OIG, recalled that the outside auditing firm, Williams Adley, was hired to conduct a review of the EMOT reports.  Interview with (b) (3) (B), (b) (6) (Aug. 20, 2020). (b) (3) (B), (b) (6) questioned what ███ (b) (6) ███ and ███ (b) (6) ███ were trying to achieve with the outside firm and whether their goal was to make ███ (b) (6) ███ look worse. *Id.* (b) (3) (B), (b) (6) said she never spoke to anyone at the auditing firm, but she provided all of her notes to the firm. *Id.*
[122] Interview with ███ (b) (6) ███ (Aug. 7, 2020).
[123] ███ (b) (6) ███ ████████████████████████
████████████████
[124] WHDHS-00000879.
[125] *Id.*
[126] Follow Up Interview with ███ (b) (6) ███ (Dec. 2, 2020).
[127] WHDHS-00000062.
[128] *Id.*
[129] WHDHS-00000072
[130] WHDHS-00000849.
[131] *See* WHDHS-00000077.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

they are planning to do if anything and let them know what our current thinking is.[132]

The clear import of the email was that [(b) (6)] intended to publicize the results of the EMOT investigation and [(b) (6)] role to Congressional oversight committees, DHS, and CIGIE in an effort to prompt them to take action against him. Minutes later, [(b) (6)] responded, "And would we tell [(b) (6)] in advance or just drop the bomb[ ]and deal with the aftermath?  Just to be clear, this is the nuclear option, yes?"[133]

[(b) (6)] responded to [(b) (6)], writing:

> Yes we would be just as transparent as we have been so far.  We tell him before we hit send.  If hsgac says they have plans to do something else with the materials we sent we can reassess.  The more I think about it I don't see how we do anything else.  He has put us both in an untenable position and it [sic] you are right will appear to some as if we are in on it.  Also we need to go on official record now.  He's already told me he doesn't support the findings and now he will clearly be here when Cuffari arrives.    I don't think he will be truthful.  Private communications to IC could be just seen as disgruntled complaints.  A public report looks like a public report[.][134]

[(b) (6)] responded, "Ok.  Here we go."[135]

Despite their decision to publicize the findings of the EMOT investigation and [(b) (6)] role, [(b) (6)] and [(b) (6)] discussed the issue with others as well.[136]  On Friday May 3, [(b) (6)] circulated a draft report to a group of DHS OIG employees, requesting a close hold, and seeking "technical comments" and "proposed revisions" by close of business on Monday, May 6.[137]  She followed up with another email 12 minutes later to a smaller subset of people from her original email, thanking the group for the "candid discussion earlier this week about the available reporting mechanisms for this work" and explained why she thought a public report was important for "transparency and accountability."[138]  On Monday, May 6, [(b) (6)] an employee who worked on the internal review, circulated a draft with a note that the report "could use a little more in the post October 2018 chronology" since "we think it isn't clear enough why we are issuing this report now, even though we finished our review and began reporting out to Congress in October."[139]

---

[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.* We attempted to ask [(b) (6)] what she meant by this exchange with [(b) (6)], including by the phrase "drop the bomb" and the term "nuclear option."  However, this email was discovered after our October 30, 2020 interview of [redacted], and she declined our request for a follow up interview.
[136] WHDHS-00000327; WHDHS-00000277; Interview with [(b)(3)(B),(b)(6)] (Oct. 30, 2020).
[137] WHDHS-00000327.
[138] *Id.*
[139] *Id.*

14

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

In her interview, ████ **(b) (5)** said that she believed ████ ████ ████, was involved in these discussions, and she recalled that **(b) (6)** ████ agreed with **(b) (6)** **(b) (3) (B), (b) (6)** that DHS should publish the findings in order to hold itself accountable.[141] ████ disagreed, noting that publication was unnecessary because Congress and other relevant stakeholders had already been briefed on the matter and the EMOT reports at issue had already been retracted.[142]  Furthermore, **(b) (3) (B), (b) (6)** noted that **(b) (6)** had already issued an apology to DHS OIG.[143]

On May 23, 2019, DHS OIG published the report on the investigation, titled "Special Report: Review Regarding DHS OIG's Retraction of Thirteen Reports Evaluating FEMA's Initial Response to Disasters" ("Special Report").[144]  Much of the Special Report focused on **(b) (6)** role as then **(b) (6)** ████ and the factors that led to the publication of "feel-good" reports that portrayed FEMA emergency responders positively.[145]  **(b) (6)** adamantly denied that he directed the auditors to sanitize their disaster reports.[146]  The Management Response from ████, **(b) (6)**, on which **(b) (6)** collaborated, was appended to the Special Report.[147] **(b) (6)**

████ **(b) (6)** ████ **(b) (6)** **(b) (6)** ████

████[148]

The publication of the Special Report received little attention at first. **(b) (6)**



---

[140] Interview with **(b) (3) (B), (b) (6)** (Oct. 30, 2020).
[141] Interview with **(b) (3) (B), (b) (6)** (July 23, 2020).
[142] *Id.*
[143] *Id.*
[144] Special Report: Review Regarding DHS OIG's Retraction of Thirteen Reports Evaluating FEMA's Initial Response to Disasters, *supra* note 110.
[145] *See id.*
[146] Follow-Up Interview with **(b) (6)** (Dec. 2, 2020).
[147] WHDHS-00000078; **(b) (6)** ████
[148] WHDHS-00000660.
[149] **(b) (6)** ████
[150] **(b) (6)** ████

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*



On June 6, 2019, ▮▮ (b) (6) ▮▮ received an email from a friend outside DHS OIG, which stated, "Sounds like you guys are going through some tough stuff right now. I'm thinking of you and wishing everything resolves well."[153] (b) (6) replied, "It's just awful. Partly because ▮▮ has had his head stuck in the sand. He was supposed to be retired by now and this wouldn't have been a story."[154] In response, the friend wrote, "So, does this mean you'll be ▮▮? Does ▮▮ have a date?"[155] In response, ▮▮ responded that ▮▮ is "hard hitting but he's a terrible leader and communicator."[156] Referring to ▮▮ retirement, ▮▮ wrote, "It was May 3 then July 31 now I think July 3, backing off over the next few weeks. Yes, I'm ▮▮ (unless the WH decides otherwise)."[157]

▮▮ (b) (6) ▮▮ was displeased with the Special Report, and belived it was intended to force him out of the office.[158] During his interview, he stated that the Special Report left out exculpatory information, such as the fact that, as ▮▮, he had raised objections about the EMOT reports when first drafted and asked that the findings be reevaluated on several occasions.[159] ▮▮ (b) (6) also noted ▮▮ efforts to draw attention to the report, pointing out that she had published the report after she had already sent a letter to Congress with the investigation's findings.[160] Finally, he speculated that ▮▮ may have planted stories about the Special Report with ▮▮ embarrass him.[161]

▮▮ recalled that ▮▮ became frustrated that ▮▮ did not take more accountability for the EMOT investigation findings and that ▮▮ lost confidence in ▮▮.[162] ▮▮ recalled meeting with ▮▮ at the time ▮▮ articles were published.[163] At the meeting, ▮▮ advised ▮▮ that the most "effective way to mitigate the damage [to OIG] was . . . to not wait to retire until [Dr. Cuffari] was confirmed."[164] ▮▮

---

[151] *Id.*
[152] *Id.*
[153] WHDHS-00000080.
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] Follow-Up Interview with ▮▮ (Dec. 2, 2020).
[159] Interview with ▮▮ (Aug. 7, 2020).
[160] *Id. See also* Follow-Up Interview with ▮▮ (Dec. 2, 2020). Our investigation revealed a letter from ▮▮ to Senators Johnson and Peters dated December 11, 2018. WHDHS-00000879. The letter provided information on the findings of the EMOT investigation. *Id.*
[161] Interview with ▮▮ (Aug. 7, 2020). As ▮▮ declined to be interviewed, we were unable to ask her whether she was responsible for encouraging ▮▮ to report on the findings of the internal review.
[162] Interview with ▮▮ (Oct. 30, 2020).
[163] Interview with ▮▮ (Aug. 27, 2020). ▮▮ did not say whether anyone else was present for this meeting.
[164] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

retired on Monday, June 10, 2019, just days after the publication of ███████ ███.[165]
███████ stated that he did so because he felt it was the best decision for the agency.[166]

**F.**   ███████ **and** ███████ **Refer** ███████ **to CIGIE**

CIGIE is an independent entity of the executive branch established by Section 11 of the Inspector General Act.[167]  CIGIE is comprised of multiple IG offices and is responsible for addressing issues of efficiency and professionalism across the IG community.[168]  Michael Horowitz, IG for DOJ, is the current Chair of CIGIE, and Allison Lerner, IG for the National Science Foundation, is the Vice Chair.[169]  The IC is the CIGIE committee responsible for receiving and reviewing allegations of wrongdoing made against "Covered Persons," which include IGs, staff members designated by each IG, and anyone serving in an Acting or Interim capacity within one of those positions.[170]  Designated staff members include all direct reports to the IGs and any other staff members for whom an IG determines there would be a risk that an internal investigation of them would lack objectivity.[171]

███████ stated that, while leading the EMOT investigation, she did not consider referring the matter to the CIGIE IC.[172]  ███████ stated that she did not believe ███████ ███████████████████████████████████████████ However, ███████ statement is inconsistent with ███████ April 30th email to ███████ in which ███████ wrote that they should "mak[e] a concurrent notification to [CIGIE] ic for whatever action they deem appropriate."[175]  To implement the plan, in early June 2019, prior to his retirement, ███ ███████ and ███████ drafted a referral to the CIGIE IC about ███████, including his performance related to the EMOT reports.[176]  ███████ wrote in an email to ███████, "Here's a draft of the CIGIE referral.  I think I've included enough info to trigger the IC's jurisdiction."[177]

---

[165] ███████
███████
[166] Follow-Up Interview with ███████ (Dec. 2, 2020).
[167] 5 U.S.C. § 11.
[168] Council of the Inspectors Gen. on Integrity and Efficiency, <u>Resources</u>, available at https://www.ignet.gov/content/cigie-governing-documents.
[169] *Id.*
[170] <u>Integrity Committee Policies and Procedures 2018</u>, Council of the Inspectors Gen. on Integrity and Efficiency, p.1, (January 2018).
[171] *Id.* at pg. 4.
[172] Interview with ███████ (Oct. 30, 2020).
[173] *Id.*
[174] *Id.*
[175] WHDHS-00000077.
[176] WHDHS-00000079.
[177] *Id.* WHDHS-00000844.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

In light of ██(b) (6)██ abrupt retirement, however, ██(b) (6)██ and ██(b) (6)██ did not send the referral.[178]

On June 25, 2019, ██(b) (6)████, the CIGIE IC sent a letter to ██(b) (6)████ inquiring why he had not referred the matter to it.[179]  Specifically, the letter stated, "[t]o date, the IC has not received a referral from DHS OIG regarding the allegations against ██(b) (6)██, as described in the … Special Report…."[180]  The IC noted ██(b) (6)███████████████████████████████████████████████████. The letter concluded, "the IC has determined to review these allegations sua sponte and trusts that, in the future, DHS OIG will promptly refer to the IC any allegations of wrongdoing against the IG or designated staff member[s] in DHS OIG."[182]

The next day, ██(b) (6)██ replied to the IC and copied ██(b) (6)██ and ██(b) (6)██ on the email.[183] ██(b) (6)██ noted that she was a "little perplexed by both the tone and substance of the letter."[184] ██(b) (6)██ further wrote:

> The team recommended that I refer the report to CIGIE but did not specify the Integrity Committee (IC). Per my discussions with the team, I notified Michael Horowitz, CIGIE Chairman, in advance of issuance about the nature of the findings and forwarded a link to the report the day it was published.  Mr. Horowitz acknowledged receipt.  Additionally, a few days prior to publishing the report, we began preparing a referral of allegations to the IC concerning our former ██(b) (6)██ ██(b) (6)██████████████████.  Along with the issues raised in the report, ██(b) (5), (b) (6)██ We finalized the referral and planned to transmit it on Monday, June 10, 2019.  Before we could send the email, however, ██(b) (6)██ announced his retirement, effective immediately on June 10.[185]

██(b) (6)██ also provided a number of explanations for why she did not previously refer the allegations to the IC, including that "[w]hen we initiated the internal review…we had no idea that the review would eventually implicate ██(b) (6)██."[186]  For her part, ██(b) (3) (B), (b) (6)██ did not provide a clear answer as to why DHS OIG did not refer the EMOT investigation to the IC once it became apparent that the report would implicate ██(b) (6)██ ██(b) (3) (B), (b) (6)██ claimed that she was unaware of whether the allegations fell within the IC's jurisdiction—an answer inconsistent with both ██(b) (6)██████ April 30th email and ██(b) (6)██████ ██(b) (5)██████.

---

[178] WHDHS-00000088.
[179] WHDHS-00000084.
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] WHDHS-00000088.
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] Interview with ██(b) (3) (B), (b) (6)██ (Oct. 30, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

█████ (b) (5) █████.  Despite (b) (3) (B), (b) (6) statements, the documentary evidence demonstrates that (b) (6) and (b) (6) planned to refer (b) (6) to the CIGIE IC for investigation and would have done so had (b) (6) not retired.

On June 27, 2019, (b) (6) emailed the IC the referral of allegations related to (b) (6), including supporting documentation, and copied (b) (6) and (b) (6) on the email.[188]  The referral letter contained additional allegations beyond the issues with the EMOT reports.[189] (b) (6) stated in her interview that she and (b) (6) wanted to include everything they had about (b) (6) that could be of interest to the IC.[190]

## G.   DHS OIG Employees' View of the Special Report

Multiple current and former DHS OIG employees stated their belief that (b) (6) and (b) (6) used the Special Report to expedite (b) (6) departure so (b) (6) could accede to the position of (b) (6).

- (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), stated her view that (b) (6) and (b) (6) used the investigation as a vehicle to push (b) (6) to retire.[191]  (b) (3) (B), (b) (6) speculated that (b) (6) and (b) (6) thought that (b) (6) would retire after the Special Report was published.[192]   According to (b) (3) (B), (b) (6), while there were some Congressional requests for briefings, (b) (6), (b) (6), and later (b) (6) also proactively reached out to the Congressional committees to brief them on the Special Report.[193]  (b) (3) (B), (b) (6) also speculated that (b) (6) was the source for the (b) (6).[194]

- (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), stated her belief that (b) (6) and (b) (6) published the Special Report to publicly humiliate (b) (6) and to force his retirement.[195]  She also heard rumors that the information regarding the Special Report was leaked to the press, but she did not have any personal knowledge of it.[196]

- (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), thought that (b) (6) and (b) (6) publicized the Special Report because they wanted to push (b) (6) into retirement.[197]  (b) (3) (B), (b) (6) specifically recalled that (b) (6) and (b) (6) wanted to do a "roadshow" about the Special

---

[188] WHDHS-00000862.
[189] WHDHS-00000863.
[190] Interview with (b) (3) (B), (b) (6) (Oct. 30, 2020).
[191] Interview with (b) (3) (B), (b) (6) (Aug. 6, 2020).
[192] *Id.*
[193] *Id.*
[194] *Id.* (b) (3) (B), (b) (6) stated that she did not know if (b) (6) leaked (b) (6) (b) (6) (b) (6) and interacted with (b) (6) when (b) (6) worked there.  *Id.*  We reviewed allegations that (b) (6) selectively leaked or otherwise provided information to the press in an improper fashion for personal gain.  We found no direct evidence that (b) (6), or anyone else, leaked information to the Washington Post.
[195] Interview with (b) (3) (B), (b) (6) (Aug. 4, 2020).
[196] *Id.*
[197] Interview with (b) (3) (B), (b) (6) (Sept. 15, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

Report throughout DHS OIG.[198] **(b) (3) (B), (b) (6)** thought that **(b) (6)** was driven by an "insatiable thirst" to take over as IG.[199] **(b) (3) (B), (b) (6)** said that she, along with others, were appalled by **(b) (6)** behavior.[200]

- **(b) (3) (B), (b) (6)**, **(b) (3) (B), (b) (6)**, described the investigation and subsequent report as a "setup" and a "hit job" by **(b) (6)** and **(b) (6)**.[201] **(b) (3) (B), (b) (6)** told us that **(b) (6)** convinced **(b) (6)** to take responsibility for the EMOT reports and then used his email taking responsibility to show to the Congressional committees that the EMOT reports were **(b) (6)** fault.[202]

- **(b) (3) (B), (b) (6)**, the **(b) (3) (B), (b) (6)**, speculated that **(b) (6)** **(b) (6)** directed **(b) (6)** to write the report in a way that would push out **(b) (6)** although he acknowledged he had no personal knowledge that occurred.[203] **(b) (3) (B), (b) (6)** recalled numerous closed-door meetings between **(b) (6)** and **(b) (6)** prior to the report being released.[204] He also observed intense conversations and felt that something did not seem right.[205] **(b) (3) (B), (b) (6)** also found it suspicious that as a result of **(b) (6)** retirement, **(b) (6)** became **(b) (6)**.[206] He believed the review should have been done externally to avoid such appearances of a conflict of interest.[207]

Other DHS OIG employees detailed suspicions underlying the purpose of publishing the report. For example, **(b) (3) (B), (b) (6)**, **(b) (3) (B), (b) (6)**, commented on the curious timing of **(b) (6)** announcement that he was postponing his retirement and the **(b) (6)**.[208] **(b) (3) (B), (b) (6)** said she heard that on the day that one of the **(b) (6)** was published **(b) (6)** and **(b) (6)** came into the office laughing and rejoicing.[209]

On the other hand, **(b) (3) (B), (b) (6)**, **(b) (3) (B), (b) (6)**, believed it was performed objectively.[210] **(b) (3) (B), (b) (6)** said **(b) (6)** was not involved in the investigation, but after completion, she was briefed on the findings and participated in the congressional briefings.[211] **(b) (3) (B), (b) (6)** recalled extensive discussions with **(b) (6)** and **(b) (6)** **(b) (6)** about whether OIG should publish the report, given the sensitivities and criticism related to **(b) (6)**.[212] He relayed that **(b) (6)** and **(b) (6)** ultimately decided the report should

---

[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] Interview with **(b) (3) (B), (b) (6)** (July 28, 2020).
[202] *Id.*
[203] Interview with **(b) (3) (B), (b) (6)** (July 27, 2020).
[204] *Id.*
[205] *Id.*
[206] *Id.*
[207] *Id.*
[208] Interview with **(b) (3) (B), (b) (6)** (July 28, 2020).
[209] *Id.*
[210] Interview with **(b) (3) (B), (b) (6)** (July 16, 2020).
[211] *Id.*
[212] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

be published because OIG would have published the report had it investigated any other organization.[213]

### H.    ██ (b) (6) ██ Retroactively Changes ██ (b) (6) ██ Position Description

On June 12, 2019, two days after ██ (b) (6) ██ retirement, ██ (b) (6) ██, emailed ██ (b) (6) ██ and copied ██ (b) (6) ██.[214] ██ (b) (6) ██ raised the issue of whether ██ (b) (6) ██ | ██ (b) (5) ██

DHS OIG's order of succession at that time was listed as follows: IG, DIG, Counsel, AIG for Audits.[216] ██ (b) (6) ██ wrote:



██ (b) (3) (B), (b) (6) ██ recalled that ██ (b) (6) ██ was concerned that ██ (b) (6) ██ | ██ (b) (5) ██

The day after receiving the email from ██ (b) (6) ██, ██ (b) (6) ██ emailed ██ (b) (6) ██, ██ (b) (6) ██, and ██ (b) (6) ██, the ██ (b) (5) ██, with the subject line, "██ (b) (6) ██ eOPF HIGH IMPORTANCE PERSONNEL SENSITIVE DO NOT SHARE."[219] ██ (b) (6) ██ wrote, "Ladies, ██ (b) (2), (b) (5), (b) (6) ██.[220] She asked whether ██ (b) (6) ██ | ██ (b) (5), (b) (6), (b) (2) ██ | ██ (b) ██ ██ (b) (2), (b) (6) ██ ██ (b) (2), (b) (6) ██.[222] ██ (b) (6) ██ replied:

---

[213] *Id.*
[214] WHDHS-00000398.
[215] *Id.*
[216] DHS Orders of Succession and Orders for Delegations of Authorities, Dep't. of Homeland Sec., Off. Of Inspector Gen., (Sept. 14, 2016).
[217] WHDHS-00000398.
[218] Interview with ██ (b) (3) (B), (b) (6) ██ (Sept. 16, 2020).
[219] WHDHS-00000403.
[220] *Id.*
[221] *Id.*
[222] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

(b) (2), (b) (5)

███████████████████████████████████████████
███████████████████████████████████████████
███████████[223]

(b) (6) noted that (b) (6) was actually placed on a "DIG PD before he retired."[224] (b) (6) responded that (b) (6) █ (b) (5) ████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████

However, by creating a new DIG PD for (b) (6) , (b) (6) established two DIG positions at DHS OIG: one held by (b) (6) and one held by (b) (6) . (b) (6) asked (b) (6) to (b) (2), (b) (5) ████████████████████."[227] (b) (6) documented in an email what transpired based on her understanding with respect to (b) (6) position changes.[228] (b) (6) then listed the required action necessary (b) (2), (b) (6) ████████████████████████████ ████████████████████████████████████████████ ███████████████████████████[229] She also requested that (b) (6) █ (b) (2), (b) (6) ███████████████████ ████████████████████████████[230] Finally, (b) (6) indicated that she would inform (b) (6) about these retroactive changes.[231]

Our review did not uncover any evidence that (b) (6) in fact ever did inform (b) (6) about these retroactive changes. (b) (6) noted that he had not spoken to (b) (6) since his retirement and had not received any correspondence from her.[232] He also did not recall anyone informing him that his position description was changed after his retirement; (b) (6) stated that in his view, any retroactive changes to his position description would be "nefarious."[233]

In her interview, (b) (3) (B), (b) (6) explained that (b) (6) called her after (b) (6) retired to inform her that (b) (6) position description of (b) (6) was not listed in OIG's order of succession, (b) (5) ████████████████████.[234] Upon speaking to (b) (6) , (b) (6), (b) (3) (B) notified (b) (6)

---

[223] *Id.*
[224] *Id.*
[225] *Id.*
[226] Interview with (b) (3) (B), (b) (6) (Aug. 27, 2020).
[227] WHDHS-00000403.
[228] *Id.*
[229] *Id.*
[230] *Id.*
[231] *Id.*
[232] Follow-Up Interview with (b) (6) (Nov. 16, 2020).
[233] *Id.*
[234] Interview with (b) (6), (b) (3) (B) (Aug. 27, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

███ .[235] ███ indicated that she and ███ were ███

[237]

Notably, ███ did not simply cancel the November 2018 position changes for both ███ and ███ because that would have reverted ███ back to the ███ position and ███ back to the ███ position. ███ ███

[238] If ███ was ███ rather than ███ , AIG for Audits ███ ███ would have become Acting IG under the order of succession when ███ retired.[239] Therefore, ███ said her ███ ███ further noted that nothing prohibited DHS OIG from having two DIGs and that she was not aware of any law that would prevent her from making retroactive changes to position descriptions.[241] ███ acknowledged that she instructed ███ to add a sentence to one of the position descriptions noting that if there are two DIGs, the most senior one serves as Acting IG.[242] ███ explained that she wanted ███ [243] ███ denied however that by doing so, she was unilaterally changing the order of succession for the agency.[244] ███ approved these retroactive changes,[245] which had the effect of purportedly validating her ability to continue to serve in the position of ███ .[246]

We asked ███ whether he was aware that ███ position description was changed retroactively after he retired. ███ said he was not aware, and that he does not recall him or anyone else in his office advising ███ to do so.[247] Furthermore, ███ ███

We spoke to ███ about this incident as well. ███ could not recall exactly why ███ requested the retroactive changes.[249] She commented that it did not make sense to her why ███ could not have been on the ███ DIG position description, since her research

---

[235] *Id.*
[236] *Id.*
[237] *Id.*
[238] *Id.*
[239] DHS Orders of Succession and Orders For Delegations Of Authorities, *supra* note 216.
[240] Interview with ███ (Aug. 27, 2020).
[241] *Id.*
[242] *Id.*
[243] *Id.*
[244] *Id.*
[245] WHDHS-00000840.
[246] Interview with ███ (Aug. 27, 2020).
[247] Interview with ███ (Sept. 16, 2020).
[248] *Id.*
[249] Interview with ███ (Sept. 3, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

indicated that it was a bona fide position and DHS OIG was allowed to have two DIGs at once.[250] ████████ also recalled arguing with ████ about making these changes.[251] ████ had never been asked to change someone's files after they retired and felt very uncomfortable doing so.[252] ████████ approached her supervisor, ████████, and explained that she was not comfortable working on the request from ████.[253] According to ████████, ████ then "went off on her" and told her to backdate the changes.[254] ████████ ultimately complied, but explained that this incident was the "straw that broke the camel's back" and that she knew that she had to leave the organization immediately.[255] ████████ also stated that ████ yelled at her for conducting research about whether it was appropriate to retroactively change ████ position description, rather than simply following ████ orders.[256]

## IV.   ATTEMPTS TO DERAIL THE NOMINATION OF DR. CUFFARI AS THE NEW IG

At the outset, we note that while any citizen has the right to question a presidential nomination in their personal capacity, our investigation focused on the statements and actions of ████, ████, and ████ while in their roles as senior employees at DHS OIG. Federal employees, in their capacity as private citizens, have a First Amendment right to express their political opinions and may contact lawmakers to do so.[257] However, it is a misuse of authority for a federal employee to use his or her public office to interfere with a Presidential nomination or the Senate confirmation process for personal gain or any other improper purpose.[258] Additionally, federal employees should not use their government resources, including the email system or access to lawmakers or other government officials, for personal gain or for any other unauthorized purposes.[259]

On November 1, 2018, the White House announced its intention to nominate Dr. Cuffari to serve as the IG of DHS.[260] Dr. Cuffari was formally nominated by the President on November 14, 2018.[261] Documentary evidence and witness interviews indicate that immediately following the

---

[250] *Id.*
[251] *Id.*
[252] *Id.*
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] Interview with ████████ (July 23, 2020).
[257] *See* Garcetti v. Ceballos, 126 S. Ct. 1951, 1953 (2006) (noting that "a citizen who works for the government is nonetheless still a citizen. The First Amendment limits a public employer's ability to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in
their capacities as private citizens."). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution
does not insulate their communications from employer discipline." *Id.* at 1960.
[258] *See* 5 C.F.R. § 2635.702 ("An employee shall not use his public office for his own private gain . . . or for the private gain of friends.").
[259] *See* 5 CFR § 2635.704 (noting that government property shall not be used for unauthorized purposes, and the term "government property" includes "office supplies, telephone and other telecommunications equipment and services, the Government mails," etc.).
[260] President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts, *supra* note 19.
[261] 164 Cong. Rec. S6968 (daily ed. Nov. 14, 2018) (nomination of Joseph V. Cuffari), https://www.govinfo.gov/content/pkg/CREC-2018-11-14/pdf/CREC-2018-11-14.pdf.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

White House's announcement, and continuing throughout Dr. Cuffari's confirmation process, ██████ ████, ████ and ████ engaged in disparaging discussions at work regarding Dr. Cuffari's qualifications, primarily regarding the validity of Dr. Cuffari's doctoral degree.

