# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| KRISTEN FREDRICKS, JOSEPH V. CUFFARI, JOSEPH E. GANGLOFF, and JAMES M. READ, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 1:23-cv-442 (RDA/LRV) |
| COUNCIL OF THE INSPECTORS GENERAL ON INTEGRITY AND EFFICIENCY ("CIGIE") INTEGRITY COMMITTEE ("IC"); KEVIN H. WINTERS, Chairman, IC, in his official capacity; ROBERT P. STORCH, Vice-Chairman, IC, in his official capacity; GAIL S. ENNIS, Member, IC, in her official capacity; KIMBERLY A. HOWELL, Member, IC, in her official capacity; DALE A. CHRISTOPHER, Deputy Director for Compliance, U.S. Office of Government Ethics, in his official capacity; TOM MONHEIM, Member, IC, in his official capacity; CATHERINE S. BRUNO, Member, IC, in her official capacity; ALLISON LERNER, Inspector General, National Science Foundation, Former Chair and Vice Chair, CIGIE, in her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

JESSICA D. ABER
UNITED STATES ATTORNEY

LAUREN A. WETZLER
Civil Chief

REBECCA S. LEVENSON
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3760
Fax:     (703) 299-3983
Email: rebecca.s.levenson@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director

CHRISTOPHER A. EISWERTH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20044
Tel:  (202) 305-0568
Fax:  (202) 616-8460
Email: christopher.a.eiswerth@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

THE COMPLAINT ......................................................................................................... 7

STANDARDS OF REVIEW .......................................................................................... 9

ARGUMENT .................................................................................................................. 9

I.      Plaintiffs' Claims Are Non-Justiciable ............................................................. 9

      A.      Mr. Gangloff ..................................................................................... 11

      B.      The DHS Plaintiffs ........................................................................... 13

II.      Plaintiffs' Claims Fail As A Matter of Law .................................................... 16

      A.      CIGIE and the IC Do Not Violate the Appointments Clause (Count I) .............. 16

      B.      CIGIE and the IC Do Not Violate the Private Nondelegation Doctrine (Count II) ..................................................................................... 20

      C.      The IC's Policies and Procedures Do Not Violate the APA (Count III) ............. 22

      D.      Plaintiffs Fail to State Valid Due Process Claims (Counts IV and V) ................. 24

      E.      CIGIE's Funding Complies with the Appropriations Clause (Count VI) ............. 27

CONCLUSION ............................................................................................................... 30

**INTRODUCTION**

Congress created the Council of the Inspectors General on Integrity and Efficiency (CIGIE) to ensure that inspectors general (IGs) and their staff, who are themselves tasked with investigating wrongdoing in federal agencies, are held to no less than the same standards as the officers and employees of the agencies they oversee. And yet, Plaintiffs in this case—the Inspector General for the Department of Homeland Security, two of his staff members, and a former staff member in the Office of Inspector General for the Social Security Administration (SSA OIG)—bring this suit against CIGIE and its Integrity Committee (IC) to prevent them from carrying out that mission.

Plaintiffs seek extraordinary relief here. They ask this Court to enjoin all IC inquiries and investigations "against them," to declare the IC's Policies and Procedures (ICPPs) unlawful, to declare that the congressionally created structure and funding of the IC is unlawful, and to declare that they are entitled to use taxpayer-funded agency counsel to respond to misconduct complaints against them. Their claims fail at the threshold and on the merits. First, Plaintiffs' claims are not justiciable. Plaintiffs have not alleged that they have suffered a cognizable injury caused by CIGIE or the IC. And even if they could, this dispute is not ripe. Adjudicating it would unnecessarily risk entangling the court in inchoate disagreements. Second, even if the Court could exercise jurisdiction over these claims, they are meritless. The complaint should accordingly be dismissed.

**BACKGROUND**

1.     The Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101 (IG Act), created independent watchdogs within various federal agencies to root out "fraud and abuse" and unethical behavior. 5 U.S.C. § 404(a); *see* Inspector General Act Amendments of 1988, Pub. L. No. 100-504 § 104(a)-(b), 102 Stat. 2515, 2523 (creating additional IGs). Today, there are at least 74 individual IGs. *See* CIGIE, *Congressional Budget Justification: Fiscal Year 2024* at 3, https://perma.cc/56KF-G6VC (*FY2024 Budget Justification*). And last year, they saved taxpayers

approximately $70 billion. CIGIE, *Annual Report to the President and Congress: Fiscal Year 2022* at 1, https://perma.cc/C92N-N5U8.

IGs fall into several categories. First, there are "presidential IGs," such as the DHS IG, who are appointed by the President and confirmed by the Senate. *See* S. Rep. No. 110-262, at 2 (2008); CIGIE, Inspector General Historical Data (Revised July 25, 2017), https://perma.cc/YJU8-Q73G (presidential IGs list). Second, there are "designated federal entity (DFE) IGs," such as the Securities and Exchange Commission, Federal Trade Commission (FTC), Amtrak, or Corporation for Public Broadcasting (CPB) IGs, who are appointed by their agency or entity heads. *See* S. Rep. No. 110-262, at 2. Third, there are "legislative branch IGs," such as the Architect of the Capitol IG, who are appointed by Article I officials. *See id.*; CIGIE, Inspector General Historical Data (Revised Mar. 22, 2015), https://perma.cc/5P9L-Y3CW (DFE and legislative branch IGs list).

Regardless of how they are appointed, the IG Act and subsequent enactments grant IGs broad power to conduct audits and investigations. *See* Inspector General Empowerment Act, Pub. L. No. 114-317 §§ 5-6 (2016), 130 Stat. 1595. The IGs are authorized "to have timely access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials" available to their agency, 5 U.S.C. § 406(a)(1)(A), and may "request such information or assistance as may be necessary for carrying out the[ir] duties and responsibilities" from any federal agency, *id.* § 406(a)(1)(3). They may take depositions and hire experts. *Id.* § 406(a)(5), (7), (8); *see also* Mem. from Jeh Johnson, Secretary of Homeland Security (May 20, 2014), https://perma.cc/4JKL-QFB8 (directing "DHS employees to cooperate fully with the Inspector General").

2.     The IGs' power and independence come with accountability. In 1992, President Bush created the President's Council on Integrity and Efficiency (PCIE) and the Executive Council on Integrity and Efficiency (ECIE) to "promote integrity and efficiency." Exec. Order No. 12805

2

§§ 1-2, 57 Fed. Reg. 20627 (May 11, 1992). The former included all presidential IGs, *id.* § 1(b)(2), and the latter included the DFE and legislative branch IGs, *id.* § 2(b)(2). Both entities were directed to "develop" "professional standards" for the IG community. *Id.* § 3(c). The Chairperson—the Deputy Director for Management in the Office of Management and Budget (OMB)—could "establish … such committees … as deemed necessary and appropriate for the efficient conduct of PCIE and ECIE functions," *id.* § 4(e), which led to the establishment of the original IC, *see* Exec. Order No. 12993 § 1, 61 Fed. Reg. 13043 (Mar. 21, 1996).

After receiving "certain administrative allegations" against IGs and their staffs, President Clinton directed the IC to "receive, review, and refer for investigation allegations of wrongdoing against IGs and certain staff members of the [Offices of Inspector General] OIGs." *Id.* The Executive Order formalized the IC's membership, *id.* § 1(b), and provided that reports of investigations would ordinarily be provided to the PCIE/ECIE Chairperson—who could forward them to the relevant agency head with recommendations from the IC and its chair. *Id.* § 4.

