IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KRISTEN FREDRICKS, *et al.*,      )
                                  )
       Plaintiffs,                )
                                  )
v.                                )      Civil Action No. 1:23-cv-442 (RDA/LRV)
                                  )
COUNCIL OF THE INSPECTORS         )
GENERAL OF INTEGRITY AND          )
EFFICIENCY, *et al.*,             )
                                  )
       Defendants.                )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim.  Dkt. 8.  The Court dispenses with oral argument as it would not aid in the decisional process.  Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).  This matter has been fully briefed and is now ripe for disposition.  Having considered the Motions to Dismiss (Dkt. 8), Defendants' Memorandum in Support (Dkt. 9), Plaintiffs' Opposition (Dkt. 13), and Defendants' Reply (Dkt. 18), the Court GRANTS Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 8) and DENIES Defendants' Motion to Dismiss for Failure to State a Claim (Dkt. 8) as MOOT for the reasons that follow.

I. BACKGROUND

Before setting forth the factual and procedural history of the instant case, the Court will provide an overview of the relevant statutory and regulatory background.

A. Statutory and Regulatory Background

The Inspector General Act of 1978 ("IG Act") created independent "watchdogs" within various federal agencies to root out "fraud and abuse" and unethical behavior.  Pub. L. No. 95-

452, 92 Stat. 1101; *see also* Inspector General Act Amendments of 1988, Pub. L. No. 100-504 §

104(a)-(b), 102 Stat. 2515, 2523 (creating additional Inspector Generals). Today, there are at least

seventy-four individual Inspector Generals ("IGs"). *See* CIGIE, *Congressional Budget

Justification: Fiscal Year 2024* at 3, https://perma.cc/56KF-G6VC.[1]

IGs fall into several categories. First, there are "presidential IGs," such as the Department

of Homeland Security ("DHS") IG, who are appointed by the President and confirmed by the

Senate. *See* S. Rep. No. 110-262, at 2 (2008) (explaining the appointment process for presidential

IGs); CIGIE, Inspector General Historical Data (Revised July 25, 2017), https://perma.cc/YJU8-

Q73G (providing a list of presidential IGs). Second, there are "designated federal entit[y] (DFE)

IGs," such as the Securities and Exchange Commission, Federal Trade Commission, Amtrak, and

Corporation for Public Broadcasting ("CPB") IGs, who are appointed by their agency or entity

heads. *See* S. Rep. No. 110-262, at 2 (explaining the appointment process for such IGs); CIGIE,

Inspector General Historical Data (Revised Mar. 22, 2015), https://perma.cc/5P9L-Y3CW

(providing a list of DFE and legislative branch IGs). Third, there are "legislative branch IGs,"

such as the Architect of the Capitol IG, who are appointed by Article I officials. *See* S. Rep. No.

110-262, at 2 (explaining the appointment process for such IGs); CIGIE, Inspector General

Historical Data (Revised Mar. 22, 2015), https://perma.cc/5P9L-Y3CW (providing a list of DFE

and legislative branch IGs).

Regardless of how they are appointed, the IG Act and subsequent enactments grant all

IGs broad power to conduct audits and investigations. For instance, IGs are authorized "to have

---

[1] The Court may properly take judicial notice of documents found on government websites.
*See Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 752 (N.D.
Cal. 2020) ("[D]ocuments found on government websites" are "the proper subject of judicial
notice."); *see also Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice
of statistics on Virginia Division of Legislative Services website).

timely access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials" available to their agency, 5 U.S.C. § 406(a)(1)(A), and may "request such information or assistance as may be necessary for carrying out the[ir] duties and responsibilities" from any federal agency, *id.* § 406(a)(1)(3).

Still, the IGs themselves are subject to oversight.  In 1992, President Bush created the President's Council on Integrity and Efficiency ("PCIE") and the Executive Council on Integrity and Efficiency ("ECIE") to "promote integrity and efficiency."  Exec. Order No. 12805 §§ 1-2, 57 Fed. Reg. 20627 (May 11, 1992).  The former included all presidential IGs, *id.* § 1(b)(2), and the latter included the DFE and legislative branch IGs, *id.* § 2(b)(2).  Both entities were directed to "develop" "professional standards" for the IG community.  *Id.* § 3(c).  The Chairperson—the Deputy Director for Management in the Office of Management and Budget ("OMB")—could "establish . . . such committees . . . as deemed necessary and appropriate for the efficient conduct of PCIE and ECIE functions," *id.* § 4(e), which led to the establishment of the original Integrity Committee ("IC"), Exec. Order No. 12993 § 1, 61 Fed. Reg. 13043 (Mar. 21, 1996).