Specifically, the same day that the White House announced its intent to nominate Dr. Cuffari, ████ sent an email to DHS OIG announcing the nomination.[262] ████ forwarded that email on her work e-mail account to several people, including ████ and the former general counsel of DHS OIG.[263] ████ wrote to ████, "Google California coast university."[264] ████ wrote to the former general counsel: "His PhD is from California Coast University. Google it."[265] The former general counsel responded that they should continue the discussion on ████ personal email account.[266] ████ forwarded her exchange to ████ on her DHS OIG e-mail account, and wrote, "This sums it up!" ████ replied from her work e-mail account, "Hahahahaha."[267]

████ also responded directly to ████, questioning the university from which Dr. Cuffari received his degree.[268] ████ wrote to ████: "if you dig around you'll see that the PhD is from California coast university and the masters is from Webster. Probably why they are not listed."[269] During his interview, ████ recalled generally that ████ openly sought to undermine Dr. Cuffari within DHS OIG and questioned his intelligence, noting that ████ said Dr. Cuffari was "dumber than a box of rocks."[270] ████ also recalled ████ saying that Dr. Cuffari is "a nice guy but dumber than a box of rocks."[271]

In addition, ████ stated that ████ had instructed ████, to run a query regarding where Dr. Cuffari obtained his Ph.D.[272] ████ also heard ████ respond, "I was right, he got it from a paper mill."[273]

When asked about his interactions with ████, ████ did not recall a specific request by ████ to investigate Dr. Cuffari before his confirmation.[274] However, ████ recalled that ████ talked about Dr. Cuffari's lack of qualifications and his Ph.D. in work meetings before Dr. Cuffari was confirmed.[275] ████ similarly stated that ████ tried to

---

[262] WHDHS-00000024.
[263] WHDHS-00000024; WHDHS-00000028; WHDHS-00000030.
[264] WHDHS-00000024.
[265] WHDHS-00000030.
[266] *Id.* As we did not have access to ████ personal email account, we do not know what further discussions occurred on this subject.
[267] *Id.*
[268] WHDHS-00000026.
[269] *Id.*
[270] Interview with ████ (Aug. 7, 2020).
[271] Interview with ████ (Aug. 6, 2020).
[272] *Id.*
[273] *Id.*
[274] Interview with ████ (Sept. 17, 2020).
[275] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

garner support for herself in senior meetings in anticipation of Dr. Cuffari's arrival.[276]  She said that these efforts intensified following Dr. Cuffari's confirmation hearing.[277]

A number of current and former DHS OIG employees corroborated that ███████ openly criticized Dr. Cuffari's qualifications to become the IG, and recruited others to do the same.  For example, (b) (3) (B), (b) (6) stated that ████ made it very clear that she thought Dr. Cuffari was not qualified and that she was not impressed with him.[278]  She said ████ was constantly trying to undermine Dr. Cuffari, and trying to recruit ████ to do so as well.[279] ███. (b) (3) (B) also recalled that ████ made a comment that she was talking to people in Congress about Dr. Cuffari.[280] ████ stated that she had heard that ████ was talking to Senate staffers about Dr. Cuffari's nomination.[281] (b) (3) (B), (b) (6) likewise had heard that ████ ████ was talking to Congressional committees about Dr. Cuffari's nomination.[282] ████. (b) (3) (B), (b) (6) also recalled ████ speaking about ████ efforts to undermine Dr. Cuffari's confirmation process.[283]  He recalled ████ saying something to the effect of ████ recent trip to the Hill" will "hopefully . . . have an impact on this confirmation."[284]

(b) (3) (B), (b) (6), who was (b) (3) (B), (b) (6) while Dr. Cuffari's nomination was pending, stated that ████ contacted him directly to express her concerns about Dr. Cuffari as well.[285] (b) (3) (B), (b) (6) explained to ████ that it is not the ████ role to get involved in vetting of presidential appointees and that she should go to the White House liaison with any concerns.[286] ████, who has served at DHS since 2003, stated that it was the first time he could recall a federal employee raising concerns about a presidential nominee.[287]

(b) (3) (B), (b) (6) stated that ████ questioned Dr. Cuffari's qualifications and encouraged employees to write letters contesting his nomination.[288]  According to (b) (3) (B), (b) (6), ████ also criticized Dr. Cuffari's nomination to other DHS OIG employees.[289] (b) (3) (B), (b) (6) also reported that ████ said that Dr. Cuffari had "no business becoming IG," that his education was a fraud, and that he was only a GS-14.[290]  Similarly, (b) (3) (B), (b) (6) reported that ████ told her Dr. Cuffari was "just a GS-14," so (b) (3) (B), (b) (6) should not have high expectations about

---

[276] Interview with (b) (3) (B), (b) (6) (Sept. 15, 2020).
[277] *Id.*
[278] *Id.*
[279] *Id.*
[280] *Id.*
[281] Interview with (b) (3) (B), (b) (6) (Aug. 10, 2020).
[282] Interview with (b) (3) (B), (b) (6) (July 28, 2020).
[283] *Id.*
[284] *Id.*
[285] Interview with (b) (3) (B), (b) (6) (Aug. 4, 2020).
[286] *Id.*
[287] *Id.*
[288] Interview with (b) (3) (B), (b) (6) (July 28, 2020).
[289] *Id.*
[290] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

his qualifications.[291] ███████ also recalled that ████████ questioned Dr. Cuffari's management experience.[292]

In addition to conversations with employees within DHS OIG, ████████, in her position as ████████, also emailed CIGIE regarding her concerns with Dr. Cuffari's nomination.  In a June 26, 2019 email, ████████ wrote to CIGIE: "we are currently struggling with a significant concern related to the nominee to be DHS Inspector General and we are unsure as to what we should do to address the issue.  Right now (as well as at various points over the last year) we would be very grateful for a CIGIE ombudsperson to whom we could raise our concerns and seek advice about how to proceed."[293]  Our review did not uncover a response from CIGIE on this issue.[294]

In addition to ████████, ████████ also raised doubts about Dr. Cuffari's nomination in her capacity as ████████ for DHS OIG.  Specifically, in June 2019, ████████ and ████████ contacted ████████, ████████, to discuss Dr. Cuffari's nomination.[295]  ████████, in her capacity as ████████ wrote to ████████ that she had "a sensitive matter related to the DHS IG nominee" to discuss.[296]  They agreed to speak on the phone and, following that conversation, ████████ sent ████████ the link to a report regarding California Coast University.[297]  During her interview, ████████ acknowledged that she and ████████ spoke to ████████ about Dr. Cuffari's nomination, and stated that they were doing so because it was in the best interests of the agency.[298]  According to ████████, ████████ agreed that ████████ and ████████ had an obligation to protect the organization and figure out whether others knew that Dr. Cuffari's degree was issued by "a diploma mill."[299]  ████████ declined our request for an interview.

████████ next reached out to ████████.  Documentary evidence indicates that ████████ called ████████ several times to speak about Dr. Cuffari's nomination but was unable to reach him initially.[300]  ████████ eventually reached him on June 27, 2019.[301]  At that point, Dr. Cuffari's nomination was awaiting

---

[291] Interview with ████████ (Sept. 3, 2020).
[292] Interview with ████████ (Oct. 30, 2020).
[293] WHDHS-00000088.
[294] After he was confirmed, IG Cuffari requested to see ████████ referral letter to CIGIE with respect to ████████ and the EMOT reports.  WHDHS-00000339. As noted above, ████████ cover email for the referral included the request to CIGIE about Dr. Cuffari's nomination.  WHDHS-00000088.  After IG Cuffari's request for the referral letter, ████████ conferred with ████████ and expressed her concern that Dr. Cuffari would be "unhappy" or "angry" if he saw ████████ reference to "a significant concern related to the nominee to be DHS Inspector General" in the cover email.  WHDHS-00000339.  ████████ replied, "Again, I really don't care if he's angry at me—I did the work at ████████ and it is what it is. It's also still a problem for our organization."  *Id.* However, ████████ eventually suggested providing the CIGIE referral letter but not the cover email to IG Cuffari.  *Id.* In response, ████████ expressed her concern that ████████ should not "hide the ball."  *Id.*  Nevertheless, it does not appear that ████████ or ████████ ever provided the cover email to IG Cuffari.
[295] WHDHS-00000090.
[296] *Id.*
[297] *Id.*
[298] Interview with ████████ (Aug. 27, 2020).
[299] *Id.*
[300] WHDHS-00000401.
[301] Interview with ████████ (July 22, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

a vote of the full Senate.[302]  When ▮(b) (6)▮ initially reached out to ▮(b) (6)▮ via email to discuss this issue, her DHS signature block identified her as the ▮(b) (6)▮" for DHS OIG.[303] During the call, ▮(b) (6)▮ raised concerns regarding Dr. Cuffari's doctoral degree, claiming it was issued by "a diploma mill."[304]  Similar to ▮(b) (6)▮, ▮(b) (6)▮ also claimed that she had previously investigated this university when she worked in Congress years prior.[305] ▮(b) (3) (B), (b) (6)▮ told ▮(b) (6)▮ that the issue had already been investigated.[306]  During his interview, ▮(b) (6)▮ explained that as part of the vetting process, ▮(b) (3) (B), (b) (6)▮ had already requested transcripts from California Coast University to verify Dr. Cuffari's doctoral degree.[307] ▮(b) (3) (B), (b) (6)▮ told us that he was surprised and "displeased" that ▮(b) (6)▮ called him because they had never spoken prior to this phone call, and it was uncommon for someone to contact him to raise concerns regarding presidential appointees given the extensive vetting process they undergo by the FBI.[308] ▮(b) (3) (B), (b) (6)▮ stated that he did not believe ▮(b) (6)▮ was calling to "help [Dr. Cuffari] with the Senate confirmation."[309]

That same month, on June 13, 2019, ▮(b) (6)▮ wrote to ▮(b) (6)▮, an ▮(b) (6)▮ that ▮(b) (6)▮ ▮(b) (6)▮ supervised in the ▮(b) (6)▮, asking for "a data dump/folder with all ▮(b) (6)▮ communications with Dr. Cuffari, the Dept., etc., on his nomination, conflicts, etc.?"[310] ▮(b) (6)▮ provided all of these documents later that day and ▮(b) (6)▮ forwarded them to another employee at DHS OIG, ▮(b) (6)▮.[311]

During her interview, ▮(b) (3) (B), (b) (6)▮ could not recall exactly why she requested these files from ▮(b) (6)▮ ▮(b) (6)▮, but explained that she may have been seeking information regarding Dr. Cuffari's doctoral degree.[312] ▮(b) (3) (B), (b) (6)▮ also could not recall why she sent the files to ▮(b) (6)▮, but she believed she may have done so in order for ▮(b) (6)▮ to include the files in an ethics database he was creating.[313] ▮(b) (3) (B), (b) (6)▮ explained that ▮(b) (6)▮ was tasked with creating a central database related ▮(b) (6)▮.[314]  At the time that ▮(b) (6)▮ sent the information to ▮(b) (6)▮, however, Dr. Cuffari had not been yet confirmed by the Senate as the IG.

Both ▮(b) (3) (B), (b) (6)▮ and ▮(b) (6)▮ were asked about ▮(b) (6)▮ "data dump" request. ▮(b) (3) (B), (b) (6)▮ recalled ▮(b) (6)▮ request for information.[315] ▮(b) (3) (B), (b) (6)▮ thought that, in her role as ▮(b) (6)▮ ▮(b) (6)▮, ▮(b) (6)▮ wanted to review all relevant information regarding the nominee and that she may have also been influenced by ▮(b) (6)▮ questions regarding Dr. Cuffari's qualifications

---

[302] *Id.*
[303] WHDHS-00000401.
[304] Interview with ▮(b) (3) (B), (b) (6)▮ (July 22, 2020); Interview with ▮(b) (3) (B), (b) (6)▮ (Aug. 27, 2020).
[305]  Interview with ▮(b) (3) (B), (b) (6)▮ (July 22, 2020).
[306] *Id.*
[307] *Id.*
[308] *Id.*
[309] *Id.*
[310] WHDHS-00000396.
[311] WHDHS-00000400.
[312] Interview with ▮(b) (3) (B), (b) (6)▮ (Aug. 27, 2020).
[313] *Id.*
[314] *Id.*
[315] Interview with ▮(b) (3) (B), (b) (6)▮ (July 31, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.



*Privileged & Confidential*
*Attorney Work Product*

to be IG.[316] ████████ did not consider the request improper though, given ████████ role as the ████████.[317]  Although ████ did not recall the "data dump" email specifically, he said the purpose of collecting these emails was to prepare for Dr. Cuffari's arrival and to review the files for potential conflicts or ethics issues.[318]  ████████ said he believed it was appropriate for ████████ to ask for this information because she needed to be able to provide ████████—IG Cuffari—once he was confirmed.[319]  Similarly, ████████, ████████, stated that ████████ may have needed to review the files to assess conflicts.[320]  Our investigation did not reveal why ████████ specifically requested all of the emails and documents regarding Dr. Cuffari's nomination process, or what ████████ did with them.

In her interview, ████████ acknowledged that she and ████████ had concerns about Dr. Cuffari's qualifications.[321]  ████████ claimed she had concerns that Dr. Cuffari received his doctoral degree from a "diploma mill," which might damage OIG's reputation.[322]  ████████ said that she expressed these concerns to several DHS OIG senior staff, including ████████, ████████ and ████████.[323]  ████████ acknowledged that she also spoke to ████████; ████████, ████████; and ████████, ████████, about her concerns about Dr. Cuffari's qualifications.[324]  During her interview, ████████ confirmed that she was making these calls in her capacity as the ████████, and was doing so out of her concern that the vetting process may not have properly scrutinized Dr. Cuffari's educational background.[325]  ████████ stated that she was only acting in the best interest of the agency and not to benefit ████████, then serving as the ████████.[326]  ████████ said that once she spoke to ████████, she "considered the matter resolved."[327]  The evidence demonstrates, however, that the efforts to undermine IG Cuffari continued.

## V.   UNDERMINING THE NEW IG

### A.   ████████ Filled Vacancies to Limit the New IG

On July 25, 2019, the United States Senate confirmed Dr. Cuffari as the new IG.[328]  With the confirmation of IG Cuffari, ████████ purportedly reverted back to the ████ role.  As she had

---

[316] *Id.*
[317] *Id.*
[318] Interview with ████████ (Sept. 16, 2020).
[319] *Id.*
[320] Interview with ████████ (Sept. 14, 2020).
[321] Interview with ████████ (Aug. 27, 2020).
[322] *Id.*
[323] *Id.*
[324] *Id.*
[325] *Id.*
[326] *Id.*
[327] *Id.*
[328] Meet the IG, *supra* note 13.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

done with [REDACTED], however, [REDACTED], with the assistance of [REDACTED], once again orchestrated a campaign to undermine the new IG.  In fact, as explained below, [REDACTED] efforts to limit the new IG had begun months earlier, shortly after he was nominated for the post.  Specifically, multiple current and former DHS OIG employees reported that [REDACTED] engaged in a concerted effort to fill open positions, in particular Senior Executive Service ("SES") positions, at the agency.

Multiple employees called the hiring unusual because SES positions typically remain vacant for the incoming IG to fill. [REDACTED], a [REDACTED] [REDACTED], described it as a contravention of the normal practice for [REDACTED] to rapidly fill SES positions in the period between IG Cuffari's nomination and his confirmation.[329] Both [REDACTED] and [REDACTED], the [REDACTED], explained that there is a general understanding in the government that those positions should be left open for the incoming presidential appointee to fill.[330]

Documentary evidence confirmed that [REDACTED] was filling these roles in the agency in order to inhibit IG Cuffari's ability to hire his own senior staff and to secure her own position as [REDACTED]. In December 2018, [REDACTED], [REDACTED] responsible for SES employees, emailed [REDACTED] regarding the process for requesting additional SES positions at DHS OIG.[331] [REDACTED] appeared hesitant to request additional slots because IG Cuffari would be able to fill these slots once confirmed.[332]  Specifically, [REDACTED] explained in her email to [REDACTED], "I don't think we should ask for any SES so new IG is limited."[333]  Later in the discussion, [REDACTED] [REDACTED] and [REDACTED] discussed the 120-day moratorium during which a new IG cannot move employees in SES positions.  After the moratorium is over, however, the new IG would be able to move SES employees into other SES positions.[334] [REDACTED] wrote, "We had discussed this a couple of times and this is one of the reasons why we needed the SES positions filled so after the moratorium there is no where to move."[335] [REDACTED] wrote to [REDACTED], "Please let me know if you need more information. I know how important this is."[336] [REDACTED] confirmed that she would not ask for additional SES positions.[337]

During her interview, [REDACTED] confirmed that [REDACTED] intended to fill the existing SES positions for two reasons: (1) to limit IG Cuffari's ability to fill the positions with his own selections, and (2) to constrain IG Cuffari's ability to move [REDACTED] from the [REDACTED] position to an open SES slot after the 120-day moratorium.[338] [REDACTED] explained that, as a result, there was rapid hiring in the run up to IG Cuffari's confirmation.[339]  She noted that she worked around

---

[329] Interview with [REDACTED] (July 24, 2020).
[330] *Id.* Interview with [REDACTED] (July 27, 2020).
[331] WHDHS-00000035.
[332] *Id.*
[333] *Id.*
[334] *See id.*
[335] *Id.*
[336] *Id.*
[337] *Id.*
[338] Interview with [REDACTED] (Sept. 3, 2020).
[339] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

the clock for ██████ on hiring issues and that they filled seven SES positions in her last eight months in the office.[340]  By contrast, she explained that agencies typically fill two to three SES positions in an entire year.[341]  ██████ thought that ██████ plan to hamstring IG Cuffari's ability to select executives was in "poor taste."[342]

As noted above, ██████ also recalled that ██████ was very concerned that IG Cuffari would reassign her from the ██ position after the 120-day moratorium was over.[343]  Under Office of Personnel Management ("OPM") guidelines, SES employees can be transferred (even against their will) to other available SES positions for which they are qualified, and therefore ██████ did not want to leave open any SES roles.[344]  She explained that ██████ would often refer to DHS OIG as "my agency" and that she needed to protect "her people" since IG Cuffari could replace her at any time.[345]

A review of DHS OIG employee records confirms that in the months following that exchange with ██████ about the need to "limit" the new IG, ██████ filled several SES positions.  Specifically, we identified six SES positions that were filled during the time-period between IG Cuffari's nomination and confirmation, although for two of these positions, the initial request to OPM preceded IG Cuffari's nomination.[346]  Additionally, one of those two requests was submitted prior to ██████ arrival at DHS OIG.[347]

The OPM SES Desk Guide provides guidance related to the timing of filling SES positions when a nominee is pending.  Specifically, the Desk Guide states:

> When an agency head leaves or announces the intention to leave, or if the President nominates a new agency head, OPM suspends [Qualifications Review Board ("QRB")] case processing for SES career appointments until a successor is appointed at the agency. OPM takes this action as a courtesy to the new agency head to afford him/her the greatest flexibility in making executive resources

---

[340] *Id.*  However, as explained further below, our investigation confirmed that six SES positions were filled during the time-period between IG Cuffari's nomination and his confirmation.  ██████, ██████ ██, confirmed that ██████ was working overtime to process ██████ new hires prior to IG Cuffari's confirmation. Interview with ██████ (July 23, 2020).  ██████ explained that she believed ██████ was hiring staff to build support for herself within the agency prior to IG Cuffari's arrival.  *Id.*

[341] Interview with ██████ (Sept. 3, 2020).

[342] *Id.*

[343] *Id.*

[344] *Id.  See also* Guide to Senior Executive Service, U.S. Off. Of Pers. Mgmt., p. 10 (noting that "An agency may reassign a noncareer appointee to another General SES position for which he/she qualifies after obtaining approval from OPM and the Office of Presidential Personnel. The agency is not required to give the appointee advance written notice of the reassignment.").

[345] Interview with ██████ (Sept. 3, 2020).

[346] For two of these SES slots, the request to OPM was made prior to IG Cuffari's nomination, but was not approved until after his nomination had been announced.

[347] OPM SES Documents – ██████ Documents.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

decisions. However, if an agency has a selection it considers urgent, OPM may consider whether to make an exception.[348]

The six employees that received SES assignments during the time-period between Dr. Cuffari's nomination (November 14, 2018) and confirmation (July 25, 2019) were:

- On January 18, 2017, OPM approved the appointment of (b) (6) to the Senior Executive Service.[349] On December 9, 2018, (b) (6) was promoted to an SES career appointment as (b) (6) [350] While (b) (6) was promoted during the relevant period, OPM approved his appointment to the SES well before IG Cuffari's nomination, and before (b) (6) arrival at DHS OIG in September 2017.

- On August 29, 2018, (b) (6) requested an exception of the QRB moratorium for (b) (6) to be appointed as (b) (6) [351] OPM approved the request. On November 25, 2018, (b) (6) was appointed as Deputy AIG (b) (6) [352]

- On November 27, 2018, (b) (6) requested an exception of the QRB moratorium to appoint (b) (6) as AIG (b) (6) [353] On March 31, 2019, (b) (6) was converted to a career SES appointment.[354]

- On December 14, 2018, (b) (6) requested an exception to appoint (b) (6) as Deputy AIG (b) (6) [355] On April 28, 2019, (b) (6) was converted to a career SES appointment.

- On March 28, 2019, (b) (6) requested an exception to appoint (b) (6) as Deputy AIG (b) (6) [356] On June 23, 2019, (b) (6) was appointed to an SES career position.

- On February 17, 2019, (b) (6) transferred to DHS OIG as a career SES employee into the role of (b) (6) [357]

(b) (3) (B), (b) (6) explained that while the QRB hiring process was followed for these hirings, she thought that (b) (6) engaged in "shady" behavior by moving forward with hiring decisions after Dr. Cuffari was nominated.[358] (b) (3) (B), (b) (6) also indicated that in her opinion, certain

---

[348] Guide To The Senior Executive Service, US Off. Of Pers. Mgmt., (March 2017), https://www.opm.gov/policy-data-oversight/senior-executive-service/reference-materials/guidesesservices.pdf.
[349] OPM SES Documents – (b) (6) Documents.
[350] SES Appointments DHS OIG 10232020 v.1.
[351] OPM SES Documents - (b) (6) Documents.
[352] Id.
[353] Id.
[354] SES Appointments DHS OIG 10232020 v.1.
[355] OPM SES Documents - (b) (6) Documents.
[356] OPM SES Documents - (b) (6) Documents.
[357] SES Appointments DHS OIG 10232020 v.1.
[358] Interview with (b) (3) (B), (b) (6) (Sept. 3, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

executives were hired not because they were the best or most qualified person for the position, but because they would fit in and were friends with those that were doing the hiring.[359] ████ explained that ████ served as the Executive Resources Board ("ERB") chair for all SES hiring.[360] ████ explained that in her experience, the ERB chair rotated among executives, and she thought it was odd that the chair role did not rotate at DHS OIG.[361] ████ also recalled that ████ was hired as ████ in large part due to her prior relationship with ████ at the ████.[362]

████, who was the ████ at the time of many of these hirings, told us that he worked with ████ to fill SES positions throughout the organization.[363]  He said he disagreed with some of ████ SES hiring choices and, in retrospect, thought he should have pushed back harder, but he said that he acquiesced to her wishes at the time because of his imminent retirement.[364]

████ hiring efforts intensified in the days leading up to IG Cuffari's confirmation in July 2019.  On July 17, 2019, just days before IG Cuffari's confirmation, ████ asked ████ ████ an employee in human resources, "to permanently reassign ████ to the ████ Position and post for a ████ (using her current PD) as soon as we can."[365]  In response, ████ informed ████ that DHS OIG had already committed to OPM to leave the position open for the new IG to fill.  Nevertheless, ████ asked him to push it through anyway.[366]  Ultimately, ████ was not promoted to ████.

████ could not recall why ████ was not promoted to ████, and he could not recall any other conversations about this issue.[367]  Several employees, including ████ ████, stated that the agency was required to keep the ████ position open for the new IG to fill.[368] ████ stated that she believed ████ was seeking to fill the ████ position with an ally who would follow ████ direction.[369]

During her interview, ████ stated she was aware that ████ attempted to assign her to the ████ position.[370]  However, ████ claimed she told ████ that she was uncomfortable moving forward with the promotion given IG Cuffari's imminent confirmation.[371]

Around the time of IG Cuffari's confirmation, ████ and ████ also sought to hire ████, who worked at the ████, to serve as AIG ████, following the

---

[359] *Id.*
[360] *Id.*
[361] *Id.*
[362] *Id.*
[363] Interview with ████ (Aug. 7, 2020).
[364] *Id.*
[365] WHDHS-00000161.
[366] *Id.*
[367] Interview with ████ (Aug. 21, 2020).
[368] Interview with ████ (Aug. 4, 2020).
[369] Interview with ████ (July 31, 2020).
[370] Interview with ████ (Aug. 27, 2020).
[371] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

retirement of ██████████. On July 23, 2019, just two days before IG Cuffari was confirmed by the Senate, ██████ and ██████ exchanged emails with the human resources staff regarding ██████ job offer.[372] ██████ wrote, "Sorry for the mad rush but we're hoping we can get him here so that there's not too much of a gap after ██████ departure."[373] ██████ ██████ stated that ██████ and ██████ appeared to be in a hurry to hire ██████.[374] There was even a discussion of swearing ██████ into the position remotely because he was on vacation and away from Washington D.C. until August.[375] ██████████ stated that could not recall that ever happening during his experience in government service.[376] ██████████ also noted that there was a rush to hire ██████ and other ██████████ personnel before IG Cuffari joined the agency.[377] On July 26, 2019, one day after the Senate confirmed IG Cuffari, ██████████ sent an agency-wide email announcing that ██████ had been appointed as AIG for ██████.[378]

During his interview, ██████ explained that ██████ and ██████ reached out to him unsolicited in early July 2019 and asked if he was interested in joining DHS OIG as AIG for ██████.[379] After he applied, he received a tentative offer and made plans to leave the ██████ ██████.[380] At some point after IG Cuffari's confirmation, however, ██████ heard that hiring at DHS OIG was on hold.[381] ██████ had not received his final offer and IG Cuffari called to inform him that he would not be receiving one.[382] ██████ acknowledged IG Cuffari's right to rescind the offer and said he respected the decision.[383]

On July 25, 2019, the same day that IG Cuffari was confirmed, OPM granted approval for DHS OIG to appoint ██████ as Deputy AIG ██████.[384] In an email about the appointment on August 5, 2019, ██████████ wrote, "Though we received a waiver to the QRB moratorium, I'm reviewing all applicable guidance to determine the extent to which IG Cuffari's confirmation impacts new SES appointments."[385]   IG Cuffari ultimately approved of ██████████ appointment.[386]

---

[372] WHDHS-00000172.
[373] *Id.*
[374] Interview with ██████████ (Aug. 21, 2020).
[375] *Id.*
[376] *Id.*
[377] Interview with ██████████ (July 24, 2020).
[378] WHDHS-00000162.
[379] Interview with ██████ (Aug. 5, 2020).
[380] *Id.*
[381] *Id.*
[382] *Id.*
[383] *Id.*
[384] WHDHS-00000169.
[385] *Id.*
[386] Interview with ██████████ (Aug. 21, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

On July 29, 2019, days after his confirmation, IG Cuffari attended a senior staff meeting at which he learned that the office was intending to hire additional employees despite anticipating a significant budget shortfall.[387]  IG Cuffari announced a hiring freeze effective immediately.[388]

IG Cuffari's hiring freeze announcement disappointed some employees who were trying to fill positions on their teams.  ████████ noted that ██████, ██████ and ██████ were upset by the hiring freeze because they had hires in the pipeline.[389]  He recalled that ██████ was visibly irritated and upset at the meeting.[390]  ████████ recalled that once IG Cuffari left the meeting, ██████ stated that IG Cuffari "doesn't know what he's talking about" and that "this is my meeting."[391]  ██████ noted that he did not initially understand the reason for the hiring freeze.[392]  However, once he became more involved in ████████ role, ██████ learned that Dr. Cuffari was attempting to "right size" the organization and ensure that the right personnel were in office.[393]

## B.   Unprofessional Behavior Directed at IG Cuffari

Several current and former DHS OIG employees described ██████ behavior in the office as unprofessional, both generally and particularly towards IG Cuffari.  For example, ██████ ██████ described ██████ as "self-centered," and said she would "trash" those who did not support her.[394]  ████████, described ██████ as unprofessional, noting that ██████ manner of communicating was particularly informal and inappropriate for someone in senior leadership.[395]  ██████ similarly stated that ██████ complaints against Dr. Cuffari were inappropriate considering that she was ████████ superior, and ████████ was a newly-appointed SES in a probationary period with the agency.[396]  ████████ ████████, noted ██████ lack of professionalism, stating that she would "get in people's space" and say "inappropriate things."[397]  ████████, ████████, also noted ██████ general unprofessional demeanor, and described her as a "capricious leader."[398]  ██████, ██████, described ██████ as scary, intimidating, not a team player, and dismissive.[399]  She stated that ██████ would often ignore her and other lower-level employees.[400]  ████████, the ████████, stated that ██████ would often speak critically of other employees during meetings, and she