3.      This dual-council system operated for about a decade "on an ad hoc, shoestring budget," with "no dedicated staff" and "limited legal authority for joint endeavors." S. Rep. No. 110-262, at 5. In 2008, Congress passed the Inspector General Reform Act (Reform Act), in part, to remedy these issues and strengthen oversight of the IG community. Pub. L. No. 110-409 § 7, 122 Stat. 4302, 4305-17 (codified in relevant part at 5 U.S.C. § 424).

Most importantly, the statute replaced the PCIE and ECIE with CIGIE. *Id.* This new council consists of the presidential, DFE, and legislative branch IGs, and representatives from law enforcement, ethics, and management agencies. 5 U.S.C. § 424(b). The OMB Deputy Director for Management serves as the Executive Chairperson, and every two years, the IGs elect one of their own to be the Council Chairperson. *Id.* § 424(b)(2).

3

CIGIE's mission is to "address integrity, economy, and effectiveness issues that transcend individual Government agencies" and to "increase the professionalism and effectiveness of personnel by developing policies, standards, and approaches to aid in the establishment of a well-trained and highly skilled workforce." *Id.* § 424(a)(2). It fulfills this charge by: (1) creating audit standards and coordinating investigations that span multiple agencies; (2) operating a training institute for IG staff; and (3) "receiv[ing], review[ing], and refer[ring] for investigation allegations of wrongdoing that are made against [IGs] and staff members of the various Offices of Inspector General." CIGIE, *Mission*, https://perma.cc/74GM-P2N9; *see* 5 U.S.C. § 424(d)(1).

4.      The Reform Act codified the IC and established explicit standards for membership and process. However, neither the statute nor the ICPPs were "intended to create any right or benefit, substantive or procedural, enforceable at law by a person against the United States, its agencies, its officers, or any person." *Id.* § 424(d)(11); *accord* CIGIE, Integrity Committee Policies and Procedures at 15 (2018), https://perma.cc/QN9T-5BSE (*ICPPs*).

The IC has six members. 5 U.S.C. § 424(d)(2). The Council Chairperson appoints four IGs, who include both presidential and DFE IGs, to serve four-year terms. *Id.* § 424(d)(2)(A)(ii). Representatives from the FBI and the Office of Government Ethics (OGE) also have committee seats. The six members then select one of the IGs to serve a two-year term as chair. *Id.* § 424(d)(2)(B). A DOJ Public Integrity Section attorney serves as a legal advisor. *Id.* § 424(d)(3).

The IC reviews and investigates complaints regarding IGs and certain OIG staff members. *Id.* § 424(d)(4). "Covered persons" include, among others, those who "report directly to the IG" and "any positions with significant responsibilities such that, in the judgment of the IG ... there is a heightened risk that an internal investigation of them would lack objectivity in fact or

4

appearance." *ICPPs* at 4. There are currently about 500 covered persons. *See* CIGIE, Integrity Committee, *Annual Report* at 4 (2022), https://perma.cc/D6Q5-TK2B (*2022 Annual Report*).

The IC receives complaints and allegations directly and on referral, including from IGs. *ICPPs* at 4. In 2022, the IC received more than 2,900 communications, which were then screened for duplicates, complaints based on objectively unreliable information, and ones determined to "be completely outside of the IC's authority." *2022 Annual Report* at 4.

Once the IC receives a communication regarding a covered person, it assigns a tracking number and refers it to the Allegation Review Group. *ICPPs* at 4. Representatives from DOJ's Public Integrity Section, the Office of Special Counsel (OSC), and the IC staff form this three-person group. 5 U.S.C. § 424(d)(5)(A). Within seven business days, it determines whether the communication needs to be referred to DOJ for criminal investigation or to OSC. *ICPPs* at 5-6.

All matters alleging wrongdoing by a covered person are then placed on the IC's agenda, and the IC has 30 days (which can be extended for 30 days more) to decide whether to open an investigation. 5 U.S.C. § 424(d)(5)(B). It makes this decision after going through multiple steps. First, the IC decides whether the communication (and any additional information from the complainant), if taken as true, meets the threshold standard, *i.e.*, that it alleges "wrongdoing against a Covered Person [involving] abuse of authority …, substantial misconduct, such as gross mismanagement, gross waste of funds, or a substantial violation of law, rule, or regulation, or conduct that undermines the independence or integrity reasonably expected of a Covered Person." *ICPPs* at 6. Second, if the complaint satisfies that standard (and about 80 did last year, *2022 Annual Report* at 4), the IC may request a written response from the covered person. *ICPPs* at 7. This is the subject's "opportunity to fully refute the allegations so that there is no need to investigate." CIGIE, *Guidance and FAQs*, https://perma.cc/4U2W-SVVT. Third, if that response does not

refute the allegations or the IC determines a response "would not serve a useful purpose," the IC may refer the matter for investigation. *ICPPs* at 7.

When an investigation is initiated (as five were in 2022, *see 2022 Annual Report* at 6), the IC is to complete it in 150 days or inform Congress about the delay, *ICPPs* at 8. The IC engages an uninvolved IG to conduct the investigation under the IC Chairperson. *Id.* at 8-9. The investigation must comply with CIGIE's Quality Standards for Investigations. *Id.* at 10. Procedurally, the investigating IG must provide the subject written notice of the allegations being investigated and an opportunity to speak with investigators. *Id.* at 9-10. The covered person's OIG must then cooperate with the IC's investigation and provide the investigator with access to the OIG's records and witnesses. *Id.* at Addendum A; *see* CIGIE, *Guidance and FAQs*.[1] Ultimately, the investigating IG drafts a report; the subject may review and respond; and the IC reviews any response and finalizes the report. *ICPPs* at 11. If allegations are substantiated, the IC makes recommendations based upon the report and supporting materials. *Id.*; *accord* 5 U.S.C. § 424(d)(8). The report and the IC's conclusions and recommendations are then forwarded to the CIGIE Executive Chairperson, the Council Chairperson, the appointing authority (*i.e.*, the President for presidential IGs; the agency head for DFE IGs), the Congressional committees of jurisdiction, and the subject (and the IG if a staff member). *ICPPs* at 12. The report may also be released publicly, sometimes with redactions. *Id.*

Crucially, neither CIGIE nor the IC has authority to act on the IC's recommendations; "[t]he responsibility and authority" to do so "belongs to the appointing authority for the Covered Person." CIGIE, *Guidance and FAQs*. The appointing authority may adopt the investigation's

---

[1] If an IG (or person authorized to provide access to OIG records or witnesses) fails to cooperate with a request for access, the IC "may make an independent finding of wrongdoing against such IG or Authorized Person." *ICPPs* at Add. A(E).

factual findings and recommendations, ignore them entirely, or take some other action. However, the Executive Chairperson must "report to the [IC] the final disposition of the matter, including what action was taken by the President or agency head." 5 U.S.C. § 424(d)(8)(B).