After receiving "certain administrative allegations" against IGs and their staffs, President Clinton directed the IC to "receive, review, and refer for investigation allegations of wrongdoing against IGs and certain staff members of the" Offices of Inspector General ("OIGs").  Exec. Order No. 12993 § 1, 61 Fed. Reg. 13043 (Mar. 21, 1996) § 1(b).  The Executive Order formalized the IC's membership, *id.* § 1(b), and provided that reports of investigations would ordinarily be given to the PCIE/ECIE Chairperson, who could forward them to the relevant agency head with recommendations from the IC and its chair, *id.* § 4.

This dual-council system operated for about a decade "on an ad hoc, shoestring budget," with "no dedicated staff" and "limited legal authority for joint endeavors."  S. Rep. No. 110-262

at 5. In 2008, Congress passed the Inspector General Reform Act ("Reform Act") to remedy these issues and strengthen oversight of the IG community. 5 U.S.C. § 424.

Importantly, the Reform Act replaced the PCIE and ECIE with the Council of the Inspectors General on Integrity and Efficiency ("CIGIE"). *Id.* This new council consisted of the presidential, DFE, and legislative branch IGs, as well as representatives from law enforcement, ethics, and management agencies. *Id.* § 424(b). The OMB Deputy Director for Management serves as the Executive Chairperson, and every two years the IGs elect one of their own to be the Council Chairperson. *Id.* § 424(b)(2).

The CIGIE's mission is to "address integrity, economy, and effectiveness issues that transcend individual Government agencies" and to "increase the professionalism and effectiveness of personnel by developing policies, standards, and approaches to aid in the establishment of a well-trained and highly skilled workforce." *Id.* § 424(a)(2). The CIGIE works to fulfill this charge by: (1) creating audit standards and coordinating investigations that span multiple agencies; (2) operating a training institute for IG staff, CIGIE, *Mission*, https://perma.cc/74GM-P2N9; and (3) "receiv[ing], review[ing], and refer[ring] for investigation allegations of wrongdoing that are made against [IGs] and staff members of the various Offices of Inspector General," 5 U.S.C. § 424(d)(1).

The Reform Act codified the IC and established explicit standards for membership and process. 5 U.S.C. § 424. The IC has six members. *Id.* § 424(d)(2). The Council Chairperson appoints four IGs, who include both presidential and DFE IGs, to serve four-year terms. *Id.* § 424(d)(2)(A)(ii). Representatives from the Federal Bureau of Investigation ("FBI") and the Office of Government Ethics also have committee seats. *Id.* § 424(d)(2)(A)(i), (iii). The six members then select one of the IGs on the IC to serve a two-year term as chair. *Id.* § 424(d)(2)(B).

A Department of Justice ("DOJ") Public Integrity Section attorney serves as a legal advisor.  *Id.* § 424(d)(3).

The IC reviews and investigates complaints regarding IGs and certain OIG staff members.  *Id.* § 424(d)(4).  "Covered persons" include, among others, those who "report directly to the IG" and "any positions with significant responsibilities such that, in the judgment of the IG . . . there is a heightened risk that an internal investigation of them would lack objectivity in fact or appearance."   CIGIE, Integrity Committee Policies and Procedures at 4 (2018), https://perma.cc/QN9T-5BSE (hereinafter, the ICPPs).  There are approximately 500 covered persons.  *See* CIGIE, Integrity Committee, Annual Report at 4 (2022), https://perma.cc/D6Q5-TK2B (hereinafter, the 2022 Annual Report).

The IC receives complaints and allegations directly and on referral, including from IGs.  ICPPs at 4.  Once the IC receives a communication regarding a covered person, it assigns a tracking number and refers it to the Allegation Review Group.  *Id.*  Representatives from DOJ's Public Integrity Section, the Office of Special Counsel ("OSC"), and the IC staff form this three-person group.  5 U.S.C. § 424(d)(5)(A).  Within seven business days, the Allegation Review Group determines whether the communication needs to be referred to the DOJ for criminal investigation or to OSC.  ICPPs at 4.