---

[387] Interview with Joseph Cuffari (June 5, 2020).
[388] *Id.*
[389] Interview with ████████ (July 28, 2020).
[390] *Id.*
[391] Interview with ████████ (Aug. 4, 2020).
[392] Interview with ████████ (July 24, 2020).
[393] *Id.*
[394] Interview with ██████ (Aug. 7, 2020).
[395] Interview with ████████ (July 31, 2020).
[396] Interview with ████████ (July 24, 2020).
[397] Interview with ████████ (Aug. 20, 2020).
[398] Interview with ████████ (Aug. 4, 2020).
[399] Interview with ██████ (Aug. 24, 2020).
[400] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

created a culture of "us versus them" between the SES employees and the non-SES employees.[401] ██████████ described ██████ as aggressive and self-centered.[402]

According to DHS OIG employees, ██████ was especially unprofessional towards IG Cuffari. ████████, ██████ stated that ██████ relationship with IG Cuffari was very unprofessional.[403] She said that ██████ and IG Cuffari seemingly never spoke to each other and that the environment in the office deteriorated, which in part drove ██. ██████ to look for a new job.[404] ██████████, ██████████, ██████ , said ██████ and IG Cuffari had a "uniquely cold" relationship.[405]

██████████, ██████████████ , stated that in September or October 2019, ██████ complained to ██████ that IG Cuffari was not qualified for his role, citing that he had a degree from a "degree mill university."[406] He said that ██████ had a number of discussions with DHS OIG personnel concerning IG Cuffari's inability to appropriately lead DHS OIG.[407] ██████ recalled that ██████ asked ██████ and others to contribute to a memo to IG Cuffari about his leadership capabilities.[408] According to ██████, toward the end of ██ ██████ tenure, she became highly emotional and fixated on IG Cuffari's actions because she wanted to be the IG.[409] ██████ said that ██████ even complained that IG Cuffari would not meet with her or respond to her calls or emails.[410] ██████ believed ██████ sent emails to IG Cuffari simply to antagonize him.[411] ██████ said that during senior staff meetings, ██████ appeared disconnected, did not pay attention to IG Cuffari while he was speaking, and often times made unpleasant faces.[412]

██████████ stated that ██████ asked him and ██████████ to write letters to CIGIE informing them that the OIG was in shambles and that IG Cuffari was not capable of running the agency.[413] ██████████ said he and ██████ refused.[414] ██████ told us that he did not recall this request, but he did recall ██████ asking the AIGs to provide her with information about how IG Cuffari's actions were negatively impacting their programs.[415]

██████████, ██████████████ , recalled that ██████ called him a couple of times in the fall of 2019 to complain about IG Cuffari.[416] In the calls, ██████ said she thought

---

[401] Interview with ██████ (Aug. 20, 2020).
[402] Interview with ██████ (Sept. 3, 2020).
[403] Interview with ██████ (July 23, 2020).
[404] *Id.*
[405] Interview with ██████ (July 8, 2020).
[406] Interview with ██████ (July 24, 2020).
[407] *Id.*
[408] *Id.*
[409] *Id..*
[410] *Id..*
[411] *Id.*
[412] *Id.*
[413] Interview with ██████ (July 28, 2020).
[414] *Id.*
[415] Interview with ██████ (July 24, 2020); Interview with ██████ (Sept. 14, 2020).
[416] Interview with ██████ (Sept. 17, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

IG Cuffari was doing "illegal things."[417] **(b) (3) (B), (b) (6)** stated that **(b) (6)** made several comments disparaging IG Cuffari's background and lack of experience, and said he was not qualified to be IG.[418] **(b) (3) (B), (b) (6)** also said that **(b) (6)** would undermine IG Cuffari by sending emails to staff immediately after IG Cuffari's emails undercutting him, or not copying him on certain emails.[419] Similarly, **(b) (3) (B), (b) (6)**, **(b) (3) (B), (b) (6)**, explained that **(b) (6)** tried to undermine everything that IG Cuffari tried to do through her comments and body language.[420] **(b) (3) (B), (b) (6)** did not recall specific examples, but said she heard **(b) (6)** ranting about what the IG was doing.[421]

In addition to **(b) (6)**, text messages between **(b) (6)** and **(b) (6)** on DHS OIG cellphones contained additional disparaging comments about IG Cuffari.  For example, on November 7, 2019, **(b) (6)** wrote a text message to **(b) (6)** about IG Cuffari, to which **(b) (6)** responded, "Can't do anything but laugh. He is an idiot."[422]

### C.    **(b) (6)** and **(b) (6)** Attempt to Investigate IG Cuffari

On August 23, 2019, approximately a month after his confirmation, IG Cuffari—who is from Arizona—announced that he was going to travel to Tucson in late October 2019.[423]  IG Cuffari planned to meet the Tucson Sector Chief, the Arizona National Guard Colonel, and other Arizona officials on the trip, and to tour a detention facility.[424]  **(b) (6)** forwarded the email from IG Cuffari to **(b) (6)**, writing, "Tucson sector chief? National guard? FBI?"[425]

That same day, **(b) (6)** called **(b) (6), (b) (7)(C)**, who was on vacation, to tell her about the trip.[426] According to **(b) (3) (B), (b) (6)**, **(b) (6)** told her that IG Cuffari was planning a trip to the Southwest border and that **(b) (6)** was concerned that the trip would be perceived as "pretextual" because IG Cuffari was visiting the city where his family lived.[427]  **(b) (3) (B), (b) (6)** said **(b) (6)** was responsible for approving IG Cuffari's travel.[428]

After speaking with **(b) (6)**, **(b) (3) (B), (b) (6)** called **(b) (3) (B), (b) (6)**, **(b) (3) (B), (b) (6)** **(b) (3) (B), (b) (6)**.[429]  **(b) (3) (B), (b) (6)** reported that **(b) (6)** asked him to investigate IG Cuffari's travel because **(b) (6)** believed the travel was illegitimate and for personal reasons.[430]  **(b) (3) (B), (b) (6)** further noted that **(b) (6)** told him that **(b) (6)** had no confidence in IG

---

[417] *Id.*
[418] *Id.*
[419] *Id.*
[420] Interview with **(b) (3) (B), (b) (6)** (Sept. 17, 2020).
[421] *Id.*
[422] Text message between **(b) (6)** and **(b) (6)**.
[423] WHDHS-00000187.
[424] *Id.*
[425] WHDHS-00000188
[426] **(b) (3) (B), (b) (6)** Memorandum to File (Aug. 26, 2019); Interview with **(b) (3) (B), (b) (6)** (Aug. 28, 2020).
[427] Interview with **(b) (3) (B), (b) (6)** (Aug. 28, 2020).
[428] *Id.*
[429] *Id.*
[430] Interview with **(b) (3) (B), (b) (6)** (July 28, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

Cuffari and was looking for reasons to question him.[431] ██████████ refused ████████ request to investigate and stated that it was inappropriate for ████ to be investigating the IG.[432]

For her part, ██████████ admitted that she called ██████████ about the Southwest border trip, but claimed she only asked ██████████ for details about IG Cuffari's trip because he was helping plan the itinerary; she denied ever asking him to investigate IG Cuffari.[433] ██████████ acknowledged, however, that ██████████ responded that it was inappropriate to raise such concerns about IG Cuffari's travel to him.[434] ██████████ disagreed, believing it was ████ ██████████ responsibility to alert IG Cuffari that the trip could be perceived as inappropriate.[435] Nevertheless, ██████████ claimed that after speaking to ██████████, she came away satisfied that the trip was appropriate for the IG to take.[436]

Immediately after speaking with ████████ ██████████ called IG Cuffari and relayed to him what had happened.[437] IG Cuffari described ██████████ as very upset on the call.[438]  Three days later, ██████████ wrote a memorandum to file memorializing his conversation with ████ ██████.[439]  The memorandum stated, in part, as follows:

> ████████ said that she had spoken with ████████ and that she ████████ was concerned that the IG was travelling to Tucson for personal reasons and not for legitimate OIG business.  I explained that reviewing the IG's travel was outside the bounds of what was appropriate.  I further explained that I did not question or review ████████ or ████████ travel because it wouldn't be appropriate, therefore, reviewing the IG's travel was completely ridiculous.  ████████ said that ████████ had no confidence in the IG and that she ████████ was obviously looking for reasons to question him.  ████████ said that ████████ believed Dr. Cuffari was only travelling under the auspices of official work, but that he was actually visiting family.[440]

During his interview, ██████████ explained that he wrote the memorandum because he was concerned about the propriety of ████████ request to investigate the IG.[441]  He also rejected ████████ claim that she was merely seeking information about IG Cuffari's travel.[442]

After receiving ██████████ call, IG Cuffari emailed ████████ about her request.[443]  He wrote to ████████, "I understand you have expressed concerns about my planned travel and visit

---

[431] ██████████ Memorandum to File.
[432] *Id. See also* Interview with ██████████ (July 28, 2020).
[433] Interview with ██████████ (Aug. 28, 2020).
[434] *Id. See also* ██████████ August 26, 2019 Memorandum to File.
[435] Interview with ██████████ (Aug. 28, 2020).
[436] *Id.*
[437] Interview with ██████████ (July 28, 2020).
[438] Interview with Joseph Cuffari (June 5, 2020).
[439] ██████████ August 26, 2019 Memorandum to File.
[440] *Id.*
[441] Interview with ██████████ (July 28, 2020).
[442] *Id.*
[443] WHDHS-00000189.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

to Arizona in October 2019," and he explained the reasons for the trip.[444]  IG Cuffari asked ███ ███ to "identify the specific facts and circumstances that caused [her] to be concerned about [his] travel activity."[445]

On August 26, 2019, at 6:41 a.m., ███ ███ forwarded IG Cuffari's message to ███ ███ with multiple question marks in the body of her message.[446]  Later that same day, at 8:19 a.m., ███ ███ responded to IG Cuffari's email, writing:



███ ███ followed up later that afternoon with more information on official travel.[448]  With regard to the Southwest border trip, she wrote that IG Cuffari's ███ ███

[450]

In her interview, ███ ███ denied that she was trying to "set up" IG Cuffari regarding his travel or requesting that ███ ███ investigate the matter.[451]  Instead, she insisted that she was looking out for IG Cuffari and the agency.[452]  She stated that she was just trying "to protect [her] client."[453]  When asked why she did not go directly to her client to discuss her concerns, ███ ███ said ███ ███ knew the details about IG Cuffari's itinerary.[454] ███ ███ also pointed out that she later provided advice to IG Cuffari about the travel situation, albeit only after ███ ███ refused her request and notified IG Cuffari of their conversation.[455]  ███ ███ claims that she was acting solely to protect IG Cuffari are implausible given her earlier efforts to scuttle IG Cuffari's confirmation and undermine him once he had arrived.[456]

---

[444] *Id.*
[445] *Id.*
[446] *Id.*
[447] WHDHS-00000452.
[448] *Id.*
[449] *Id.*
[450] *Id.*
[451] Interview with ███ ███ (Aug. 28, 2020).
[452] *Id.*
[453] *Id.*
[454] *Id.*
[455] *Id.*
[456]  We also reviewed multiple allegations related to ███ ███ , ███ ███ and ███ ███ obtaining IG Cuffari's email and the email of other DHS OIG employees without legitimate need or authority.  We found no evidence indicating that ███ ███ , ███ ███ , or ███ ███ accessed IG Cuffari's emails, improperly or otherwise.  ███ ███ , ███ ███ , stated he was not aware of any such conduct.  Interview with ███ ███ (Sept. 21, 2020).  In their interviews, ███ ███ and ███ ███ denied trying to access IG Cuffari's

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

**D.**   ████ **Accuses IG Cuffari of Unethical Conduct**

Less than one week after the travel incident with ████, IG Cuffari confronted another accusation from ████ that he was acting inappropriately.  During IG Roth's tenure, DHS OIG had accepted a request from the IG for the Intelligence Community ("CIG") to review a complaint filed by a former Central Intelligence Agency ("CIA") employee.[457]  IG Cuffari recused himself from the investigation because it involved former CIA IG David Buckley, who was Dr. Cuffari's friend.[458]  Although there was some confusion about how to effectuate IG Cuffari's recusal, ████ ████ ultimately handled the matter on behalf of the agency.[459]  But when IG Cuffari inadvertently joined a meeting about the matter, ████ came to his office shortly after the meeting and told him that she was going to report him to Michael Horowitz, the Chair of CIGIE.[460]

The investigation involved a CIA employee who alleged that CIA IG officials, including CIA IG Buckley, retaliated against him by suspending his security clearance and putting him on administrative leave.[461]  DHS OIG investigated and partially substantiated the allegations.[462]  On April 25, 2019, DHS OIG completed its investigation and ████ signed the Report on Investigation ("ROI").[463]

Emails show that the ROI underwent additional reviews and revisions after ████ retirement and was not ready for distribution until August 2019.[464]  On August 7, 2019, ████ emailed herself talking points for a meeting with IG Cuffari that laid out the background of the investigation, high-level findings, and the next steps regarding closing out the matter.[465]  The talking points included the following bullets:

> (1) "Potential conflict of interest - The ROI substantiates the retaliation allegations against former CIA IG David Buckley, who was present at Dr. Cuffari's HSGAC hearing and supported his nomination. [Buckley may have overlapped/worked with Dr. Cuffari during his time at the DOD IG, but I have not confirmed this.]"; and

> (2) "[s]ince this investigation was completed prior to your confirmation, and given your relationship with CIA IG Buckley, I would recommend that you be recused from the

---

emails or the emails of other OIG employees.  *See* Interview with ████ (Aug. 28, 2020); *see also* Interview with ████ (Oct. 30, 2020).
[457] DHS OIG Investigative Summary, Unclassified Summary, CIA OIG Employee Whistleblower Retaliation Complaint (Aug. 8, 2019), available at https://www.oig.dhs.gov/sites/default/files/assets/2019/I16-NON-DHS-SID-18500.pdf.
[458] Interview with Joseph Cuffari (June 5, 2020); DHS OIG Timeline (06/08/2020).
[459] *See* Interview with Joseph Cuffari (June 5, 2020).
[460] *Id.*
[461] DHS OIG Investigative Summary, Unclassified Summary, CIA OIG Employee Whistleblower Retaliation Complaint (Aug. 8, 2019), available at https://www.oig.dhs.gov/sites/default/files/assets/2019/I16-NON-DHS-SID-18500.pdf.
[462] *Id.*
[463] WHDHS-00000336.
[464] WHDHS-00000329.
[465] WHDHS-00000336.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

matter.  If you concur, I will handle any requests we may receive about the matter.  If any such requests come to you directly, you can just refer them to me."[466]

IG Cuffari met with (b) (6) and (b) (6) on August 9, 2019.[467]  According to IG Cuffari, they provided an overview of the investigation, and explained that the unclassified version of the report was ready for his review.[468]  IG Cuffari explained to (b) (6) and (b) (6) that he had recused himself from participation in the matter.[469]

On August 28, 2019, IG Cuffari's assistant received a call from the (b) (6) , (b) (6) (b) (6) , requesting an in-person meeting with him to discuss the investigation.[470]  IG Cuffari stated that he instructed his assistant to inform (b) (6) that he was recused from the matter.[471]

(b) (6) came to DHS OIG to discuss the matter the following day, August 29, 2019.[472] (b) (6) sent an invitation for the meeting listing (b) (6) and (b) (6) as the required attendees and containing a note that read "Report issued – Retaliation WPU that occurred at CIA."[473]  Despite the location of the meeting being the "IG's office," IG Cuffari was not included on the invitation.[474]  Nevertheless, IG Cuffari ended up in the meeting and was apparently caught off-guard when the subject of the investigation arose.[475]  IG Cuffari reiterated that he was recused from the matter and excused himself from the meeting.[476]

According to IG Cuffari, (b) (6) came to him after the meeting, stating that the investigation was discussed in his presence and that she planned to inform Mr. Horowitz about the matter.[477] We uncovered no evidence that (b) (6) actually followed through on her statement by notifying IG Horowitz or anyone else at CIGIE about the incident, and both (b) (6) and (b) (6) declined our requests for interviews.  Although it does not appear that (b) (6) or (b) (6) intentionally sought to include IG Cuffari in the meeting about a matter from which he was recused, (b) (6) appears to have taken advantage of the mix-up to suggest that IG Cuffari engaged in unethical behavior and to further challenge his authority.

**E.**  (b) (6) **and** (b) (6) **Allege that IG Cuffari Violated the IG Act**

In November 2019, (b) (6) and (b) (6) sparred with IG Cuffari over the publication of an investigative report arising from a whistleblower complaint that had been referred to DHS OIG

---

[466] *Id.*
[467] Interview with Joseph Cuffari (June 5, 2020).  We also confirmed the date of this meeting through an email review of calendar invitations.  Our review uncovered a calendar invitation for a meeting on August 9, 2019 with required attendees, IG Cuffari and (b) (6) , and titled, "Meeting – (b) (6) ." WHDHS-00000338.
[468] Interview with Joseph Cuffari (June 5, 2020).
[469] *Id.*
[470] *Id.*
[471] *Id.*
[472] *See* WHDHS-00000184.
[473] *Id.*
[474] *Id.*
[475] Interview with Joseph Cuffari (June 5, 2020).
[476] *Id.*
[477] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

from the OSC.[478]  The OSC complained that the report, herein referred to as the "Tecate Report," had been published before the OSC could finish its own review, but ██████████ and ██████████ insisted that the law required its publication and dismissed contrary views.[479]  After conducting research on the question, ██████████████████████████████████████████████████████ but by that point, publication had already led to unnecessary conflict with the OSC and with IG Cuffari.

Specifically, in 2018, the OSC referred allegations concerning possible violations of immigration law at the Tecate, California Port of Entry to DHS OIG for investigation.[481]  ██████████ directed the investigation and drafted the Tecate Report.[482]  Emails show that ██████████ sent ██████████ and ██████████ the draft report on June 28, 2019, noting that ██████████, had already reviewed and approved it.[483]  ██████████ warned ██████████ that the OSC would be "unhappy" if DHS OIG posted the report before the OSC completed its review process, but that the IG Act may require it to be published before then.[484]  ██████████ told ██████████ she believed the report should be published.[485]

On September 5, 2019, ██████████ emailed IG Cuffari to inform him that DHS OIG planned to publish the Tecate Report, but ██████████ did not flag the potential for the OSC to take issue with the publication of the report.[486]  Approximately three weeks later, DHS OIG published the report on its website.[487]  The OSC had not yet concluded its review process at the time.[488]  To make matters worse, the report contained the name of the whistleblower, who had agreed to disclose his name to Congress and DHS OIG, but did not consent to have his or her name included in the public report.[489]

The OSC notified the DHS Assistant General Counsel—who subsequently informed ██.  ██████████—that the whistleblower raised concerns about being named in the report.[490]  In his interview, ██████████ explained that DHS OIG's report initially disclosed the whistleblower's name due to a misunderstanding over the whistleblower's consent.[491]  ██████████ emailed the

---

[478] WHDHS-00000315; WHDHS-00000299.
[479] WHDHS-00000195; WHDHS-00000347; WHDHS-00000303; WHDHS-00000351.
[480] Interview with ██████████ (Aug. 28, 2020).
[481] WHDHS-00000858.
[482] Interview with ██████████ (July 16, 2020).
[483] WHDHS-00000413.
[484] *Id.*
[485] *Id.*
[486] WHDHS-00000342.
[487] Investigation of Alleged Violations of Immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel, Dep't. of Homeland Sec., Off. Of the Inspector Gen., (Sept. 26, 2019), ██████████████████████████████████████████████
[488] *See* WHDHS-00000195.
[489] WHDHS-00000858.
[490] Interview with ██████████ (July 16, 2020); WHDHS-00000858.
[491] Interview with ██████████ (July 16, 2020); WHDHS-00000858.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

whistleblower to apologize for the disclosure.[492]  On October 28, 2019, a redacted version of the Tecate Report was re-published on DHS OIG's website.[493]

Also in October 2019, ████ and ████ discussed publishing the Tecate report with ████[494] ████ said that the report was required to be published under the IG Act.[495] In her email memorializing the conversation with ████, ████ noted that ████ expressed frustration with DHS OIG's decision to post the Tecate Report prior to the OSC's completion of its review process and asked for advance notice in the future.[496]

On November 8, 2019, IG Cuffari spoke to ████, about the Tecate Report.[497]  In a follow up letter to IG Cuffari on November 14, 2019, ████ expressed his concerns about DHS OIG's report and requested that DHS OIG "refrain from publishing its report publicly until the OSC review process was complete."[498]

On November 26, 2019, IG Cuffari directed ████ to remove the Tecate Report from OIG's website.[499]  IG Cuffari's memorandum stated:

> I recently learned that on September 26, 2019, our office published on our external website, OSC File Number DI-18-58035 (OIG-19-65).  This publication was unredacted, disclosed the whistleblower's name, and published before the Office of Special Counsel had completed its inquiry.
>
> I am directing you to immedeiately [sic] take all appropriate action to remove OSC File Number DI-18-58035 from public view and remediate the disclosure by close of business today.[500]

That same day, ████ replied to IG Cuffari explaining that the report had already been replaced with a redacted version, rectifying the whistleblower's concerns.[501]  The following day, IG Cuffari emailed ████ again directing her to comply with his instructions to remove the Tecate Report from OIG's website.[502] ████ replied, "Joe, it's already been removed and redacted. Per my email below, we took prompt action when we first learned of the issue weeks ago. ████ sent you a copy of the redacted version that is now on our website. Do you still want it removed even though the issue you identified has already been addressed? If so please confirm and I will have ████ remove it."[503]  IG Cuffari directed that the redacted version be

---

[492] WHDHS-00000349.
[493] WHDHS-00000317.
[494] WHDHS-00000195.
[495] WHDHS-00000347.
[496] WHDHS-00000195.
[497] WHDHS-00000858.
[498] *Id.*
[499] WHDHS-00000315.
[500] *Id.*
[501] WHDHS-00000299.
[502] *Id.*
[503] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

removed from the website.[504]  Per IG Cuffari's instructions, ██████████ [(b) (3) (B), (b) (6)] arranged for the Tecate Report to be removed from the website.[505]

On December 4, 2019, █████ [(b) (6)] drafted and sent a memorandum to IG Cuffari addressing the concerns that the Tecate Report disclosed the whistleblower's name.[506]  The memorandum explained that "the disclosure of the complainant's name was an inadvertent error" and was "remediated immediately."[507]

On January 15, 2020, ███████ [(b) (6)] ████████████, emailed ██████ [(b) (6)], ██████ [(b) (6)], ██████ [(b) (6)] and ████ [(b) (6)] asking ████ [(b) (5)] ████████.[508] ██ [(b) (6)] ██████ [(b) (6)] forwarded the email to █████ [(b) (6)], █████ [(b) (6)], and █████ [(b) (6)] writing dismissively, "I can't even."[509]  The following day, ██████ [(b) (6)] sent ██████ [(b) (6)] talking points which included the reasons why she believed removing the Tecate Report would contravene the IG Act.[510]

Later, ████████ [(b) (3) (B), (b) (6)] researched the issue of whether the IG Act required the Tecate Report to be published.[511] ██████ [(b) (3) (B), (b) (6)] concluded that ██████ [(b) (6)] █████ [(b) (5)] ██████ ██ [(b) (3) (B), (b) (6)] As explained in her interview, █████ [(b) (5)]
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████.[513]

---

[504] *Id.*
[505] Interview with ████████ [(b) (3) (B), (b) (6)] (July 27, 2020).
[506] WHDHS-00000316; WHDHS-00000317.
[507] WHDHS-00000317.
[508] WHDHS-00000303.
[509] *Id.*
[510] WHDHS-00000351.
[511] Interview with ████████ [(b) (3) (B), (b) (6)] (Aug. 28, 2020).
[512] *See id.*
[513] *Id.* Section 4(e)(1) of the Inspector General Act ("IG Act") provides that "whenever an Inspector General *issues a recommendation* for corrective action to the agency," the Inspector General must, among other things, (a) "submit the document making a recommendation for corrective action to the head of the establishment" and (b) "not later than 3 days after the recommendation for corrective action is submitted in final form to the head of the establishment, post the document making a recommendation for corrective action on the website of the Office of Inspector General." 5a U.S.C. § 4(e)(1) (emphasis added).  The Tecate Report expressly states it "contains no recommendations." The Tecate Report, *supra* note 488. ██████ [(b) (5)] ████████████████████
Additionally, Section 8M(b)(1)(A) of the IG Act provides, in part that: "The Inspector General of each Federal agency and designated Federal entity shall . . . not later than 3 days after any audit report, inspection report, or evaluation report (or portion of any such report) is submitted in final form to the head of the Federal agency or the head of the designated Federal entity, as applicable, post that report (or portion of that report) on the website of the Office of Inspector General." 5a U.S.C. § 8M(b)(1)(A).  Audits, inspections, and evaluations are different from investigations.  *See* Congressional Research Service, Statutory Inspectors General in the Federal Government: A Primer (Jan. 3, 2019) available at https://www.everycrsreport.com/files/20190103_R45450_b79ea6a64860e857714e961814cc0c206ad135ef.pdf (explaining that "IG audits and inspections or evaluations include programmatic analysis, which may involve analyses related to the compliance, internal control, or efficiency and effectiveness of agency programs and operations. . . . IG investigations, by contrast, typically include nonprogrammatic analysis and instead focus primarily on alleged misuse or mismanagement of an agency's programs, operations, or resources . . . ."). ██████ [(b) (5)]
████████████████████████████████████████████████████

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

███ and ███ ███ The facts do not establish that ███ or ███ ███ were intentionally untruthful about the obligations of the IG Act, but nevertheless provided incorrect information on multiple occasions to IG Cuffari and the OSC and were obstinate when others questioned their position.

### F.     ███ and ███ Seek to Withhold Information from IG Cuffari

Current and former DHS OIG employees raised concerns that ███ and ███ had sought to withhold information from IG Cuffari, and that ███ insisted that the agency's business run through her.