5.     The Reform Act further ensured that CIGIE and the IC would receive stable funding, unlike the ad hoc budget available to the PCIE and ECIE. First, Congress authorized interagency funding specifically for "the functions of the [IC]." 5 U.S.C. § 424(c)(3)(A)(i)(II). As a result, when authorized by the Executive Chairperson, CIGIE's member IGs contribute to the council's funding. Second, Congress permitted CIGIE to establish a revolving fund in which transfers can be deposited and "shall remain available to [CIGIE] without fiscal year limitation." 5 U.S.C. § 424(c)(3)(B)(iv). Third, Congress codified a clear statement rule such that "[n]o provision of law enacted after October 14, 2008, shall be construed to limit or supersede" CIGIE's interagency funding or revolving fund "unless such provision makes specific reference to the authority in that subparagraph." *Id.* § 424(c)(3)(C).

CIGIE nonetheless makes yearly requests to Congress for funding or justifies its expenditures. In its latest appropriations request, CIGIE sought $20.2 million, which included $5.4 million in direct appropriations with the remainder coming from "collected assessments" from member OIGs. CIGIE, *FY2024 Budget Justification* at 2.

## THE COMPLAINT

Plaintiffs are the DHS IG, Mr. Cuffari, and two of his staff members, Ms. Fredricks and Mr. Read, *see* Compl. ¶¶ 1-3 (collectively, "DHS Plaintiffs"), as well as Mr. Gangloff, who retired in 2019 as a staff member in the SSA OIG, *see id.* ¶ 4.

The DHS Plaintiffs allege that CIGIE received complaints regarding their alleged misconduct, *see, e.g.*, *id.* ¶¶ 28, 64-66 & Ex. 2, 118, that the IC requested that they respond to certain complaints, *see, e.g.*, *id.* ¶¶ 29, 64, 118; that they could not use OIG resources, including

counsel, in responding to allegations of individual wrongdoing, *see, e.g.*, *id.* ¶¶ 28, 69, 119, and that most complaints were resolved without an investigation, let alone a finding of wrongdoing, *see, e.g.*, *id.* ¶¶ 30, 64, 66, 121. Mr. Cuffari alleges that at least some complaints or cases against him remain pending, *see id.* ¶¶ 65, 71-72, and Ms. Fredricks and Mr. Read allege that they have been asked to respond to requests for information as recently as April 3, 2023, *see id.* ¶¶ 39, 126.

Mr. Gangloff alleges that, two years after he retired from SSA OIG, he received a letter from the IC informing him that it had opened an investigation involving him and others. *Id.* ¶¶ 86, 88 & Ex. 3. However, "in the over 8 months since th[is] notification," Mr. Gangloff "has not been contacted by the [IC]." *Id.* ¶¶ 86, 96. And he does not allege that any other action is imminent.

Plaintiffs filed suit on April 4, 2023, contending that CIGIE, and the IC, have violated their rights. Count I asserts that the IC members are officers who have not been properly appointed under the Appointments Clause. *See* Compl. ¶¶ 173-78. Count II asserts that the Reform Act violates the private nondelegation doctrine by allowing "a nominally public entity"—the IC—to have "federal investigatory authority over the operations of federal departments" when it "is staffed, at least in part, by private or hybrid individuals" such as the Amtrak and CPB IGs. *Id.* ¶¶ 186-87; *see id.* ¶¶ 180-87. Count III alleges that the IC violated the Administrative Procedure Act's notice-and-comment requirements when it promulgated its ICPPs. *Id.* ¶¶ 189-95. Counts IV and V allege that the IC has violated due process by "placing the burden of proof on the subject of the complaint," *id.* ¶ 198, and denying Plaintiffs access to government attorneys and documents, *see id.* ¶¶ 201-204. Count VI alleges that CIGIE's funding mechanism violates the Appropriations Clause. *See id.* ¶¶ 206-07.

Plaintiffs seek to enjoin the IC from taking actions "against [them] … without further order of this Court," a declaration that the ICPPs, the structure of the IC, and its funding mechanism are

unlawful, and a declaration that any IC "investigation of their acts while performing their duties cannot be deemed 'personal,' so that nothing prevents Plaintiffs' representation by—nor precludes their getting input from—their respective agencies and those agencies' counsel." *Id.* at 45.

## STANDARDS OF REVIEW

Rule 12(b)(1) requires dismissal of an action when the court lacks subject matter jurisdiction. *Maravilla v. Ngoc Anh Rest., Ltd.*, 2016 WL 6821090, at *1 (E.D. Va. Nov. 17. 2016). Rule 12(b)(6) requires dismissal when a complaint fails to state a valid claim. For 12(b)(6) motions, "'a plaintiff's well-pleaded allegations are taken as true and … viewed in the light most favorable to the plaintiff,' …; however, 'legal conclusions pleaded as factual allegations, unwarranted inferences, unreasonable conclusions, and naked assertions devoid of further factual enhancement are not entitled to the presumption of truth.'" *Guillen v. Esper*, 2020 WL 3965007, at *8 (E.D. Va. July 13, 2020). A court may consider "matters of public record [and] documents attached to the complaint …, so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## ARGUMENT

### I.   Plaintiffs' Claims Are Non-Justiciable

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). The doctrines of standing and ripeness spring from this constraint. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). As the party invoking the Court's jurisdiction, Plaintiffs bear the burden of establishing both. *See, e.g.*, *The Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008). And they cannot satisfy that test here.

For standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and

(iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Establishing an "injury in fact" requires a plaintiff to demonstrate "an invasion of a legally protected interest," *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992), and "that the dispute is 'traditionally thought to be capable of resolution through the judicial process,'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997). To be "concrete," the injury "must actually exist"— meaning it is "real" and "not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). To be imminent, the "threatened injury" must "be *certainly impending*"; "allegations of *possible* future injury are insufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Standing, moreover, "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 141 S. Ct. at 2208.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Garner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977)). Whether "a claim is ripe turns on the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). Fitness is satisfied "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see Texas v. United States*, 523 U.S. 296, 300 (1998) (claim is unripe "if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'"). Hardship "is measured by the immediacy of the threat and the burden imposed on the

10

petitioner who would be compelled to act under threat of enforcement of the challenged law." *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992).

      **A.**     ***Mr. Gangloff***

      Mr. Gangloff alleges no cognizable injury, and even if he can assert one, his claims are premature. They should thus be dismissed.

      1.      Mr. Gangloff lacks standing. The only "injury" that he alleges is that the IC "launch[ed] a formal investigation" without providing him an opportunity "to respond to the allegations" before doing so and without "clearly inform[ing] him of the charges against him." Compl. ¶ 86. This is insufficient for multiple reasons.