All matters alleging wrongdoing by a covered person are then placed on the IC's agenda, and the IC has 30 days (which can be extended for 30 more days) to decide whether to open an investigation.  5 U.S.C. § 424(d)(5)(B).  The IC makes this decision after going through three steps.  First, the IC decides whether the communication (and any additional information from the complainant), if taken as true, meets the threshold standard, *i.e.*, that it alleges "wrongdoing against a Covered Person [involving] abuse of authority . . . , substantial misconduct, such as gross

mismanagement, gross waste of funds, or a substantial violation of law, rule, or regulation, or conduct that undermines the independence or integrity reasonably expected of a Covered Person." ICPPs at 6.  Second, if the complaint satisfies that standard (and about 80 did in 2022, 2022 Annual Report at 4), the IC may request a written response from the covered person, ICPPs at 7.  This is the subject's "opportunity to fully refute the allegations so that there is no need to investigate." CIGIE, Guidance and FAQs, https://perma.cc/4U2W-SVVT (hereinafter, the Guidance and FAQs).  Third, if that response does not refute the allegations or the IC determines a response "would not serve a useful purpose," the IC may refer the matter for investigation.  ICPPs at 7.

Once an investigation is initiated (as five were in 2022, 2022 Annual Report at 6), the IC is to complete it in 150 days or inform Congress of the delay, ICPPs at 8.  The IC engages an uninvolved IG to conduct the investigation under the IC Chairperson.  ICPPs at 8-9.  The investigation must comply with the CIGIE's Quality Standards for Investigations.  *Id.* at 10. Procedurally, the investigating IG must provide the subject written notice of the allegations being investigated and an opportunity to speak with investigators.  *Id.* at 9-10.  The covered person's OIG must then cooperate with the IC's investigation and provide the investigator with access to the OIG's records and witnesses.  *Id.* at Addendum A(B).  If an IG (or person authorized to provide access to OIG records or witnesses) fails to cooperate with a request for access, the IC "may make an independent finding of wrongdoing against such IG or Authorized Person."  *Id.* at Addendum A(E).

Ultimately, the investigating IG drafts a report, the subject may review and respond, and the IC reviews any response and finalizes the report.  *Id.* at 11.  The IC makes recommendations based upon the report and supporting materials.  *Id.*; *accord* 5 U.S.C. § 424(d)(8).  The report and the IC's conclusions and recommendations are then forwarded to the CIGIE Executive

Chairperson, the Council Chairperson, the appointing authority (*i.e.*, the President for presidential IGs; the agency head for DFE IGs), the Congressional committees of jurisdiction, and the subject (and the affected IG if the subject is a staff member).  ICPPs at 11-12.  The report may also be released publicly, sometimes with redactions.  *Id.* at 12.

Neither the CIGIE nor the IC has authority to act on the IC's recommendations; "[t]he responsibility and authority" to do so "belongs to the appointing authority for the Covered Person." Guidance and FAQs.  "The appointing authority . . . may consider the IC's findings and conclusions in connection with deciding whether to take action in favor of a complainant."  *Id.* Finally, the Executive Chairperson must "report to the [IC] the final disposition of the matter, including what action was taken by the President or agency head."  5 U.S.C. § 424(d)(8)(B).

### B. Factual Background

Plaintiffs are the DHS IG, Joseph V. Cuffari, and two of his staff members, Kristen Fredricks and James M. Read, Dkt. 1 ¶¶ 1-3 (collectively, the "DHS Plaintiffs"), as well as Joseph E. Gangloff, who retired in 2019 from his position as Chief Counsel to the IG for the Social Security Administration ("SSA") OIG, *id.* ¶ 4.