███ ███ at the time, reported that in mid-September 2019, ███ ███ called him and asked why he had not provided the draft reports on a child migrant death investigation to her and ███ [514] ███ responded that he had provided the draft reports to IG Cuffari.[515] ███ recalled that ███ became angry and demanded to know why he had done that, to which ███ responded that IG Cuffari had requested them.[516] According to ███, ███ stated that draft reports should not be given to IG Cuffari.[517] ███ also reminded ███ that she was his "rating official."[518] ███ stated that ███ gave him that same reminder several more times over the next few weeks.[519]

At the time, ███ was a new SES employee and still in the one-year probationary period during which the agency evaluates a new SES employee's performance.[520]  As a result, a bad performance review from ███ could lead to ███ removal from an SES position.[521] ███ viewed ███ statements that she was his "rating official" as implicit threats that she could jeopardize his employment status if he did not accede to her demands.[522]

On or around September 23, 2019, ███ summoned ███ to her office for a meeting.[523]  According to ███, ███ stated that she wanted to wait for ███

---

███ (b) (5) ███

[514] Memo from ███ (Nov. 21, 2019).
[515] *Id.*
[516] Interview with ███ (July 28, 2020).
[517] *Id.*
[518] *Id.*
[519] *Id.*
[520] *Id.*
[521] Addressing Poor Performance, Sr. Exec. Service,https://www.opm.gov/policy-data-oversight/senior-executive-service/adverse-actions/ses-addressing-poor-performance-fact-sheet.pdf (last visited 12/12/2020) (noting that "the agency may remove" an employee "from the SES based upon unacceptable performance" during the probationary period).
[522] Interview with ███ (July 28, 2020).
[523] Memo from ███ (Nov. 21, 2019).
[523] *Id.*

45

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

██ before beginning the meeting, but eventually began when ██ did not arrive.[524]   In the meeting, ██ again expressed her anger that ██ had provided IG Cuffari with the draft reports, and stated that IG Cuffari was not capable of running the agency.[525] ██ once again reminded ██ that she was his "rating official."[526] ██ explained that he felt "extremely threatened and intimidated."[527]   At that time, ██ announced to ██ that he was immediately stepping down as ██ and returning to his role as ██ for personal reasons.[528]

██, the ██, stated that ██, like ██, also made a concerted effort to prevent information from reaching IG Cuffari, including information about disciplinary matters.[529] ██ conclusion was based on his own interactions with ██ and what he had heard from at least three other people.[530] ██ said ██ eventually insisted that ██ stop meeting directly with IG Cuffari.[531]

██ also believed that ██, ██ and ██ kept important information from IG Cuffari.[532]   After being removed from the ██ and being detailed to the ██, ██ continued to ██.[533]   When she attempted to send that information to IG Cuffari directly (rather than to ██, who had replaced ██), ██ admonished ██, writing "was there anything unclear in my earlier email (attached) that any communications you received as a result of your former job duties you must forward only to ██?"[534]   When ██ noted that she had heard through "rumors in the building" that IG Cuffari wanted to see everything that was addressed to his attention, ██ scolded her, writing, "You're a GS-15, and you ignored my instructions based on 'rumors in the building'?"[535]

G.   ██ and ██ Charge IG Cuffari with Abusing his Authority Regarding the Telework Policy

Early in IG Cuffari's tenure, a decision about whether to permit a DHS OIG employee to telework from across the country—and broader discussions about the agency's telework policy—escalated from a respectful disagreement to bitter conflict that created further animosity and distrust among

---

[524] Interview with ██ (July 28, 2020).
[525] *Id.*
[526] Memo from ██ (Nov. 21, 2019).
[527] *Id.*
[528] *Id.*
[529] Interview with ██ (July 27, 2020).
[530] *Id.* ██ did not provide the names of the other three people he mentioned.
[531] *Id.* ██ also believed ██, informed ██ of all Dr. Cuffari's meetings and calls. *Id.*   However, he we found no documentary evidence of this practice.
[532] Interview with ██ (Aug. 10, 2020).
[533] *Id.*
[534] WHDHS-00000454.
[535] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

the agency's leadership.  As with previous episodes, [(b) (6)] and [(b) (6)] challenged IG Cuffari, claiming that he was acting inappropriately and abusing his authority.

In October 2019, [(b) (6)], [(b) (3) (B), (b) (6)], notified his supervisors, including [(b) (6)], that he planned to move to [(b) (6)] in November 2019 [(b) (6)].[536]  [(b) (6)] asked to expand his telework agreement to the maximum extent permitted by law and DHS OIG policy so that he could work from his new home in [(b) (6)].[537]  By all accounts, [(b) (6)] was an excellent employee, and his request raised difficult questions about the wisdom of permitting telework so far from DHS OIG's headquarters.[538]  Under DHS OIG's policy at the time, employees could telework if they received written approval from their supervisors and physically reported to their duty station at least two days per pay period.[539]  The policy was silent on the issue of long-distance telework, but it made clear that telework was a management prerogative rather than an employee right.[540]

[(b) (6)] flagged the telework request for IG Cuffari and sought his feedback on her plan to approve the request.[541]  On October 15, 2019, [(b) (6)] emailed IG Cuffari to ask whether he had any input given that [(b) (6)] would be departing for [(b) (6)] in three weeks.[542]  She wrote that the arrangement "would merely require a modification to [[(b) (6)]] telework agreement, permitting him to telework to the full extent allowable (i.e., reporting to HQ twice per pay period), like many other OIG employees currently do."[543]  [(b) (6)] argued that the telework arrangement would be "cost neutral from the agency's perspective" because [(b) (6)] would personally pay for his periodic travel to the office.[544]

IG Cuffari was concerned about the financial and operational risks that a long-distance telework arrangement posed to the agency.[545]  After meeting with [(b) (6)] to discuss the issue, IG Cuffari asked for information about the specific request and the agency's telework practices more broadly.[546]  He directed [(b) (6)] to draft a memo detailing whether [(b) (6)] request complied with agency policy.[547]  IG Cuffari specifically asked that [(b) (6)] explain why she was "concerned that denying the request would give rise to claims that we were treating similarly situated employees differently," including by identifying the employees she believed were similarly situated.[548]

---

[536] Interview with [(b) (3) (B), (b) (6)] (July 16, 2020).
[537] *Id.  See also* WHDHS-00000257.
[538] WHDHS-00000224.
[539] WHDHS-00000200.
[540] *See id.*
[541] Interview with [(b) (3) (B), (b) (6)] (Oct. 30, 2020).
[542] WHDHS-00000344.
[543] *Id.*
[544] *Id.*
[545] WHDHS-00000225; WHDHS-00000485.
[546] WHDHS-00000256.
[547] *Id.*
[548] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

Following the receipt of IG Cuffari's request, **(b) (6)** directed **(b) (6)** that she not respond to IG Cuffari's request without first consulting with **(b) (6)** and **(b) (6)**.[549] **(b) (6)** did not respond directly to IG Cuffari and did not provide the list of employees that IG Cuffari requested.[550]  Instead, she drafted a memo and sent it to **(b) (6)**, who submitted it on her behalf.[551]  The memo explained why **(b) (6)** believed **(b) (3) (B), (b) (6)** telework request complied with DHS OIG's policy and federal law.[552]  Though IG Cuffari had asked for additional time to consider the request, **(b) (6)** told him that she would temporarily approve it:[553]

> Per DHS OIG's telework directive, I, as **(b) (6)** manager, am responsible for approving or disapproving his proposed telework arrangement. … I fully support his request and believe that a denial of his request would jeopardize the [**(b) (6)**] mission.  As you know, he and his family are scheduled to move in early November.  **(b) (3) (B), (b) (6)** will continue his employment under a modified telework arrangement while you consider this matter, and pending any official changes to DHS OIG's telework policy.[554]

When transmitting **(b) (6)** memo to IG Cuffari, **(b) (6)** did not provide IG Cuffari with the information he requested about other agency proposed employees who supposedly had similar telework arrangements.[555]  **(b) (6)** claimed that it would be "inappropriate" for **(b) (6)** to provide that information.[556]  **(b) (6)** did not explain why it would be inappropriate to provide the head of the agency with information about which employees, if any, were teleworking from a long distance.[557]  Without explanation, **(b) (6)** opined that there was "no basis" to deny **(b) (6)** **(b) (3) (B), (b) (6)** request under the current policy.[558]

Several weeks later, after fully considering the issue, IG Cuffari denied **(b) (6)** request to telework from **(b) (6)** in a memorandum explaining the basis for his decision.[559]  **(b) (6)** He expressed concern that approving the arrangement would impair DHS OIG's ability to require **(b) (2), (b) (6), (b) (5)**

**(b) (2), (b) (6), (b) (5)**

---

[549] WHDHS-00000659.
[550] WHDHS-00000198.
[551] WHDHS-00000197.
[552] WHDHS-00000198.
[553] *Id.*
[554] *Id.*
[555] *See* WHDHS-00000197.
[556] *Id.*
[557] WHDHS-00000198.
[558] WHDHS-00000197.
[559] WHDHS-00000224.
[560] WHDHS-00000225.
[561] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

**(b) (2), (b) (6), (b) (5)**

At the same time that he denied the request, IG Cuffari also suggested edits to DHS OIG's Grievance Handbook to add telework decisions to the list of decisions exempted from the grievance process.[563]   IG Cuffari explained that the telework program, "when effectively administered, is a valuable way to increase productivity," and that any "disputes or other concerns" about the program could be brought directly to the Inspector General rather than handled through the formal grievance process.[564]

**(b) (6)** responded to the denial with a direct and forceful memo asking IG Cuffari to reconsider his decision.[565]   The memorandum challenged IG Cuffari's legal and factual positions, insisting that **(b) (3) (B), (b) (6)** request was permitted by DHS OIG policy.[566]   In addition, the memo challenged not only IG Cuffari's judgment, but also his motives.[567]   **(b) (6)** wrote that she was "frankly shocked and dismayed" that IG Cuffari had characterized the telework discussions as an "administrative burden" given that she viewed them as "relat[ing] to the career and livelihood of a committed, high-performing OIG employee."[568]   She further argued that IG Cuffari, "in [her] humble opinion," had committed "an abuse of authority" by modifying the Grievance Handbook, in her view, "purely to deprive an individual employee of the ability to raise concerns about one of [his] decisions."[569]

**(b) (6)** and **(b) (6)** pressed IG Cuffari to reconsider as well.[570]   **(b) (6)** emailed IG Cuffari to emphasize that she agreed with **(b) (6)**, stating, "Modifying our grievance and telework policies to target one employee is a clear abuse of your authority as IG."[571]   **(b) (6)** told IG Cuffari that she believed his actions created **(b) (5)** [572] She explained, **(b) (5)** [573] IG Cuffari rejected the notion that he had changed the grievance policy to target **(b) (3) (B), (b) (6)**, noting that "I am the head of this agency and decisions I make are often final."[574]

**(b) (3) (B), (b) (6)** determined that he would not move back to D.C., and on November 15, 2019 asked for a **(b) (6)** transition period to "smoothly transfer [his] responsibilities."[575]   To accommodate

---

[562] *Id.*
[563] *See* WHDHS-00000235.
[564] WHDHS-00000224.
[565] WHDHS-00000215; WHDHS-00000216.
[566] WHDHS-00000216.
[567] *Id.*
[568] *Id.*
[569] *Id.*
[570] WHDHS-00000221; WHDHS-00000485.
[571] WHDHS-00000221.
[572] WHDHS-00000485.
[573] *Id.*
[574] *Id.*
[575] WHDHS-00000223.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

this request, IG Cuffari proposed a "situational telework" arrangement that would expire ███ ███ . Under this arrangement, IG Cuffari stated that ███ ███ would not be required to travel to Washington, D.C. two days per pay period.[577]   IG Cuffari expressed the view that his proposal, rather than the arrangement proposed by ███ ███ , would better protect the agency from financial exposure.[578]

███ ███ intervened in the discussion to question not only IG Cuffari's decision, but also his leadership.[579]  She responded to IG Cuffari's proposal by accusing him of "unwillingness to follow established OIG policies or to even engage in discussions on these issues with [his] executive team" in a way she found "baffling," "extraordinarily confusing," and "concerning on many levels."[580]  She claimed that IG Cuffari's actions had left OIG's policies in "complete disarray."[581] ███ ███ made the "strong recommendation" that IG Cuffari "hold [himself] to the same standards" to which OIG holds senior leaders in DHS who fail to follow DHS policies.[582]

Around this time, as discussed further below, ███ ███ and ███ ███ sent a referral letter to the CIGIE IC charging IG Cuffari with "gross mismanagement" of the agency.[583]   Among the allegations contained in the letter, they charged that IG Cuffari had "abused his authority by attempting to modify DHS OIG's existing policies and procedures to target a particular employee."[584]  ███ ███ notified IG Cuffari that she had referred him to CIGIE.[585]

On November 22, 2019, IG Cuffari emailed ███ ███ to request paperwork to approve the ███ ███ situational telework arrangement.[586]  In the email, IG Cuffari outlined the conditions for ███ ███ , specifically, that ███ ███ provide IG Cuffari with weekly proposals and certifications of his work and that he not travel without IG Cuffari's approval.[587]   IG Cuffari emphasized that ███ ███ initial telework request "was not within our policy and any manager lacked authority to approve it."[588]

In late January 2020, IG Cuffari's ███ ███ , ███ ███ , told ███ ███ that after ███ ███ , ███ ███ ███ (b) (5) continued to resist the decision, arguing that ███ ███ was being treated unfairly because there were other OIG employees who had been permitted to telework from hundreds of miles away.[590]  She argued that ███ ███ request should be granted absent a policy change to

---

[576] WHDHS-00000259.
[577] *Id.*
[578] *Id.*
[579] WHDHS-00000261.
[580] *Id.*
[581] *Id.*
[582] *Id.*
[583] WHDHS-00000305; WHDHS-00000255.
[584] WHDHS-00000305.
[585] WHDHS-00000314.
[586] WHDHS-00000294.
[587] *Id.*
[588] *Id.*
[589] WHDHS-00000354.
[590] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

require that employees live within a certain proximity of their duty location, which she claimed would affect many other employees.[591]  Again, (b) (6) did not provide IG Cuffari with a list of other employees who were supposedly teleworking from across the country.[592]

On February 27, 2020, IG Cuffari brought this dispute to a close by instructing (b) (6) to notify (b) (6) that his telework agreement would terminate on (b) (6)  IG Cuffari explained that the telework agreement he approved for (b) (6) was "always intended to be temporary" and that the arrangement (b) (6) originally approved was "inconsistent" with DHS OIG's telework directive.[594]  IG Cuffari told (b) (6) that the "telework arrangement you approved for (b) (6) subordinated the legitimate mission-related needs of OIG to the personal preferences of an employee who chose to relocate to (b) (6)  Thus, IG Cuffari concluded that he "overruled" (b) (6) "exercise of discretion with regard to (b) (6) telework privileges."[596]

Consistent with IG Cuffari's direction, (b) (6) communicated to (b) (6) that his telework agreement was being terminated.[597]  She reiterated to (b) (6) that she had been "overruled."[598]  After doing so, she informed (b) (6) that she "respectfully disagree[d] with this decision," but had notified (b) (6) as instructed.[599]

This debate over whether a single employee should be permitted to telework from (b) (6), against the backdrop of attempts to undermine IG Cuffari's authority, escalated this issue from a basic policy disagreement to accusations of personal misconduct that further limited the ability of the leadership team to operate effectively.  While the communications began for the most part respectful and constructive, (b) (6) escalated the rhetoric by questioning IG Cuffari's motives and claiming he had abused his authority to punish a particular employee.  (b) (6) intervention in the discussion at key points added little substance but added accusations of violations and abuses.  The discourse was worsened by repeated assertions—not supported with evidence—that many other OIG employees were long-distance teleworking.  The refusal or inability to provide evidence to back their claims created further distrust among the parties.  Rather than reaching a constructive resolution of this matter, (b) (6) and (b) (6) charged IG Cuffari with abusing his authority and referred the matter to CIGIE.[600]

---

[591] *Id.*

[592] *Id.* Over the course of these discussions, it appears that IG Cuffari was provided with the name of one OIG employee who was teleworking from North Dakota.  WHDHS-00000485.

[593] WHDHS-00000323.

[594] *Id.*

[595] *Id.*

[596] *Id.*

[597] WHDHS-00000322.

[598] *Id.*

[599] *Id.*

[600] WHDHS-00000305; WHDHS-00000255.  Following the denial of (b) (6) telework request, IG Cuffari asked (b) (6) to set up a telework committee to review DHS OIG's telework policy and propose possible revisions for his review.  WHDHS-00000485. We reviewed an allegation that (b) (6) engaged in professional misconduct and insubordination when she drafted the proposed telework procedures that directly contradicted what IG Cuffari requested.  On December 6, 2019, (b) (6) sent IG Cuffari a memorandum on behalf of the telework

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

**H.**   ██ (b) (6) ██   **Failure to Follow IG Cuffari's Directive**

We reviewed an allegation that ██ (b) (6) ██ failed to timely report allegations of improprieties against ██ (b) (6) ██ and ██ (b) (6) ██ after being directed to do so by IG Cuffari.

On September 24, 2019, IG Cuffari had a meeting with ██ (b) (6) ██ about a complaint from ██ (b) (6), (b) (3) (B) ██, a ██ (b) (3) (B), (b) (6) ██ in the ██ (b) (3) (B), (b) (6) ██,[601] ██ (b) (6) ██ informed IG Cuffari that ██ (b) (6), (b) (3) (B) ██ had made a complaint to the Senate HSGAC and potentially to CIGIE alleging disparate treatment by ██ (b) (6) ██ and ██ (b) (6) ██[602] ██ (b) (3) (B), (b) (6) ██ and ██ (b) (6) ██, ██ (b) (3) (B), (b) (6) ██, had previously filed complaints against each other, and ██ (b) (6) ██ alleged that ██ (b) (6) ██ and ██ (b) (6) ██ only investigated ██ (b) (3) (B), (b) (6) ██ complaint and not his because they were her friends with ██ (b) (3) (B), (b) (6) ██.[603]  IG Cuffari said that during a meeting, ██ (b) (6) ██ suggested that ██ (b) (3) (B), (b) (6) ██ complaint should be referred to the CIGIE IC since ██ (b) (6) ██ ██ (b) (6) ██, as the ██ (b) (6) ██, was a "covered person."[604]  IG Cuffari agreed, and instructed ██ (b) (6) ██ to draft a referral letter to the CIGIE IC regarding ██ (b) (3) (B), (b) (6) ██ allegations against ██ (b) (6) ██.[605]

After several weeks, ██ (b) (6) ██ had not provided the draft referral letter to IG Cuffari as he had requested.[606]  A month later, on October 16, 2019, IG Cuffari met with ██ (b) (6) ██ and ██ (b) (6) ██ ██ (b) (6) ██ then ██ (b) (6) ██ Cuffari, to follow up about the draft referral letter.[607]  During the meeting, ██ (b) (6) ██ denied ever telling IG Cuffari that the matter should be referred to the CIGIE IC, claiming that the issue did not rise to the level of requiring a referral to the CIGIE IC and that he ██ (b) (6) ██, could internally handle the matter despite the fact that ██ (b) (6) ██ was a "covered person."[608]  After ██ (b) (6) ██ left the meeting with IG Cuffari, IG Cuffari showed ██ (b) (6) ██ a handwritten note about the prior meeting and stated that ██ (b) (6) ██ was not being truthful about his request to draft a referral to CIGIE.[609]

We reviewed IG Cuffari's contemporaneous handwritten notes of his meeting with ██ (b) (6) ██, which corroborate that ██ (b) (6) ██ recommended sending the "allegations about ██ (b) (6) ██ and ██ (b) (6) ██

---

committee, outlining their proposed recommendations for the DHS OIG telework policy.  WHDHS-00000594.   The telework committee ██ (b) (2), (b) (5) ██ ██.  *Id.*  We found no evidence that ██ (b) (6) ██ engaged in professional misconduct or insubordination or directly contradicted IG Cuffari's request.  Rather, our investigation found that ██ (b) (6) ██, along with the other members of the telework committee, followed IG Cuffari's instructions in proposing possible revisions to the telework policy.  While the committee did not strictly adhere to the 10-page limit IG Cuffari suggested, (WHDHS-00000600) this failure was de minimis.

[601] DHS OIG Timeline (06/08/2020).
[602] Interview with Joseph Cuffari (June 8, 2020).
[603] *Id.*
[604] *Id.*
[605] Dr. Cuffari took contemporaneous notes dated September 24, 2019 memorializing his conversation with ██ (b) (6) ██.  ██ (b) (6) ██ IG Cuffari's Notes of his September 24, 2019 Conversation with ██ (b) (6) ██.  We reviewed these notes, which largely corroborate Dr. Cuffari's account.
[606] Interview with Joseph Cuffari (June 8, 2020).
[607] *Id.*
[608] *Id.*
[609] Response to WilmerHale Investigation from ██ (b) (3) (B), (b) (6) ██ (Dec. 8, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

to CIGIE," and that IG Cuffari directed ▮(b) (6)▮ to "prepare a memo with supporting documents."[610]

In her interview, ▮(b) (3) (B), (b) (6)▮ said she did not recall IG Cuffari asking her to draft a referral letter to the CIGIE IC about the allegations related to ▮(b) (3) (B), (b) (6)▮.[611] ▮(b) (3) (B), (b) (6)▮ also said she did not recall meeting with IG Cuffari and ▮(b) (6)▮ to discuss the referral to CIGIE.[612]

IG Cuffari's contemporaneous notes of his meeting with ▮(b) (6)▮ corroborate his statement that ▮(b) (6)▮ recommended sending the allegations to the CIGIE IC and that he asked her to prepare a memo on the issue with supporting documentation. In his written responses to questions, ▮(b) (3) (B), (b) (6)▮ largely confirmed IG Cuffari's account. Given ▮(b) (6)▮ friendship with ▮(b) (6)▮ and ▮(b) (6)▮, it is plausible that ▮(b) (6)▮ would have been reluctant to draft a referral letter to the CIGIE IC regarding potential misconduct on their part.

## I.   Confusion Over a Meeting with Foreign Nationals at DHS OIG Leads to Further Suspicion

Like the telework dispute, a mundane decision about whether to host an hour-long meeting with an international delegation led IG Cuffari to further distrust ▮(b) (6)▮.

On October 17, 2019, ▮(b) (6)▮, ▮(b) (6)▮, emailed ▮(b) (6)▮ and ▮(b) (6)▮ to inquire whether IG Cuffari was interested in attending a meeting with a foreign delegation.[613] According to ▮(b) (6)▮, the DOJ Overseas Prosecutorial Development and Training ("OPDAT"), along with the State Department Resident Legal Advisor at the U.S. Embassy in Myanmar, was planning to bring a delegation of foreign officials to DHS OIG's office on November 6 or 7 for about an hour.[614] ▮(b) (6)▮ asked ▮(b) (6)▮ to let her know if IG Cuffari was interested in doing a meet-and-greet or presentation at the meeting.[615]

On November 2, 2019, ▮(b) (6)▮ emailed IG Cuffari, copying ▮(b) (6)▮, asking if he was interested in attending the OPDAT meeting with the Myanmar delegation.[616] ▮(b) (6)▮ explained that the delegation wanted to learn about DHS OIG and that the meeting was scheduled to take place the following week."[617] Finally, ▮(b) (6)▮ stated that ▮(b) (6)▮ could attend the meeting as an alternative if IG Cuffari could not attend.[618] Two days before the meeting, on November 4, 2019, IG Cuffari emailed ▮(b) (6)▮ and ▮(b) (6)▮ informing them that he planned to attend.[619]

---

[610] Joseph Cuffari's handwritten notes of meeting with ▮(b) (6)▮.
[611] Interview with ▮(b) (3) (B), (b) (6)▮ (Aug. 28, 2020).
[612] *Id.*
[613] WHDHS-00000465.
[614] *Id.*
[615] *Id.*
[616] WHDHS-00000480.
[617] *Id.*
[618] *Id.*
[619] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

Later that day, IG Cuffari emailed ██████ stating that he recalled from previous government experience that he had to obtain foreign access clearance from the DOJ Security and Emergency Planning Division to participate in "foreign visits."[620]  He asked ██████ to confirm whether DHS "has a similar clearance requirement and if so whether the Chief Security Officer has conducted the required security checks and granted such approval."[621]

██████ responded that she knew about his "previous involvement which is partly why ██████ ██████ thought [IG Cuffari would] be interested in this visit" and "assume[ed] all the security checks etc. were done but will confirm."[622]  Following IG Cuffari's email, ██████ emailed ██████ ██████ noting that IG Cuffari would attend the meeting and asked whether she had information on the security clearances.[623] ██████ forwarded ██████ email to ██████, ██████ to the IG, who looked into the issue.[624]

On November 5, 2019, ██████ emailed IG Cuffari stating:

> The security check is still in process apparently.  DHS requires 30 days notice, they didn't get the names soon enough, but DOJ apparently has cleared.  Question as to why we can't rely on reciprocity using DOJ's clearance, but they're trying to work through it.  It may mean the meeting has to be at DOJ instead of here, but we'll keep you posted.[625]

The following day, ██████ told IG Cuffari that she "finally got to the bottom of the clearance question" and confirmed that the meeting had to be held at DOJ.[626]

██████ had extended the invitation to IG Cuffari to attend the OPDAT meeting without first determining whether the appropriate clearances were in place for the attendees to enter the DHS OIG facility, and ultimately was unable to secure those clearances in time to hold the meeting.[627]  It is unclear whether this security issue would have been identified had IG Cuffari himself not asked ██████ to check on it.  Although we found no evidence that the failure to obtain these clearances was more than an innocent mistake, this error—in the context of the contemporaneous efforts of ██████ and her allies to undermine IG Cuffari's work—led IG Cuffari to suspect that ██████ or ██████ might have been trying to lure him into a meeting with foreign nationals that violated DHS OIG's security protocols.[628]

---

[620] *Id.*
[621] *Id.*
[622] WHDHS-00000475.
[623] WHDHS-00000477.
[624] *Id.*
[625] WHDHS-00000475.
[626] WHDHS-00000483.
[627] *Id.*
[628] *See* Interview with Joseph Cuffari (June 8, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

**J.    Another Dispute Leads** ▮(b) (6)▮ **and** ▮(b) (6)▮ **to Send Complaints about IG Cuffari to CIGIE IC and Congress**

In the fall of 2019, DHS OIG was preparing an audit report on undocumented immigrant families separated after crossing the border (the "Separated Families Report"). ▮(b) (3) (B), (b) (6)▮, the ▮(b) (3) (B), (b) (6)▮, provided a draft of the Separated Families Report to IG Cuffari for his comments in September 2019, at the end of fiscal year. [629]  She said the team had also provided IG Cuffari an advance copy in August 2019.[630] ▮(b) (3) (B), (b) (6)▮ recalled following up with IG Cuffari several times about the report, but found that he was still reviewing it.[631]

On November 12, 2019, IG Cuffari received a letter from the Chairwoman of the House Committee on Oversight and Reform, Representative Carolyn Maloney, inquiring about the status of the Separated Families Report.[632]  IG Cuffari explained that Chairwoman Maloney had the erroneous idea that he had "parked the report" and that he was sitting on it for political purposes.[633]

Two days later, on November 14, 2019, ▮(b) (6)▮ sent a referral letter to the CIGIE IC alleging that Dr. Cuffari had engaged in "gross mismanagement" of the organization, "abused [his] authority" as Inspector General, and demonstrated "impaired independence."[634]  The letter was signed by ▮(b) (6)▮, but listed both ▮(b) (6)▮ and ▮(b) (6)▮ as contacts to contact about the issues.[635] ▮(b) (6)▮ was also copied on the email submitting the referral.[636]  The first allegation related to IG Cuffari's supposed withholding of OIG reports, including the Separated Families Report.[637] ▮(b) (6)▮ and ▮(b) (6)▮ had testified before Congress that the Separated Families Report would be published by the end of September.[638]  In the referral letter, ▮(b) (6)▮ wrote, "IG Cuffari's withholding of reports constitutes management action (or inaction) creating a substantial risk of significant adverse impact upon DHS OIG's ability to accomplish its mission."[639]  The referral also included the allegation by ▮(b) (6)▮ and ▮(b) (6)▮ that IG Cuffari "abused his authority" with respect to the ▮(b) (6)▮ telework issue."[640]

After submitting the letter to CIGIE, ▮(b) (6)▮ emailed IG Cuffari, "Today I submitted a formal complaint to the CIGIE Integrity Committee alleging that you have grossly mismanaged the

---

[629] Interview with ▮(b) (3) (B), (b) (6)▮ (Aug. 7, 2020).
[630] *Id.*
[631] *Id.*
[632] WHDHS-00000207.
[633] Interview with Joseph Cuffari (June 8, 2020).
[634] WHDHS-00000305. On November 20, 2019, Dr. Cuffari also self-reported to CIGIE allegations from ▮(b) (6)▮ ▮(b) (6)▮ about his leadership with respect to the Separated Families Report.  Cuffari Referrals to CIGIE, p. 21. We have not identified any response from CIGIE.
[635] *Id*.
[636] WHDHS-00000869.
[637] WHDHS-00000305.
[638] *Id.*
[639] *Id.*
[640] WHDHS-00000870.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

organization, abused your authority as Inspector General, and demonstrated independence impairments."[641]