      First, Mr. Gangloff generally has no legally protected interest in precluding a government investigation into alleged government misconduct. *Cf. Wiley v. Mayor & City Council of Balt.*, 48 F.3d 773, 777 (4th Cir. 1995) (Powell, J.) (noting that "public employer" has right "to question an employee about matters relating to the employee's job performance"); *Procedures for Investigation Allegations Concerning Senior Administration Officials*, 6 Op. O.L.C. 626, 628 (1982) ("The President has inherent authority to supervise and direct the performance of his appointees in office, and to investigate allegations of possible misconduct related to that performance."). This is, in other words, not the type of dispute ordinarily capable of judicial resolution. *Raines*, 521 U.S. at 819. Second, the Reform Act and the ICPPs themselves expressly state that the ICPPs—the purported basis for giving Mr. Gangloff a chance to respond to the allegations before an investigation is opened—do not "create any right or benefit, substantive or procedural, enforceable at law by a person against the United States, its agencies, its officers, or any person." 5 U.S.C. § 424(d)(11); *accord ICPPs* at 15. Third, even if they did, the ICPPs expressly state that "the [IC] may refer a matter for investigation without requesting a response

from the subject if the allegations clearly warrant an investigation and a response would not serve a useful purpose or would result in unnecessary delay." *ICPPs* at 7. The IC's actions are, on their face, consistent with the ICPPs. Fourth, even if none of that were the case, Mr. Gangloff does not assert that the alleged investigation has impacted—or will impact—him in any way. He does not allege, for instance, that there has been a demand for information, that the IC has attempted to sanction him (which he admits it cannot do), that it has recommended sanctions, that it has initiated adjudicative proceedings against him, or even that it has published a report. *Cf. Jefferson v. Harris*, 170 F. Supp. 3d 194, 204-06 (D.D.C. 2016). Nor does he allege any of those actions is imminent. Rather, Mr. Gangloff twice states that he has had no contact with the IC in the eight months since receiving notification of the investigation. Compl. ¶¶ 86, 92. He thus lacks a sufficient personal stake in this case to confer jurisdiction on the Court to entertain his claims.

2.      Mr. Gangloff's claims also fail on ripeness grounds because he asks the Court to entangle itself prematurely "in abstract disagreements" and to interfere with the IC's investigation before "an administrative decision has been formalized and its effects felt in a concrete way." *Abbott Labs.*, 387 U.S. at 148-49. These claims are not fit for judicial decision, and Mr. Gangloff does not claim that he will be harmed before they are. *See Miller*, 462 F.3d at 319.

As noted above, Mr. Gangloff has been notified that a complaint was made against him and that the IC had decided to open an investigation. The IC and the investigating IG have otherwise made no contact with him, and he does not allege that they have taken any action against him. *See, e.g.*, Compl. ¶¶ 86, 92. "In the ordinary course, judicial proceedings are appropriate only after the investigation has led to enforcement, because '[j]udicial supervision of agency decisions to investigate might hopelessly entangle the courts in areas that would prove to be unmanageable and would certainly throw great amounts of sand into the gears of the administrative process.'"

*Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003); *see FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980) ("the issuance of the complaint averring reason to believe has no legal force comparable to that of the regulation at issue in *Abbott Laboratories*, nor any comparable effect upon Socal's daily business"). There is no reason to depart from this usual rule here, particularly when Mr. Gangloff does not allege any harm—present or future—before the investigation's conclusion. His claims are thus non-justiciable on ripeness grounds.

> **B.**    ***The DHS Plaintiffs***

The DHS Plaintiffs' claims are also non-justiciable on standing and ripeness grounds.

1.    These plaintiffs identify four supposed injuries: (1) the IC has subjected them to investigations unless they could demonstrate the complaint was meritless, *see, e.g.*, Compl. ¶¶ 29, 41, 64, 120; (2) it has forced them to respond to requests for information and testify as witnesses, *see, e.g.*, *id.* ¶¶ 33, 36, 39, 64, 72, 74, 118, 122, 124; (3) it has forced them to spend money on private attorneys, *see, e.g.*, *id.* ¶¶ 28, 36, 67, 73, 121, 123, 127; and (4) it has interfered with their official duties, *see, e.g.*, *id.* ¶¶ 32, 34, 39, 70, 76, 127. None is sufficient.

As to the first purported injury, these individuals—like Mr. Gangloff—lack a cognizable interest in stopping a government investigation into government misconduct, regardless of the standard the IC applies to their pre-investigation response. *See* p. 11, *supra*; *cf. United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that agencies "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not'"); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). But even if they had one, the DHS Plaintiffs mischaracterize the IC's process: the IC first measures a complaint against a rigorous threshold standard and then determines whether the written response (if requested and submitted) adequately refutes the allegations before initiating an investigation. *See ICPPs* at 6-7. This process results in

the early closure of most matters. In fact, of the more than 2,900 communications that the IC received in 2022, it opened only 80 cases and ultimately initiated only 5 investigations. *2022 Annual Report* at 4. And based on the DHS Plaintiffs' own allegations (at ¶¶ 31, 64, 123), it appears the same is true here with many matters being resolved without adverse consequences.

The DHS Plaintiffs' second alleged injury—that they were *compelled* to respond to the IC's requests and testify as witnesses—is inaccurate and insufficient. They do not allege that they were served with a subpoena or other legal process. At most, the DHS Plaintiffs suggest on "information and belief" that the IC's requests must be interpreted as being similarly binding because they would "automatically [be] found guilty of failing to cooperate" if they declined to participate, *id.* ¶ 124; *see id.* ¶¶ 40, 72. The DHS Plaintiffs allege no fact and offer no citation that would support such a belief. Nor do they allege that the IC (or CIGIE, more generally) even implied there would be such an automatic finding. Indeed, this professed belief makes little sense given that, by their allegations, the requested information and interviews were labeled "voluntary," and no Defendant has authority to take adverse action against them for failing to cooperate, *see* pp. 6-7, *supra*. Only their appointing authorities do. The DHS Plaintiffs' cooperation, at the end of the day, was voluntary or, at most, compelled by someone other than Defendants. Voluntary compliance is insufficient to establish an injury in fact, and compliance caused by a third party's independent action is not fairly traceable to Defendants. *See, e.g.*, *Nat'l Council for Adoption v. Jewell*, 156 F. Supp. 3d 727, 734 (E.D. Va. 2015).

The third purported injury does not qualify for similar reasons. Any decision to employ private counsel was the DHS Plaintiffs' own. They have no greater right to taxpayer-funded representation when facing allegations of abuse of authority or misconduct than DHS employees have as part of DHS OIG's own investigations. *See* p. 26, *infra*. DHS OIG attorneys represent the

14

office—not individual officeholders—and the DHS Plaintiffs' decision to seek counsel is no more an injury than if DHS employees did the same in response to a DHS OIG investigation.

Finally, Plaintiffs have no personal interest in the conduct of their official duties. They assert claims in their personal capacities. *See, e.g.*, Compl. ¶ 20; *cf.* 28 U.S.C. § 516 ("the conduct of litigation in which the United States, an agency, or officer thereof is a party... is reserved to … the Department of Justice").[2] As private parties, they have the same interest as all other citizens in the government's proper administration. *See, e.g., Allen v. Wright*, 468 U.S. 737, 754 (1984). Generalized grievances against interference with DHS OIG are not Article III injuries.

2.  The DHS Plaintiffs' claims are also not ripe for adjudication. As their own allegations make clear (at ¶ 123), the IC has not made any findings or recommendations concerning them, and any IC scrutiny may end "without any adverse determination," obviating the need for the Court to weigh in on novel constitutional issues. *See Standard Oil*, 449 U.S. at 240-42.