The DHS Plaintiffs allege that they have been subjected to a relentless stream of IC complaints.  *Id.* ¶ 64.  They further claim that the IC's decision to investigate even the most obviously meritless complaints brought against them was in retaliation for their own attempts to have the IC address the dysfunction and dishonesty among senior DHS OIG leadership.  *Id.* ¶¶ 27, 34, 42, 56, 59.  The DHS Plaintiffs also allege that the IC complaints against them triggered a series of IC investigations, follow-ups, and requests for supplementary information. *Id.* ¶ 64.  They stress that they were forced to spend an inordinate amount of time and resources responding to these allegations of misconduct, and that they could not use OIG resources, including counsel, in

doing so.  *Id.* ¶¶ 28, 64, 69, 119.  The DHS Plaintiffs note that most of the IC complaints were resolved without an investigation, *id.* ¶¶ 28, 30, 64, 121, though Mr. Cuffari points out that at least some complaints against him remain pending, *id.* ¶¶ 64-65, and Ms. Fredricks and Mr. Read allege that they have been asked to respond to requests for information as recently as April 3, 2023, *id.* ¶¶ 39, 126.

Meanwhile, Mr. Gangloff asserts that, two years after he retired from SSA OIG, he received a letter from the IC informing him that it had opened an investigation involving him and others.  *Id.* ¶¶ 86, 88.  Mr. Gangloff further claims that, "in the over [eight] months since the notification, he has not been contacted by the IC to provide additional information." *Id.* ¶¶ 86.[2]

Based on these allegations, Plaintiffs now bring suit against the CIGIE, the IC, and members of those entities,[3] asking this Court to enjoin all IC inquiries and investigations against them, to declare the IC's Policies and Procedures (the "ICPPs") unlawful, to declare that the congressionally created structure and funding of the IC is unlawful, and to declare that Plaintiffs are entitled to use agency counsel to respond to misconduct complaints against them.  *Id.* at 45.

### C. Procedural Background

Plaintiffs filed a Complaint against Defendants in this Court on April 4, 2023.  Dkt. 1. Thereafter, on May 30, 2023, Defendants filed an unopposed Motion for Extension of Time to Respond to Plaintiffs' Complaint, Dkt. 6, which Magistrate Judge Lindsey R. Vaala granted the

---

[2] In Plaintiffs' Opposition, Mr. Gangloff notes that, on June 8, 2023, after the filing of the instant Complaint, he received a request from the IC to participate in a voluntary interview.  Dkt. 13 at 8; *see also* Dkt. 13-1 (voluntary interview request).

[3] More specifically, Defendants in the instant case are the CIGIE, the IC, Kevin H. Winters (Chairman, IC), Robert P. Storch (Vice-Chairman, IC), Gail S. Ennis (Member, IC), Kimberly A. Howell (Member, IC), Dale A. Christopher (Deputy Director for Compliance, U.S. Office of Government Ethics), Tom Monheim (Member, IC), Catherine S. Bruno (Member, IC), and Allison Lerner (Inspector General, National Science Foundation; former Chair and Vice Chair, CIGIE).

next day, Dkt. 7.  Subsequently, on June 23, 2023, Defendants filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, Dkt. 8, and a Motion to Dismiss for Failure to State a Claim, Dkt. 8, along with a single Memorandum in Support of both Motions to Dismiss, Dkt. 9.  Later, on June 27, 2023, the parties filed a Joint Motion for Extension of Time to File Plaintiffs' Opposition and Defendants' Reply, Dkt. 11, which Magistrate Judge Vaala granted the day after, Dkt. 12.  Plaintiffs then filed an Opposition to Defendants' Motions to Dismiss on July 17, 2023.  Dkt. 13.  Defendants subsequently filed a Consent Motion for Extension of Time to File Reply on July 20, 2023, Dkt. 15, which Magistrate Judge Vaala granted that same day, Dkt. 16.  On July 28, 2023, Defendants filed a Reply in support of their Motions to Dismiss.  Dkt. 18.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure Rule 12(b)(1) provides for the dismissal of an action if a court lacks subject matter jurisdiction.  In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is supported.  *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

There are two ways in which a defendant may prevail on a 12(b)(1) motion.  First, and as Defendants do here, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject-matter jurisdiction may be based."  *Adams*, 697 F.2d at 1219.  Under this method of attack, all facts as alleged by the plaintiff are assumed to be true.  *Id.*

9

However, conclusory statements and legal conclusions in a complaint are not entitled to a presumption of truth. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). Under this latter approach, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