Five days later, on November 19, 2019, IG Cuffari responded to Chairwoman Maloney's letter, writing that the Separated Families Report needed some edits and would be published as soon as it was ready.[642]  IG Cuffari denied the report was being "withheld for any partisan or political reasons."[643]   To avoid the appearance of partisanship with the report, IG Cuffari delegated authority to ▮(b) (6)▮ to sign the report since the audit work was done prior to his confirmation.[644]

The next morning, on November 20, 2019, ▮(b) (6)▮ refused.[645]  In a strongly worded response to IG Cuffari, ▮(b) (6)▮ charged that his letter to Chairwoman Maloney was "not truthful" because the report was finished.[646]  She wrote that IG Cuffari had the report since September 23, 2019, and suggested that he had intentionally delayed his review.[647]  She further claimed that since his memo to her delegating authority "was prepared less than a day after you sent your letter to Chairwoman Maloney, your actions are deceitful."[648]  She ended her email by noting, "I have already sent this information to the Integrity Committee and will take any other actions I deem appropriate to protect the integrity of DHS OIG."[649]

That same morning, ▮(b) (6)▮ sent a follow up email to the CIGIE IC alleging that IG Cuffari's response to Chairwoman Maloney was not truthful.[650]  She wrote, "Contrary to his claim, no additional 'editing, reviewing, and evaluation' of the report is taking place."[651]  She concluded her email by writing, "It appears IG Cuffari simply is unwilling to affix his name to a report with findings with which he is 'uncomfortable' for reasons that appear to relate to his relationship/position vis-à-vis the Administration/White House."[652]

In addition to the CIGIE IC, ▮(b) (6)▮ and ▮(b) (6)▮ reached out to Congressional staffers, briefing both the majority and minority staffs of the House Committee on Oversight and Reform. ▮(b) (6)▮ wrote that she "wanted to alert [them] to some inaccuracies in the letter" that IG Cuffari sent.[653]  They also provided the staffers with a copy of their CIGIE referral letter.[654]

---

[641] WHDHS-00000857.
[642] WHDHS-00000282.
[643] *Id.*
[644] Interview with Joseph Cuffari (June 8, 2020); *see also* WHDHS-00000281.
[645] Interview with Joseph Cuffari (June 8, 2020); *see also* WHDHS-00000850; WHDHS-00000281.
[646] WHDHS-00000281.
[647] *Id.*
[648] *Id.*
[649] *Id.*
[650] WHDHS-00000264.
[651] *Id.*
[652] *Id.*
[653] WHDHS-00000267.
[654] *Id.*  We reviewed allegations that ▮(b) (6)▮ engaged in a pattern of selectively having meetings with members of Congress and/or legislative staff of only one political party.  Two witnesses stated that ▮(b) (6)▮ communicated with Senator Schumer's office in an effort to derail IG Cuffari's nomination.  With respect to the

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

On November 25, 2019, DHS OIG published the Separated Families Report, signed by IG Cuffari.[655]  The report contained a footnote which read, "The IG signed this report to ensure its timely completion and submission to Congress and the public, but did not participate in the investigative phases of the project."[656]  ████████████████, said she found the footnote odd, noting she has never seen such a footnote included in a report signed by an IG.[657] ██████████ thought IG Cuffari was trying to separate himself from the work.[658]

For his part, IG Cuffari explained that he added the footnote at the recommendation of ████ ██████████████████████, to demonstrate that IG Cuffari was not involved in the underlying investigation nor had he made substantive changes to the report.[659]  The footnote was to refute the allegation made by ████████ and ████████ to Congress and CIGIE that he had interfered in the report for political reasons.[660]

On December 11, 2019, the CIGIE IC sent ████████ a letter notifying her that they declined to investigate her complaint.[661]

## VI.   MISTREATMENT OF OTHER DHS OIG EMPLOYEES

### A.   An Atmosphere of Mistrust and Retaliation

In addition to their efforts to undermine ████████ and IG Cuffari outlined above, current and former DHS OIG employees detailed what they believed to be a pattern of mistreatment by ████████, ████████ and to a lesser extent ████████, of any employees deemed insufficiently loyal or standing in the way of their agenda.[662] ████████████████, explained that ████████, ████████ and ████████ operated together and ████████████ suggested that they would retaliate against anyone who crossed them.[663] ████████ said ████████, ████████, and ████████ had a target on the backs of certain DHS OIG personnel, and she believed their goal was to get certain people out of the way.[664]  As a result,

---

Separated Families Report, our investigation uncovered that ████████ emailed Congressional staff members of both the Majority and Minority committee staff.  In another instance, ████████ emailed a member of the Democratic staff of the House Oversight and Reform Committee regarding her concerns that IG Cuffari was retaliating against her and suggested a bipartisan hearing.  While we found ████████ had multiple interactions with Congress, we did not find evidence to substantiate the allegation that she engaged in a pattern of selectively having meetings with just one political party.
[655] DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families, The Dep't. of Homeland Sec., Off. Of the Inspector General, https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf (Nov. 29, 2019).
[656] Id.
[657] Interview with ████████ (Aug. 7, 2020).
[658] Id.
[659] Interview with Joseph Cuffari (June 8, 2020).
[660] Id.
[661] WHDHS-00000298.
[662] Interview with ████ (July 22, 2020); Interview with ████████ (July 23, 2020).
[663] Interview with ████ (July 22, 2020).
[664] Interview with ████ (July 23, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

some employees referred to them collectively as the "Mean Girls."[665] █████████ similarly described them as "the Trio," who would target individuals they did not like.[666]

In interviews, current and former DHS OIG employees described a challenging working environment where employees often faced verbal abuse and threats of poor performance evaluations.[667] For example, as noted above, █████ explained that █████ would "trash" those who did not support her.[668] █████████████, stated that █████ would often speak critically of other employees during meetings.[669] ██████ ██████ ████████, described █████ as "belittling and demeaning to the entire core of chief inspectors" and GS-15s, including █████████,[670] █████████ left former position as ████████ ██ — ████████████ —due to █████ mistreatment.[671]

████████, █████████████, described her as "cutting" and "mean" to █████ and recalled that she caused one █████ to cry in the workplace.[672] ████████████, described her as "mean" and "abusive."[673] █████████ alleged that █████ attempted to force █████ to resign from her role as █████, and threatened her with poor performance evaluations if she did not.[674] █████████ believed █████ tried to get her to resign simply because she would not bend to █████ requests.[675] Other employees, such as █████████ and █████████, described █████ as a "bully" and "disrespectful."[676] █████████ ██████, stated that █████ became "aggressive" when she was displeased with employees.[677]

---

[665] Interview with █████████ (Sept. 3, 2020); Interview with █████████ (Sept. 15, 2020).  The term "Mean Girls" is a reference to the 2004 movie of the same name about high school social cliques and the interactions between them. *See* Mean Girls (Paramount Pictures Film Released Apr. 19, 2004).
[666] Interview with █████████ (July 28, 2020).
[667] *See* Interview with █████████ (July 23, 2020); Interview with █████ (Aug. 7, 2020); Interview with █████████ (Sept. 15, 2020); Interview with █████████ (July 31, 2020).
[668] Interview with █████████ (Aug. 7, 2020).
[669] Interview with █████████ (Aug. 20, 2020).
[670] Interview with █████████ (Sept. 15, 2020).
[671] *Id.*
[672] Interview with █████████ (July 31, 2020).
[673] Interview with █████████ (July 23, 2020).
[674] *Id.*
[675] *Id.*
[676] Interview with █████████ (Sept. 3, 2020); Interview with █████████ (July 24, 2020).
[677] Interview with █████████ (Oct. 28, 2020).  We reviewed an allegation that █████ created a hostile work environment and permitted a subordinate to create a hostile work environment.  While there was evidence, as described above, of █████ unprofessional behavior to subordinates, we did not find any evidence that █████ conduct was motivated by a discriminatory intent.  *See, e.g.*, Ashraf-Hassan v. Embassy of France in United States, 999 F. Supp. 2d 106, 113 (D.D.C. 2013) ("To prevail on a hostile-work-environment claim, a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult…") (internal quotation marks and citation omitted).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

By contrast, ██████ said she liked ██████ and felt badly that ██████ got caught up in the "Mean Girl club."[678] ██████ described ██████ as "smart" and "a bright ██████"[679] ██████ also had a favorable impression of ██████, recalling that ██████ hosted a team-building event at her home.[680]  For the most part, few witnesses had negative things to say about ██████ treatment of DHS OIG employees.

**B.    Accumulation of Power Through the Consolidation of Human Resources Management Division under the Office of Counsel**

In August 2018, ██████ and ██████ transferred 17 members of the Human Relations and Management Division ("HRMD") from the Office of Management ("OM") to the OC.[681]  At the time, ██████, while ██████.  The employees were moved following allegations by several employees, including ██████, the ██████, that ██████ had ██████.  The move was purportedly designed to ██████ during the pendency of the investigation of those allegations.[683]

When an employee has made a claim of ██████, it is unusual for management to move the complainant (not to mention an entire department) as opposed to the alleged transgressor.  The movement of the complainant as opposed to the transgressor could create a perception of ██████ ██████.  Thus, in these situations, the typical practice is to remove the alleged transgressor from the situation rather than the complainant.[684]

During her interview, ██████ stated that ██████ and ██████ told her that HRMD would be moved from OM to the OC because of complaints filed against her.[685]  ██████ told ██████ that they were worried about ██████ but that it would be too disruptive to place ██████ on administrative leave, which ██████ said would have been the normal process.[686]  ██████ described the approach as "very unusual."[687]

In her interview, ██████ explained that as ██████, ██████ oversaw ██████ ██████.[688]  She stated that since the allegations of wrongdoing were limited to HRMD, she and ██████ decided that HRMD should be moved rather than ██

---

[678] Interview with ██████ (Sept. 3, 2020).  We also reviewed an allegation that ██████ permitted a ██████.  We were not able to find any evidence to support this allegation.
[679] Interview with ██████ (Sept. 3, 2020).
[680] Interview with ██████ (Aug. 7, 2020).
[681] Interview with ██████ (July 23, 2020); DHS OIG Timeline (06/08/2020).
[682] Interview with ██████ (July 23, 2020).
[683] *Id.*
[684] ██████████████████████████████████████████████
[685] Interview with ██████ (Aug. 6, 2020).
[686] *Id.*
[687] *Id.*
[688] Interview with ██████ (Oct. 30, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

██████████ .[689]  As a result of the move, ██████ became ██████ ████████ and all HRMD personnel from August 2018 to February 2019.[690]  In February 2019, when ██████ joined DHS OIG, she ████████ .[691]

████████████ said ████████ and ████████ told her that they would not announce the move publicly, but would say that it was part of an end-to-end review of HRMD's processes if they had to discuss it.[692]  When the reorganization was announced to the affected employees, ██████ communicated to ██████████ that the move would occur as part of a 30-day trial.[693]  In fact, HRMD remained under OC for more than a year until it was moved back at IG Cuffari's direction.[694]

Shortly after his confirmation, IG Cuffari asked why HRMD was under the OC and expressed his intention that HRMD be returned to OM.[695]  On August 13, 2019, ████████ , ████████ ██████ told ████████ that "Dr. Cuffari requested yesterday that we start the process of transferring HR[MD] back to OM."[696]

In November 2019, IG Cuffari requested additional information from ██████ and ██████ on the reasons underlying the 2018 decision to move HRMD.[697]  Our investigation uncovered internal communications between ████████ , ████████ and ████████ about a possible response.[698]  In one email exchange among the three individuals, ████████ wrote that HRMD was moved from under OM because DHS OIG had received complaints about ████████ and others.[699]  ████████ also prepared a timeline of the ████████ investigation.[700]  The timeline noted that, in August 2018, "████████ and then-████████ ██████ evaluated the situation and determined that, while the inquiry was ongoing, the HR function should be removed from ██████ direct supervision" both to "shield the complainants from further direct contact with their alleged ████████" and "to protect ████████ from further claims of ████████ ."[701]

On November 14, 2019, ██████ provided a memorandum to IG Cuffari regarding the ██████ investigation.[702]  The memorandum stated that, ████████

---

[689] *Id.*
[690] DHS OIG Timeline (06/08/2020).
[691] *Id.*
[692] Interview with ████████ (Aug. 6, 2020).
[693] Interview with ████████ (July 23, 2020).
[694] *Id.*
[695] WHDHS-00000273.
[696] *Id.*
[697] WHDHS-00000210.
[698] WHDHS-00000269.
[699] *Id.*
[700] *Id.*
[701] *Id.*
[702] WHDHS-00000811.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

(b) (5)
[703]

In January 2020, in response to additional questions from (b) (6), about the move of HRMD, (b) (6) wrote in an email that the HRMD move "was not officially documented."[704] (b) (3) (B), (D) (b) also stated her belief that there was no formal/official paperwork to reassign the employees from OM to the OC.[705]  During her interview, (b) (3) (B), (b) (6) stated that the HRMD move was not documented with new SF-50s or other paperwork.[706]  However, she disputed that the lack of SF-50s meant that the move was improper or that she was overseeing HR in an unofficial capacity.[707]  (b) (3) (B), (b) (6) similarly stated that "we didn't cut personnel actions" for the move, meaning that no formal personnel documentation was completed.[708]

Consistent with the witnesses' statements, our investigation did not identify any documentation from the Fall of 2018 formalizing the move of HRMD from OM to the OC.  However, we found no OPM or DHS guidelines requiring SF-50s to effectuate the employees' moves.[709]

Internal emails and documents corroborate the stated rationale for moving HRMD under the OC, albeit after the fact—namely, that HRMD was moved from OM after DHS OIG received complaints from HRMD employees concerning executives in that office.[710]  While moving HRMD to the OC enabled (b) (6), (b) (6), and (b) (6) to have greater control over personnel actions and investigations, we did not find evidence to conclude that this was the primary motivation for the reorganization.

Nevertheless, the effect of reassigning HRMD under the OC was that it consolidated personnel decisions and employee misconduct investigations under the auspices of first (b) (6) and later, (b) (6). Multiple current and former DHS OIG employees shared the general belief that (b) (6), (b) (6) and (b) (6) initiated improper investigations or took personnel actions against employees deemed to be insufficiently loyal.[711]

Following the move of HRMD to the OC, a number of administrative investigations into employees were conducted by the OC (b) (6)            (b) (6) and later (b) (6)[712]

---

[703] *Id.*
[704] WHDHS-00000633.
[705] Interview with (b) (3) (B), (b) (6) (Aug. 6, 2020).
[706] Interview with (b) (3) (B), (b) (6) (Aug. 27, 2020).
[707] *Id.*
[708] Interview with (b) (3) (B), (b) (6) (Oct. 30, 2020).
[709] Chapter 21: Realignment and Mass Transfer, Off. Of Pers. Mgmt, https://www.opm.gov/policy-data-oversight/data-analysis-documentation/personnel-documentation/processing-personnel-actions/gppa21.pdf ("Agencies may use any method that meets the conditions in Chapter 4, section 6, to notify employees of realignment actions. This is an additional agency option *in lieu of* the individual Standard Form 50, Notification of Personnel Action, or the list form of notice.").
[710] WHDHS-00000213.
[711] *See* Interview with (b) (3) (B), (b) (6) (Aug. 6, 2020); Interview with (b) (3) (B), (b) (6) (July 22, 2020); Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[712] *See* Interview with (b) (3) (B), (b) (6) (Aug. 20, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

When asked about the number of internal investigations of DHS OIG employees, [(b) (3) (B), (b) (6)], the [(b) (3) (B), (b) (6)] █████, stated that it was because employees kept filing complaints against one another, and [(b) (6)] was holding employees accountable for any misconduct.[713]

Our review found no clear standard applied before launching an internal investigation of a DHS OIG employee.  In February 2020, [(b) (6)] ███, [(b) (6)] ██████, asked [(b) (6)] and [(b) (6)] about the standard they applied when opening an internal investigation.[714] [(b) (6)] forwarded the request to [(b) (6)], and [(b) (6)] later included [(b) (6)] in the discussion, and they discussed how to craft a coordinated response.[715]  After exchanging several drafts internally, [(b) (6)] responded to [(b) (6)] with a lengthy description, which stated (in relevant part) that:

> OC does not have a written policy governing when to open a management inquiry in response to allegations. [(b) (6)]
>
> ████████████████████████████████████
> ████████████████████████████████████
> ████████████████████████████████████
> ████████████████████████████████████

[(b) (2), (b) (5)]
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████[718]

In her interview, [(b) (3) (B), (b) (6)] acknowledged that there were no written criteria for determining whether to open a management inquiry.[719]  However, [(b) (3) (B), (b) (5)] said that typically she and [(b) (6)] [(b) (6)] ███.[720] [(b) (3) (B), (b) (6)] said that [(b) (6)] was sometimes involved in the decision.[721]  [(b) (3) (B), (b) (6)] confirmed that there was no standard practice for opening an internal investigation.[722]  [(b) (3) (B), (b) (6)] attributed this to the culture of DHS OIG,

---

[713] We reviewed allegations that [(b) (6)], [(b) (6)], and [(b) (6)] made anonymous calls to the DHS OIG complaint hotline to justify initiating unwarranted investigations of employees.  Our review identified evidence of investigations initiated in response to complaints filed by individuals other than [(b) (6)], [(b) (6)], and [(b) (6)].  Despite reviewing numerous hotline complaints from the relevant time-period however, we did not identify any evidence that [(b) (6)], [(b) (6)] or [(b) (6)] made anonymous calls to the hotline.

[714] WHDHS-00000325.

[715] *Id.*

[716] WHDHS-00000320.

[717] WHDHS-00000320.

[718] WHDHS-00000325.

[719] Interview with [(b) (3) (B), (b) (6)] (Aug. 28, 2020).

[720] *Id.*

[721] *Id.*

[722] Interview with [(b) (3) (B), (b) (6)] (Oct. 20, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

where she claimed there were no clear-cut, structured guidance or policies in place.[723]  As a result, ███████████ described it more as an ad-hoc approach.[724]  ████████ insisted that in crafting a response to ███████, she and ███████ were not creating a post-hoc written criteria.[725]  Instead, she believed they were putting "pen to paper" on the approach already used to determine whether to open management inquiries.[726]  For her part, ███████ stated that they "would often do, you know, some pressure testing to see, you know, can – can we gauge the credibility of it."[727]  She explained that "basically we were doing kind of a threshold analysis to see if these were credible allegations of – of something that rose to the level of requiring a review."[728]

## C.  Reassignment of ███████ and Initiation of a Criminal Investigation for Use of a Parking Pass

███████ served as the ███████ at DHS OIG from 2009 to 2019—a time-period that encompassed service to IGs ███████, John Roth, and ███████.[729] ███████ strongly disliked ███████, a sentiment seemingly shared by ███████ and ███████.  ███████ made it known repeatedly that she intended to remove ███████ from the DHS OIG ███████ position as soon as she became ███████.

███████, ███████, and ███████ raised various complaints about ███████. For one, ███████ believed that ███████ had improperly promoted ███████ to a GS-15.[730] ███████ openly complained within DHS OIG that ███████ was not doing work sufficient to justify her GS-15 salary.[731]  According to ███████, ███████ and ███████ also did not like ███████ sitting in to take notes during meetings with ███████.[732] ███████ confirmed that she was "uncomfortable" with ███████ attending meetings and taking notes during sensitive personnel meetings.[733] ███████ believed that ███████ had improperly restored ███████ hours of leave, thereby allowing her to rollover excessive leave to the following year.[734]  ███████ and ███████ also had questioned ███████ purchase of a nameplate for IG Cuffari's door in June 2019, a month before he was confirmed by the Senate.[735] While ███████ had approved of ███████ purchase of the nameplate, ███████ explained that it represented "poor judgment" and ███████ was counseled about the proper use of her government purchase card.[736] ███████ included the nameplate issue in her referral to CIGIE

---

[723] *Id.*
[724] *Id.*
[725] Interview with ███████ (Aug. 28, 2020).
[726] *Id.*
[727] Interview with ███████ (Oct. 30, 2020).
[728] *Id.*
[729] Interview with ███████ (Aug. 6, 2020); Interview with ███████ (Aug. 10, 2020).
[730] WHDHS-00000863.
[731] Interview with ███████ (Aug. 27, 2020).
[732] Interview with ███████ (Aug. 6, 2020).
[733] Interview with ███████ (Aug. 27, 2020).
[734] Interview with ███████ (Oct. 30, 2020).
[735] Interview with ███████ (Aug. 28, 2020).
[736] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

about [(b) (6)], claiming that it "put Dr. Cuffari in a dangerous situation vis-à-vis Congress, which has been known to look unfavorably on nominees whose actions presuppose confirmation."[737]

[(b) (6)], [(b) (6)] and [(b) (6)] spoke disparagingly of [(b) (6), (b) (7)(C)] role in the DHS OIG [(b) (6)]. In her interview, [(b) (6)] described [(b) (6), (b) (7)(C)] as "[(b) (6)] and she let you know it and nobody got access [(b) (6)] unless they went through" [(b) (6), (b) (7)(C)].[738]  A number of witnesses commented that on repeated occasions, [(b) (6)] stated her intention to remove [(b) (6), (b) (7)(C)] from her [(b) (6)] position as soon as [(b) (6)] had retired.  For example, [(b) (3) (B), (b) (6)] said [(b) (6)] told her that she would do whatever it took to get [(b) (6), (b) (7)(C)] out of the [(b) (6)].[739] [(b) (3) (B), (b) (6)] corroborated this as well, noting that [(b) (6)] [(b) (6)] did not plan to keep [(b) (6), (b) (7)(C)] in her [(b) (6)] position once [(b) (6)] retired.[740] [(b) (3) (B), (b) (6)] stated that [(b) (6)] said in an open senior staff meeting that "[(b) (6)] is out as soon as possible."[741] [(b) (6)] confirmed that [(b) (6)] did not intend to keep [(b) (6), (b) (7)(C)] in her [(b) (6)] positon once [(b) (6)] retired, but [(b) (6)] did not know whether [(b) (6), (b) (7)(C)] would be reassigned to another position at that time.[742]

[(b) (6)] told DHS OIG investigators that there was "friction" between [(b) (6), (b) (7)(C)], [(b) (6)], [(b) (6)], and [(b) (6)], and that he heard all three make "disparaging comments" about [(b) (6), (b) (7)(C)].[743] [(b) (6)] thought that the source of the friction had to do with [(b) (6)] loyalty to him in the face of [(b) (6)], [(b) (6)], and [(b) (6)] trying to force him into retirement.[744]  In an email from April 26, 2019 referring to [(b) (6), (b) (7)(C)], [(b) (6)] wrote to [(b) (6)] and [(b) (6)] that "Cinderella will be back in rags on May 3.  But I'll keep the glass slippers...."[745]  In her interview, [(b) (6)] presumed that [(b) (6)] reference to May 3rd was the date when [(b) (6)] was expected to retire.[746] [(b) (6)] explained that in this email, [(b) (6)] was stating that [(b) (6), (b) (7)(C)] would "not be on a high horse and in charge of the [(b) (6)] in the way that she has been when [(b) (6)] retires because [(b) (6)] was, you know, the person who really promoted her and gave her vast authority as his [(b) (6)]."[747]  However, [(b) (6), (b) (6)] said she did not remember having any conversations with [(b) (6)] about moving [(b) (6), (b) (7)(C)] out of her [(b) (6)] position.[748] [(b) (6)] also pushed back on the idea that there was any tension between [(b) (6)] and [(b) (6), (b) (7)(C)] a statement inconsistent with the evidence and witnesses' statements.[749]  The same day [(b) (6)] sent her email to [(b) (6)] and [(b) (6)],

---

[737] WHDHS-00000862.
[738] Interview with [(b) (3) (B), (b) (6)] (Oct. 30, 2020).
[739] Interview with [(b) (3) (B), (b) (6)] (Aug. 6, 2020).
[740] Interview with [(b) (3) (B), (b) (6)] (Oct. 30, 2020).
[741] Interview with [(b) (3) (B), (b) (6)] (July 28, 2020).
[742] Interview with [(b) (3) (B), (b) (6)] (Aug. 27, 2020).
[743] I19-OIG-SIU-18975 MOA, 10-21-19 [(b) (6)] Interview.
[744] *Id.*
[745] WHDHS-00000067.
[746] Interview with [(b) (6), (b) (6)] (Aug. 27, 2020).
[747] Interview with [(b) (3) (B), (b) (6)] (Oct. 30, 2020).
[748] *Id.*
[749] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

April 26, 2019, she also sent a separate email to ██ **(b) (6)** and ██ **(b) (6)** , **(b) (6)** , inquiring about where in the agency **(b) (6), (b) (7)(C)** could be transferred.[750]

On June 13, 2019, just three days after **(b) (6)** retirement, **(b) (6)** and **(b) (6)** removed **(b) (6), (b) (7)(C)** from her .[751] **(b) (6)** and **(b) (6)** told **(b) (6)** that they wanted to make changes to the **(b) (6)** and that she was being reassigned.[752]  Initially, they did not have a new position for **(b) (6), (b) (7)(C)** , so she was placed on a detail to the **(b) (6)** , effective June 24, 2019, until she received a new position description.[753]  Later, **(b) (6)** and **(b) (6)** informed **(b) (6), (b) (7)(C)** that she was going to be moved to the **(b) (6)** permanently.[754]  **(b) (6)** explained in her interview that she had last worked in the **(b) (6)** prior to becoming an **(b) (3) (B), (b) (6)** eleven years before.[755]  When **(b) (6), (b) (7)(C)** was reassigned to **(b) (6)** , **(b) (6), (b) (7)(C)** was a GS-15 and did not understand what her role in the **(b) (6)** would be or her expectations.[756]  She was concerned that she would not know how to do the job since it had been a decade since she had done it.[757]

**(b) (6)** was also moved from her cubicle in the **(b) (6)** to a cubicle in the **(b) (6)** seating area.[758]  **(b) (6)** asked **(b) (6)** about her seating arrangement because all GS-15 employees in the had offices.  In response, **(b) (6)** explained that only GS-15 attorneys were assigned to offices.[759]  **(b) (6)** noted that there were empty offices and asked **(b) (6)** if she could use one until more attorneys were hired.[760]  **(b) (6)** refused.[761]

Despite being removed from the **(b) (6)** , **(b) (6)** **(b) (6)** **(b) (6)** IG Cuffari.  When she attempted to **(b) (6)** , **(b) (6)** severely admonished her.  In one email, on July 9, 2019, **(b) (6)** wrote, "I believe **(b) (6)** was clear when you were reassigned from the **(b) (6)** that **(b) (6)** was handling all matters.  Any communications you receive from anyone concerning OIG matters that come to you because **(b) (6)** immediately upon receiving them."[762]  In her interview, **(b) (3) (B), (b) (6)** explained:

> A GS-15 should be able to follow very simple instructions, like she's no longer in
> the position and **(b) (6)** was acting as **(b) (6)** .  I expect my
> instructions to be followed….I mean, it just – that passive aggressiveness as I

---

[750] WHDHS-00000851.
[751] *See* Interview with **(b) (3) (B), (b) (6)** (Aug. 10, 2020).
[752] Interview with **(b) (3) (B), (b) (6)** (Aug. 10, 2020).
[753] *Id.*
[754] *Id.*
[755] Interview with **(b) (3) (B), (b) (6)** (Aug. 6, 2020).
[756] Interview with **(b) (3) (B), (b) (6)** (Aug. 10, 2020).
[757] *Id.*
[758] Follow-Up Interview with **(b) (6)** (Dec. 2, 2020) (noting that **(b) (6)** occupied a cubicle when she served as **(b) (6)** ); WHDHS-00000653.
[759] *Id.*
[760] *Id.*
[761] *Id.*
[762] WHDHS-00000457.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

characterize it was inappropriate and I can't tolerate that.  I don't have time for that.[763]