Here, the challenged agency actions—the alleged requests for information, investigations, denial of agency counsel—are not final, and future events may determine the scope and character of their claims. *Cf. id.* at 241. Indeed, the IC has not made any finding, and any hypothetical adverse action would be taken by the President or their appointing authority—not Defendants. That lack of finality makes this a textbook example of an unripe case brought too soon. *See, e.g., Texas*, 523 U.S. at 300; *Miller*, 462 F.3d at 319. And it deprives this Court of jurisdiction.[3]

---

[2] Plaintiffs have sued eight individuals solely in their official capacities. Compl. ¶¶ 10-17. Putting aside whether this was necessary or appropriate as to current IC members (Winters, Monheim, Ennis, Howell, Christopher, and Bruno), *id.* ¶¶ 10, 12-16, Mr. Storch and Ms. Lerner are not current IC members, *see* CIGIE, *Integrity Committee*, https://perma.cc/CY5X-S6AV. They have no authority to investigate Plaintiffs or steer the IC as Plaintiffs request. They should be dismissed.

[3] Plaintiffs cannot cure their jurisdictional deficiencies by relying on *Axon Enterp., Inc. v. FTC*, 143 S. Ct. 890 (2023). *Axon* addressed only whether certain statutes stripped district courts of jurisdiction—which is not at issue here. In any event, Plaintiffs are not subject to an adjudicatory proceeding nor is the IC determining their rights.

15

## II.     Plaintiffs' Claims Fail As A Matter of Law

The complaint attempts to state six claims. None has merit, and all should be dismissed.

### A.     *CIGIE and the IC Do Not Violate the Appointments Clause (Count I)*

Plaintiffs' claim (at ¶¶ 173-78)—that appointment of the four IGs to the IC violates the

Appointments Clause—is meritless. These IGs are validly appointed officers, and they may take

on these ancillary duties without a separate appointment. *See Jefferson v. Harris*, 285 F. Supp. 3d

173, 189-90 (D.D.C. 2018) (rejecting Appointment Clause challenge to CIGIE and the IC).

1.     The Appointments Clause provides:

> [The President] shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint ... all other Officers of the United States, whose Appointments
> are not herein otherwise provided for, and which shall be established by Law: but
> the Congress may by Law vest the Appointment of such inferior Officers … in the
> President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. By its terms, this clause distinguishes between "Officers of the United

States"—who "hold an office under the government" and "exercis[e] significant authority pursuant

to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 124 (1976)—and employees or

"lesser functionaries" to whom the clause does not apply, *id.* at 126 & n.162.

Once officers are properly appointed, they do not need to be reappointed when they take

on additional duties. The Supreme Court has long recognized that "[C]ongress may increase the

power and duties of an existing office without thereby rendering it necessary that the incumbent

should be again nominated and appointed." *Shoemaker v. United States*, 147 U.S. 282, 301 (1893).

If the additional duties are assigned to the office—not the officer—and are "germane" to the office

already held, reappointment is unnecessary. *Weiss v. United States*, 510 U.S. 163, 174 (1994).

2.     Plaintiffs' contention that the IC members were not appropriately appointed to the

IC has already been rejected as "futile." *Jefferson*, 285 F. Supp. 3d at 189. Under the Reform Act,

the IC is made up of two "statutorily specified appointees and four [IGs] appointed by the [Council]

16

Chairperson." *Id.* (citing 5 U.S.C. § 424(d)(2)). All six members here have "already been properly appointed as … government officer[s]," and their IC duties are germane to those offices. *Id.*

As an initial matter, Plaintiffs allege no basis for questioning whether four of the six IC members are properly appointed officers. Indeed, Plaintiffs suggest no issue whatsoever with the FBI or OGE officials serving on the IC. And they likewise offer no suggestion that either Mr. Monheim or Ms. Ennis, as presidential IGs who went through the same confirmation process as Mr. Cuffari, were not constitutionally appointed. Instead, Plaintiffs challenge only whether Mr. Winters and Ms. Howell—the Amtrak and CPB IGs, respectively—are properly appointed. *See* Compl. ¶ 178. And the Court should not credit those conclusory allegations for at least two reasons.

First, whether the appointment of these two DFE IGs to their primary posts complies with the Appointments Clause is immaterial. Under the ICPPs, four IC members form a quorum. *See ICPPs* at 3. The IC could thus act without Mr. Winters and Ms. Howell being present, and Plaintiffs offer no basis to conclude the IC would have chosen a different course in that event.[4]

Second, Mr. Winters' and Ms. Howell's appointments comply with the Appointments Clause. Congress created both offices in 1988, *see* Inspector General Act Amendments, 102 Stat. at 2523, and funds both, *see, e.g.*, Amtrak OIG, *Congressional Budget Estimate Fiscal Year 2024* at 6, https://perma.cc/BXF2-NVN5 (Mar. 13, 2023); Corp. for Pub. Broad., *Appropriation Request and Justification FY 2023/FY 2025* at 68 (Mar. 28, 2022), https://perma.cc/9DY4-3UKM. Both Amtrak and the CPB are controlled by boards of directors; the voting members of each are presidentially appointed and Senate-confirmed. *See, e.g.*, 49 U.S.C. § 24302(a) (Amtrak); 47 U.S.C. § 396(c) (CPB). These boards, in turn, appointed Mr. Winters and Ms. Howell. *See, e.g.*,

---

[4] Ms. Ennis and Mr. Christopher are recused from certain IC matters. In these instances, the FTC's IG and the Fair Housing Finance Agency's IG have, respectively, assumed their roles. Because these IGs are properly appointed, the IC maintains a quorum at all relevant times.

102 Stat. at 2523. Accordingly, even if Amtrak and CPB must comply with the Appointments Clause, *cf. Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 396-97 (1995), they have done so in appointing their IGs, *see Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 512-13 (2010). The IC's six members, particularly the four IGs selected by the Council Chairperson, are thus properly appointed officers independent of their CIGIE involvement. *See Jefferson*, 285 F. Supp. 3d at 189.[5]

3.     Because the four IC IGs are properly appointed officers, reappointment is necessary only if the additional duties that they assume are bestowed on the officer (as opposed to the office) and not germane to their roles as IGs. Neither is the case here.

For one thing, the statute makes clear that the IGs' status as officers is what makes them (and any other IG CIGIE member) eligible for selection to the IC. *See Jefferson*, 285 F. Supp. 3d at 189 (citing 5 U.S.C. § 424(b)(1), (d)(2)). Congress has not sought to enlarge a particular individual's power as opposed to IG offices more broadly. *Cf. Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1192-93 (D.D.C. 1990). Rather, if one of the IG IC members resigned their IG post, they would not continue on the IC; another eligible IG would fill their IC slot. *Cf. id.* (citing *Shoemaker*, 147 U.S. at 300-01).

Plaintiffs' allegations, moreover, confirm that the IG IC members' duties are germane to their duties as IGs. They assert, for instance, that "[w]hen conducting investigations, the [committee] essentially assumes the authorities expressly vested in the Office of Inspector General for the relevant agency." Compl. ¶ 136; *see id.* ¶¶ 78 ("the IC operates as a 'Super IG'"), 148 (similar). That tight connection between the IGs' primary duties and their IC work satisfies *Weiss*. *See* 510 U.S. at 175-76 (duties of military judge germane to duties of commissioned officer).

---

[5] Plaintiffs' suggestion (at ¶ 177) that there may be a constitutional issue if a legislative branch IG were appointed to the IC is purely speculative. Legislative branch IGs are not eligible for the IC, 5 U.S.C. § 424(d)(2)(A)(ii), and Plaintiffs do not allege otherwise.

Therefore, because the IC members who are IGs are properly appointed officers and their committee work is germane to their ordinary duties, the Appointments Clause does not require a second appointment. *See Jefferson*, 285 F. Supp. 3d at 189-90.