### III. ANALYSIS

In their Complaint, Plaintiffs bring six claims against Defendants. Count I alleges that the IC members are officers who have not been properly appointed under the Appointments Clause. Dkt. 1 ¶¶ 173-78. Count II asserts that the Reform Act violates the private nondelegation doctrine by allowing "a nominally public entity"—the IC—to have "federal investigatory authority over the operations of federal departments" when it "is staffed, at least in part, by private or hybrid individuals" such as the Amtrak and CPB IGs. *Id.* ¶¶ 186-87. Count III alleges that the IC violated the Administrative Procedure Act's notice-and-comment requirements when it promulgated its ICPPs. *Id.* ¶¶ 189-95. Counts IV and V assert that the IC has violated Plaintiffs' due process rights by "placing the burden of proof on the subject of the complaint," *id.* ¶ 198, and denying Plaintiffs access to government attorneys and documents, *id.* ¶¶ 201-04. And Count VI alleges that the CIGIE's funding mechanism violates the Appropriations Clause. *Id.* ¶¶ 206-07.

Defendants move the Court to dismiss the Complaint for lack of subject matter jurisdiction on standing and ripeness grounds. Alternatively, Defendants contend that none of Plaintiffs' claims have merit and should thus be dismissed for failure to state a claim. This Court will begin by addressing whether it has subject matter jurisdiction over Plaintiffs' claims.

## A. Justiciability

Before the Court may proceed to the merits, it must consider whether the instant case is justiciable. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). The doctrines of standing and ripeness spring from this constraint. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). As the parties invoking the Court's jurisdiction, Plaintiffs bear the burden of establishing both. *The Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008).

### 1. Standing

Defendants first attack Plaintiffs' standing to bring suit. "[T]he standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case 'at the outset of the litigation.'" *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). To have standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Establishing an "injury in fact" requires a plaintiff to demonstrate "an invasion of a legally protected interest," *Lujan*, 504 U.S. at 560, and "that the dispute is 'traditionally thought to be capable of resolution through the judicial process,'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). To be "concrete," the injury "must actually exist"—meaning it is "real" and "not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). To be imminent, the "threatened

injury" must "be *certainly impending*"; "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations omitted).

a. Mr. Gangloff

As alleged in the Complaint, Mr. Gangloff's primary claim of injury is that the IC did not (1) inform him of the allegations against him and (2) let him respond to those allegations.  Dkt. 1 ¶ 86.  He appears to have abandoned this argument in his Opposition, however.  *See generally* Dkt. 13 (failing to respond to Defendants' argument that the IC's actions in this regard were consistent with the ICPPs); *see also Intercarrier Commc'ns, LLC v. Kik Interactive, Inc.*, No. 3:12-cv-771, 2013 WL 4061259, at *1 (E.D. Va. Aug. 9, 2013) (concluding that where a party does not respond to an argument it is "effectively conceding" the argument).  Instead, as a basis for injury, Mr. Gangloff now points to a request to participate in a "voluntary" interview that he received from the IC after Plaintiffs filed the Complaint in the instant case.  Dkt. 13 at 7-8.[4]  In Mr. Gangloff's view, although the IC couched this interview invitation in the language of "voluntariness," the IC is threatening him with an automatic finding of wrongdoing if he chooses not to take part in the interview.  *Id.*  Mr. Gangloff thus asserts that he is put to an untenable "choice": cooperate with Defendants or risk being defamed.  *Id.* at 8.

This Court is unconvinced.  As Defendants correctly explain in their Reply, Dkt. 18 at 3, Addendum A to the ICPPs provides that, if an *IG or Authorized Person* fails to cooperate with the

---

[4]  The Court recognizes that Mr. Gangloff may not amend the Complaint through his Opposition in this manner.  *See, e.g.*, *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) ("[Plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").  Nonetheless, the Court addresses this newly raised allegation and ultimately finds that it fails to create a cognizable injury for the reasons discussed *infra*.