Six days later after ██████ email, on July 15, 2019, a criminal investigation was initiated into ████████ use of a parking pass.[764]  According to the report of the investigation, it was initiated "based on information from ███████." [765]  ████████ alleged that ████████ "may have misused a government funded parking card that had been created for Dr. Joseph Cuffari . . . ."[766]  In her interview, █████████ stated that ████████ provided her with documentation showing activity on a parking pass assigned to IG Cuffari, whose nomination at that time was pending confirmation.[767]  According to ████████, ████████ had directed the agency to revoke parking passes for anyone who was not an "SES, executive, or had a reasonable accommodation" in an attempt to cut costs.[768]  Prior to his retirement, ████████ had raised the issue of ██ ████ continued use of the parking pass with ████████, and he stated that he would discuss it with her.[769]

An employee in OM reviewed parking pass usage and informed ████████ that ████████ had a parking pass that had been assigned to IG Cuffari.[770]  ████████ asked ████ for advice about how to proceed and ████████ said she would handle it.[771]  ████████ later learned that an inquiry was opened to investigate this issue.[772]  █████████ believes the use of the parking pass was a legitimate question to pursue, but was skeptical that it warranted a full investigation.[773]

In her interview, █████████ stated that she felt some investigation needed to occur, and notified ████████, and ████████, of the activity on the parking pass.[774]  █████████ said they told her that INV would investigate the issue because there could be potential fraud. [775]  On July 23, 2019, ████████ notified the FBI that DHS OIG initiated a criminal investigation concerning allegations that ████████ violated 18 U.S.C. § 641 (theft of government property).[776]  Also on July 23, 2019, ████████, contacted ████████ of the Public Integrity Section at the DOJ, and briefed him

---

[763] Interview with ████████ (Aug. 27, 2020).
[764] WHDHS-00000285.
[765] *Id.*
[766] *Id.*
[767] *See* Interview with ████████ (Aug. 27, 2020); Interview with ████████ (Aug. 28, 2020).
[768] Interview with ████████ (Aug. 6, 2020).
[769] Interview with ████████ (Oct. 30, 2020).
[770] Interview with ████████ (Aug. 6, 2020).
[771] *Id.*
[772] *Id.*
[773] *Id.*
[774] Interview with ████████ (Aug. 27, 2020).
[775] *Id.*
[776] FBI Notification, July 23, 2019.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

on the allegation related to ███ [b) (6), (b) (7)(C)]. [777] ███ [b) (6)] declined to open a criminal matter. [778]  On July 27, 2019, ███ [b) (3) (B), (b) (7)(C)] was notified that she was under investigation. [779]

In her interview, ███ [b) (3) (B), (b) (6)] told us that she decided that INV should handle the ███ [b) (6), (b) (7)(C)] investigation because she felt ███ [b) (6), (b) (7)(C)] would not be treated fairly if the investigation were conducted by ███ [b) (6)] and the OC. [780] ███ [b) (3) (B), (b) (6)] pointed to the fact that ███ [b) (6), (b) (7)(C)] had already been removed from the ███ [b) (6)] and treated poorly by ███ [b) (6)] and ███ [b) (6)]. [781] She said that ███ [b) (6)] had already made it clear that she did not trust ███ [b) (6), (b) (7)(C)] because of her loyalty to ███ [b) (6)]. [782]  Because of her concerns, ███ [b) (3) (B), (b) (6)] decided INV would handle the investigation on the basis that the allegation related to potential criminal activity and INV could run an efficient and straightforward investigation of that charge. [783]

In his interview, ███ [b) (3) (B), (b) (6)] stated that he told ███ [b) (6)] that INV was not the appropriate vehicle to investigate this issue. [784] ███ [b) (6)] responded that INV would investigate it "for the benefit of the agency." [785] ███ [b) (3) (B), (b) (6)] recalled that during the course of the ███ [b) (6), (b) (7)(C)] investigation, ███ [b) (6)] and ███ [b) (6)] showed great interest in the outcome of the investigation. [786] ███ [b) (3) (B), (b) (6)] found it odd that ███ [b) (6)] was interested in ███ [b) (6), (b) (7)(C)] parking pass investigation, particularly because ███ [b) (6)] did not express interest in other more serious cases INV was handling. [787]

The report of the investigation into ███ [b) (6), (b) (7)(C)] was completed by INV on November 25, 2019, and provided to ███ [b) (6)]. [788]  The report concluded that, "[t]he Special Investigations Unit (SIU) did not substantiate the allegation that ███ [b) (6), (b) (7)(C)] misused the government funded parking card." [789]  The report found that ███ [b) (6)] "had given ███ [b) (6), (b) (7)(C)] permission to use the parking card on an ad-hoc basis to use for official DHS OIG business" and "found no evidence that ███ [b) (6)] or any other member of DHS OIG, to include management, instructed ███ [b) (6), (b) (7)(C)] to discontinue using the parking card." [790]

For her part, ███ [b) (3) (B), (b) (6), (b) (7)(C)] explained that she was a "covered employee" and as such her investigation should have been handled by the CIGIE IC and not DHS OIG. [791] ███ [b) (3) (B), (b) (6)] and ███ [b) (3) (B), (b) (6)] confirmed that the ███ [b) (6), (b) (7)(C)] investigation should have been referred to the

---

[777] MOA_2 - Other - DOJ Public Integrity Section Declination.
[778] *Id.*
[779] Interview with ███ [b) (3) (B), (b) (6)] (Aug. 10, 2020).
[780] MOA_2 - Other - DOJ Public Integrity Section Declination.
[781] Interview with ███ [b) (3) (B), (b) (6)] (Sept. 15, 2020).
[782] *Id.*
[783] *Id.*
[784] Interview with ███ [b) (3) (B), (b) (6)] (July 24, 2020).
[785] *Id.*
[786] *Id.*
[787] *Id.*
[788] WHDHS-00000284; WHDHS-00000285.
[789] WHDHS-00000284.
[790] *Id.*
[791] Interview with ███ [b) (3) (B), (b) (6)] (Aug. 10, 2020).

CIGIE IC.[792] A May 13, 2019, email from [redacted], on behalf of [redacted], to CIGIE includes her designation as a "covered position."[793] [redacted] and [redacted] acknowledged that the conduct that was investigated occurred when [redacted] was serving in a covered position, and [redacted] informed CIGIE about the investigation after it was initiated.[794] However, [redacted] wrote that the issue did not warrant a referral to the CIGIE IC.[795]

According to CIGIE's policies, the CIGIE IC "may consider wrongdoing alleged to have occurred while an individual served as a Covered Person, even if that individual is no longer a Covered Person or in government service when the IC receives the allegation."[796] [redacted] was still in her covered position when the investigation was initiated on July 15, 2019 even though she was detailed to [redacted][797]

[redacted] believes she was investigated for the parking pass due to her "association" with former IGs [redacted] and Roth.[798] [redacted] also thought that "she was being targeted" by [redacted] and [redacted].[799] [redacted] also claimed the investigation was retaliatory, although she could not specify precisely what actions for which she was being retaliated.[800]

Multiple current and former DHS OIG employees echoed [redacted] view that the parking pass investigation was vindictive in nature. [redacted], [redacted], told us that she believed the investigation into [redacted] was retaliatory, and that [redacted], [redacted], and [redacted] were behind it.[801] Similarly, [redacted], [redacted], expressed his belief that [redacted] was investigated simply because [redacted] did not like [redacted].[802]

[redacted] last day was [redacted] She left voluntarily, but reported that she felt she had no choice.[804] [redacted] explained that she had a lot of annual leave stored up and she needed to use it before the end of the year.[805] [redacted] informed [redacted] that her leave

---

[792] Interview with [redacted] (July 24, 2020); Interview with [redacted] (Sept. 15, 2020).
[793] WHDHS-00000651.
[794] WHDHS-00000183; WHDHS-00000179.
[795] WHDHS-00000183.
[796] <u>Policies and Procedures of the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency, Counc of the Inspector Gen. of Integrity and Efficiency</u>, (Jan. 2018), p.1-2, https://www.ignet.gov/sites/default/files/files/Integrity_Committee_Policies_and_Procedures_Revised_Jan-2018_Final.pdf.
[797] [redacted] was not permanently reassigned to her new position in the [redacted] unit until August 4, 2019. [redacted] - Updated Status Memo (EEO OSC matters).
[798] I19-OIG-SID-[redacted] MOA (10) 09-20-19 [redacted] Interview.
[799] I19-OIG-SID-[redacted] MOA (10) 09-20-19 [redacted] Interview.
[800] Interview with [redacted] (Aug. 6, 2020); Interview with [redacted] (Aug. 10, 2020). We reviewed an allegation that the parking pass investigation was initiated in retaliation for [redacted]. We did not find any evidence that [redacted] and [redacted] were aware of [redacted]. [redacted], or that they took actions against her as retaliation for those activities.
[801] Interview with [redacted] (July 24, 2020).
[802] Interview with [redacted] (July 24, 2020).
[803] Interview with [redacted] (Aug. 10, 2020).
[804] *Id.*
[805] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

would not be restored that year, which would have resulted in a significant financial loss if ███. ███ did not retire.[806]  Accordingly, ████ felt as though she had no choice but to retire.

### D.     Reassignment of IG ██████

████ served as ████████ beginning in 2015 with IG Roth.[807]  In her role as ████, ████, met weekly with ████ and reported to her.[808]  On September 10, 2018, at one of their weekly meetings, ████ informed █████ that she was being reassigned to a position in ████ immediately.[809] ██████ was not given any warning about the reassignment, nor did she ever receive a formal reassignment letter.[810]  Instead, like ████, she was abruptly removed from the ████ and placed on a detail in a different section of the agency.[811] █████ position description remained for the role of █████.[812]

According to █████, ████ told her that the move was to protect her because a new IG, might want to select █████.  At the time of the reassignment in September 2018 however, no one had been nominated for the position yet.  Accordingly, █████ did not credit that explanation.[813]  Instead, █████ suspected that ████ did not like the idea of (a GS-15) reporting to her, preferring instead to have only SES direct reports.[814] ███ ████ also heard from ████, that ████ did not like that █████ had a bigger office than ████.[815]

█████ remained assigned to ████ as of December 2020. █████ believes that she was "on the receiving end of ████ inappropriate practices."[816]  As a result, she believes that her "career got derailed to some degree because of this reassignment."[817] ████ stated that he was aware that ████ reassigned █████.[818]  He stated that █████ had not been serving in a traditional █████, and he was not working closely with her.[819] █████ observed some tension between ████ and ████, but he did not know the source of the tension.[820]

## VII.   THE UNCONFIRMED REMAINING ALLEGATIONS

In addition to the numerous events and allegations detailed above, WilmerHale also investigated a number of other allegations that could not be confirmed.  Some involved allegations for which

---

[806] *Id.*
[807] Interview with ██████ (Aug. 20, 2020).
[808] *Id.*
[809] *Id.*
[810] *Id.*
[811] *Id.*
[812] *Id.*
[813] *Id.*
[814] *Id.*
[815] *Id.*
[816] Email from █████ to OIG Inquiries (June 12, 2020).
[817] *Id.*
[818] Follow-Up Interview with ████ (Dec. 2, 2020).
[819] *Id.*
[820] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

we uncovered a substantial amount of corroborating evidence but nonetheless lacked a critical piece that prevented us from confirming the allegation.  For other allegations, there was no supporting evidence or witnesses denied critical facts.  These allegations related to (A) false testimony before Congress; (B) the preferential or unfavorable treatment of DHS OIG employees; and (C) purported instances of misconduct, malpractice or unprofessional behavior.  We describe some of the more significant unconfirmed allegations below.  A list summarizing the remaining unconfirmed allegations not addressed below is included in Appendix A.

### A.    False Testimony Before Congress

We reviewed the allegation that (b) (6) gave false testimony during a hearing before Congress.  Specifically, (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), and (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), both reported that (b) (6) had been less than forthcoming in her testimony to Congress.



(b) (3) (B), (b) (6) told us that she watched the hearing live and subsequently read the transcript, and believed that (b) (6) responses were not truthful.[826] (b) (3) (B), (b) (6) (b) (6)



---

[821] Interview with (b) (3) (B) (July 24, 2020).
[822] WHDHS-00000097.
[823] *Id.*
[824] *Id.*
[825] *Id.*
[826] Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[827] *Id.*
[828] *Id.*
[829] *Id.*
[830] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

(b) (3) (B), (b) (6)   also believed (b) (6)   was not forthcoming with respect to her testimony (b) (6)

(b) (3) (B), (b) (6) believed the complaint was discussed again at a July 9, 2019 follow-up meeting, but she did not know for certain.[836]

We reviewed documentation from both staff meetings (b) (6)

(b) (6)

(b) (6)

---

[831] Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[832] Interview with (b) (3) (B), (b) (6) (July 24, 2020); Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[833] Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[834] *Id.*
[835] *Id.*
[836] *Id.*
[837] WHDHS-00000634; WHDHS-00000637; Engagement Planning Agenda 07-09-2019 (1).
[838] WHDHS-00000637.
[839] Engagement Planning Agenda 07-09-2019 (1).
[840] (b) (6)
[841] *Id.*
[842] WHDHS-00000853; *see also* Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[843] WHDHS-00000853.
[844] *Id.*



*Privileged & Confidential*
*Attorney Work Product*

███████ ███████

███████

Thus, as to the allegation that ███████ perjured herself before Congress, the evidence demonstrates that ███████ had discussed ███████ in preparation for testimony. The first known discussion occurred nearly a month before her testimony, while the second discussion occurred just three days prior to her testimony. However, it is possible that ███████ did not recall the complaints in that moment, which occurred during a lengthy Congressional hearing. The fact that ███████ promptly responded after the hearing in writing to Representative Tlaib's question, disclosing accurate and additional information, suggests that ███ ███████ did not intend to conceal the information from Congress. ███████ declined to sit for an interview, so we could not assess her credibility on this point. Accordingly, we were not able to fully assess the allegation that ███████ lied to Congress.

### B.   Preferential or Unfavorable Treatment of DHS OIG Employees

#### 1.   *Appointment of* ███████

Multiple allegations pertain to the propriety of ███████ appointment to an SES position as ███ ███████. We reviewed allegations that ███████ took a number of actions to effectuate the appointment of ███████ to an SES position, including falsely claiming that there was no one available to run the ███████ and making public comments that undermined confidence in the impartiality of a search and interview process. We also reviewed allegations that ███████ conspired with ███████ to be appointed to the position.

Multiple witnesses interpreted ███████ appointment of ███████ to the ███████ ███████ position as an act of favoritism to benefit a close friend.[846] For example, ███████, who oversaw the SES positions in HRMD, told us that while she respected ███████ and thought highly of her, she believed that ███████ lacked the experience for the ███████ role and that more experienced attorneys were passed over for the job.[847] ███ ███ felt that ███, ███████ was given the position because of ███████ close relationship with ███████.[848] ███████ called the appointment a "power play" by ███████ and ███████.[849] Similarly, ███████ stated that ███████ and ███████ used "machinations" to avoid posting the position so that more qualified candidates would not apply for the role and she could acquire an SES position.[850] As part of our investigation, we reviewed administrative files related to this position.[851] We found no evidence that the ███████ was publicly posted or that

---

[845] Interview with ███████ (July 24, 2020).
[846] Interview with ███████ (Aug. 20, 2020); Interview with ███████ (July 22, 2020); *see also* Interview with ███████ (Sept. 3, 2020).
[847] Interview with ███████ (Sept. 3, 2020).
[848] *Id.*
[849] Interview with ███████ (Aug. 20, 2020).
[850] Interview with ███████ (July 22, 2020). However, we found no documentary evidence of any such "machinations."
[851] Hard Copy Personnel Files SHQ_707520092911350.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

anyone else applied for the role. Rather, a draft announcement in the file indicated that [b) (5)] ."[852]

[b) (6)] was instrumental in [b) (6)] appointment. On June 7, 2018, [b) (6)] provided [b) (6)] a series of draft documents relating to the appointment of [b) (6)] as [b) (6)] [b) (6)] , including a Standard Form 52 Request for Personnel Action, a draft position description, a "Justification, Resume, and Organizational Chart For [b) (6)] ," and a draft resume for [b) (6)] .[853] The SF 52 Request for Personnel Action form sought authorization for [b) (6)] to be converted to an SES limited term appointment from her "[b) (6)] [b) (6)] role at the time to [b) (6)] ."[854] The metadata on the job description document also revealed that it was edited *after* the "request for personnel action" form for [b) (6)] was drafted.[855] Because [b) (6)] was already selected for the position, the edits to the job description may have been made to justify the requested personnel action.

After receiving the documents from [b) (6)] , [b) (6)] wrote an email to [b) (6)] and [b) (6)] with the subject line, "good news."[856] [b) (6)] wrote, "I can make that type of appointment and [b) (6)] is moving on it now. Also, would it be better if technically you reported to me until everything has wrapped up? I believe [b) (6)] should report to the agency head but maybe for now we should make a change?"[857] [b) (6)] then revised the position description so that that the limited-term position would report to [b) (6)] as [b) (6)] [b) (6)] .[858] In her interview, [b) (3) (B), (b) (6)] stated that this change was because she was involved in the [b) (6)] and therefore, [b) (6)] thought it best that [b) (6)] report to her rather than [b) (6)] .[859]

Between June 20, 2018, and June 22, 2018, [b) (6)] , [b) (6)] , and [b) (6)] exchanged emails about the announcement that [b) (6)] would make about the new appointment.[860] On June 22, 2018, [b) (6)] sent an agency-wide email to all DHS OIG employees announcing the appointment of [b) (6)] as [b) (6)] .[861] The announcement from [b) (6)] to all employees at DHS-OIG stated, "I am very pleased to announce that I have decided to appoint [b) (6)] to the position of [b) (6)] . As [b) (6)], [b) (6)] will serve as DHS OIG's [b) (6)] while the [b) (6)] position remains vacant."[862] In his interview, [b) (6)] stated he was not involved in the selection of [b) (6)] [b) (6)] for this role because he generally allowed [b) (6)] to handle administrative matters such

---

[852] *Id.*
[853] WHDHS-00000001; WHDHS-00000002; WHDHS-00000004; WHDHS-00000006; WHDHS-00000010; WHDHS-00000016.
[854] WHDHS-00000002.
[855] WHDHS-00000004; WHDHS-00000006.
[856] WHDHS-00000357.
[857] *Id.*
[858] *Id.*
[859] Interview with [b) (3) (B), (b) (6)] (Oct. 30, 2020).
[860] WHDHS-00000019; WHDHS-00000020.
[861] WHDHS-00000023.
[862] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

as this one.[863]  He further stated that he was not aware that ▮(b) (6)▮ reported to ▮(b) (6)▮, and insisted that, as the agency's ▮(b) (6)▮, ▮(b) (6)▮ should have been reporting to him.[864]

▮(b) (3) (B), (b) (6)▮ also pointed out that the position of ▮(b) (6)▮ was described as crucial when it was created and filled by ▮(b) (6)▮ with ▮(b) (6)▮[865] However, once ▮(b) (6)▮ moved on to become the ▮(b) (6)▮ the position was left vacant, undermining the argument that it was critical.[866]  Our review confirmed that the position was left vacant after ▮(b) (6)▮ was appointed to the ▮(b) (6)▮ role.  In an email on March 27, 2019, ▮(b) (6)▮ wrote to all of DHS OIG: "Now that ▮(b) (6)▮ will be helming ▮(b) (6)▮, ▮(b) (6)▮ ▮(b) (6)▮ will step into the role of ▮(b) (6)▮ and the ▮(b) (6)▮ position is no longer needed."[867]

Our investigation revealed evidence that the ▮(b) (6)▮ position was vacant at the time that ▮(b) (6)▮ was appointed by ▮(b) (6)▮ to serve as ▮(b) (6)▮ and that the position was specifically created for ▮(b) (6)▮.  Documentary evidence shows that ▮(b) (6)▮ and ▮(b) (6)▮ worked together, along with ▮(b) (6)▮, to facilitate the appointment of ▮(b) (6)▮ to the new position.  However, the investigation did not identify any false claims or certifications made by ▮(b) (6)▮ or ▮(b) (6)▮ in connection with ▮(b) (6)▮ appointment.  We also did not identify any evidence that ▮(b) (6)▮ made public comments that undermined confidence in the impartiality of a search and interview process for the position, though it does appear that it was not publicly advertised and no other candidates were considered other than ▮(b) (6)▮.  It is also apparent that DHS OIG employees believed that ▮(b) (6)▮ selection was an act of favoritism on ▮(b) (6)▮ part and the evidence supports this interpretation of events, given that ▮(b) (6)▮ played a critical role in securing the position for ▮(b) (6)▮ and it appears that they worked together to secure the appointment.

2.    *Investigation of* ▮(b) (6)▮

As explained above, in August 2018, ▮(b) (6)▮ and ▮(b) (6)▮ transferred 17 members of the HRMD from OM to the OC.  The move was purportedly designed to shield HRMD personnel from further ▮(b) (6)▮ by ▮(b) (6)▮ during the investigation of the allegations against her.[868]  The effect of this highly unusual move was to consolidate personnel decisions and employee misconduct investigations under the auspices of first ▮(b) (6)▮ and later, ▮(b) (6)▮.  One of the allegations we investigated was whether the allegations against ▮(b) (6)▮ were frivolous, and used by ▮(b) (6)▮ and ▮(b) (6)▮ as a pretext to justify the move of HRMD from OM to the OC for their own ends.

Our investigation found that there were multiple complaints made about ▮(b) (6)▮ by her subordinates in HRMD.  Between June 9, 2017 and April 9, 2018, at least six complaints were

---

[863] Follow-Up Interview with ▮(b) (6)▮ (Dec. 2, 2020).
[864] *Id.*
[865] Interview with ▮(b) (3) (B), (b) (6)▮ (July 22, 2020).
[866] *Id.*
[867] ▮(b) (6)▮, ▮(b) (2), (6)▮
[868] Interview with ▮(b) (3) (B), (b) (6)▮ (July 23, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

filed through the DHS OIG hotline concerning ███(b) (6)███.[869]  While two of the complaints came from anonymous sources, four did not.  The complaints alleged that ███(b) (6)███ ███(b) (6)███ ████████████████.  Below is a brief overview of the relevant allegations we identified.

- On June 9, 2017, an HR specialist alleged ███(b) (6)███ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- On April 6, 2018, an anonymous complainant alleged ███(b) (6)███ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The complainant reported that ███(b) (6)███ directed him/her to submit the complaint.[876]

- Also on April 6, 2018, another anonymous complainant alleged ███(b) (6)███ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[869] Complaint ███(b) (6), (b) (7)(C)███ ████████████████████████████

[870] The name of the HR specialist has been redacted to protect confidentiality.  DHS OIG's Whistleblower Protection Unit (WPU) reviewed this complaint and determined that the complainant had alleged a ███(b) (6)███ ███████████████ by ███(b) (6)███.  WHDHS-00000274. ███(b) (6)███ ████ WHDHS-00000274.

[871] WHDHS-00000274; WHDHS-00000491; Complaint ███(b) (6), (b) (7)(C)███.

[872] Complaint ███(b) (6), (b) (7)(C)███.

[873] *Id.*

[874] Anonymous Employee, DHS OIG Exit Interview Survey Responses.

[875] *Id.*

[876] Complaint ███(b) (6), (b) (7)(C)███.

[877] Complaint ███(b) (6), (b) (7)(C)███.

[878] *Id.*

[879] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

(b) (6) ████  The complainant alleged that (b) (6) ████████ directed him/her to submit the complaint.[881]

- On April 7 and April 9, 2018, (b) (3) (B), (b) (6) ████ filed two complaints against (b) (6) (b) (6) ████.[882]  She alleged (b) (6) ████████ ██████████████████████████████████████████ ████████████████████████████

- On April 9, 2018, (b) (3) (B), (b) (6) ████████ filed a complaint against (b) (6) (b) (6) ████. (b) (6) ████ ██████████████████████████████████

At least five of the six complaints were reviewed by the OC and IQO.[885]  The (b) (6) ████████ investigation was the first investigation undertaken by the newly formed PLD that was created under (b) (6) ████ direction.[886]

On November 4, 2019, the report was finalized.[887]  The 103-page report detailed the allegations and the OC's findings.[888]  The report found several allegations against (b) (6) ████ (b)(6), (b)(5) ████████████████████████████████████████████ (b) (6), (b) (5) ██████████████████ ████ (b) (6), (b) (5) ██████████████████ ████████████████████████████████████████████ ████████████████████████████

While WilmerHale did not conduct an independent review of the OC's investigation of (b)(6) (b) (6) ████, we did review the complaints and interview some of the complainants as part of our investigation.  We found no evidence that the investigation of (b) (6) ████████ was frivolous or unwarranted.  Likewise, we uncovered no evidence that the investigation of (b) (6) ████ was used as a pretext in order to justify the move of HRMD to the OC.

*3.  Reprisal against (b) (3) (B), (b) (6) ████████*

We reviewed allegations that (b) (6) ████ engaged in reprisals against (b) (3) (B), (b) (6) (b) (3) (B), (b) (6) ████, who she supervised as part of the move of HRMD under the OC.  Between August and October 2019, (b) (3) (B), (b) (6) ████ claimed that (b) (6) ████ engaged in mean and demeaning behavior

---

[880] *Id.*
[881] *Id.*
[882] Complaint (b) (6), (b) (7)(C) ████.
[883] Complaint (b) (6), (b) (7)(C) ████.
[884] Complaint (b) (6), (b) (7)(C) ████.
[885] Complaints (b) (6), (b) (7)(C) ████████████.
[886] Interview with (b) (3) (B), (b) (6) ████ (Oct. 30, 2020).
[887] WHDHS-00000768; WHDHS-00000665.
[888] *See* WHDHS-00000665.
[889] *See id.*
[890] *See id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

toward her.[891]  For example, ███████████ explained that ███████ reprimanded her for refusing to follow ████████ orders without first researching the propriety of the requests.[892] ████ ████ said ████████ repeatedly spoke harshly to her and other staff and frequently criticized HRMD for its failures.[893] ███████████ also claimed that ████████ made requests of HRMD staff, and then repeatedly "moved the ball" by changing her request when HRMD responded to her.[894]  According to ███████████, ████████ also told DHS OIG senior leadership and other SES employees that she did not trust the information HRMD provided to her and would tell others it was not valid.[895]

███████████ believed ████████ ultimate goal was to force her to resign as ███████████ .[896] ███████████ attended weekly meetings with ████████ and ████████ ████████ .[897]  During one of these meetings, ███████████ stated that she was not going to be forced out of her position.[898] ███████████ said ████████ then "gritted her teeth" and told ████ she would give ████████ a failing performance rating.[899] ███████████ said ████████, ████████, and ████████ targeted certain DHS OIG personnel they viewed as impediments to their agenda.[900]  She stated that their goal was to ensure that employees follow their directions without question.[901]

In January 2020, ████████ submitted a FY2019 end-of-year performance appraisal for ████. ███████████ with a rating of "unsatisfactory."[902] ███████████ believed this poor rating was in retaliation for her not following ████████ directives.[903]  At the time, HRMD operated under the OC even though ████████ remained ███████████ official supervisor.[904] ████████ signed ███████████ performance rating in the DHS OIG system despite not being her official supervisor.[905]

However, we did not find any evidence that the poor performance rating was "reprisal" for ████████ ███████████ "refus[ing] to fabricate allegations against another employee that ████████ wished to discipline or otherwise remove."  Instead, the evidence suggested that ████████ was extremely

---

[891] Interview with ███████████ (Sept. 18, 2020).
[892] *Id.*
[893] *Id.*
[894] *Id.*
[895] *Id. See also* Interview with ███████████ (Sept. 17, 2020). ███████████ ███████████ also told us that the HR function was poorly run; noting, for example, that HR would routinely pay employees the wrong amount. *Id.* He also said the HR Department routinely did a poor job of issuing certification lists for job positions.  *Id.*
[896] Interview with ███████████ (Sept. 18, 2020).
[897] *Id.*
[898] *Id.*
[899] *Id.*
[900] *Id.*
[901] *Id.*
[902] WHDHS-00000620; WHDHS-00000621; WHDHS-00000628.
[903] Interview with ███████████ (Sept. 18, 2020).
[904] *Id.*
[905] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

dissatisfied with ██ [b) (3) (B), (b) (6)] performance and her refusal to resign, which led to ██ ██ failing performance rating.