4. Finally, even if the position of IC member were considered separately, there would be no Appointments Clause violation here. As noted above (at 16), the Appointments Clause is concerned only with "Officers of the United States"—not "'lesser functionaries' in the Government's workforce" for whom it "cares not a whit about who named them." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). Because an IC member does not qualify as an officer, *see id.*, they are not subject to the Appointments Clause as such. *See Jefferson*, 285 F. Supp. 3d at 188-89.

The Supreme Court has looked to numerous factors in "distinguishing between officers and employees," including "ideas of tenure and duration" and "the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 138 S. Ct. at 2051-52 (cleaned up). Unlike administrative law judges, IC members serve on a temporary basis. *Cf. id.* at 2052-53. IC members are appointed to a four-year term by the Council Chairperson, but they remain in their post only so long as they remain an IG. They draw no salary beyond what they receive for their day job. Further, they do not exercise "significant authority pursuant to the laws of the United States." *Id.* at 2051. They do not perform adjudicative functions by regulating hearings, admitting evidence, enforcing discovery orders, or making findings of fact or legal conclusions. *See id.* at 2053-54. They do not conduct civil litigation (including to compel production of documents), enforce judicial rulings, or take final action against covered persons. *See Buckley*, 424 U.S. at 140. Rather, the Reform Act empowers the IC *as a body* only to review allegations, refer matters for investigation, and make recommendations that only the President or other agencies can act upon. *See Jefferson*, 285 F. Supp. at 190. A separate, uninvolved IG even conducts the investigations.

These powers alone are not enough to qualify as an officer. This claim should be dismissed.

  **B.**    ***CIGIE and the IC Do Not Violate the Private Nondelegation Doctrine (Count II)***

  Plaintiffs' contention (at ¶¶ 180-87) that Congress has improperly delegated investigatory authority over the operations of federal departments to "private and hybrid individuals" in contravention of the private nondelegation doctrine does not withstand scrutiny.

  Their claim proceeds in three steps. First, relying on *Association of American Railroads v. Department of Transportation*, 721 F.3d 666 (D.C. Cir. 2013), Plaintiffs assert that executive and legislative authority cannot ever be "delegated to a private entity." Compl. ¶ 185. Second, they claim that, by permitting Mr. Winters and Ms. Howell to serve on the IC, despite being DFE IGs, Congress and CIGIE have done that, *id.* ¶ 186, and third, as a result, the IC has unlawfully acquired "the power to obtain documents and information for all executive and legislative agency operations, to affect operations of various agencies within the United States Government, and to recommend removal of individuals from government service," *id.* ¶ 187. Each link is faulty.

  On the law, Plaintiffs present a distorted view. The private nondelegation doctrine limits the extent to which Congress may delegate authority to private entities, as opposed to agencies, and sounds in due process. *See Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 709 (5th Cir. 2017). In *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), the Supreme Court applied this doctrine against the federal government to strike down a statute that allowed some coal producers to set wages and hours for all area producers unconstrained by public agency review, holding that such "obnoxious" delegation to private persons was "arbitrary" and contrary to due process. *Id.* at 281-83, 311. But three years later, the Court upheld a revised scheme as "unquestionably valid" because the private parties "functioned subordinately" to the government entity. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). *Association of American Railroads* did not narrow this doctrine nor could it. Indeed, the Supreme Court vacated the D.C. Circuit decision

on which Plaintiffs rely when it determined that *Amtrak* is, "for purposes of determining the validity of the metrics and standards, … a governmental entity." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 46 (2015). In concluding there was no nondelegation issue, the Court specifically noted that "[i]n addition to controlling Amtrak's stock and Board of Directors the political branches exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations." *Id.* at 52. And there is no suggestion that CPB stands in a different position.

On whether Congress has actually delegated regulatory authority to private individuals, the public record contradicts Plaintiffs. CIGIE is a government entity, as is its component IC. *See* 5 U.S.C. § 424. Congress created it to serve a public purpose, set out its membership and authorities, requires it to provide information to the public, and funds its operations. *See id.; cf. Ass'n of Am. R.R.*, 575 U.S. at 52-53. That CIGIE allegedly uses "private or hybrid individuals" to assist in its work does not render CIGIE a private entity any more than an OIG hiring a consultant privatizes that office. And even if the Amtrak or CPB IGs were private parties, there is no plausible claim that those individual IGs do not "function subordinately" to the IC, CIGIE, and the subject's appointing authority for these purposes. *Adkins*, 310 U.S. at 399.

Finally, Plaintiffs' parade of horribles is a mirage. The IC's—or, more accurately, the investigating IG's—power to obtain documents and information from within an agency being investigated stands on firm foundation. Congress charged the IC with investigating allegations of wrongdoing made against IGs and covered persons, directed the IC to promulgate policies and procedures for doing so, and directed the IGs to assist the IC with any investigation as required. 5 U.S.C. § 424(d)(6)-(7). The IC promulgated its ICPPs, including its March 2021 addendum setting out IGs' responsibility to provide documents and information during an investigation similar to the responsibility agencies have in providing their IGs with access to relevant records, 5 U.S.C.

§ 406(a). These provisions also indicate a firm congressional intent for the IC to root out malfeasance and other wrongdoing and, thus, have an effect on agencies. *See id.* § 424(d)(1). And Congress expressly directed the IC to include recommendations in its reports. *See id.* § 424(d)(8)(A). Far from suggesting an entity run wild, the outcomes Plaintiffs fear are those intended by Congress. That is not a constitutional issue for this Court to remedy.

### C.      *The IC's Policies and Procedures Do Not Violate the APA (Count III)*

Plaintiffs' claim (at ¶¶ 188-195) that the IC lacked authority to issue the ICPPs and that the ICPPs must be issued through notice and comment fails as a matter of law.

First, Congress expressly directed the IC to "establish additional policies and procedures necessary to ensure fairness and consistency in" its investigations, including "determining whether to initiate an investigation," "conducting investigations," and "creating procedures to avoid conflicts of interest for [IC] investigations."5 U.S.C. § 424(d)(7)(B)(i). CIGIE is simply required to submit a copy of these policies and procedures to the appropriate congressional committees. *Id.* § 424(d)(7)(B)(iii). The ICPPs are therefore not only authorized, but required, by law.

Second, Plaintiffs' claim that the IC needed to issue the ICPPs through notice and comment is similarly unavailing. The ICPPs comply with Section 424(d)(7)(B)'s provisions, and in any event, "[n]ot all rules must be issued through the notice-and-comment process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The APA specifically exempts interpretative rules, general statements of policy, and rules of agency organization, procedure, or practice from that requirement. 5 U.S.C. § 553(b)(A). And the ICPPs fall within that exemption. When the rules in question concern how an agency carries out its administrative functions, they are procedural—and within the bounds of what the agency may fashion without notice and comment. *See Associated Dry Goods Corp. v. EEOC*, 720 F.2d 804, 809 (4th Cir. 1983). "A rule that simply prescribes the manner in which the parties present themselves or their viewpoints to the agency does not alter the

22

underlying rights or interests of the parties.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 349-50 (4th Cir. 2001). What matters, in other words, is whether the rule changes the "*substantive standards*" the agency uses to evaluate a party's submission. *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994). The ICPPs do not.