IC, the IC may make a finding of wrongdoing against them, *see* ICPPs at Addendum A(E) ("[I]f an IG or Authorized Person fails to respond fully and in a timely fashion to an IC request for OIG records, documents, witnesses, or other information, the IC may make an independent finding of wrongdoing against such IG or Authorized Person for failure to cooperate in the IC investigation . . . ."); *see also* ICPPs at Addendum A(A) (defining an "Authorized Person" as an individual other than the IG "with full and final authority to provide" the IC with "access to all OIG records, documents, witnesses, and other information that the IC . . . deems necessary to carry out [its] duties"). But here, Mr. Gangloff does not allege that he is an IG or someone authorized to act on an IC request such that Addendum A would apply to him. Accordingly, even if the risk of an automatic finding of wrongdoing were sufficient to constitute an injury in fact, Mr. Gangloff has not adequately alleged that he currently faces any such risk.

Mr. Gangloff also argues that he is being injured by the IC unlawfully continuing to assert jurisdiction over him after he retired from the federal government. Dkt. 1 ¶ 91. In response, Defendants maintain that the IC's jurisdiction is best understood as extending to former employees. Dkt. 18 at 4. By statute, the IC reviews misconduct allegations made against "staff members" who "report[] directly to an [IG]," 5 U.S.C. § 424(d)(1), (d)(4)(A)(i), such as an IG's chief counsel, Mr. Gangloff's former role, Dkt. 1 ¶ 81. Significantly, Congress did not include any language in the statute limiting the term "staff members" to current employees, and Plaintiffs offer no basis for reading such a qualifier into the statute. Moreover, restricting the IC's jurisdiction to current employees would create perverse incentives by allowing employees accused of misconduct to shield their actions from scrutiny by resigning. As such, this Court declines to construe the statutory language as circumscribing the IC's jurisdiction to current employees. For

these reasons, the Court finds that Mr. Gangloff has not alleged any injury that could support standing.

### b. The DHS Plaintiffs

In an effort to establish standing, the DHS Plaintiffs first argue that they are being forced to spend an inordinate amount of time and resources responding to meritless IC complaints brought against them.  Dkt. 13 at 7.  Defendants, on the other hand, contend that being subjected to a misconduct investigation in and of itself does not create an injury in fact.  Dkt. 9 at 13.

Typically, plaintiffs lack a cognizable interest in preventing a government investigation into misconduct.  *See United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that an agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not" (internal quotation omitted)); *see also F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232, 244 (1980) (finding no irreparable harm in the context of determining whether an agency's issuance of a complaint constituted a final action because "the expense and annoyance of litigation is part of the social burden of living under government" (internal quotation omitted)).

Still, as Plaintiffs point out, federal courts have departed from this general principle on several occasions, finding that unlawful investigations can support standing in certain circumstances. Dkt. 13 at 7 (citing *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984); *Brandsasse v. City of Suffolk, Va.*, 72 F. Supp. 2d 608, 614-15 (E.D. Va. 1999)).  The cases Plaintiffs cite, however, show that something more than simply being asked to answer questions as part of a government investigation is necessary to create a cognizable injury.  For instance, in *Brandsasse*, the plaintiff was a city police officer whose superiors had informed him that he was ineligible for promotion because it was the policy of the police department to disallow promotions

to individuals under investigation. 72 F. Supp. 2d at 611. In holding that the plaintiff had sufficiently alleged an injury, the district court reasoned that the mere existence of the indefinite investigation prevented the plaintiff from being considered for promotion. *Id.* at 614. Similarly, in *Clark*, the plaintiff alleged that the Library of Congress had subjected him to an overly intrusive investigation on the basis of his peaceful association with a lawful political organization. 50 F.2d at 94. The *Clark* court found standing because the investigation itself led to the Library's decision not to promote him to positions that he was qualified for and was chilling his First Amendment-protected expression. *Id.* at 93-94.

The instant case is readily distinguishable. While Plaintiffs repeatedly claim in a conclusory fashion that the IC inquiries at issue here are interfering with the DHS OIG's exercise of its legal duties, Dkt. 1 ¶¶ 32, 64, 70, 74, they simultaneously concede that the office "has largely" been able to fulfill its mission of holding individuals accountable for misconduct, Dkt. 1 ¶ 75. Thus, because Plaintiffs have not plausibly alleged any harm stemming from the IC complaints filed against them over and above the inconvenience of having to obtain counsel and respond to government inquiries, the Court finds that their allegations fall short of establishing an injury in fact. *See Standard Oil Co. of California*, 449 U.S. at 244 ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." (internal quotation omitted)).