> 4.    *Investigation of* [b) (3) (B), (b) (6)]

We reviewed an allegation that [b) (3) (B), (b) (6)] was investigated in retaliation for refusing to investigate IG Cuffari.  As detailed above, on August 23, 2019, [b) (6), (b) (3) (B)] called [b) (3) (B), (b) (6)], [b) (3) (B), (b) (6)], and asked him to investigate IG Cuffari's travel to the Southwest border because [b) (6)] believed the travel was illegitimate and for personal reasons.[906] [b) (3) (B), (b) (6)] refused [b) (6)] request to investigate and stated that it was inappropriate for [b) (6)] to be investigating the IG.[907]

[b) (3) (B), (b) (6)] stated that immediately thereafter, he felt a "sea change" in how [b) (6)] and [b) (6)] treated him.[908]  He noticed a change in their everyday posture.[909]  By way of example, he stated that when he was in the hallway, [b) (6)] would abruptly close her door, or [b) (6)] and [b) (6)] would not look at him or acknowledge his presence in senior staff meetings.[910]

Four days after [b) (6)] request to investigate IG Cuffari, on August 27, 2019, [b) (3) (B), (b) (6)] was interviewed as the subject of an internal investigation by the OC.[911]  Specifically, [b) (3) (B), (b) (6)] was interviewed by [b) (6)], and [b) (6)] [b) (6)], in connection with an investigation relating to the performance rating of the [b) (3) (B), (b) (6)] Office.[912]  The interview pertained to allegations from an anonymous complaint that [b) (3) (B), (b) (6)] had asked the [b) (3) (B), (b) (6)] Office to lower the [b) (3) (B), (b) (6)] 2018 performance rating and threatened to retaliate against [b) (3) (B), (b) (6)] if she did not.[913]

During the interview, [b) (3) (B), (b) (6)] categorically denied the allegations.[914]  Instead, [b) (3) (B), (b) (6)] believed the investigation was in retaliation for his refusal to investigate IG Cuffari's travel based on the circumstantial evidence of the timing and the presence of [b) (6)] in the interview.[915]  [b) (6)], who had previously worked with [b) (6)] and [b) (6)] at the [b) (6)], was then serving as [b) (6)] [b) (6)].[916]

---

[906] Interview with [b) (3) (B), (b) (6)] (Sept. 15, 2020).
[907] *Id.*
[908] *Id.*
[909] *Id.*
[910] *Id.*
[911] Memo from [b) (3) (B), (b) (6)] (Nov. 21, 2019).
[912] *Id.*
[914] *Id.* [b) (3) (B), (b) (6)] Signed MOA; DHS OIG Hotline Complaint [b) (6), (b) (7)(C)].
[914] [b) (3) (B), (b) (6)] Signed MOA.
[915] [b) (3) (B), (b) (6)] Interview (September 15, 2020).
[916] [b) (3) (B), (b) (6)] Interview (September 15, 2020); Follow-Up Interview with [b) (3) (B), (b) (6)] (Dec. 11, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

The documentary evidence revealed however that the investigation was triggered by an anonymous complaint that was originally filed in December 2018, and [(b) (6)] had been working on the investigation for months.[917]  The evidence also revealed that [(b) (6)] initially reached out to schedule the interview with [(b) (3) (B), (b) (6)] on August 21, 2019, two days prior to [(b) (6)] request to investigate IG Cuffari.[918]  On August 22, 2019, a day before [(b) (6)] request, [(b) (6)] and [(b) (3) (B), (b) (6)] agreed to do the interview on August 27, 2019.[919]

During her interview, [(b) (3) (B), (b) (6)] claimed that she was not aware of the management inquiry regarding [(b) (3) (B), (b) (6)] until sometime after February 28 2020.[920]  She also claimed that she was not formally notified of, and did not approve, [(b) (6)] participation in the investigation.[921]  But documentary evidence contradicts both of her statements.

In June 2019, soon after learning of a CIGIE IC complaint about failure to take action in the [(b) (3) (B), (b) (6)] investigation, [(b) (6)] emailed [(b) (6)] about the matter, copying [(b) (6)].[922]  In the email, [(b) (6)] instructed [(b) (6)] to [(b) (5)] .[923]  [(b) (6)] replied to that email and requested a copy of the complaint against [(b) (3) (B), (b) (6)].[924]  [(b) (6)] provided [(b) (6)] a copy of the original complaint, a summary of its allegations, and a report on her interview of [(b) (3) (B), (b) (6)], who had denied the allegations against [(b) (3) (B), (b) (6)].[925]  In July 2019, [(b) (6)] suggested to [(b) (6)] that [(b) (6)] could help with the investigation to get the matter resolved quickly.[926]

Over the next seven months, [(b) (6)] was repeatedly informed of the status of the allegations against [(b) (3) (B), (b) (6)].  For example, in November 2019, [(b) (6)] sent [(b)(6)] [(b) (6)] the final memorandum and recommendation on the [(b) (3) (B), (b) (6)] management inquiry, along with supporting documents for [(b) (6)] "review and finaliz[ation]."[927]  In January 2020, [(b) (6)] also received and provided comments on a chart of DHS OIG investigations, which included this [(b) (3) (B), (b) (6)] management inquiry.[928]

In sum, the evidence does not support the allegation that [(b) (3) (B), (b) (6)] was investigated because of his refusal to investigate IG Cuffari on August 23rd.  As explained above, the complaint against [(b) (3) (B), (b) (6)] was filed in December 2018, and on August 22, 2019, he and [(b) (6)] set

---

[917] DHS OIG Hotline Complaint [(b) (3) (B), (b) (6)] ; WHDHS-00000657.
[918] WHDHS-00000657.
[919] *Id.*
[920] *See* Interview with [(b) (3) (B), (b) (6)] (Aug. 28, 2020); [(b) (6)] [(b) (6)] (Feb. 28, 2020).
[921] Interview with [(b) (3) (B), (b) (6)] (Aug. 28, 2020).
[922] WHDHS-00000408.
[923] *Id.*
[924] *Id.*
[925] *Id.*
[926] WHDHS-00000841.
[927] WHDHS-00000808.
[928] WHDHS-00000617.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

the date of August 27th for the interview.  Nevertheless, (b) (6) statement during her interview about her awareness of the investigation was inaccurate.  Similarly, her statement about her knowledge of (b) (6) participation in the investigation was also inaccurate.  Emails show that (b) (6) was briefed about the investigation on several occasions, and that she not only knew about (b) (6) participation in the (b) (6) investigation, she actually suggested it.[929]

> 5.   *Investigation of* (b) (3) (B), (b) (6)

We also reviewed allegations that (b) (6) and (b) (6) initiated an adverse personnel action or removal action against then (b) (3) (B), (b) (6) for frivolous claims after trying to elicit a series of false misconduct allegations from other employees.  In connection with this allegation, we reviewed allegations that (b) (6) and (b) (6) falsified his performance appraisals and that (b) (6) and (b) (6) falsified government documents and directed that false information be created to support a removal action of a SES employee.  We also reviewed allegations that (b) (6), (b) (6), and (b) (6) provided false testimony before the Merit Systems Protection Board ("MSPB") about (b) (3) (B), (b) (6) and his performance, and that (b) (6) (b) (6) knowingly caused falsified government documents to be introduced into evidence and considered by a tribunal.

Separately, we reviewed allegations that (b) (6) threatened (b) (3) (B), (b) (6) by directing comments to him about her concealment of a handgun in her purse and her utilization of a concealed carry permit despite the fact that she is not permitted to bring a weapon into the workplace.  In connection with this allegation, we were also asked to determine whether (b) (6) unlawfully brought a weapon into the office.

> a)   <u>Investigation of</u> (b) (3) (B), (b) (6)

The investigation into (b) (3) (B), (b) (6) was the result of several complaints made against him. (b) (6) (b) (3) (B), (b) (6) supervisor, (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), stated that employees in the that (b) (3) (B), (b) (6) supervised reported that he made (b) (6), (b) (6), used (b) (6)

One of the complaints underlying the investigation into (b) (3) (B), (b) (6) is a complaint made by (b) (3) (B), (b) (6).[932] (b) (3) (B), (b) (6) and (b) (3) (B), (b) (6) had a tense email exchange on May 25, 2018 about the transfer of an employee.[933]  After (b) (3) (B), (b) (6) wrote to (b) (3) (B), (b) (6) that he should "rethink [his] tact," (b) (3) (B), (b) (6) responded:

---

[929] WHDHS-00000410.
[930] Interview with (b) (3) (B), (b) (6) (Sept. 15, 2020).
[931] DHS OIG Hotline Complaint (b) (6).
[932] WHDHS-00000635.
[933] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

Really ███? Rethink my tact with you, or what? There was not a single thing in my email that was out of line. Within the last three months, you have talked about sending agents to a (b) (6) ███████████████████████████████████████████

In his interview, (b) (3) (B), (b) (6) stated that he had witnessed all the behavior he described in the email.[935] (b) (3) (B), (b) (6) (b) (3) (B), (b) (6) ███████████████████████████████████████ (b) (6), (b) (3) (B) ████████

For his part, (b) (3) (B), (b) (6) stated that when he saw the allegations in (b) (3) (B), (b) (6) email, he was in complete shock, because the allegations were completely irrelevant to the issue.[939] When he saw that (b) (6) and (b) (6) were copied on the email, he had the sense the email was orchestrated.[940]

Around the same time, on June 14, 2018, an anonymous complaint was submitted to the DHS OIG hotline.[941] The complaint alleged that (b) (3) (B), (b) (6) (b) (6) ████████████████████████████████ The complaint concluded that (b) (3) (B), (b) (6) (b) (6) ██████ Upon receipt of the complaint, (b) (6) (b) (6) wrote to (b) (6) :

> Today INV received an anonymous complaint against (b) (3) (B), (b) (6) regarding the same or similar allegations made by (b) (3) (B), (b) (6). The complaint was sent through the Hotline and was also sent to Congress. Given the seriousness of the allegations, (b) (3) (B), (b) (6) has decided to place ██████ on Administrative Leave for the allowed 5-10 days while she reviews.[944]

(b) (3) (B), (b) (6) told us that she informed (b) (6) of the complaints about ███.[945] (b) (3) (B), (b) (6) told (b) (6) ██████ that the complaint needed to be investigated,

---

[934] *Id.*
[935] Interview with (b) (3) (B), (b) (6) (September 15, 2020).
[936] *Id.*
[937] *Id.*
[938] Interview with (b) (3) (B), (b) (6) (July 28, 2020).
[939] Interview with (b) (3) (B), (b) (6) (Sept. 15, 2020).
[940] *Id.*
[941] WHDHS-00000359.
[942] FW: ███ Complaint and IQO review of ██; Complaint dated June 14 2018.pdf.
[943] *Id.*
[944] WHDHS-00000359.
[945] Interview with (b) (3) (B), (b) (6) (Sept. 15, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

but that █(b) (6)█ should not be involved in the investigation because █(b) (3) (B), (b) (6)█ was an employee in that division.[946] █(b) (3) (B), (b) (6)█ said the complaint was sent to the OC, and she then had no input on how it was investigated.[947] █(b) (3) (B), (b) (6)█ was then placed on administrative leave.[948]

WilmerHale reviewed two reports that were prepared about the █(b) (3) (B), (b) (6)█ investigation—one dated June 10, 2018, from █(b) (6)█, to █(b) (6)█,[949] and one dated October 3, 2018, from █(b) (6)█, to █(b) (6)█ ██(b) (6)██ her supervisor.[950] █(b) (5), (b) (6)█

██████████████████████████████████████████████████████████████████████

Our investigation found no evidence that █(b) (6)█, █(b) (6)█, or █(b) (6)█ initiated an investigation against █(b) (3) (B), (b) (6)█ for an improper purpose.  Instead, the investigation into █(b) (6)█ ████████ was initiated as a result of several complaints against him and █(b) (6)█

██████████████████████████████████████████████████████████████████████

      b)   <u>Performance Appraisals</u>

We also investigated an allegation that █(b) (6)█ and █(b) (6)█ falsified █(b) (3) (B), (b) (6)█ performance appraisals.  While our investigation uncovered deficiencies with his performance appraisals, we found no evidence that the appraisals were falsified.

█(b) (3) (B), (b) (6)█ received four versions of his FY 2018 performance appraisal.[956]  In his interview, █(b) (3) (B), (b) (6)█ identified a number of problems with the FY 2018 performance appraisals,

---

[946] *Id.*
[947] *Id.*
[948] █(b) (3) (B), (b) (6)█ AdminLeave6-19-2018.
[949] WHDHS-00000383.
[950] ROI █(b) (3) (B), (b) (6)█.
[951] *See* WHDHS-00000383; ROI █(b) (3) (B), (b) (6)█.
[952] WHDHS-00000383.
[953] *Id.*
[954] ROI █(b) (3) (B), (b) (6)█, at 11-13.
[955] Interview with █(b) (3) (B), (b) (6)█ (Sept. 15, 2020); Interview with █(b) (3) (B), (b) (6)█ (Sept. 17, 2020).  We also looked into whether █(b) (3) (B), (b) (6)█ was investigated and/or removed from his position in retaliation for █(b) (3) (B), (b) (6)█ █(b) (3) (B), (b) (6)█.  We did not find any evidence to support this claim.
[956] FY 2018 Performance Appraisal Closeout; Exhibit B. - █(b) (3) (B), (b) (6)█ (█(b) (3) (B), (b) (6)█)_FY18 Executive Perf Reissued PII 060419; FY18 Final Performance Appraisal - █(b) (3) (B), (b) (6)█; FY18 Performance Appraisal - █ █(b) (3) (B), (b) (6)█_SIGNED (1) .

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

including with respect to the dates on the appraisals, the signatures, and the allegations mentioned in them.[957]  He stated that the appraisals contained a number of unsubstantiated allegations and falsely stated that he was failing in his job.[958]

[REDACTED] recalled that the appraisal was delayed because of the government shutdown, which is corroborated by email evidence we reviewed that show the appraisal was discussed after the shutdown.[959]   We identified  a  number  of  communications  in  February  2019  about [REDACTED]  performance  appraisal.  On February 6, 2019, [REDACTED]  sent [REDACTED] write-up of the appraisal to [REDACTED], [REDACTED]  and [REDACTED] for review ahead of submission to the Performance Review Board ("PRB").[960]  [REDACTED]  made substantial edits to the narrative[961] and [REDACTED]  recirculated a new draft on February 19, 2019.[962]  On February 20, 2019, [REDACTED]  wrote, [REDACTED]  and I reworked the other three  remaining  elements  a  little.  [REDACTED]: if  you  need  assistance  with identifying suitable examples to insert I am happy to assist."[963]  [REDACTED]  then circulated a new draft, which [REDACTED]  and [REDACTED]  approved.[964]  [REDACTED]  wrote that day, "I agree this strikes the exactly [sic] the right balance. [REDACTED]  has given the appropriate amount of credit for his contributions to the office while still being very firm on the areas where he has failed to perform at a satisfactory level."[965]  [REDACTED]  received this first FY 2018 performance appraisal on February 21, 2019.[966]  In her interview, [REDACTED]  explained that it was not outside the normal processes for [REDACTED], as [REDACTED] second-line supervisor, to have been involved in the initial drafting of his performance appraisal.[967]

The appraisal provided to [REDACTED]  was signed by [REDACTED]  and dated December 28, 2018.[968]  [REDACTED] was rated "unsatisfactory" and the summary section included a number of allegations about [REDACTED], including that he used [REDACTED] It stated that he "referred to [REDACTED]

[REDACTED]   The summary cited several specific instances of [REDACTED] making [REDACTED]

A few days later, on February 25, 2019, [REDACTED]  sent the two reports of the [REDACTED] management inquiry from June and October 2018 to [REDACTED]  and [REDACTED],

---

[957] Interview with [REDACTED] (July 24, 2020).
[958] *Id.*
[959] Interview with [REDACTED] (Sept. 15, 2020); WHDHS-00000048.
[960] WHDHS-00000048.
[961] *Id.*
[962] WHDHS-00000050.
[963] WHDHS-00000053.
[964] *Id.*
[965] *Id.*
[966] FY 2018 Performance Appraisal Closeout; Annotated Timeline (August 10 2020).
[967] Interview with [REDACTED] (Oct. 23, 2020).
[968] FY 2018 Performance Appraisal Closeout.
[969] *Id.* at 7.
[970] *Id.* at 8.
[971] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

copying ███████ .[972] ███████ wrote, "I left ███████ off of this email to prevent any possible 'taint' issue for her at this phase of the process."[973] ███████ interview that since ███████ would be serving as ███████ "higher-level reviewer" should he decide to challenge the findings in his appraisal, ███████ had told ███████ that ███████ should not be included in discussions about the appraisal.[974]  However, ███████ recalled ███████ being in meetings related to ███████ appraisal and emails demonstrate that ███████ continued to be involved in discussions about his appraisal after this date.[975]  In addition, information from the management inquiry was included in the FY2018 appraisal.[976]

In March 2019, ███████ filed a complaint ███████

███████

On April 22, 2019, ███████ met with ███████ in person to discuss his allegations.[982]  ███████ stated that the allegations against him were false and that he felt he was being treated differently from other SES employees.[983]  ███████ confirmed that other employees who had allegedly engaged in misconduct were not treated as harshly as ███████.[984]  Specifically, ███████ recalled that little was done concerning alleged ███████ lodged against a similarly situated SES official ███████, but that ███████ was "persecuted significantly" for allegedly making ███████

On May 2, 2019, ███████ wrote to ███████ and ███████ that because the FY 2018 appraisal "cites incidents that could not have occurred in the appraisal period, there is reasonable cause to

---

[972] WHDHS-00000380.
[973] *Id.*
[974] Interview with ███████ (Sept. 15, 2020).
[975] Interview with ███████ (Sept. 3, 2020); WHDHS-00000055.
[976] Exhibit B. - ███████ (███████) FY18 Executive Perf Reissued PII.
[977] Interview with ███████ (Sept. 15, 2020).
[978] WHDHS-00000063.
[979] *Id.*
[980] *Id.*
[981] Interview with ███████ (Aug. 27, 2020).
[982] Interview with ███████ (July 24, 2020).
[983] *Id.* WHDHS-00000391.
[984] Interview with ███████ (Aug. 7, 2020).
[985] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

believe that the evaluation violates SES performance laws, a prohibited personnel practice under 5 U.S.C. § 2302(b)(12)."[986]

On June 4, 2019, (b) (6) sent (b) (3) (B), (b) (6) a revised performance appraisal.[987]  In the letter accompanying the reissued appraisal, (b) (6) stated that DHS OIG was rescinding and reissuing the FY 2018 appraisal (b) (6)  She indicated that "the only substantive revisions to the appraisal" were changes to the narrative section containing the allegations.[989]

A comparison of the February 21, 2019 version and the June 4, 2019 version of the appraisals confirmed that the only difference between the versions was that several of the older allegations pertaining to (b) (3) (B), (b) (6) were removed, (b) (3) (B), (b) (6)
____.  The June 4, 2019 appraisal included the same cover page as the one sent on February 21, 2019, with (b) (6) electronic signature dated December 28, 2018.[991]  On June 5, 2019, (b) (3) (B), (b) (6) submitted a request for higher-level review of his June 4, 2019 performance appraisal.[992] (b) (6) did not sign the appraisals as the "higher level review" authority.[993]  Rather, that field is left blank on each of the appraisals.[994]  However, (b) (6) wrote a statement on June 20, 2019 stating that she performed the higher level review and approved the rating.[995]  DHS OIG submitted the appraisal to the PRB on June 24, 2019.[996]

On July 2, 2019, the PRB wrote that it agreed with (b) (3) (B), (b) (6) rating but recommended changes to the narrative descriptions, which (b) (6) and (b) (6) then discussed.[997]  On July 9, 2019, (b) (6) sent the performance appraisal to (b) (6), the PRB chair, for his "electronic signature."[998]  After internal discussions following the PRB's recommendation, DHS OIG did not make any changes to the narrative.[999]

On July 16, 2019, (b) (6) sent the appraisal to (b) (3) (B), (b) (6) attorneys reflecting PRB review,[1000] but it was the wrong version of the appraisal.  Instead of sending the June 4, 2019 appraisal with the PRB chair's signature, (b) (6) sent the rescinded February 21, 2019 appraisal with the PRB chair's signature.[1001]  On July 18, 2019, (b) (6) notified (b) (6)

---

[986] WHDHS-00000433.
[987] Exhibit B. - (b) (3) (B), (b) (6) ( (b) (3) (B) (b) (6) )_FY18 Executive Perf Reissued PII.
[988] WHDHS-00000394.
[989] *Id.*
[990] *Id.* Exhibit B. - (b) (3) (B), (b) (6) ( (b) (3) (B) (b) (6) )_FY18 Executive Perf Reissued PII 060419.
[991] *Id.*
[992] FY18 Performance Appraisal - WHDHS-00000086.
[993] FY18 Performance Appraisal - (b) (3) (B), (b) (6) SIGNED.
[994] FY18 Final Performance Appraisal - (b) (3) (B), (b) (6); FY18 Performance Appraisal - (b) (6)
(b) (6) _SIGNED.
[995] WHDHS-00000163.
[996] WHDHS-00000082; WHDHS-00000086.
[997] WHDHS-00000445.
[998] WHDHS-00000091.
[999] WHDHS-00000450; WHDHS-00000093.
[1000] WHDHS-00000432.
[1001] *Id.* FY18 Final Performance Appraisal - (b) (3) (B), (b) (6).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

█(b) (6)█ that he had "sent the old, rescinded appraisal" to █(b) (3) (B), (b) (6)█ lawyers and instructed him to "retract and send the new appraisal."[1002]  On July 18, 2019, █(b) (6)█ wrote to █(b) (3) (B), (b) (6)█ lawyers, "Due to an administrative error, the wrong performance appraisal was sent to you. I need to rescind the removal notice and performance appraisal and will reissue shortly."[1003]

On July 23, 2019, █(b) (6)█ wrote to █(b) (6)█ that he received the correct signed performance appraisal from PRB chair █(b) (6)█.[1004]  He then sent the revised performance appraisal to █(b) (3) (B), (b) (6)█ lawyers, along with a notice for █(b) (3) (B), (b) (6)█ dated July 23, 2019 removing him from his SES role and demoting him to a GS-15 position effective August 23, 2019.[1005]  In the email, █(b) (6)█ explained the administrative error to █(b) (3) (B), (b) (6)█ lawyers, stating that he had "inadvertently sent the [PRB] Chair, █(b) (6)█, the rescinded appraisal to sign rather than requesting he sign and return to [him] the correct appraisal he already had."[1006]

On July 25, 2019, █(b) (6)█ and █(b) (6)█ testified in an MSPB hearing regarding █(b) (3) (B), (b) (6)█ performance appraisals.[1007]  In her sworn testimony, █(b) (6)█ testified that she was not aware of █(b) (3) (B), (b) (6)█  As discussed above, emails demonstrate that █(b) (6)█ had been aware of █(b) (3) (B), (b) (6)█ and that she was not in favor of granting it.[1009]  Two days after the MSPB hearing, DHS OIG filed a motion to correct the record accompanied by an affidavit from █(b) (6)█ correcting the statements she made regarding █(b) (3) (B), (b) (6)█  In the affidavit, she noted that contrary to her sworn testimony, █(b) (3) (B), (b) (6)█ which DHS OIG denied.[1011]  The MSPB judge denied DHS OIG's motion to correct the record.[1012]

With respect to the allegations that we investigated, we have not identified any evidence that █(b) (6)█ █(b) (6)█ █(b) (6)█, or █(b) (6)█ falsified the appraisals in any way.  While there were changes made between the first and second versions of the appraisal, those changes were made in response to issues identified by █(b) (3) (B), (b) (6)█ and clearly communicated to █(b) (3) (B), (b) (6)█ lawyers.  With regard to the third and fourth versions of the appraisals, reflecting the PRB's final review, our review confirmed that the wrong, retracted appraisal was sent to █(b) (3) (B), (b) (6)█ as the result of an administrative error.  The mistake was explained to █(b) (3) (B), (b) (6)█ lawyers and the correct appraisal was sent to █(b) (3) (B), (b) (6)█ lawyers on July 23, 2019.

---

[1002] WHDHS-00000442.
[1003] WHDHS-00000443.
[1004] WHDHS-00000178.
[1005] WHDHS-00000447; █(b) (6)█ █(b) (6), (b) (2)█ (August 22 2019).
[1006] *Id.*
[1007] *See generally* July 24, 2019 Transcript of Proceeding Administrative Hearing of the Merit Systems Protection Board ("MSPB Hearing Tr.").
[1008] MSPB Hearing Tr. 168:1-6.
[1009] WHDHS-00000063.
[1010] █(b) (2), (b) (6)█ -DocNum █(b) (6)█ Affidavit.
[1011] *Id.*
[1012] Order Denying Motion to Amend Record.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

While (b) (3) (B), (b) (6) has alleged that the incorrect dates and different signatures for the PRB officer are evidence that the appraisals were falsified, we did not find evidence to support that claim. The same date of December 28, 2018 appears on all four appraisals as a result of (b) (6) (b) (6) electronic signature. The date is crossed out on the fourth appraisal and replaced with June 4, 2019 in handwriting. The different signature for the PRB chair appears to be the result of an electronic signature being included on the third appraisal, while a manual signature was included on the fourth one.

### c)   Removal from SES

On August 22, 2019, (b) (6) wrote a letter to (b) (3) (B), (b) (6) stating that his telework status would end on September 3, 2019, at which point he would receive more information about his duties.[1013] On September 17, 2019, (b) (3) (B), (b) (6) returned to work at DHS-OIG as a GS-15 employee in (b)(6).[1014] We did not uncover any evidence that this action was pretextual or in retaliation for a protected disclosure or activity.

### d)   Concealed Weapon Incident

Shortly after returning to work at DHS OIG, on September 26, 2019, (b) (3) (B), (b) (6) wrote to IG Cuffari to report misconduct involving (b) (6).[1015] (b) (3) (B), (b) (6) conveyed that during an "icebreaker" in an (b) (6) meeting, (b) (6), (b) (7)(C) made comments about a concealed weapon.[1016] He did not specify the date of the meeting. In his letter to IG Cuffari, (b) (3) (B), (b) (6) wrote:



In his interview, (b) (3) (B), (b) (6) described the meeting at which (b) (6), (b) (7)(C) made these comments and reiterated his sense that (b) (6), (b) (7)(C) was directing her comments to him in a threatening manner.[1018] Other witnesses, including (b) (3) (B), (b) (6), (b) (3) (B), (b) (6), recalled (b) (6), (b) (7)(C) comments regarding a concealed weapon.[1019] However, no witnesses corroborated (b) (3) (B), (b) (6) view that (b) (6), (b) (7)(C) was directing the comment to him.

(b) (6), (b) (7)(C) statement was made before a large gathering of DHS OIG employees and, while it may have exhibited poor judgment on her part, we found no evidence that her comments were

---

[1013] WHDHS-00000185.
[1014] (b) (3) (B), (b) (6) Annotated Timeline.
[1015] WHDHS-00000650.
[1016] Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[1017] WHDHS-00000650.
[1018] Interview with (b) (3) (B), (b) (6) (July 24, 2020).
[1019] Interview with (b) (3) (B), (b) (6) (July 24, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

intended to be a threat to the group generally, or to ████████████ specifically, or that ██████████ in fact brought a concealed handgun into the DHS OIG building.

### 6.    *Disciplinary Action Taken Against* ████████

We reviewed allegations that ████████ engaged in misconduct related to ████████████, ████████████ ████████████, including that she unjustifiably disciplined ████████████ when his conduct was underserving of serious punishment.



Our investigation did not reveal sufficient evidence to substantiate the allegation that ████████ unjustifiably disciplined ████████████.    While ████████████ did complain that ████████ inappropriately handled his suspension, and IG Cuffari subsequently reduced the punishment, we have not found any evidence to indicate that ████████ engaged in reprisal against him following his appeal, or that her initial discipline was unjustified.