As such, in *Inova*, the Fourth Circuit held that a procedural rule governing an HHS administrative appeals process was procedural and, therefore, that the agency "was not required to promulgate its rule under the APA's notice and comment procedure," even though the rule required dismissal of the plaintiff's appeal. 244 F.3d. at 349-50; *see also JEM Broad.*, 22 F.3d at 326 ("Of course, procedure impacts on outcomes and thus can virtually always be described as affecting substance, but to pursue that line of analysis results in the obliteration of the distinction that Congress demanded"). The ICPPs fit even more neatly within this exception because they govern the IC's *investigative* process, not, as in *Invoa*, an *adjudicative* one. The IC does not have an adjudicative function; rather, at most, after the investigation, a report is generated and referred to a decisionmaker outside the agency. *See* pp. 6-7, *supra*. Indeed, the review procedure merely sets forth how the IC handles complaints it receives through investigation. And although Plaintiffs challenge the ICPPs' substance, "[b]eyond the APA's minimum requirements, courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" *Perez*, 575 U.S. at 102.[6]

---

[6] To the extent that Plaintiffs challenge the policy preventing agency counsel from representing them with respect to complaints about Plaintiffs' own conduct, this requirement is not within the ICPPs, but is a longstanding policy of the executive branch regarding executive branch misconduct investigations, including by an OIG, *see* p. 26, *infra*. Plaintiffs also challenge Addendum A of the ICPPs, but that Addendum simply gives the IC parity to access the same documents that an IG would have when investigating misconduct. *See* 5 U.S.C. § 406(a)(1)(A). Plaintiffs, suing in their personal capacities, lack standing to raise their agencies' institutional interests. *See* p. 15, *supra*.

**D.**     ***Plaintiffs Fail to State Valid Due Process Claims (Counts IV and V)***

Plaintiffs assert (at ¶¶ 196-204) two due process claims, alleging that the IC has violated their rights by applying a standard that does not afford them the presumption of innocence and by denying them the right to have agency counsel represent them in their responses to the IC, which then limits their ability to access agency documents for their response. Neither claim has merit.

1.     Plaintiffs' due process claims fail at the outset. The IC acts only in an investigative role, not an adjudicative one; thus, the "Due Process clause is not implicated ... because an administrative investigation adjudicates no legal rights." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742 (1984). The IC does not have the power "to adjudicate or make binding determinations which *directly* affect the legal rights of individuals," *Hannah v. Larche*, 363 U.S. 420, 442 (1960) (emphasis added); *see* pp. 6-7, *supra*. Accordingly, as here, "[w]here only investigative powers of an agency are utilized, due process considerations do not attach." *Georator Corp. v. EEOC,* 592 F.2d 765, 768 (4th Cir. 1979). Plaintiffs' claims are "foreclosed." *O'Brien*, 467 U.S. at 742.

Plaintiffs' argument (at ¶ 149) that the IC *recommends* disciplinary action does not save their claims. The mere power to make recommendations to an official who then independently determines whether to pursue further action is insufficient to turn an investigatory process into an adjudicative one. *See Aponte v. Calderon*, 284 F.3d 184, 195 (1st Cir. 2002) (holding that "the Due Process Clause has not been triggered" because "the Commission did not and cannot adjudicate the legal rights of appellees or any other individual."). The IC's recommendations "determine[] the rights and liabilities of no one" and are "merely preparatory to some further proceeding"; thus, Plaintiffs have "no entitlement to any particular set of due process protections in connection with" an IC investigation. *Popovic v. United States,* 997 F. Supp. 672, 679 (D. Md. 1998); *see id.* at 678 (agency's investigative report finding misconduct was not "adjudicative" and thus did not trigger

24

due process protections). Plaintiffs' due process claims fail as a matter of law.

2.      Plaintiffs' claims fail for additional reasons. First, to advance a due process claim, a plaintiff must first "establish that he had a property or liberty interest at stake." *Smith v. Ashcroft,* 295 F.3d 425, 429 (4th Cir. 2002). But there is no "constitutionally protected interest in being free from investigation." *Aponte*, 284 F.3d at 193. Although Plaintiffs allege (at ¶ 149) a liberty interest in their reputations, they have not alleged that their reputations have been damaged by the IC. In fact, the complaint states (at ¶¶ 31, 64, 121, 123) that the IC has closed numerous complaints without any adverse finding. Plaintiffs speculate that ongoing IC investigations pose a "threat of public defamation" for which there would be "no redress" if the IC were—hypothetically—to issue one. *See id.* ¶¶ 92, 149. Even assuming this highly speculative harm is possible, Plaintiffs in cases "involving allegedly defamatory statements by the government" must "show more than reputational injury in order to prevail on a constitutional claim." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314-15 (4th Cir. 2012); *see id.* at 316 (lack of remedy for defamation does not allow plaintiff to proceed with a due process claim that is "nothing more than an ordinary defamation action dressed in constitutional garb"). A plaintiff must demonstrate "that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status," such as termination of employment. *Id.* at 315. Plaintiffs do neither.[7]

Second, as to Count IV, Plaintiffs wrongly assert (at ¶ 29) that the initial response process "presumes guilt" and thus violates due process. Not so. For one thing, Plaintiffs' characterization of the standard the IC applies when deciding whether to close a case *without investigation*—as

---

[7] Plaintiffs' theory, brought to its logical conclusion, would mean that any federal employee concerned about an internal investigation's potential outcome could halt that investigation by raising speculative concerns that a report *could* be defamatory and *could* have an eventual effect on his or her employment. This would significantly hinder, if not altogether prevent, agencies— including the IC and the IG community—from investigating wrongdoing in the government.

opposed to any standard for ultimate fact-finding—bears little resemblance to what the IC actually does. *ICPPs* at 7; *see* pp. 5-6, *supra*. For another, the IC's approach results in the vast majority of cases being resolved without investigation. *See* p. 8, *supra.* In any event, Plaintiffs are not entitled to a presumption of innocence in an *investigation*. "The principle of presumption of innocence is a creature of a criminal proceeding" and thus does not apply here. *Rosenthal v. Justices of the Supreme Ct. of Cal.*, 910 F.2d 561, 564 (9th Cir. 1990).

Third, as to Count V, Plaintiffs also complain that the IC did not allow taxpayer-funded agency counsel to represent them *individually* in their responses to potential misconduct complaints. But agency counsel represent government interests—not individual interests—and Plaintiffs have admitted that they were able to retain outside counsel as they wished. This practice is not unique or novel. DOJ's Office of Legal Counsel has long held that "absent express congressional authorization, counsel may not be provided to defend executive branch employees in an investigation or proceeding being pursued within the executive branch." *Representation of White House Employees*, 4B U.S. Op. Off. Legal Counsel 749, 753, 1980 WL 20982 (Aug. 27, 1980). Indeed, the IG community follows this approach as well, *see, e.g.*, Office of Inspector General, Dep't of Commerce, *FAQs About OIG Investigations*, https://perma.cc/9HET-B435 ("Government attorneys represent the agency only and may not act on behalf of an employee. An employee may retain a private attorney at personal expense for representation during an OIG investigation or interview."). And Plaintiffs' complaint that they are personally unable to access agency documents for their responses to the IC fares no better, as Plaintiffs allege that the IC can obtain, and has obtained, such documents from the agency directly, *see* Compl. ¶ 74. Plaintiffs also have no constitutional right to access "exculpatory" information in the course of an

investigative, non-adjudicative process.[8] *See Hannah*, 363 U.S. at 441-42 (an investigation's target has no due process right to know specific charges being investigated, to know complainants' identities, or to cross-examine the complainants); *O'Brien*, 467 U.S. at 742 (due process does not require that an investigation's target be informed of third party subpoenas); *Popovic*, 997 F. Supp. at 679 (investigation's subject has no constitutional right to have investigator consider particular exculpatory evidence).[9] Plaintiffs' due process claims should be dismissed.