The DHS Plaintiffs next attempt to establish standing by asserting that they were forced to respond to the IC's requests or else face an automatic finding of wrongdoing. Dkt. 1 ¶¶ 33, 36, 39, 64, 72, 74, 118, 122, 124. Like Mr. Gangloff, however, the DHS Plaintiffs misread the ICPPs. As explained *supra*, Addendum A concerns only requests for information made to an OIG or an Authorized Person. Critically, neither Ms. Fredricks nor Mr. Read are IGs, and they do not allege

that they are Authorized Persons under the meaning of Addendum A.  And although Mr. Cuffari is an IG, the Complaint alleges that he has delegated the responsibility of responding to IC requests to DHS's Principal Deputy IG.  Thus, it is not clear that Addendum A would be applicable to him.[5] But even if Addendum A did apply to Mr. Cuffari, he would not be able to clear the hurdle of establishing causation.  As noted *supra*, standing requires a showing "that the injury was likely caused by the defendant."  *TransUnion LLC v. Ramirez*, 141 S. Ct. at 2203.  Here, however, none of the Defendants have the authority to take any adverse action against Mr. Cuffari for failing to cooperate—only their appointing authorities do.  *See* Guidance and FAQs (explaining that only the appointing authority may act on the IC's recommendations).  Accordingly, even if Mr. Cuffari's compliance with the IC's requests could be characterized as involuntary, it was compelled by someone other than Defendants and thus not fairly traceable to them.  *See Nat'l Council for Adoption v. Jewell*, 156 F. Supp. 3d 727, 734 (E.D. Va. 2015) (holding that, to establish the causal connection necessary for standing, "[i]t is not enough for an agency to encourage a third party to act in a particular way if the agency is not actually directing the party or mandating a specific result" (citing *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976))).

The DHS Plaintiffs also aver that they were injured by having to pay private attorneys to assist them with responding to IC inquiries.  Dkt. 13 at 9.  In support of their position, the DHS Plaintiffs first bring the Court's attention to 28 C.F.R. § 50.15, which they claim establishes a

---

[5] Similarly unavailing is Mr. Cuffari's argument that he faces an impossible choice between (1) cooperating with an IC investigation and having to provide the IC with information about criminal investigations and (2) not cooperating and risking an automatic adverse finding.  Dkt. 13 at 9.  The IC has procedures in place for dealing with precisely such a situation where an IG believes that he may be prohibited by law from sharing certain information with the IC.  *See* ICPPs at Addendum A(C) ("An IG or Authorized Person who believes that providing the IC with access to OIG records, documents, witnesses, or other information may be prohibited by law may contact the IC Working Group to discuss appropriate measures to facilitate access.").

default rule for agency counsel to represent federal employees in government investigations brought against them.  Dkt. 13 at 9.  The DHS Plaintiffs also point to a formal Office of Legal Counsel ("OLC") opinion that they assert "explains how common, ethical, and normal it is for the Department of Justice to aid a person investigated, even in his personal capacity, when there is no conflict between him and the agency, and the representation would serve agency's interests."  *Id.* (citing *Retaining Private Counsel to Represent the DHS Secretary in Impeachment Processes*, 47 Op. O.L.C. 1, slip op. (Jan. 4, 2023), https://perma.cc/6CN9-P9CL [hereinafter, *Retaining Private Counsel*]).  But these sources are inapposite.  The regulation that the DHS Plaintiffs cite provides that the DOJ, *in its discretion*, *may* provide such representation in certain circumstances.  28 C.F.R. § 50.15(a)(1).  Likewise, the OLC opinion concerns whether an agency *may*—not *must*—retain private counsel to assist in impeachment proceedings for official actions in certain circumstances. *Retaining Private Counsel*.  Thus, despite their contentions otherwise, the DHS Plaintiffs have not established that they are entitled to taxpayer-funded counsel in the course of responding to IC complaints.  The DHS Plaintiffs therefore cannot rely on the denial of agency counsel and their decision to engage private attorneys as a cognizable injury.

Additionally, Mr. Read's claim that he has been injured by "not being able to advise his client and proceed according to his best professional judgment[,]" Dkt. 13 at 9, fails because Mr. Read's client is DHS OIG—not Mr. Cuffari personally.  Significantly, Mr. Read does not allege that the IC is, in any way, limiting the advice that he can provide to DHS OIG.