### C.    **Misconduct, Malpractice or Unprofessional Behavior**

### 1.    *IG Cuffari Questions* ████████ *Drafting of an Ethics Screening Agreement*

We reviewed an allegation that ████████ purposefully drafted a "defective and unworkable" ethics screening agreement.  Against the backdrop of ████████ allegation that IG Cuffari had

---

[1020] Interview with ████████████ (July 22, 2020).
[1021] WHDHS-00000389.
[1022] Interview with ████████████ (July 22, 2020).
[1023] *Id.*
[1024] *Id.*
[1025] *Id.*
[1026] *Id.*
[1027] *Id.*
[1028] *Id.*
[1029] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

violated his recusal obligations regarding the CIA investigation and other efforts to keep information from IG Cuffari, he questioned the ethics screening agreement presented to him by ████████, which would have given ████████ authority to screen matters from IG Cuffari without his knowledge or involvement.[1030]

As a Presidential appointee requiring Senate confirmation, IG Cuffari had 90 days from the date of his confirmation, July 25, 2019, to comply with the terms of his ethics agreement, including by submitting a screening agreement.[1031] ████████ worked to prepare a draft agreement with ████████ ████████, and ████████ ████████.[1032]

On October 17, 2019, ████████ emailed ████████ and another attorney in the OC, attaching a draft screening agreement and other ethics forms for IG Cuffari's signature.[1033] On October 23, 2019, ████████ forwarded ████████ email to IG Cuffari with the documents attached.[1034] ████████ wrote that IG Cuffari had "previously signed a hard copy of the screening agreement that hadn't been updated." ████████ further noted that the documents were all due the next day on October 24, 2019 (three months after IG Cuffari's confirmation).[1035]

IG Cuffari forwarded ████████ email to ████████, for his review.[1036] ████████ replied by asking IG Cuffari if he had seen the following provision of the draft screening agreement:

> I have instructed the Counsel to the Inspector General ("Counsel") (or Deputy Counsel in the absence or unavailability of the Counsel) to screen all DHS matters directed to my attention that involve outside entities or that require my participation, to determine if they involve any of the individuals, entities, or organizations listed above, and if they do to direct these matters to the Deputy Inspector General (the Alternate Official) for action or assignment, without my knowledge or involvement.[1037]

████████ stated that he was concerned that the paragraph assigned responsibility for screening matters to ████████.[1038]

On the same day ████████ forwarded the documents to IG Cuffari, October 23, 2019, ████████ emailed ████████ to say, "He hasn't responded to any of my emails including the ethics

---

[1030] WHDHS-00000855.
[1031] *See* 5 C.F.R. § 2634.802(b); WHDHS-00000461.
[1032] WHDHS-00000461.
[1033] WHDHS-00000467.
[1034] WHDHS-00000468
[1035] *Id.* In her email, ████████ indicated that she had sent ████████ email to IG Cuffari on October 17, 2019 but that due to a technology issue she suspected that the email did not get delivered.  WHDHS-00000468.
[1036] WHDHS-00000855.
[1037] *Id.*
[1038] Response to WilmerHale Investigation from ████████ (Dec. 8, 2020).

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

agreement.  Trying to figure out what to make of it."[1039] ▮(b) (6)▮ responded that IG Cuffari had replied to one email she sent earlier that day but "otherwise crickets."[1040]

Later that day, IG Cuffari replied to ▮(b) (6)▮, "I am disappointed that this was not brought to me at an earlier date, as even one week ago the importance of this matter was not identified among the countless e-mails I received.  I intend to address this later with you."[1041]  IG Cuffari then asked ▮(b) (6)▮ a series of questions about the screening agreement, including whether several paragraphs in the agreement, including the paragraph that ▮(b) (6)▮ had flagged, were part of a "template form used department wide"; whether the provisions of agreement were "substantially identical to what John Roth and ▮(b) (6)▮ and their predecessors signed"; and whether they were "substantially identical" to what other IGs sign.[1042]  Finally, IG Cuffari noted that, "rather than the cumbersome and burdensome process outlined" in the draft agreement, he wondered whether a better approach would be for him to list the matters from which he is recused and that, if someone approached him about one of those matters, he would direct that person to the DIG or AIG for INV.[1043]

▮(b) (6)▮ replied to IG Cuffari, noting that they had discussed the screening agreement two weeks earlier and that IG Cuffari had signed a prior draft that just needed to be updated.[1044]  ▮(b) (6)▮ statement was incorrect, as IG Cuffari had not signed the previous agreement; ▮(b) (6)▮ informed ▮(b) (6)▮ of this fact after ▮(b) (6)▮ incorrectly advised IG Cuffari that he had already signed the agreement.[1045]

▮(b) (6)▮ also answered some of IG Cuffari's questions.  She explained that the paragraphs IG Cuffari asked about were from a template shared by DHS.[1046]  She also answered that ▮(b) (6)▮ would not have signed a screening agreement since he was not a Senate-confirmed appointee and that Mr. Roth signed a screening agreement that came from DHS, so it would have likely had substantially similar language.[1047]  ▮(b) (6)▮ also answered that she did not know whether other IGs had signed agreements with similar language.[1048]

After replying to IG Cuffari, ▮(b) (6)▮ wrote to ▮(b) (6)▮ from DHS and informed her that she answered IG Cuffari's "many questions about the agreement" but that she was "[d]oubtful that they allayed his concerns."[1049]  ▮(b) (6)▮ continued, "I don't know what he's thinking but I suspect he doesn't want a formal process, that he wants to make decisions about what needs to be discussed for possible recusal without my active involvement/knowledge up-front."[1050] ▮(b) (6)▮.

---

[1039] WHDHS-00000190.
[1040] *Id.*
[1041] WHDHS-00000468.
[1042] *Id.*
[1043] *Id.*
[1044] WHDHS-00000191.
[1045] WHDHS-00000472.
[1046] WHDHS-00000191.
[1047] *Id.*
[1048] *Id.*
[1049] WHDHS-00000470.
[1050] *Id.*

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

███ (b) (6) ███ noted that she had previously gone into "great depth" with IG Cuffari on his ethics and pledge requirements.[1051]  ███ (b) (6) ███ replied (erroneously) that IG Cuffari "signed the darn thing two weeks ago when the only difference was what he was subject to re[c]usal on.  So these 11th hour issues make no sense.  Unless he didn't read what he signed."[1052]

On October 24, 2019, IG Cuffari emailed ███ (b) (6) ███, and attached his revised screening agreement.[1053]  When ███ (b) (6) ███ received a copy, she noted that IG Cuffari "opted to change the screening arrangement" and asked that ███ (b) (6) ███ send to her the list of matters from which IG Cuffari recused himself.[1054]  ███ (b) (6) ███ was concerned that the revised screening agreement "might not cover prospective items" but that IG Cuffari had previously acknowledged his continued obligation to recuse himself from matters that "he knows or should know require[] his recusal."[1055]  ███ (b) (6) ███ replied, "[f]ascinating changes."[1056]  Notably, the finalized agreement did not authorize ███ (b) (6) ███ to screen matters on IG Cuffari's behalf.[1057]

In sum, our investigation did not reveal that ███ (b) (6) ███ drafted a "defective and unworkable" ethics agreement.  It appears that ███ (b) (6) ███, and not ███ (b) (6) ███ drafted the agreement, and that it, including the paragraph that ███ (b) (6) ███ initially found concerning, appeared to be modeled after a standard Office of Government Ethics form.[1058]  But the evidence did demonstrate that ███ (b) (6) ███ erred by claiming that IG Cuffari had signed a previous version of the agreement when in fact he had not.  Moreover, given ███ (b) (6) ███ efforts to undermine IG Cuffari and the atmosphere of distrust within the leadership of the agency, it is unsurprising that IG Cuffari objected to the ethics screening agreement as originally drafted entrusting her to screen his matters.

## VIII.  CONCLUSION

In sum, our investigation revealed that ███ (b) (6) ███, with the assistance of ███ (b) (6) ███ and ███ (b) (6) ███, engaged in a systematic effort to undermine ███ (b) (6) ███ in order to advance her goal of leading the agency.  This effort included, among other things, insubordination and disrespect towards ███ (b) (6) ███ in front of the agency's senior staff, badgering ███ (b) (6) ███ to retire, lobbying senior staff to convince him to leave, and overseeing the EMOT investigation that directly implicated him and publicizing its results.  Current and former DHS OIG employees described ███ (b) (6) ███

---

[1051] *Id.*

[1052] *Id.*

[1053] WHDHS-00000473.

[1054] *Id.*

[1055] *Id.*

[1056] *Id.*

[1057] WHDHS-00000809.

[1058] Flexibility in Ensuring and Documenting Compliance with Ethics Agreements, Off. Of Govt. Ethics, (Nov. 4, 2014), available at https://www.oge.gov/Web/OGE.nsf/0/E527228F98093F59852585BA005BEC70/$FILE/eecbe744513c40b7a3c049d ef23f2fdd3.pdf; Effective Screening Arrangements for Recusal Obligations, Off. Of Govt. Ethics (Jun. 1, 2004), available at https://www2.oge.gov/web/oge.nsf/All%20Advisories/1E1D99C40A8CC70E85257E96005FBDBA/$FILE/DO-04-012.pdf?open.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

insubordination and disrespect towards ██(b) (6)██ as "uncomfortable," "awkward," "childish," and "frustrating."

With respect to IG Cuffari, ██(b) (6)██, with the assistance of ██(b) (6)██ and to a lesser degree ██(b) (6)██, publicly disparaged him to other DHS OIG employees. For example, ██(b) (6)██ and ██(b) (6)██ made statements that his degree came from a "diploma mill." ██(b) (6)██ also made statements that he was "dumber than a box of rocks" and "only a GS-14." ██(b) (6)██, ██(b) (6)██, and ██(b) (6)██ reached outside the agency to try and scuttle IG Cuffari's nomination as well, contacting individuals in DHS, CIGIE, Congress, and the ██(b) (6)██. In the months leading up to his confirmation, ██(b) (6)██ manipulated the hiring process "so [the] new IG is limited." ██(b) (6)██ repeatedly referred to DHS OIG as "my agency" and that she needed to protect "her people" from IG Cuffari. Once he was confirmed, ██(b) (6)██ and ██(b) (6)██ made concerted efforts to prevent information from reaching IG Cuffari, and even threatened DHS OIG employees who directly provided IG Cuffari with reports and documents that he requested. ██(b)(6)██ ██(b) (6)██ and ██(b) (6)██ attempted to persuade the ██(b) (6)██ to investigate IG Cuffari's official travel.

Their efforts created a culture of fear and retribution within the agency directed at employees deemed insufficiently loyal. ██(b) (6)██ described ██(b) (6)██ as having a "Machiavellian" leadership style and stated that she would "trash" people who did not support her. ██(b) (6)██ was described by employees as "cutting," "mean," and "abusive" to anyone who disagreed with her. Disfavored employees found themselves threatened with poor performance reviews or reassigned to different positions.

While we could not substantiate other allegations, based on the documents reviewed and the witnesses available to us, we found that the evidence demonstrated that ██(b) (6)██—with the assistance of ██(b) (6)██ and ██(b) (6)██ often planted and then cultivated seeds of divisiveness, disorder, and dissension to the detriment of DHS OIG and its mission.

**Submitted By** 

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

**Appendix A:**

**Remaining Unconfirmed Allegations**

| Allegations | Findings |
| --- | --- |
| [(b) (6)] allegedly approved reports that she knew to be materially false or misleading. | We did not find any evidence of materially false or misleading information in reports. |
| [(b) (6)] allegedly engaged in prohibited personnel practices, including intentionally failing to provide performance plans and evaluations. | We did not find any evidence that [(b) (6)] engaged in prohibited personnel practices. Although we found evidence that [(b) (3) (B), (b) (6)] [(b)(6)] was not responsible for providing a performance plan, [(b) (3)(B), (b)(6)] did not receive a performance plan to |
| [(b) (6)] and [(b) (6)] allegedly failed to take particular workplace actions based on favoritism, and [(b) (6)] allegedly failed to implement or comply with appropriate procedures for recusal. | As detailed in the report, our review found that there was no clear standard applied for the initiation of an investigation against a DHS OIG employee following a complaint, but we did not find evidence that [(b) (6)] or [(b)(6)] [(b)(6)] failed to take particular workplace actions on the basis of favoritism or that [(b) (6)] failed to comply with recusal procedures. |
| [(b) (6)] [(b) (6)] | Our investigation identified a number of emails in which [(b) (6)] [(b) (6)] [(b) (6)]. Because this allegation forms the basis of [(b) (6)] [(b) (6)] we did not reach a conclusion on this allegation. |

1

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

| Allegations | Findings |
|---|---|
| **(b) (6)** allegedly failed to adequately maintain records, including of key matters such as settlements and settlement agreements. | In her interview, **(b) (6), (b) (6)** said she was not aware of having violated recordkeeping requirements.  We did not find any evidence that she did. |
| **(b) (6)**, **(b) (6)**, and **(b) (6)** allegedly failed to comply with recordkeeping requirements and agency procedures regarding electronic communications. | In her interview, **(b) (6), (b) (6)** said she was not aware of having violated **(b) (6)** recordkeeping requirements.  We did not find any evidence that **(b) (6)**, or **(b) (6)** violated recordkeeping requirements. |
| **(b) (6)**, **(b) (6)**, and **(b) (6)** allegedly failed to comply with OIG policies regarding text messages and cell phone use (e.g., limiting personal use and prohibiting inappropriate use to view explicit material or engage in otherwise prohibited activity). | In her interview, **(b) (6), (b) (6)** said she was not aware of having violated OIG policies regarding text messages and cell phone use.  We did not find any evidence that she did.<br><br>In her interview, **(b) (6), (b) (6)** said she was not aware of having violated OIG policies regarding text messages and cell phone use. We did not find evidence that she did.  Although at least one person told us that **(b) (6)** **(b) (6)** sent text messages during meetings, we did not find evidence that **(b) (6)** violated OIG policies regarding text messages and cell phone use. |

2

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

| Allegations | Findings |
|---|---|
| (b)(6) allegedly failed to recuse herself despite a conflict of interest and also failed to preserve relevant data. | DHS OIG has indicated that this allegation refers to actions by (b)(6) relating to DHS official (b)(6) and a letter to Congress accusing her of not cooperating with a Department of State OIG investigation.  We did not find any evidence confirming this allegation in our investigation. |
| (b)(6) and (b)(6) allegedly failed to follow telework procedures. | In her interview, (b)(6), (b)(6), (b)(6) said she was not aware of having violated telework procedures.  We did not find any evidence that (b)(6) or (b)(6) violated telework procedures. |
| (b)(6) allegedly improperly selected reviewing officials who would provide ratings for SES personnel, including herself, at DHS OIG. | We were not able to interview (b)(6), who we understand to be the person with knowledge of this issue.  We did not find any other evidence to substantiate this allegation. |
| (b)(6) allegedly abused the FOIA response process and improperly accessed the Relativity database. | In her interview, (b)(6) said she was not aware of any allegations related to abuse of the FOIA response process or Relativity databases.  We did not find any evidence that she abused the FOIA response process or improperly accessed the Relativity database. |
| (b)(6) allegedly caused false information to be transmitted to the Office of Special Counsel. | It is alleged that (b)(6) withheld responsive documents from the DHS OIG response to OSC counsel regarding the complaint by (b)(3), (b)(6).  We did not find any evidence that this occurred. |

3

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

| Allegations | Findings |
|---|---|
| (b) (6) allegedly permitted her personal political preferences to guide or otherwise manipulate official agency actions. | We did not find any evidence that (b) (6) permitted her personal preferences to influence her work. |

4

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

## Appendix B

### I.  INTERVIEW METHODOLOGY

In light of the global COVID-19 pandemic, all interviews were conducted by videoconference. Most interviews were conducted over the Microsoft Teams platform, with a few exceptions.[1059]

All interviewees were informed that they were being asked to provide information as part of an investigation being conducted by DHS OIG into alleged misconduct and/or improper performance of official duties.

The interviewers explained that they were WilmerHale attorneys who had been retained by DHS OIG, and that they did not represent the interviewee or any other individual at DHS in a personal capacity.  Interviewers stated that the discussion was covered by the attorney-client privilege and that the privilege belonged to DHS OIG, and not to the interviewee personally.  The interviewers further explained that DHS OIG could decide whether, and to what extent, to waive the privilege and share the contents of the interviews with third parties, including other government agencies or Congress, without notifying the interviewee.

All interviewees were asked not to discuss the nature of the interview with any other persons, except any private legal counsel retained by the interviewee related to this investigation.

WilmerHale interviewed 53 individuals, many of whom are current or former DHS OIG personnel. Some individuals were interviewed on multiple occasions.

In total, WilmerHale conducted approximately 71 interviews of the following 53 individuals:

- (b) (3) (B), (b) (6) ((b) (3) (B), (b) (6));
- (b) (3) (B), (b) (6) );
- (b) (3) (B), (b) (6) ((b) (3) (B), (b) (6));
- (b) (3) (B), (b) (6)
- (b) (3) (B), (b) (6) ((b) (3) (B), (b) (6));
- (b) (3) (B), (b) (6) ((b) (3) (B), (b) (6) ;
- (b) (6)
- (b) (3) (B), (b) (6) ((b) (3) (B), (b) (6)
- Joseph Cuffari (Inspector General);
- (b) (6)
- (b) (3) (B), (b) (6) ((b) (3) (B), (b) (6) );
- (b) (6)

---

[1059] (b) (3) (B), (b) (6) interview was conducted over Adobe Connect (b) (3) (B), (b) (6) (b) (3) (B), (b) (6) (b) (3) (B), (b) (6), and a few other individuals were interviewed by teleconference.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

(b) (3) (B), (b) (6)

[redacted]

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

## II.   DOCUMENT REVIEW METHODOLOGY

### A.   Document Review

Overall, we reviewed over 42,000 documents.  In conducting this investigation, WilmerHale collected and reviewed a broad range of materials, including:

**Emails:** WilmerHale collected over 1.3 million email communications from a dozen former and current DHS OIG employees.  The emails spanned a period of nearly three years, and we applied targeted search terms and parameters to identify relevant emails for the investigation.[1060]  These search terms were designed to target emails relating to the allegations of misconduct against ▊(b) (6)▊ ▊(b) (6)▊ ▊(b) (6)▊ , and ▊(b) (6)▊ at issue in our investigation.  Overall, we reviewed over 34,000 emails and attachments.

**Computer Review:**  Additionally, WilmerHale obtained over 13,500 documents that DHS OIG IT remotely collected in February 2020 from DHS computer devices issued to ▊(b) (6)▊ , ▊(b)(6)▊ ▊(b) (6)▊ , and ▊(b) (6)▊ .[1061]  Through a targeted analysis, WilmerHale identified and reviewed over 1,900 potentially relevant documents.  WilmerHale also retained forensic experts who imaged all six DHS-issued laptops used by ▊(b) (6)▊ , ▊(b) (6)▊ , and ▊(b) (6)▊ (two laptops per employee).  The forensic experts were able to extract content from all six laptops.  Through a targeted analysis, WilmerHale identified and reviewed over 4,500 files for previously unidentified relevant content.

**Cell Phone Materials**:  The forensic experts also analyzed data stored on the DHS OIG cell phones issued to ▊(b) (6)▊ , ▊(b) (6)▊ , and ▊(b) (6)▊ .  The forensic experts were able to extract some information from all three cell phones.  The data they were able to extract included, but was not limited to, text messages, voicemails, chats, emails and documents.  WilmerHale reviewed all potentially relevant content.

**Deleted Materials:**  WilmerHale learned that prior to her departure, ▊(b) (6)▊ deleted approximately 6,000 files from her laptop.  DHS OIG was able to restore approximately 3,500 of these files for review.  WilmerHale performed an analysis of the metadata for these files to identify only files that were reviewable and could potentially be business related.  This yielded a document population of approximately 2,100 files, all of which were reviewed.

**Transfer of Electronic Files:**  We reviewed an allegation that on May 2, 2020, ▊(b) (6)▊ transferred a "massive batch" of electronic files to ▊(b) (6)▊ shortly before ▊(b) (6)▊ separation from DHS OIG.  In her interview, ▊(b) (3), (b), (6)▊ confirmed that she had transferred files related to her work as ▊(b) (6)▊ to a shared drive for ▊(b) (6)▊ Our investigation confirmed that

---

[1060] For most of our custodians, we were given full access to the data set and were able to review any files that hit on our search terms.  However, we were not given full access to the data set for IG Dr. Cuffari.  Instead, we provided a list of search terms and a date restriction to the counsel's office of DHS OIG, who applied those terms to the data set and then reviewed the resulting search hits before providing access to us.  We understand that certain documents may have been withheld from our review set on the basis of irrelevancy, privilege, or other sensitivity.
[1061] However, this collection was not a complete inventory of documents stored on these devices, as DHS OIG IT was not able to retrieve all documents due to technical limitations.

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

(b) (6)    accessed files from a DHS OIG shared drive folder called F:\Groups\OIG-wide\Transition (b) (6) \."  WilmerHale was unable to review the files located in this folder because this folder was not backed up on DHS OIG's server.  Nevertheless, we did review the names of the files in the folder, which suggest that (b) (6) transferred these files to the (b) (6) shared drive for legitimate work-related purposes.

**Personnel Files:**  WilmerHale obtained and reviewed personnel files for a number of current and former DHS OIG employees, including (b) (6) , (b) (6) and (b) (6) .

**Other Documents:**  WilmerHale obtained and reviewed several hundred additional relevant files from DHS OIG.  These files included administrative documents, documents excerpted from hard-copy personnel files, policies and procedures, standards of conduct and codes of ethics, organizational charts, and DHS OIG hotline complaints, among others.

### B.    Limitations on the Investigation

#### 1.    *Key witnesses refused to be interviewed*

WilmerHale requested interviews of a number of additional witnesses, but some were unwilling to participate in an interview.  Of those witnesses, some were compelled to participate in the interview by his/her employer.[1062]  However, some key witnesses refused to be interviewed and could not otherwise be compelled to participate:

- (b) (6) : (b) (6) is one of the three subjects of this investigation, and is thus a primary person of interest.  She would likely have been able to share information related to her intentions, as well as her observations and recollections of key events.  On August 6, 2020, WilmerHale contacted (b) (6) . to inquire as to whether (b) (6) would make herself available for an interview.  That same day, (b) (6) informed WilmerHale that (b) (6) would not make herself available for an interview.

- (b) (6) : (b) (6) served as (b) (6) of the CIGIE Integrity Committee during the relevant time period, and he would likely have information concerning the CIGIE IC's investigations process generally, as well as the investigations of (b) (6) , IG Cuffari, and (b) (6) . (b) (6) would likely also be able to discuss whether certain investigations were referred to the CIGIE IC and explain why the committee declined to investigate in some instances.  On September 18, 2020, WilmerHale contacted (b) (6) to inquire as to whether he would agree to be interviewed.  After receiving no response, WilmerHale contacted (b) (6) again on September 21, 2020.   That same day, (b) (6) noted that he would not agree to be interviewed.

- (b) (6), (b) (3) (B) : (b) (6), (b) (3) (B) is the former (b) (6), (b) (3) (B) to IG Cuffari.  (b) (6), (b) (3) (B) would likely have information concerning the misconduct that allegedly took place during his tenure at DHS OIG, and efforts to undermine IG Cuffari.  In July 2020, WilmerHale contacted (b) (6), (b) (3) (B) to inquire as to whether (b) (6), (b) (3) (B) would make

---

[1062] These witnesses included (b) (3) (B), (b) (6) , (b) (3) (B), (b) (6) , and (b) (3) (B), (b) (6) .



*Privileged & Confidential*
*Attorney Work Product*

himself available for an interview.  In September 2020, **(b) (6), (b) (3) (B)** counsel, **(b) (6)** **(b) (6)** . spoke with WilmerHale to discuss the nature of the interview. Thereafter, **(b) (6)** represented that **(b) (6), (b) (3) (B)** was unable to sit for an interview due to **(b) (6), (b) (3) (B)**, but he would answer written questions.  WilmerHale sent written questions to **(b) (6), (b) (3) (B)** on October 6, 2020.  On December 9, 2020, **(b) (6), (b) (3) (B)** provided responses to the written questions.  With the exception of these written responses, we were not able to interview **(b) (6), (b) (3) (B)** or show him any relevant documents. [1063]

- **(b) (6)** : As the **(b) (6)** , **(b) (6)** would likely be familiar with CIGIE's interactions with DHS OIG during the relevant time-period as well as his interactions with IG Cuffari and **(b) (6)** .  In September 2020, WilmerHale contacted **(b) (6)** to inquire as to whether he would make himself available for an interview. On September 15, 2020, **(b) (6)** notified WilmerHale that **(b) (6)** was "not in a position to" sit for an interview related to this investigation.

- **(b) (6)** : **(b) (6)** is the **(b) (6)** , and she is the **(b) (6)** . **(b) (6)** and **(b) (6)** contacted **(b) (6)** to discuss IG Cuffari's nomination before he was confirmed.  **(b) (6)** would likely have information about these discussions, and in particular, whether she recommended **(b) (6)**, **(b) (6)** contact the DHS White House liaison.  In July 2020, WilmerHale contacted **(b) (6)** **(b) (6)** to inquire as to whether she would agree to an interview.  On September 15, 2020, **(b) (6)** notified WilmerHale that **(b) (6)** was "not in a position to" sit for an interview related to this investigation.

- **(b) (6)** : As **(b) (6)** , **(b) (6)** would likely be familiar with complaints filed with OSC, including allegations of reprisal filed by **(b) (3) (B), (b) (6)** in November 2019.  In July 2020, WilmerHale contacted **(b) (6)** to inquire as to whether he would make himself available for an interview.  On July 30, 2020, **(b) (6)** notified WilmerHale that the General Counsel of OSC contacted her to convey that **(b) (6)** declined to be interviewed.

- **(b) (6)** : **(b) (6)** **(b) (6)** was allegedly selected by **(b) (6)** to serve on the Performance Review Board (PRB).  The PRB approves all performance evaluations of SES employees in the DHS OIG.  **(b) (6)** allegedly recused himself when **(b) (6)** **(b) (6), (b) (2)** from IG Cuffari, an action DHS OIG asked WilmerHale to investigate.  **(b) (6)** would likely have spoken to his selection process for the PRB, his relationship with **(b) (6)** , and the reason he recused himself from **(b) (6)** review.  In August 2020, WilmerHale contacted **(b) (6)** to inquire as to whether he would agree to an interview.  On August 26, 2020, **(b) (6)** responded to our inquiry noting that he believed participating in the interview would be "problematic."  He did not provide any additional detail as to why.  On September 11, 2020, WilmerHale contacted **(b) (6)** to confirm his position about attending the interview.  WilmerHale received no response.  On September 25, 2020, **(b) (6)**

---

[1063] **(b) (3) (B), (b) (6)** Response to WilmerHale Investigation 12-8-20.

5

All redactions in this document made pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

*Privileged & Confidential*
*Attorney Work Product*

notified WilmerHale that ██(b) (6)██ was "uncomfortable" proceeding with an interview and his employer did not want to compel him to sit for the interview.

- (b) (6)  (b) (6) ████████████████
  (b) (6)  (b) (6)  likely would have had information concerning the Tecate Report; DHS OIG's telework policy; and various other allegations of misconduct and mismanagement.  In September 2020, WilmerHale contacted ██(b) (6)██ to inquire as to whether he would make himself available for an interview.  On September 23, 2020, (b) (6) ██(b) (6)██ responded noting that he is on military orders and is therefore not available for the interview.  ██(b) (6)██ is on active military duty until March 1, 2021.

Some other potential witnesses were unreachable.[1064]

---

[1064] Those witnesses included ██(b) (6)██
██(b) (6)██
██(b) (6)██

All redactions in this document are pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

(b) (6), (b) (3) (B)

All redactions in this document are pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

(b) (6), (b) (3) (B)

All redactions in this document are pursuant to FOIA Exemption 3(b) are also subject to redaction pursuant to FOIA Exemption 6.

(b) (6), (b) (3) (B)