**E.    *CIGIE's Funding Complies with the Appropriations Clause (Count VI)***

Plaintiffs' argument (at ¶¶ 161-71, 205-07) that Congress's chosen means for funding CIGIE and the IC violate the Appropriations Clause lacks support in text, history, and precedent.

1.    The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. That "straightforward and explicit command" "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *OPM v. Richmond*, 496 U.S. 414, 424 (1990). It "protects Congress's 'exclusive power over the federal purse.'" *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012). But aside from rejecting open-ended appropriations for the military, U.S. Const. art. I, § 8, cl. 12, the Constitution does not limit Congress's authority to decide "how and when any money should be applied for [public] purposes," 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213

---

[8] Plaintiffs assert that it is "impossible" to "meaningfully answer" the IC's requests without information from the agency, even though they assert that 12 DHS OIG employees produced 3 million documents to the IC and their responses have led to the closure of complaints without adverse findings, *see* Compl. ¶¶ 31, 64, 74, 121, 123.

[9] Plaintiffs argue that the IC has wrongly investigated complaints of retaliation, which are within the exclusive jurisdiction of the OSC, *see* Compl. ¶ 153, but Congress expressly authorized the IC to "conduct any related investigation" "concurrently" with DOJ or OSC. 5 U.S.C. § 424(d)(7)((D).

(1st ed. 1833); *see Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) ("Congress has plenary power to give meaning to [the Appropriations Clause]").

Courts have repeatedly affirmed Congress's authority to fund federal agencies through methods other than granular yearly direct appropriations. For instance, they have recognized that Congress has long made lump-sum appropriations and delegated to agencies how best to spend and transfer funds. *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321-22 (1937) ("Congress has wide discretion in the matter of prescribing details of expenditures"); *see Clinton v. City of New York*, 524 U.S. 417, 467 (1998) (Scalia, J., concurring in part and dissenting in part) ("The constitutionality of such appropriations has never seriously been questioned."). The judiciary has likewise noted that Congress can "loosen its own reins on public expenditure" by "authoriz[ing] appropriations that continue" for more than a single year, including permanent appropriations with no expiration date. *Am. Fed. of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004). Such permanent appropriations are commonplace: in Fiscal Year 2022, such spending accounted for approximately 63.8% of the federal budget—a total of $3.76 trillion. *See* Congressional Budget Office, *The Accuracy of CBO's Budget Projections for Fiscal Year 2022* at 3 (Jan. 2023). And courts have upheld Congress's creation of revolving funds as "an on-going appropriation which does not have to be renewed each year." *United Biscuit Co. of Am. v. Wirtz*, 359 F.2d 206, 212 & n.14 (D.C. Cir. 1965).

2.     Congress's decision to fund CIGIE and the IC through a revolving fund filled by other appropriated monies complies with constitutional text, appropriations history, and precedent.

As described above (at 7), Congress expressly authorized CIGIE's use of "interagency funding," "[n]otwithstanding [31 U.S.C. §] 1532," for "the functions of the [IC]," 5 U.S.C. § 424(c)(3)(A)(i)(II); directed CIGIE's members to "fund or participate in the funding of such

activities," *id.* § 424(c)(3)(A)(ii); and authorized a revolving fund, which remains available to CIGIE "without fiscal year limitation," *id.* § 424(c)(3)(B). This means, practically speaking, that CIGIE's IG members vote on the council's budget, the OIGs include this assessment amount "in their budget request[s] to Congress," and then, "[o]nce appropriated by Congress, CIGIE collects the funding from each OIG." CIGIE, *FY 2024 Budget Justification* at 10.

Each facet of this system fits within well-established bounds of Congress's appropriations authority. As an initial matter, Congress has directly appropriated every dollar that CIGIE collects from the member OIGs. In fact, the individual OIGs—including the DHS OIG—specifically list contributions to CIGIE within their budget requests and justifications. *See, e.g.*, Dep't of Homeland Sec., Office of Inspector Gen., *Fiscal Year 2023 Congressional Justification* at O&S-4, https://perma.cc/39EG-BMS3 (including $0.8M in the FY2023 Budget "to support … CIGIE"). Congress has in turn expressly granted CIGIE authority to transfer money appropriated to the individual OIGs and to create a revolving fund. 5 U.S.C. § 424(c)(3)(A)-(B). These are long-standing and appropriate options available to Congress. *See, e.g.*, *United Biscuit Co.*, 359 F.2d at 213. And far from relinquishing control, Congress has expressly reserved the right to revoke CIGIE's authority to use interagency funding. *See* 5 U.S.C. § 424(c)(3)(C). Simply put: no part of CIGIE and the IC's funding runs afoul of the Appropriations Clause.

3. Plaintiffs' arguments to the contrary are meritless. First, Plaintiff denies (at ¶ 161) that CIGIE and the IC's funding is "appropriated by Congress." That conclusory statement is insufficient, *see Guillen*, 2020 WL 3965007 at *8, and inaccurate, *see* p. 7, *supra*.

Second, Plaintiffs suggest (at ¶ 169) that the Executive Chairperson's "ability to cut off funding for non-discretionary actions of CIGIE and the IC" somehow creates a nondelegation or Appropriations Clause issue. Even if that argument carried water (and it does not), it could

similarly be made with respect to any appropriation or any Executive Officer: "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances … in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). But more importantly, there is no allegation here that the Executive Chairperson is not appropriately funding CIGIE functions, and any suggestion that he may in the future is speculation.

Third, Plaintiffs contend (at ¶ 170) that Congress's funding mechanism inappropriately "prevents Congressional control of [CIGIE and the IC] without striking at the resources of the IGs." That too is incorrect. Congress may "loosen its own reins on public expenditure." *Am. Fed. of Gov't Emps.*, 388 F.3d at 409. And Congress retains power to withdraw CIGIE's transfer authority or to put appropriate conditions on its appropriations. *See* 5 U.S.C. § 424(c)(3)(C).

In short, Congress has validly exercised its "plenary power" in choosing how to fund CIGIE and the IC. *Harrington*, 553 F.2d at 194. Count VI should be dismissed.

## CONCLUSION

For the above-described reasons, this case should be dismissed for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted.

Dated: June 23, 2023            Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JESSICA D. ABER
UNITED STATES ATTORNEY

*By*:

LAUREN A. WETZLER
Civil Chief
Office of the United States Attorney

_____/s/_____
REBECCA S. LEVENSON
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue

30

Alexandria, Virginia 22314
Tel:    (703) 299-3760
Fax:    (703) 299-3983
Email:  rebecca.s.levenson@usdoj.gov

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

CHRISTOPHER A. EISWERTH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, DC 20005
Telephone:    (202) 305-0568
Facsimile:    (202) 616-8460
Email: christopher.a.eiswerth@usdoj.gov

*Counsel for Defendants*