The DHS Plaintiffs' final argument that they will be injured by a public report "that does not have to include anything they have said in their defense" fares no better.  Dkt. 13 at 9.  Such an assertion is much too speculative to amount to an injury in fact.  The content of any IC report depends entirely on the results of an investigation, and the DHS Plaintiffs have not alleged any

facts suggesting that a damaging report is "certainly impending." *Clapper*, 568 U.S. at 417. Accordingly, because the DHS Plaintiffs have not put forth any cognizable injuries, the Court finds that they have failed to establish standing.

## 2. Ripeness

Defendants next assert that, even if Mr. Gangloff or the DHS Plaintiffs could establish a cognizable injury, their claims are premature.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Garner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977)).  "[W]hether a claim is ripe turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (internal quotation omitted).  Fitness is satisfied "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) (a claim is unripe "if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'" (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-81 (1985))).  Hardship "is measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992).

In the instant case, Defendants argue that neither Mr. Gangloff's nor the DHS Plaintiffs' claims are ripe because Plaintiffs ask the Court to entangle itself prematurely "in abstract disagreements" and to interfere with the IC's investigation before "an administrative decision has been formalized and its effects felt in a concrete way." Dkt. 9 at 12 (quoting *Abbott Labs.*, 387 U.S. at 148-49). In their Opposition, Plaintiffs barely address the issue of ripeness, except to label the doctrine "prudential." Dkt. 13 at 6. Contrary to Plaintiffs' description of ripeness as a "prudential" doctrine, however, the Supreme Court has characterized "[r]ipeness [a]s a justiciability doctrine" "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807-08.

More importantly, Plaintiffs fail to overcome Defendants' showing that judicial review is premature. *National Park Hospitality*, a case cited by Defendants, is particularly instructive here. That case presented an analogous situation where the challenged regulation itself—like the inquiries and investigations at issue in the case at bar—did "not create 'adverse effects of a strictly legal kind,'" and the Supreme Court held that the plaintiff needed to wait until enforcement resulted in "a concrete dispute about a particular concession contract." *Nat'l Park Hosp.*, 538 U.S. at 809, 812. Another case that Defendants point to, *Texas v. United States*, stands for a similar proposition. There, the State of Texas challenged Section 5 of the Voting Rights Act, and the Court concluded that Texas' claims were not ripe because "whether the problem Texas present[ed] w[ould] ever need solving" was "too speculative." *Texas*, 523 U.S. at 302. The same is true for Plaintiffs' concerns regarding the outcome of any inquiry here—it is entirely possible that the IC investigations into Plaintiffs will end without any adverse determinations, thereby obviating the need for this Court to weigh in on the constitutional issues Plaintiffs raise. Plaintiffs have therefore

failed to establish that their claims are "fit" for judicial review at this time. *See Miller*, 462 F.3d at 319 ("A case is fit for judicial decision when . . . the action in controversy is final and not dependent on future uncertainties.").

Nor have Plaintiffs shown sufficient "hardship" to support a determination that the instant case is ripe for adjudication. *See Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992) ("The hardship prong is measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law."). As discussed *supra*, the only purported hardships resulting from the challenged IC investigations are those related to compliance with requests for information, but those are costs that Plaintiffs must face as "part of the social burden of living under government." *Standard Oil Co. of Californi*a, 449 U.S. at 244 (internal quotation omitted). The Court thus finds that this matter is not yet ripe for judicial consideration.

*    *    *

In sum, because Plaintiffs lack standing to sue the CIGIE and the IC, and because their constitutional claims are not ripe at this juncture, the Court dismisses the Complaint for lack of subject matter jurisdiction.[6]

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 8) is GRANTED; Plaintiffs' Complaint is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction; and it is

---

[6] Because the Court lacks subject matter jurisdiction over the instant case, it will not address the merits of the Complaint, and Defendants' Motion to Dismiss for Failure to State a Claim (Dkt. 8) will be denied as moot.

FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (Dkt. 8) is DENIED as MOOT.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record and to close this civil action.

It is SO ORDERED.

Alexandria, Virginia
November 2, 2023

/s/
Rossie D. Alston, Jr.
United States District Judge